# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| WORLEY & OBETZ, INC., *et al.*,[1] | : | Case No. 18-13774 (REF) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | **Related D.I.: 353** |

## ORDER (A) APPROVING BIDDING PROCEDURES, INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (B) SCHEDULING BID DEADLINE, AUCTION DATE, AND SALE HEARING AND APPROVING NOTICE THEREOF; AND (C) APPROVING PROCEDURES TO FIX CURE AMOUNTS RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND APPROVING NOTICE THEREOF

Upon the motion (the "Sale and Bidding Procedures Motion") of Christine C. Shubert (the "Trustee"), the Chapter 7 Trustee for the estates of Worley & Obetz, Inc., *et al.* (the "Debtors"), under Sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Fed. R. Bankr. P. 6004 and 9014, and L.B.R. 6004-1 and 9014-3, for entry of: (I) this initial order (the "Bidding Procedures Order"), substantially similar to the procedures attached to this Bidding Procedures Order as Exhibit A, to be used for the sale (the "Sale") of certain of the Debtors' assets and related personal property (the "Purchased Assets")

---

[1] The Debtors is these cases, along with the last four digits of their federal tax identification numbers are (i) Worley & Obetz, Inc. (6576) (Case No. 18-13774-REF); (ii) Americomfort, Inc. (7605) (Case No. 18-13775-REF); (iii) Ranck Plumbing Heating & Air Conditioning, Inc. (9625) (Case No. 18-13776-REF); (iv) Amerigreen Energy, Inc. (6284) (Case No. 18-13777-REF); (v) Advance Air, Inc. (8111) (Case No. 18-13778-REF); (vi) Amerigreen Energy Brokers, LLC (2358) (Case No. 18-13779-REF); (vii) Amerigreen Electricity, LLC (8977) (Case No. 18-13780-REF); (viii) Amerigreen Hedging Services, LLC (8549) (Case No. 18-13781-REF); (ix) Amerigreen Lubricants, LLC (7489) (Case No. 18-13782-REF); (x) Amerigreen Natural Gas, LLC (3222) (Case No. 18-13783-REF); and (xi) Amerigreen Propane, LLC (Case No. 18-13784-REF).

For purposes of this Sale and Bidding Procedures Motion, this Bidding Procedures Order, the Bidding Procedures, the Agreement, and the Transactions contemplated therein, (i) the defined term "Debtors" does not include Debtor Ranck Plumbing Heating & Air Conditioning, Inc. (Case No. 18-13776-REF), and (ii) the defined term "Purchased Assets" does not include and specifically excludes any and all assets, fixtures, furniture, machinery, equipment, properties, interests, and any other rights of Debtor Ranck Plumbing Heating & Air Conditioning, Inc.

and the proposed Asset Purchase Agreement (the "Agreement"),[2] (b) approving the form of notice of the Bidding Procedures,[3] Auction, Approval Hearing and Sale, and (c) approval of procedures for the assumption by the Trustee to the Successful Bidder of the Assumed Contracts, including notice of the proposed Cure Costs; and (II) entry of a second order (the "Approval Order") following a subsequent hearing (the "Approval Hearing"), (a) approving the Sale of the Purchased Assets under the Agreement to the entity or entities (the "Successful Bidder")[4] submitting the Successful Bid at the Auction for the Purchased Assets set forth in the Agreement, free and clear of liens, claims and interests, except for Assumed Liabilities and Permitted Encumbrances, (b) the Agreement and the obligations incurred by the Trustee and the Successful Bidder thereunder, (c) the assumption, sale and assignment to the Successful Bidder, of certain contracts of the Debtors, and (d) granting related relief; the Court having reviewed the Sale and Bidding Procedures Motion and scheduled a hearing (the "Procedures Hearing") on the Sale and Bidding Procedures Motion, and the Court having found that (i) the Court has jurisdiction to consider the Sale and Bidding Procedures Motion and the relief requested therein pursuant to 28 and U.S.C. §§ 157 and 1334, (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); and (iv) notice of the Sale and Bidding Procedures Motion and Procedures Hearing was sufficient under the circumstances; and after due deliberation the Court having determined that the relief requested in the Sale and Bidding Procedures Motion

---

[2] A true and correct copy of the Agreement is attached hereto as Exhibit B.

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement, Bidding Procedures and/or the Sale and Bidding Procedures Motion.

[4] The term "Successful Bidders", as defined in the Bidding Procedures, is used in the singular throughout this Sale and Bidding Procedures Motion, the Bidding Procedures Order and the Bidding Procedures. However, it should be noted that the Bidding Procedures contemplate the possibility of bids on Lots of the Purchased Assets. Thus, there is the potential that there could be multiple Successful Bidders, in which case it is the Trustee's intention and the relief requested herein shall apply to all Successful Bidders.

is in the best interests of the Debtors' estates and their creditors; and good and sufficient cause having been shown;

AND FURTHER FOUND AND DETERMINED THAT:

A. This Court has jurisdiction over the Bankruptcy Cases and the Sale and Bidding Procedures Motion as a core proceeding and over the parties and property affected hereby under 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

B. Under the circumstances, the notice given by the Trustee of the Sale and Bidding Procedures Motion and the Procedures Hearing constitutes appropriate notice and complies with 11 U.S.C. § 363 and Fed. R. Bankr. P. 2002 and 6004.

C. The Bidding Procedures in the form attached hereto as Exhibit A are fair, reasonable, and appropriate and are designed to maximize the recovery from the Sale of the Purchased Assets.

D. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014.

E. The Trustee, in conjunction with their professionals and advisors, has conducted a robust marketing process since the filing of the Bankruptcy Cases with respect to the Purchased Assets. The Agreement represents the highest and best offer that the Trustee has received to date as a result of such marketing efforts. The Trustee's determination that the Agreement constitutes the highest and best offer for the Purchased Assets received to date constitutes a valid and sound exercise of the Trustee's business judgment. Further, the bid made by the proposed Purchaser is reasonably likely to encourage fair and competitive bidding and will

3

be reasonably likely to subject the proposed Purchaser's offer to a competitive bidding process through Auction.

F. The Bidding Procedures are reasonable and appropriate under the circumstances of these Bankruptcy Cases.

G. The Trustee has determined that the payment of the Break-up Fee under the circumstances set forth in the Sale and Bidding Procedures Motion and Agreement is supported by a compelling and sound business justification and is in the best interests of the Debtors' estates under 11 U.S.C. § 363 because, among other things:

(i) The Break-up Fee is the product of arm's length, good faith negotiations between the Trustee and the proposed Purchaser;

(ii) The Break-up Fee is a material component of, and a condition to, the proposed Purchaser's bid for the Purchased Assets;

(iii) The Break-up Fee is commensurate with the real and substantial benefit conferred upon the Debtors' estates by the proposed Purchaser and the bid evidenced by the Agreement; and

(iv) The amount of the Break-up Fee is fair and reasonable under the circumstances and designed to maximize the proceeds from the Sale.

H. The Break-up Fee is an actual, necessary cost and expense of preserving the Debtors' estates under 11 U.S.C. § 503, and necessary to induce the proposed Purchaser to continue to pursue the purchase of Purchased Assets.

I. The form and scope of the Notice of Bid Deadline, Auction, and Approval Hearing (as defined below) is reasonably calculated to provide all interested parties with timely and appropriate notice of the Sale, Approval Hearing, Auction, and Bidding Procedures and complies with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and applicable case law.

4

J.  The form and scope of the Notice of Assumption and Assignment (as defined below) is reasonably calculated to provide each non-Debtor counterparty to the Contracts (as defined below) with timely and appropriate notice of the potential assumption and assignment of its Contract and complies with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, Local Rules and applicable case law.

K.  To the extent any of these findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

IT IS HEREBY ORDERED THAT:

1.  The Sale and Bidding Procedures Motion (as it pertains to approval of the matters set forth herein) is GRANTED. Any objections to this Bidding Procedures Order that have not been previously resolved or withdrawn are overruled on the merits. The Bidding Procedures Order shall be valid, binding, and enforceable on all parties in interest and fully effective immediately upon entry.

2.  The Trustee will cause to be served, within five (5) business days after issuance of the Bidding Procedures Order, by first-class mail, postage prepaid, (i) notice of the Bid Deadline, Auction, and Approval Hearing substantially in the form annexed hereto as Exhibit C (the "Notice of Bid Deadline, Auction, and Approval Hearing") (ii) the Bidding Procedures Order including the Bidding Procedures attached hereto as Exhibit A and the Agreement attached hereto as Exhibit B, and (iii) the Sale and Bidding Procedures Motion (collectively with the Notice of Bid Deadline, Auction and Approval Hearing, the Bidding Procedures Order and the Bidding Procedures, the "Sale Package"), upon: (a) all potential buyers previously identified or solicited by the Trustee and any additional parties who have previously expressed an interest in potentially acquiring some or

5

all of the Purchased Assets, (b) proposed Purchaser and its counsel, (c) all other potentially interested parties identified by the Trustee and her professionals, (d) the Office of the United States Trustee for the Eastern District of Pennsylvania, (e) each non-Debtor counter-party to the Debtors' executory contracts and unexpired leases (collectively, the "Contracts"), (f) all parties who have requested notice in the Debtors' bankruptcy cases under Fed. R. Bankr. P. 2002, (g) Fulton Bank, N.A. and its counsel, (h) all parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Purchased Assets, (i) the Internal Revenue Service, (j) the Attorney General for the State of Pennsylvania, (k) the United States Attorney's office, (l) all applicable federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested in the Sale and Bidding Procedures Motion, and (m) the Securities and Exchange Commissions. Those parties in (a)-(m) will be sent the Sale Package. Such notice shall be sufficient and appropriate notice of the Sale with respect to known interested parties.

## BIDDING PROCEDURES AND AUCTION

3.        The Bidding Procedures, annexed hereto as Exhibit A, are incorporated herein by reference and are approved and shall govern the qualification of bidders, the submission, content, and qualification of all Qualified Bids and bidding procedures relating to the Auction of the Purchased Assets. The Bidding Procedures are necessary and reasonable under the circumstances of these Bankruptcy Cases, are intended and likely to preserve and enhance the value of the Debtors' estates and are approved in their entirety.

4.        The proposed Agreement, annexed hereto as Exhibit B, is incorporated by reference and is approved as the form of agreement to be used by bidders in conjunction with the Bidding Procedures.

5.       Subject to the terms and conditions set forth in the Bidding Procedures, the Trustee is hereby authorized and directed to (a) solicit any person to become a potential Bidder, (b) permit any person or entity to conduct a due diligence investigation in connection with the Sale, (c) in consultation with Fulton Bank, N.A., determine whether a Bid timely submitted by a potential Bidder is a Qualified Bid, (d) if one or more (i) Qualified Bids (other than the Qualified Bid under the Agreement from the proposed Purchaser) for the entirety of the Purchased Assets, or (2) Lot Bids (each of which must be a Qualified Bid) providing for, in the aggregate, a Purchase Price that exceeds the Minimum Initial Overbid, is timely submitted, conduct an Auction, (e) at the conclusion of such Auction, in consultation with Fulton Bank, N.A., identify the highest or otherwise best offer as the Successful Bid and the Successful Bidder and the next highest or otherwise best Overbid after the Successful Bid as the Back-Up Bid and the Back-Up Bidder, and (f) seek Bankruptcy Court approval at the Approval Hearing of (i) if there was no Auction held, the Agreement and the Transactions contemplated thereby with the proposed Purchaser, or (ii) if there was an Auction held, the Successful Bid submitted by the Successful Bidder and the Back-Up Bid submitted by the Back-Up Bidder.

6.       The proposed Purchaser shall be entitled to a Break-up Fee of $243,000, which shall be paid in accordance with Section 6.3(e) of the Agreement on the terms and subject to the conditions set forth in the Agreement. The Break-up Fee shall be payable as an allowed chapter 7 administrative expense claim.  If payment of the Break-up Fee is required under the Agreement, the Trustee is authorized to take all necessary steps and directed, without need for any application, motion, or further order of this Court, to pay to the proposed Purchaser the Break-up Fee.  If the proposed Purchaser is not the Successful Bidder or the Back-up Bidder, the Trustee is authorized and directed to take all necessary steps, without need for any application, motion, or further order

7

of this Court, to release and return the Good Faith Deposit of the proposed Purchaser to the proposed Purchaser within four (4) business days of entry of the Approval Order.

7.      Solely for purposes of determining the Round Leading Bid, the full amount of the Break-up Fee potentially payable shall be added to every Overbid submitted by the proposed Purchaser at Auction. The proposed Purchaser, if it so chooses, may include as a credit and have added to the aggregate amount of any Overbid it submits at the Auction, all or a portion of the Break-up Fee potentially payable to it. Participation in the Auction (or lack thereof) does not in any way limit or affect the proposed Purchaser's right to receive the Break-up Fee on the terms and conditions set forth in the Agreement.

## APPROVAL HEARING AND OBJECTIONS TO THE SALE

8.      The Court shall hold the Approval Hearing on **September 18, 2018 at 11:00 a.m. (Eastern Time)**, or such other date and time as may be convenient to the Court, or as may be announced at the Approval Hearing without further notice.

9.      To be considered by the Court, any objections to either (x) the Sale of the Purchased Assets to the proposed Purchaser under the Agreement, to the Successful Bidder at Auction under a Modified APA, the Agreement submitted by the proposed Purchaser, or to the Modified APA submitted by the Successful Bidder, or (y) the assumption and assignment of Assumed Contracts and Cure Costs amount shall (a) be in writing, (b) conform to the Bankruptcy Rules and Local Rules, (c) set forth the name of the objecting party, the nature and amount of any claims or interest held or asserted against the Debtors' estates or their properties, the basis for the objection and the specific grounds therefor and (d) be filed with the Court and served on the following (collectively, the "Objection Notice Parties"): (i) the Office of the United States Trustee, Attn: Dave P. Adams, Esq., 833 Chestnut Street, Suite 500, Philadelphia, PA 19107; (ii) counsel to the Trustee, Fox

8

Rothschild LLP, Attn: Michael J. Menkowitz, Esq., 2000 Market Street, 20th Floor, Philadelphia, PA 19103, Email: mmenkowitz@foxrothschild.com; (iii) counsel to the Purchaser, Vedder Price, P.C., 222 N. LaSalle Street, Chicago, IL 60601, Attn: Michael M. Eidelman, Esq., Email: meidelman@vedderprice.com; (iv) counsel to Fulton Bank, N.A., Reed Smith LLP, Attn: Brian M. Schenker, 1717 Arch Street, Suite 3100, Philadelphia, PA 19103, Email:bschenker@reedsmith.com; and (v) counsel for the Successful Bidder, so as to be received no later than **4:00 p.m. (Eastern Time) on September 10, 2018** (the "Approval Objection Deadline").

10.    Any party that fails to timely file and serve an objection on the Objection Notice Parties before the expiration of the Approval Objection Deadline and otherwise in accordance with the Bidding Procedures Order shall be barred and prohibited from asserting at the Approval Hearing or at any time thereafter any objection to the Sale and Bidding Procedures Motion, the consummation and performance of the Sale as contemplated by the terms of the Agreement or Modified APA submitted by the Successful Bidder, including the transfer of the Purchased Assets free and clear of all liens, claims, encumbrances and interests ("Liabilities") (other than any Assumed Liabilities by the Successful Bidder), or the proposed Cure Costs and the assumption, sale and assignment of any Assumed Contract to the Successful Bidder.

11.    If the Trustee receives prior to the Bid Deadline, (1) a Qualified Bid (other than the Qualified Bid under the Agreement from the proposed Purchaser) for the entirety of the Purchased Assets, or (2) a combination of Lot Bids (each of which must be a Qualified Bid) providing for, in the aggregate, a Purchase Price that exceeds the Minimum Initial Overbid, the Trustee will conduct an auction (the "Auction") for the Sale of the Purchased Assets commencing at **9:00 a.m. (Eastern Time) on September 17, 2018** at the offices of Fox Rothschild LLP, 2000 Market Street, 20th

Floor, Philadelphia, PA 19103, or such other time as the Trustee notifies all Qualified Bidders who have submitted Qualified Bids. The Trustee shall conduct an open Auction in accordance with the Bidding Procedures on the record, recorded by a court reporter. Each Qualified Bidder participating at the Auction shall confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

## ASSUMPTION AND ASSIGNMENT OF CONTRACTS

12.     The Trustee shall send notice within five (5) business days of the date of the issuance of the Bidding Procedures Order substantially in the form hereto as Exhibit D (the "Notice of Assumption and Assignment") to all non-Debtor counter-parties to the Contracts. The Notice of Assumption and Assignment shall set forth (i) that such Contract may be assumed by the Trustee and assigned to the Successful Bidder under the Bidding Procedures and (ii) the Cure Costs (as defined in the Notice of Assumption and Assignment) associated with the assumption and assignment of such Contract. Upon receipt of any Qualified Bid submitted by a Qualified Bidder, the Trustee shall promptly determine whether a Notice of Assumption and Assignment needs to be given to any additional non-Debtor parties to Contracts, which are listed on any schedule to such Qualified Bidder's version of the Agreement to be assumed and assigned to such Qualified Bidder (the "Assumed Contracts"), and shall mail, or otherwise serve by overnight courier service or other prompt method of service, within three (3) business days of receipt of such Qualified Bid, such additional Notices of Assumption and Assignment as may be required. A counterparty to a Contract which later receives a notice that a Qualified Bidder has designated that Contract for assumption and assignment may object as set forth in paragraphs 13 and 16 below.

13.     All objections to the assumption, sale and assignment of any Assumed Contract or to any Cure Cost (each, an "Assumption and/or Cure Objection") must be filed with the Court and

10

served upon the Objection Notice Parties so as to be actually received no later than the Approval Objection Deadline. All Assumption and/or Cure Objections must state with specificity the nature of such objection and may be heard by the Court at the Approval Hearing or such other date and time as the Trustee may schedule with the Court.

14.     If an objection timely filed and served in accordance with paragraph 13 above challenges a Cure Costs, such objection must set forth the amount of cure being claimed by the objecting party (the "Claimed Cure Cost") with appropriate documentation in support thereof. Upon receipt of a timely filed and served objection to a Cure Cost, the Trustee shall include in a post-closing cure reserve amount (the "Post-Closing Cure Reserve Amount") an amount equal to the Claimed Cure Costs, which amount may be released and paid to such counterparty by the Trustee after the Cure Cost is fixed by the Court or agreed upon by the Trustee and the objecting party as the Claimed Cure Cost. So long as the Claimed Cure Costs shall have been set aside in an escrow account (the "Escrow Account"), the Trustee shall be authorized, without further delay, to assume, sell and assign the Assumed Contract that is the subject of such Claimed Cure Cost objection to the Successful Bidder.

15.     If no objection to the Cure Cost or the proposed assumption, sale and assignment in respect of an Assumed Contract is timely filed and served: (i) the Trustee may assume, sell and assign to the Successful Bidder such Assumed Contracts, (ii) the Cure Cost set forth in the Notice of Assumption and Assignment shall be binding upon the respective non-Debtor party to the Assumed Contract for all purposes in these Bankruptcy Cases, and (iii) the respective non-Debtor party shall be forever barred from objecting to the assumption, sale and assignment of the relevant Assumed Contract and/or Cure Cost, and from asserting against the Trustee or the Successful

Bidder any right of setoff, condition to assignment and/or any additional cure or other amount with respect to such Assumed Contract.

16.     Non-Debtor parties to Assumed Contracts may raise objections to adequate assurance of future performance under the Assumed Contracts at the Approval Hearing.

17.     The effective date of any assumption, sale and assignment of any Assumed Contract shall be the Closing (as defined in the Agreement). Accordingly, any Cure Costs to be paid under any Assumed Contract shall be paid in accordance with the Agreement with the proposed Purchaser, or in accordance with the Modified APA with the Successful Bidder (other than Purchaser), upon or as soon as reasonably practicable after the Closing Date or as soon thereafter as the Cure Cost is fixed by the Court or agreed upon by the Trustee, the Successful Bidder, and the objecting party.

## ADDITIONAL PROVISIONS

18.     The Agreement and any Schedules and Exhibits Thereto (the "Transaction Documents") may be amended, modified or supplemented, or the provisions thereof waived, in accordance of the terms of the Agreement without further order of this Court or notice thereof to any party, other than potential Bidders or Qualified Bidders.

19.     The failure to include or reference in this Bidding Procedures Order any particular provisions of the Bidding Procedures shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

20.     This Court shall retain exclusive jurisdiction to interpret, construe, enforce and implement the terms of this Bidding Procedures Order and grant any remedy, at law or equity, as the circumstances require.

21.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Bidding Procedures Order shall not be stayed for fourteen (14) days after the entry hereof and shall be effective and enforceable immediately upon signature hereof.

22.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Bidding Procedures Order.

Dated: 8/29/18

THE HONORABLE JEAN K. FITZSIMON
UNITED STATES BANKRUPTCY JUDGE

Exhibit "A"

These bidding procedures (the "Bidding Procedures") set forth the terms by which Christine C. Shubert (the "Trustee" or the "Seller"), the chapter 7 Trustee for the estates of Worley & Obetz, Inc., *et al.* (collectively, the "Debtors"), may effectuate a sale (the "Sale") of certain of the Debtors' assets and related personal property (the "Purchased Assets"), subject to the terms and conditions and in accordance with the process and procedures set forth herein. These Bidding Procedures were approved by an order (the "Bidding Procedures Order") entered on August 29, 2018, by the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court") in the following proceeding: *In re Worley & Obetz, Inc., et al.*, Case No. 18-13774 (REF) (Jointly Administered).

## I.    Important Dates, Contact Information, and Terms

The following dates and deadlines apply to the proposed Sale.

| | |
|---|---|
| **Bid Deadline:** | September 13, 2018 at 10:00 a.m. (prevailing ET) |
| **Auction:** | September 17, 2018 at 9:00 a.m. (prevailing ET) |
| **Approval Hearing:** | September 18, 2018 at 11:00 a.m. (prevailing ET) |
| **Sale Closing:** | On the Date of the Approval Order, or at such other time or place as Purchaser and Seller may agree |

The key dates in the sale process may be extended by the Trustee in consultation with Fulton Bank, N.A. ("Fulton Bank") or by the Bankruptcy Court for cause.

Parties interested in the Purchased Assets may contact the Trustee through Bederson LLP, the Trustee's court-appointed accounting firm by contacting: Charles N. Persing, Partner,

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order, the Sale and Bidding Procedures Motion, or the Asset Purchase Agreement (the "Agreement").

The Debtors is these cases, along with the last four digits of their federal tax identification numbers are (i) Worley & Obetz, Inc. (6576) (Case No. 18-13774-REF); (ii) Americomfort, Inc. (7605) (Case No. 18-13775-REF); (iii) Ranck Plumbing Heating & Air Conditioning, Inc. (9625) (Case No. 18-13776-REF); (iv) Amerigreen Energy, Inc. (6284) (Case No. 18-13777-REF); (v) Advance Air, Inc. (8111) (Case No. 18-13778-REF); (vi) Amerigreen Energy Brokers, LLC (2358) (Case No. 18-13779-REF); (vii) Amerigreen Electricity, LLC (8977) (Case No. 18-13780-REF); (viii) Amerigreen Hedging Services, LLC (8549) (Case No. 18-13781-REF); (ix) Amerigreen Lubricants, LLC (7489) (Case No. 18-13782-REF); (x) Amerigreen Natural Gas, LLC (3222) (Case No. 18-13783-REF); and (xi) Amerigreen Propane, LLC (Case No. 18-13784-REF).

For purposes of the Sale and Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures, the Agreement, and the Transactions contemplated therein, (i) the defined term "Debtors" does not include Debtor Ranck Plumbing Heating & Air Conditioning, Inc. (Case No. 18-13776-REF), and (ii) the defined term "Purchased Assets" does not include and specifically excludes any and all assets, fixtures, furniture, machinery, equipment, properties, interests, and any other rights of Debtor Ranck Plumbing Heating & Air Conditioning, Inc.

Bederson LLP, 347 Mt. Pleasant Avenue, West Orange, NJ 07052 Telephone: (office) (973) 530-9181, (mobile) (347) 637-0489, Email: cpersing@Bederson.com.

Fulton Bank and its professionals shall have consultation rights throughout the Bid and the Auction process (and references to the Trustee's use of "discretion" or "sole discretion" herein are not intended to be limiting on such consultation rights).

## II.    Due Diligence and Participation

To participate in the sale process as a potential Bidder, conduct due diligence upon the Purchased Assets, and be entitled to submit a Bid for consideration hereunder, any third party (other than Purchaser) (each a "Bidder") must deliver the following to the Trustee:

   (A)    an executed confidentiality agreement in form and substance reasonably satisfactory to the Trustee; and

   (B)    a statement and other factual support demonstrating to the Trustee's reasonable satisfaction, that the Bidder has a *bona fide* interest in purchasing the Purchased Assets or one (1) or more Lots of the Purchased Assets.

Upon satisfactory receipt of the items above, as determined by the Trustee, then such interested party will be deemed a "Bidder," and the Trustee will deliver to such Bidder: (A) an information package containing information and financial data with respect to the Purchased Assets (the "Information Package"); and (B) access information for the Trustee's confidential electronic data room concerning the Purchased Assets (the "Data Room"). The identity of each Bidder may be disclosed to any other Bidders.

Until the business day immediately preceding the Bid Deadline, the Trustee will provide any Bidder such due diligence access or additional information as the Trustee determines to be reasonably requested and appropriate under the circumstances. In the event that any such due diligence material is in written form and has not previously been provided to any other Bidder, the Trustee will provide such materials to all Bidders to the extent practicable, as well as to Fulton Bank. The Trustee retains the right to establish, maintain and make available a "virtual data room" containing due diligence material in written form, access to which shall be made available to all Bidders.

Unless otherwise determined by the Trustee, the availability of additional due diligence to a Bidder will cease if (A) the Bidder does not become a Qualified Bidder or (B) the bidding process is terminated in accordance with its terms. Except as provided above with respect to the Information Package and access to the Data Room, neither the Trustee nor her representatives will be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any party.

A Bidder may participate in the bidding process by (i) submitting a Bid for the acquisition of all of the Purchased Assets, or (ii) submitting a Lot Bid for one (1) or more of the eighteen (18) Lots of the Purchased Assets.

## III.    Bid Deadline

A Bidder that desires to become a Qualified Bidder must submit written and electronic copies of its bid (the "Bid") in accordance with the terms of the Bidding Procedures so that the

2

Bid is actually received by each of the Notice Parties (as defined below) no later than 10:00 a.m. (prevailing Eastern Time) on September 13, 2018 (the "Bid Deadline").

The "Notice Parties" means each of the following: (A) counsel to the Trustee, Fox Rothschild LLP, Attn: Michael J. Menkowitz, Esq., 2000 Market Street, 20th Floor, Philadelphia, PA 19103, Email: mmenkowitz@foxrothschild.com; (B) counsel to Wiggins Gas Propane & Alternative Fuels LLC, Vedder Price, P.C., 222 N. LaSalle Street, Chicago, IL 60601, Attn: Michael M. Eidelman, Esq., Email: meidelman@vedderprice.com; and (C) counsel to Fulton Bank, N.A., Reed Smith LLP, Attn: Brian M. Schenker, 1717 Arch Street, Suite 3100, Philadelphia, PA 19103, Email:bschenker@reedsmith.com (collectively, the "Notice Parties").

## IV.    Qualified Bids

Assuming that there is an Auction, a Bidder will not be entitled to participate in any Auction or otherwise purchase the Purchased Assets, unless it shall have submitted a Qualified Bid by the Bid Deadline in accordance with these Bidding Procedures which satisfies each of the following conditions (the "Bid"):

(A)    Written Submission of Modified APA and Commitment to Close. Bidders must submit a Bid by the Bid Deadline in the form of an executed mark-up of the Agreement (each a "Modified APA") reflecting such Bidder's proposed changes to the Agreement (together with a blackline of the Modified APA against the Agreement), and a written and binding commitment to close on the terms and conditions set forth therein. The Trustee may discuss the Modified APA of any Bidder after submission with such Bidder including, for clarification, the terms and conditions of the Modified APA. Each Modified APA shall (I) have substantially similar terms and conditions (provided that no Bid other than this Agreement may provide for payment of any break-up fee, expense reimbursement, or similar type of payment) as the Agreement except with higher and better consideration; and (II) contain terms and conditions in the aggregate no less favorable to the Debtors' estates than the terms and conditions in the Agreement; *provided, however,* the Trustee shall have the sole discretion to sell the Debtors' assets in the lots described in Section 6.3(c)(iv) of the Agreement (each, a "Lot Bid") in accordance with the Bidding Procedures Order and these Bidding Procedures. In order for a Modified APA to be deemed a Qualified Bid, it must provide for the acquisition of all of the Purchased Assets or contain a Lot Bid.

(B)    Irrevocable. A Bid must be irrevocable until four (4) Business Days after entry of the Approval Order (the "Termination Date");

(C)    Contingencies. A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence. Any other contingencies associated with a Bid may not, in the aggregate, be materially more burdensome than those set forth in this Agreement;

(D)    Financing Sources and Evidence of Financial Ability to Close. A Bid must identify the actual Bidder and owners and ultimate parent company of the Bidder and contain written evidence of a commitment for financing or other evidence of the

3

ability to fund and consummate the Sale on or before a closing date satisfactory to the Trustee with appropriate contact information for such financing or funding sources;

(E) <u>No Fees Payable to Bidder</u>. A Bid may not request, be conditioned on or otherwise entitle the Bidder (other than Purchaser) to any break-up fee, expense reimbursement or similar type of payment. A Bidder shall be deemed to waive the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid or the Bidding Procedures;

(F) <u>Good-Faith Deposit</u>. Each Bid must be accompanied by a cash deposit in an amount equal to ten (10%) percent in cash of the cash and the value of the non-cash purchase price allocated to the Purchased Assets under the Modified APA, which shall be paid to the Trustee to be held in an escrow account established at United Bank, ABA Number 211170318; Account No. 710000007408; Name: Worley & Obetz, Inc.; Reference - in accordance with these Bidding Procedures;

(G) <u>Minimum Initial Overbid</u>. The aggregate consideration in a Bid must have (I) a cash purchase price for the Purchased Assets of the amount payable for the Purchased Assets under the Agreement, being Eight Million One Hundred Thousand Dollars ($8,100,000.00), <u>plus</u> (II) the amount of the Bid Protection ($243,000.00), <u>plus</u> (III) the amount of the Break-Up Fee ($243,000.00) (the "<u>Minimum Initial Overbid</u>"); and

(H) <u>List of Executory Contracts and Unexpired Leases</u>. Each Bid must be accompanied by a list of Debtors' executory and unexpired leases that the Bidder desires to assume and a packet of information, including financial information, that will be provided to the non-Debtor parties to such executory contracts and unexpired leases sufficient to demonstrate adequate assurance of future performance.

The Trustee shall deliver to the Notice Parties, at least forty-eight (48) hours prior to the Auction, written confirmation that she has a good faith basis to believe the Bidder has a sufficient commitment for financing, as set forth in subparagraph (D) above.

A Bid received from a Bidder that is determined by the Trustee to meet the above requirements (or any modification to the above requirements made at the discretion of the Trustee) will be considered a "<u>Qualified Bid</u>", and each potential Bidder that submits a Qualified Bid will be considered a "<u>Qualified Bidder</u>". For purposes of the Auction, the proposed Purchaser and Fulton Bank will each be deemed a Qualified Bidder without the need to meet the above requirements (or any modification to the above requirements made at the discretion of the Trustee) but, in the case of Fulton Bank, subject in all respects to the Credit Bidding section set forth below.

A Qualified Bid, the Opening Bid (as defined below), and any subsequent Overbids[2] at the Auction may be valued by the Trustee based upon factors such as: (A) the amount and nature of

---

[2] For purposes of these Bidding Procedures, the Sale and Bidding Procedures Motion, the Bidding Procedures Order, and these Bidding Procedure, the term "Overbid" shall have the meaning as ascribed in Section 6.3(c)(v) of the Agreement, which provides "[a]n "<u>Overbid</u>" is any Bid made at the Auction subsequent to Seller's announcement of

the consideration; (B) the proposed assumption of liabilities, if any; (C) the ability of the Qualified Bidder to close the proposed transaction; (D) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (E) any purchase price adjustments; (F) the impact of the contemplated transaction on any actual or potential litigation; (G) the net economic effect of any changes from the Agreement, if any, contemplated by the contemplated transaction documents (the "Contemplated Transaction Documents"), (H) the net after-Tax consideration to be received by the Trustee; (I) the net amounts to be paid to the Debtors' estates, taking into account, among other things, payment of the Break-Up Fee and Cure Costs; and (J) such other considerations as Trustee deems relevant in her reasonable business judgment (collectively, the "Bid Assessment Criteria").

The Trustee reserves the right to impose additional terms and conditions with respect to all Qualified Bidders, and otherwise modify these Bidding Procedures.

## V.     Credit Bid

For purposes of these Bidding Procedures and the Auction, Fulton Bank shall be deemed a Qualified Bidder and shall have the right to submit a credit bid up to the full amount of its allowed secured claim for the Purchased Assets at Auction (the "Credit Bid"). As a condition to Credit Bidding all or any portion of its secured claim for the Purchased Assets at Auction, (i) Fulton Bank shall not exercise its credit bid rights to make the Minimum Initial Overbid; and (ii) any Credit Bid by Fulton Bank shall contain a stipulation and agreement with the Trustee providing for the consensual use of cash collateral by the Trustee to pay the Break-Up Fee to Wiggins Gas Propane & Alternative Fuels LLC, and Fulton Bank shall enter into a stipulation and agreement with the Trustee that Fulton Bank shall pay all amounts due under the Second Amended Stipulation and Order between the Trustee and Fulton Bank [D.I. 334].

## VI.     Opening Bid

To begin the bidding, the Trustee will select what she determines, in her discretion, to be the highest Qualified Bid (for the entirety of the Purchased Assets or Lots of the Purchased Assets) (the "Opening Bid"). The aggregate consideration of the Opening Bid must be equal to or greater than the Minimum Initial Overbid amount of $8,586,000.00. Each subsequent round of bidding shall continue in minimum increments of at least $250,000.00 (the "Subsequent Overbid Increment"). At least one (1) Business Day prior to the start of the Auction, the Trustee shall provide a copy of the Opening Bid to all participating Qualified Bidders attending the Auction and a blackline of the Opening Bid against the Agreement.

## VII.     Auction

If the Trustee receives prior to the Bid Deadline, (1) a Qualified Bid (other than the Qualified Bid under the Agreement from the proposed Purchaser Wiggins Gas Propane & Alternative Fuels LLC) for the entirety of the Purchased Assets, or (2) a combination of Lot Bids (each of which must be a Qualified Bid) providing for, in the aggregate, a Purchase Price that

---

(A) the Opening Bid, and (B) the then highest and/or best Overbid at the beginning of each subsequent round of bidding (the "Round Leading Bid")."

exceeds the Minimum Initial Overbid, then the Trustee will conduct an Auction to take place at **9:00 a.m. (Eastern Time) on September 17, 2018** at the offices of Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, PA 19103, or such other time as the Trustee notifies all Qualified Bidders who have submitted Qualified Bids.

Only Qualified Bidders and their designated authorized representatives will be eligible to participate at the Auction. Only the authorized representatives (including counsel and other advisors) of each of Wiggins Gas Propane & Alternative Fuels LLC, Qualified Bidders, the Trustee and any other party in interest or its representative who provide the Trustee with written notice forty-eight (48) hours prior to the Auction shall be permitted to attend the Auction.

At the Auction, Qualified Bidders will be permitted to increase their Bids. Bidding on the Purchased Assets will start at the purchase price and terms proposed in the Opening Bid, and will proceed thereafter in minimum increments of at least the Subsequent Bid Increment.

The Trustee may adopt rules, for the Auction at any time that the Trustee determines to be appropriate to promote the goals of the bidding process and are not inconsistent with these Bidding Procedures, including auctioning Lots of the Purchased Assets first but making any "winning bid" on a Lot of the Purchased Assets contingent upon the outcome of the Auction of all of the Purchased Assets. The Trustee shall have the sole discretion to conduct the Auction of the Purchased Assets in any combination or order as the Trustee determines to be appropriate; provided, however, the Trustee intends to first auction individual Lots of the Purchased Assets to Qualified Bidders, then second, auction combinations of Lots of the Purchased Asset to Qualified Bidders, and then third, conduct an auction of all of the Purchased Assets (Lots No. 1-18) to Qualified Bidders for a bulk-bid.

Any rules developed by the Trustee will provide that all Bids will be made and received in one room, on an open understanding that the true identity of each Qualified Bidder will be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid submitted in response to the Opening Bid or to any Overbid made at the Auction will be fully disclosed to all other Qualified Bidders throughout the entire Auction, and each Qualified Bidder will be permitted to take what the Trustee determines to be an appropriate amount of time to respond to the previous bid at the Auction.

Upon conclusion of the bidding, the Auction shall be closed, and the Trustee shall identify the highest and/or best Overbid or Opening Bid (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder"), and the next highest and/or best Overbid after the Successful Bid (the "Back-up Bid"), and advise the remaining Qualified Bidders of such determination. All bidding for the Purchased Assets will be concluded at the Auction and there will be no further bidding at the Bankruptcy Court hearing held in the Bankruptcy Cases to approve the highest or best bid for the Purchased Assets (the "Approval Hearing"). If the Successful Bidder fails to close on the Successful Bid, the Back-Up Bid shall automatically be deemed to be the winning bidder. At the Approval Hearing, the Trustee will present the Successful Bid and the Back-up Bid to the Bankruptcy Court for approval.

No additional Bids may be submitted or considered after the conclusion of the Auction.

**EACH BID – INCLUDING BIDS CONTAINED IN THE BID PACKAGE, SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE QUALIFIED**

BIDDER UNTIL FOUR (4) BUSINESS DAYS AFTER ENTRY OF THE APPROVAL ORDER (THE "TERMINATION DATE").

## VIII. Acceptance of Qualified Bids

The Trustee presently intends to consummate the Sale with the Successful Bidder, or if the Successful Bidder cannot or refuses to consummate the Sale because of the breach or failure on the part of the Successful Bidder, then with the Back-up Bidder. However, the Trustee's presentation of the Successful Bid and the Back-up Bid to the Bankruptcy Court for approval does not constitute the Trustee's acceptance of such bid. The Trustee will be deemed to have accepted the Successful Bid or the Back-up Bid, as applicable, only when such bid has been approved by the Approval Order.

If for any reason the Successful Bidder fails to consummate the purchase of the Purchased Assets, or any subset thereof, the Back-up Bid may be deemed by the Trustee to be the highest or best bid, and the Trustee and the Back-up Bidder will thereafter effect the Sale of the Purchased Assets to the Back-up Bidder as soon as is commercially reasonable. If such failure to consummate the purchase is the result of a breach by the Successful Bidder, the Trustee shall have the right to retain the Good Faith Deposit until required to return it by order of the Bankruptcy Court and shall reserve the right to seek all available damages from the Successful Bidder, including, but not limited to, with respect to the Good Faith Deposit.

## IX. The Approval Hearing

On or before September 18, 2018, subject to any continuance or postponement by the Bankruptcy Court, the Bankruptcy Court shall conduct a hearing (the "Approval Hearing") to determine whether to approve the Sale of the Purchased Assets free and clear of all liens, claims, interests, encumbrances and liabilities, including the assumption and assignment of certain executory contracts and unexpired leases as described in the applicable Agreement.

At the Approval Hearing, the Trustee will seek Bankruptcy Court approval of the Sale of the Purchased Assets to the Successful Bidder and the Back-up Bidder. In the event that the Successful Bidder cannot or refuses to consummate the Sale because of the breach or failure on the part of the Successful Bidder, the Trustee will be permitted to close with the Back-up Bidder without further order of the Bankruptcy Court. The Trustee's presentation to the Bankruptcy Court for approval of these particular bids does not constitute acceptance of any bids. The Trustee has accepted a bid only when the Bankruptcy Court, following the Approval Hearing, has approved the Sale and entered an order authorizing and approving the Sale, which shall be in form and substance acceptable to the Trustee and the Successful Bidder or the Back-up Bidder, as applicable (the "Approval Order"). The Approval Hearing may be adjourned or rescheduled without notice or with limited and shortened notice to parties, including by (A) an announcement of such adjournment at the Approval Hearing or at the Auction or (B) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of the Approval Hearing.

## X. Terms of Sale; "As Is, Where Is"

Any Sale shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Trustee, her professionals, or the Debtors' chapter 7 estates, whether written or verbal, whether express, implied or by operation of law, except and solely to the extent expressly set forth in the Agreement of the Successful Bidder or the Back-up Bidder, as

applicable. Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Purchased Assets that are subject of the Auction prior to making its bid, that it has relied solely upon its own independent review and investigation in making its bid. Except as otherwise provided in the Agreement of the Successful Bidder or the Back-up Bidder, as applicable, all of the Debtors' right, title and interest in the Purchased Assets shall be sold free and clear of liens, claims, interests, encumbrances and liabilities as proposed in the form of Approval Order (collectively, the "Liabilities"), with any Liabilities to attach to the proceeds of the Sale as permitted by law and provided in the proposed form of Approval Order.

## XI.  Closing

Except to the extent of any contrary provision in the Agreement of the Successful Bidder or the Back-up Bidder, as applicable, the ("Closing") shall occur on the date of the Approval Order, or at such other time or place as the Trustee and the Successful Bidder or the Back-up Bidder, as applicable, may agree.

## XII.  General

The Trustee may amend these Bidding Procedures or the bidding process at any time and from time to time in any manner that she determines will best promote the goals of the Bidding Procedures, including extending or modifying any of the dates described herein. The Trustee shall promptly notify parties in interest and potential Bidders of any such modifications. No bidder has any rights against the Trustee, the Debtors' estates, or any of the Trustee's professionals by virtue of any modification of these Bidding Procedures, or by virtue of having its Bid accepted by the Trustee or approved by the Bankruptcy Court. To participate in the Auction, each Qualified Bidder will sign an acknowledgement of no rights or claim against the Trustee, the Debtors' estates, or the Trustee's professionals for the foregoing.

## XIII.  Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders will be held in escrow by the Trustee and while held in escrow will not become property of the Debtors' estates unless released from escrow pursuant to the terms of the applicable escrow agreement or pursuant to further order of the Bankruptcy Court. The Trustee will retain the Good Faith Deposits of the Successful Bidder and the Back-up Bidder until the closing of the Sale unless otherwise ordered by the Bankruptcy Court. The Good Faith Deposits of the other Qualified Bidders will be returned within four (4) business days of entry of the Approval Order. At the closing of the Sale contemplated by the Successful Bid, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit. The Good Faith Deposit of the Back-up Bidder will be released by the Trustee four (4) business days after the Closing of the Sale. Upon the return of the Good Faith Deposits, their respective owners will receive any and all interest that will have accrued thereon.

## XIV.  Reservation of Rights

The Trustee reserves the right to amend or modify the proposed Bidding Procedures, including without limitation, the proposed Bid Deadline, Auction Date, and Approval Hearing Date, in connection with the conditions or requirements of any Qualified Bidder.

# Exhibit "B"

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

WIGGINS GAS PROPANE & ALTERNATIVE FUELS LLC

AND

CHRISTINE C. SHUBERT, IN HER CAPACITY AS CHAPTER 7 TRUSTEE
FOR THE ESTATES OF WORLEY & OBETZ, INC., ET AL.

August 24, 2018

# TABLE OF CONTENTS

Page

1.   DEFINITIONS...................................................................................................... 2
     1.1   Definitions............................................................................................. 2
     1.2   Cross References.................................................................................... 6

2.   PURCHASE AND SALE ........................................................................................ 7
     2.1   Purchase and Sale ................................................................................. 7
     2.2   Excluded Assets .................................................................................... 9
     2.3   "AS IS, WHERE IS" SALE.................................................................. 11
     2.4   Assumed Liabilities ............................................................................. 12
     2.5   Excluded Liabilities ............................................................................. 13
     2.6   Assumption/Assignment of Contracts and Rights. ............................... 13
     2.7   Consideration; Allocation of Consideration ........................................ 14
     2.8   Closing ................................................................................................ 15
     2.9   Deliveries by Seller.............................................................................. 15
     2.10  Deliveries by Purchaser ....................................................................... 16

3.   REPRESENTATIONS AND WARRANTIES OF SELLER.......................................... 16
     3.1   Power ................................................................................................... 16
     3.2   Authorization ....................................................................................... 16
     3.3   Governmental Authorization ................................................................ 16
     3.4   Non-contravention ............................................................................... 16
     3.5   Required Consents ............................................................................... 16
     3.6   Litigation.............................................................................................. 17
     3.7   Permits ................................................................................................. 17
     3.8   Compliance with Laws and Court Orders............................................. 17
     3.9   Intellectual Property Rights ................................................................. 17
     3.10  Environmental Matters......................................................................... 17
     3.11  Real Property ....................................................................................... 17
     3.12  Employment Matters and Employee Benefits ....................................... 18
     3.13  Taxes ................................................................................................... 18
     3.14  Sufficiency of and Title to the Purchased Assets.................................. 18
     3.15  Insurance ............................................................................................. 18
     3.16  Service of Bankruptcy Documents ....................................................... 18
     3.17  Certain Fees ......................................................................................... 18

4.   REPRESENTATIONS AND WARRANTIES OF PURCHASER.................................... 19
     4.1   Organization......................................................................................... 19
     4.2   Corporate Authorization ...................................................................... 19
     4.3   Governmental Authorization ................................................................ 19
     4.4   Non-contravention ............................................................................... 19
     4.5   Litigation.............................................................................................. 19
     4.6   Adequacy of Funds .............................................................................. 19

5.   COVENANTS OF SELLER.................................................................................... 20

-i-

## TABLE OF CONTENTS
(continued)

Page

5.1 Access to Information .......................................................................... 20
5.2 Sales of De Minimis Assets ................................................................. 20
5.3 Notices of Certain Events ..................................................................... 20

6. COVENANTS OF PURCHASER AND SELLER ............................................. 20

6.1 Efforts; Further Assurances ................................................................. 20
6.2 Certain Filings .................................................................................... 20
6.3 Bankruptcy Issues ............................................................................... 21
6.4 Notices ................................................................................................ 32

7. TAX MATTERS ................................................................................................ 33

7.1 Tax Cooperation ................................................................................. 33
7.2 Transfer Taxes .................................................................................... 33
7.3 Real Property Taxes ............................................................................ 33
7.4 Personal Property, Ad Valorem and Excise Taxes ............................. 33

8. CLOSING CONDITIONS ................................................................................. 33

8.1 Conditions to Obligations of Purchaser and Seller ............................ 33
8.2 Conditions to Obligations of Purchaser ............................................. 34
8.3 Conditions to Obligations of Seller .................................................... 34

9. TERMINATION ................................................................................................ 35

9.1 Grounds for Termination .................................................................... 35
9.2 Effect of Termination .......................................................................... 35
9.3 Fees and Expenses .............................................................................. 35

10. MISCELLANEOUS .......................................................................................... 36

10.1 Notices ................................................................................................ 36
10.2 Limitation on Damages ....................................................................... 36
10.3 Waivers ............................................................................................... 37
10.4 Successors and Assigns ....................................................................... 37
10.5 Governing Law .................................................................................... 37
10.6 Jurisdiction .......................................................................................... 37
10.7 Waiver of Jury Trial ............................................................................ 38
10.8 No Third Party Beneficiaries .............................................................. 38
10.9 Entire Agreement; Amendments; Counterparts .................................. 38
10.10 Pre-Petition Secured Party ................................................................. 38
10.11 Headings; Interpretation ..................................................................... 39

## EXHIBITS
Exhibit A      Form of Bill of Sale, Assignment and Assumption Agreement

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** dated as of August 24, 2018 (this "Agreement") is entered into by and between Christine C. Shubert, in her capacity as Chapter 7 Trustee ("Seller") for the estates of (i) Worley & Obetz, Inc. (Case No. 18-13774-REF); (ii) Americomfort, Inc., Case No. 18-13775-REF); (iii) Amerigreen Energy, Inc. (Case No. 18-13777-REF); (iv) Advance Air, Inc. (Case No. 18-13778-REF); (v) Amerigreen Energy Brokers, LLC (Case No. 18- 13779-REF); (vi) Amerigreen Electricity, LLC (Case No. 18-13780-REF); (vii) Amerigreen Hedging Services, LLC (Case No. 18-13781-REF); (viii) Amerigreen Lubricants, LLC (Case No. 18-13782-REF); (ix) Amerigreen Natural Gas, LLC (Case No. 18-13783-REF); and (x) Amerigreen Propane, LLC (Case No. 18-13784-REF) (collectively, the "Debtors") and Wiggins Gas Propane & Alternative Fuels LLC, a Delaware limited liability company (or its Assignee, "Purchaser"). Purchaser and Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

**WHEREAS,** prior to the Petition Date (as defined below), Debtor Worley & Obetz, Inc. ("W&O") and certain Affiliates (as defined below) provided certain energy products and services to their commercial and residential clients, including fuel, bio-heating oil, biodiesel, propane, gasoline, natural gas and electricity (the "W&O Business");

**WHEREAS,** prior to the Petition Date, Debtor Amerigreen Energy, Inc. and certain Affiliates operated as an energy wholesaler to retail distributors operating in the Mid-Atlantic and New England markets and provided certain energy products and services to their retail fuel distributors, fuel stations, commercial clients, and commercial and residential clients of W&O, including ethanol, biodiesel, biofuels, and petroleum, as well as hedging and marketing services, and electricity and gas plans (together with the W&O Business, the "Business");

**WHEREAS,** on June 6, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court");

**WHEREAS,** Seller is the duly appointed and acting Chapter 7 trustee for each of the Debtors' bankruptcy cases which are now jointly administered under Case No. 18-13774 (REF) (Jointly Administered) (collectively, the "Bankruptcy Cases");

**WHEREAS,** Seller desires to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of and acquire such Purchased Assets and to assume such Assumed Liabilities, in each case on an "AS IS, WHERE IS" basis except for the representations and warranties expressly set forth in Section 3 below and upon the terms and subject to the conditions set forth herein; and

**WHEREAS,** the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to an Approval Order (as defined below) to be entered in the Bankruptcy

Cases pursuant to §§ 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.    **Definitions.**

1.1    Definitions.    The following terms, as used herein, have the following meanings:

(a)    "Acquired Owned Real Property" means all of the real property, together with all Improvements located thereon and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights and interests appurtenant thereto, owned in fee by Seller, and any part or parcel thereof set forth on Schedule 2.1(a).

(b)    "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such other Person.

(c)    "Bid Protection" means an amount equal to 3% of the Purchase Price, or $243,000.

(d)    "Break-Up Fee" means an amount equal to 3% of the Purchase Price, or $243,000.

(e)    "Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in Pennsylvania are authorized or required by Law to close.

(f)    "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any Laws promulgated thereunder.

(g)    "Claim" means a "claim" as defined in Section 101 of the Bankruptcy Code.

(h)    "Closing Date" means the date of the Closing.

(i)    "Code" means the Internal Revenue Code of 1986, as amended.

(j)    "Cure Costs" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the

2

assumption and/or assignment of the Assumed Contracts to Purchaser as provided herein.

(k) "Employee" means an individual who is employed by the Debtors, whether on a full-time or a part-time basis, whether active or inactive as of the Closing Date, and includes an employee on short-term or long-term disability leave.

(l) "Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA §3(3)) and any other benefit or compensation plan, program, agreement, arrangement or payroll practice (whether written or unwritten) maintained, sponsored, or contributed or required to be contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any liability as set forth on Schedule 3.12(a).

(m) "Environmental Laws" means, whenever in effect, all federal, state, and local Laws and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all contractual obligations and all common Law, in each case concerning public or employee health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state Laws).

(n) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

(o) "ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with Seller for purposes of Code § 414.

(p) "Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority, or arbitral body.

(q) "Hazardous Substances" means any substance, material or waste regulated by any Governmental Authority, including any material, substance or waste which is defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "contaminant," "toxic waste," "pollutant" or "toxic substance" under any provision of Environmental Law, and including petroleum, petroleum products, asbestos, presumed asbestos-containing material or asbestos-containing material, urea formaldehyde and polychlorinated biphenyls.

(r) "Improvements" means all buildings, improvements, structures, streets, roads and fixtures located, placed, constructed or installed on or under the

3

Acquired Owned Real Property or the Leased Real Property, including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration systems, facilities, lines, installations and conduits.

(s)    "Intellectual Property Rights" means all of Seller's intellectual property rights including, but not limited to: (i) patents, patent applications, patent rights, patent disclosures and inventions (whether or not patentable or reduced to practice); (ii) trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, websites, domain names and other indicia of source and all goodwill associated therewith; (iii) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (iv) know-how, trade secrets, customer lists (including all wholesale, retail and commercial customer account lists, whether active or inactive including complete contact information), proprietary information, proprietary processes and formulae, databases and data collections; (v) all source and object code, software (including front and back office software, customer management and fuel management systems, accounting and billing systems, POS inventory systems and fleet management systems), algorithms, architecture, structure, display screens, layouts, inventions and development tools; and (vi) all documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records.

(t)    "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means the actual knowledge of Christine C. Shubert.

(u)    "Law" means any law, statute, regulation, rule, code, decree, constitution, ordinance, treaty, rule of common law or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(v)    "Leased Real Property" means all land, Improvements or other interests in real property leased or subleased by Seller, as lessee, which is used or intended to be used in, or otherwise related to, the Business and set forth on Schedule 1.1(v), unless previously rejected pursuant to section 365 of the Bankruptcy Code.

(w)    "Liability" means any claim, debt, liability, obligation, Tax or commitment of any nature whatsoever (whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated or due or to become due), whenever or however arising (including those arising out of any contract or tort, whether based on negligence, strict liability or otherwise), and including all costs and expenses related thereto.

(x)    "Lien" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), pledge, security interest, Claim, encumbrance,

4

restriction, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or noncontingent, material or nonmaterial, known or unknown. For the avoidance of doubt, the definition of Lien shall not include any license or sublicense of Intellectual Property Rights granted by Seller or any lease or sublease by Seller (as lessor or sublessor) of real property.

(y) "<u>Order</u>" means any award, decision, decree, order, directive, injunction, ruling, judgment or consent of or entered, issued, made or rendered by any Governmental Authority.

(z) "<u>Permits</u>" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and other similar documents and authorizations issued by any Governmental Authority to Seller, in each case to the extent transferable without the consent of any Governmental Authority.

(aa) "<u>Permitted Encumbrances</u>" means (i) Liens included in the Assumed Liabilities; (ii) encumbrances waived in writing by Purchaser; (ii) all restrictions on the use of the Purchased Assets arising as a result of the application of zoning and similar laws; (iv) all exceptions, restrictions, easements, charges, rights-of-way, and other encumbrances that are set forth in any Permit; and (v) other imperfections in title, if any, or conditions, reservations, restrictions, easements, encroachments, or rights of way, if any, none of which, individually or in the aggregate, materially detracts from the value, or impairs in any significant way the use of the property subject thereto;

(bb) "<u>Person</u>" means an individual, corporation, partnership, limited liability Debtors, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(cc) "<u>Post-Retirement Liabilities</u>" means with respect to all Employees and retirees, all Liabilities for the post-retirement benefits, including those provided under the Employee Benefit Plans, as applicable.

(dd) "<u>Pre-Closing Tax Period</u>" means (i) any Tax period ending on or before the Closing Date; and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(ee) "<u>Property Taxes</u>" means all real and personal property Taxes levied with respect to the Purchased Assets for any taxable period or portion thereof.

(ff) "<u>Real Estate</u>" means the Acquired Owned Real Property and the Leased Real Property.

(gg) "<u>Release</u>" has the meaning set forth in CERCLA.

5

(hh) "Tax" means (i) any federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority (a "Taxing Authority") responsible for the imposition thereof (whether domestic or foreign), whether or not disputed, and (ii) Liability for the payment of any amounts of the type described in clause (i) as a result of being a transferee, party to any agreement or any express or implied obligation to indemnify any other Person.

(ii) "Tax Returns" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

(jj) "Trade Payables" means all trade payables incurred by the Debtors in the ordinary course of business.

1.2    Cross References. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Allocation Schedule | 2.7(b) |
| Approval Hearing | 6.3(c)(vi) |
| Approval Order | 6.3(f) |
| Assignment and Assumption Agreement | 2.9(b) |
| Assumed Contracts | 2.1(b) |
| Assumed Contracts A/R | 2.1(d) |
| Assumed Liabilities | 2.4 |
| Auction | 6.3(c) |
| Back-up Bid | 6.3(c)(vi) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid | 6.3(b)(i) |
| Bid Assessment Criteria | 6.3(c)(i) |
| Bid Deadline | 6.3(b)(i) |
| Bidder | 6.3(b)(i) |
| Bidding Procedures | 6.3(a) |
| Bidding Procedures Order | 6.3(a) |

6

| Term | Section |
| --- | --- |
| Business | Recitals |
| Closing | 2.8 |
| Contemplated Transaction Documents | 6.3(c)(i) |
| Debtors | Preamble |
| Deposit | 2.7(a) |
| End Date | 9.1(b) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.5 |
| Lot Bid | 6.3(b)(ii)(A) |
| Minimum Initial Overbid | 6.3(b)(ii)(G) |
| Missing Assets | 2.7(c) |
| Modified APA | 6.3(b)(ii)(A) |
| Notice Parties | 6.3(b)(i) |
| Opening Bid | 6.3(c)(i) |
| Overbid | 6.3(c)(v) |
| Party or Parties | Preamble |
| Petition Date | Recitals |
| Purchase Price | 2.7(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Qualified Bid | 6.3(b)(ii) |
| Qualified Bidder | 6.3(b)(ii) |
| Reimbursement Demand | 2.7(c) |
| Round Leading Bid | 6.3(c)(v) |
| Sale and Bidding Procedures Motion | 6.3(a) |
| Seller | Preamble |
| Subsequent Overbid Increment | 6.3(c)(v)(A) |
| Successful Bid | 6.3(c)(v) |
| Successful Bidder | 6.3(c)(vi) |
| Tax Claim | 7.1 |
| Taxing Authority | 1.1(gg) |
| Termination Date | 6.3(b)(ii)(B) |
| Term Sheet | 2.2(h) |
| Transactions | Recitals |
| Transfer Taxes | 7.2 |

2. **Purchase and Sale.**

2.1 <u>Purchase and Sale</u>. Subject to the terms and conditions set forth in this Agreement and the Approval Order, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all right, title and interest of Seller as of the Closing Date in and to all of Seller's and Debtors' properties and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and whether or not carried or reflected on the books and records of Seller, that are listed in subsections (a) - (l) below, other than the

7

Excluded Assets (the "Purchased Assets"), free and clear of all Liens (other than the Assumed Liabilities and Permitted Encumbrances). The cost of collecting and removing the Purchased Assets from their various locations shall be borne by Purchaser; *provided, however*, Seller shall, at her cost, use commercially reasonable efforts to assist Seller's efforts by enforcing the terms of this Agreement and the Approval Order against third parties. Subject to Section 2.2, the Purchased Assets purchased hereunder shall include the following:

      (a)    the Acquired Owned Real Property set forth on Schedule 2.1(a); provided Purchaser may advise Seller of any additions or deletions to Schedule 2.1(a) within two (2) Business Days before the Approval Hearing;

      (b)    all rights of Seller under the executory contracts and unexpired leases of Seller that are set forth on Schedule 2.1(b) not previously rejected pursuant to section 365 of the Bankruptcy Code (collectively, the "Assumed Contracts"); provided Purchaser may advise Seller of any additions or deletions to Schedule 2.1(b) within two (2) Business Days before the Approval Hearing;

      (c)    all inventory, including, without limitation, that set forth on Schedule 2.1(c), including, but not limited to, propane, gasoline, kerosene, diesel, diesel exhaust fluid, retail and wholesale inventory for sale or distribution of any kind except to the extent contained in an Excluded Asset;

      (d)    any accounts receivable and all proceeds arising therefrom arising from and after the Petition Date and out of or in connection with the Assumed Contracts (collectively, the "Assumed Contracts A/R");

      (e)    all tangible personal property and intangible property whether located on Acquired Owned Real Property, Leased Real Property, other real property, in transit, or in the possession of any Person, including, but not limited to, all machinery, equipment, storage tanks and vessels, pumps, dispensers, displays, spare parts, signage, industry memorabilia, tools, vehicles, computers (but excluding laptops), mobile phones, personal digital assistants, computer equipment (but excluding laptops), hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, other miscellaneous supplies and other tangible personal property of any kind, including, without limitation, that set forth on Schedule 2.1(e);

      (f)    all Permits set forth on Schedule 2.1(f) to the extent the same may be assigned consistent with their terms;

      (g)    all Intellectual Property Rights, including, without limitation, the items set forth on Schedule 2.1(g); provided that Purchaser may advise Seller of any additions or deletions to Schedule 2.1(g) within two (2) Business Days before the Approval Hearing;

8

(h)     all cars, trucks, trailers, forklifts, other industrial vehicles, other motor vehicles, and boats and watercrafts whether powered or unpowered, including, without limitation, those set forth on Schedule 2.1(h), and any personal property located on or within such vehicles, boats and watercrafts;

(i)     all deposit or prepaid charges and expenses paid exclusively in connection with or relating exclusively to any Purchased Asset;

(j)     all books, records, files and papers of Seller relating to the Business or the Purchased Assets, including equipment logs, service books and records, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records (all in the state in which such records and information currently exist), provided that Seller shall be entitled to access such books, records, files, computer systems, and papers with reasonable notice;

(k)     all goodwill directly arising from, related to or resulting from the Business; and

(l)     All Lots of Purchased Assets set forth in Section 6.3(c)(iv)(1) – (18) of this Agreement.

2.2     Excluded Assets. Notwithstanding any other provision of this Agreement to the contrary, the following assets (the "Excluded Assets") shall not be transferred, conveyed, sold or assigned to Purchaser, and the Purchased Assets shall not include any of the following assets of Debtors or Seller:

(a)     all cash, cash equivalents and bank deposits (including, without limitation, deposits posted as collateral for letters of credit) or similar cash items;

(b)     all deposit or prepaid charges and expenses paid exclusively in connection with or relating exclusively to any Excluded Assets;

(c)     any accounts receivable and all proceeds of Seller other than the Assumed Contracts A/R;

(d)     all of the Seller's rights under this Agreement and/or other documents and agreements executed in connection with the Transactions contemplated herein;

(e)     any and all right, title, leasehold interest, leases and any other interest in and with respect to the following property (collectively known as the "Wo-Go Stations"): (i) Molly's Convenience Store and Wo-Go located at 35 Doe Run Road, Manheim, PA 17545; (ii) the Ephrata Wo-Go & Pacific Pride, located at 1634 W. Main Street, Ephrata, PA 17522; (iii) the Lancaster Wo-Go & Pacific Pride, located at 202 Greenfield Road, Lancaster, PA 17602; (iv) the Lititz Wo-Go and bulk underground storage facility, located at 746 Rothsville Road, Lititz, PA 17543; (v) the Harrisburg Wo-Go Station and bulk underground storage facility,

9

located at 854 South 16th Street, Harrisburg, PA 17104; (vi) the Elizabethtown Pacific Pride, located at 101 East Cherry Street, Elizabethtown, PA 17022; and (vii) the Mount Joy Pacific Pride, located at 30 Orchard Road, Mount Joy, PA 17552;

(f)     all tangible personal property associated with the Wo-Go Stations, including, but not limited to, all machinery, equipment, storage tanks and vessels, pumps, dispensers, displays, spare parts, signage, industry memorabilia, tools, vehicles, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, other miscellaneous supplies and other tangible personal property of any kind, including, without limitation, that set forth on Schedule 2.2(f);

(g)     all intercompany obligations, liabilities and indebtedness between the Debtors including, but not limited to, any and all promissory notes between the Debtors, any Affiliates and/or insiders and any note indebtedness owed to Debtors by any Affiliates or insiders;

(h)     any (i) confidential personnel and medical records pertaining to any Employee of the Debtors; (ii) other books and records that Trustee determines are necessary or advisable to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Debtors or any of the Purchased Assets; (iii) minute books, stock or membership interest records and corporate seals; and (iv) documents relating to proposals to acquire the Purchased Assets by Persons other than Purchaser; (v) documents prepared primarily in connection with the transactions contemplated by the Term Sheet dated as of July 26, 2018, by and between Purchaser and Trustee (the "Term Sheet");

(i)     all Tax losses and Tax loss carry forwards of the Debtors and the rights to receive Tax refunds, credits and credit carry forwards with respect to any Taxes of the Debtors;

(j)     any claim, right or interest of the Seller and the Debtors in or to any refund, rebate, abatement or other recovery for Taxes of the Debtors, together with any interest due thereon or penalty rebate arising therefrom, and all Tax credits and other Tax attributes of the Debtors, for the Pre-Closing Tax Period, but only to the extent the Tax in respect of which such refund or reimbursement is made was not borne by Purchaser or any of its Affiliates;

(k)     all insurance policies or rights to proceeds thereof relating to the Purchased Assets;

(l)     any stock or other equity interests in Debtors or any subsidiaries or Affiliates of the Debtors;

10

(m)     all claims, actions, liabilities, debts, demands, damages and causes of action, whatsoever, whether in law or in equity, whether known or unknown, which the Seller and/or the Debtors have, may have had, may have in the future accrue to them, arising out of or in connection with, in whole or in part, and relating to the Debtors including, any and all claims, actions, liabilities, debts, demands, damages and causes of action against any of the Debtors' subsidiaries, Affiliates, predecessors and successors in interest, insiders, members, managers, officers, directors, shareholders, investors, employees, representatives, professionals, consultants, accountants, servants, attorneys or other agents;

(n)     all avoidance actions and other causes of action under the Bankruptcy Code or similar state insolvency law;

(o)     all assets, fixtures, furniture, machinery, equipment, properties, interests and rights of the Seller or the Debtors which were previously sold, transferred, conveyed, including, but not limited to, the assets of Debtor Ranck Plumbing, Heating & Air Conditioning, Inc., or otherwise abandoned; and

(p)     all laptops.

2.3     "AS IS, WHERE IS" SALE.

(a)     EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 3 BELOW, THE PURCHASED ASSETS ARE BEING SOLD IN AN "AS IS" CONDITION, ON A "WHERE IS" BASIS AND "WITH ALL FAULTS" AS OF THE CLOSING DATE (AS DEFINED BELOW), AND SUCH SALE IS WITHOUT RECOURSE, REPRESENTATION, OR WARRANTY OF ANY KIND TO OR BY THE SELLER, WHETHER EXPRESS, IMPLIED OR IMPOSED BY LAW, WHICH RECOURSE, REPRESENTATIONS, AND WARRANTIES (EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 3 BELOW) ARE HEREBY EXPRESSLY DISCLAIMED BY PURCHASER.

(b)     PURCHASER ACKNOWLEDGES THAT IT IS FULLY RELYING ON ITS OWN (OR ITS REPRESENTATIVES') INSPECTIONS, EXAMINATIONS AND EVALUATIONS OF THE REAL ESTATE AND NOT UPON ANY STATEMENTS (ORAL OR WRITTEN) THAT MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY THE DEBTORS OR SELLER OR ANY OF THEIR RESPECTIVE REPRESENTATIVES, AGENTS OR ATTORNEYS. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS (OR PURCHASER'S REPRESENTATIVES HAVE), OR PRIOR TO THE CLOSING DATE WILL HAVE, THOROUGHLY INSPECTED AND EXAMINED THE REAL ESTATE TO THE EXTENT DEEMED NECESSARY BY PURCHASER IN ORDER TO ENABLE PURCHASER TO EVALUATE THE CONDITION OF THE REAL ESTATE AND ALL OTHER ASPECTS OF THE REAL ESTATE (INCLUDING, BUT NOT LIMITED TO,

11

THE ENVIRONMENTAL CONDITION OF THE REAL ESTATE), AND PURCHASER ACKNOWLEDGES THAT PURCHASER IS RELYING SOLELY UPON ITS OWN (OR ITS REPRESENTATIVES') INSPECTION, EXAMINATION AND EVALUATION OF THE REAL ESTATE AND IS QUALIFIED TO MAKE SUCH INSPECTION, EXAMINATION AND EVALUATION. AS A MATERIAL PART OF THE CONSIDERATION OF THIS AGREEMENT AND THE PURCHASE OF THE ACQUIRED OWNED REAL PROPERTY, PURCHASER HEREBY AGREES TO ACCEPT THE ACQUIRED OWNED REAL PROPERTY ON THE CLOSING DATE IN ITS "AS IS, WHERE IS" CONDITION, WITH ALL FAULTS AND, WITHOUT REPRESENTATIONS AND WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES AGREE THAT THE SALE OF THE ACQUIRED OWNED REAL PROPERTY IS WITHOUT ANY WARRANTY, AND THAT THE SELLER AND DEBTORS HAVE NOT MADE ANY, AND EXPRESSLY AND SPECIFICALLY DISCLAIM ANY AND ALL, REPRESENTATIONS, GUARANTIES OR WARRANTIES, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW OR RELATING TO THE ACQUIRED OWNED REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, OF OR RELATING TO: (A) THE OWNERSHIP, USE, INCOME, POTENTIAL, EXPENSES, OPERATION, CHARACTERISTICS OR CONDITION OF THE ACQUIRED OWNED REAL PROPERTY OR ANY PORTION THEREOF, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF SUITABILITY, HABITABILITY, MERCHANTABILITY, DESIGN OR FITNESS FOR ANY SPECIFIC PURPOSE OR A PARTICULAR PURPOSE; (B) THE NATURE, MANNER, OR CONDITION (PHYSICAL, STRUCTURAL OR OTHERWISE) OF THE ACQUIRED OWNED REAL PROPERTY, OR THE SURFACE OR SUBSURFACE THEREOF, WHETHER OR NOT OBVIOUS, VISIBLE OR APPARENT; (C) THE ENVIRONMENTAL CONDITION OF THE ACQUIRED OWNED REAL PROPERTY AND THE PRESENCE OR ABSENCE OF OR CONTAMINATION BY HAZARDOUS MATERIALS, OR THE COMPLIANCE OF THE ACQUIRED OWNED REAL PROPERTY WITH ALL REGULATIONS OR LAWS PERTAINING TO HEALTH OR THE ENVIRONMENT, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL LAWS; AND (D) THE SOIL CONDITIONS, DRAINAGE, FLOODING CHARACTERISTICS, UTILITIES OR OTHER CONDITIONS EXISTING IN, ON OR UNDER THE ACQUIRED OWNED REAL PROPERTY. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

2.4    Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the liabilities and obligations of Seller or the Business related to or arising under all (i) Purchased Assets, including, without limitation, the Assumed Contracts, Permits, and Intellectual Property Rights, that accrue after the Closing, (ii) liabilities related to the Permitted Encumbrances,

12

(iii) one half of the Transfer Taxes, and (iv) any and all liabilities for Taxes, if any, attributable to Purchaser's ownership of the Purchased Assets after the Closing Date (collectively, the "Assumed Liabilities") in each case, but in no event to include any Liabilities or obligations of any Debtor or its Affiliates that relate to any breach of representation, warranty, covenant or agreement that arose on or prior to the Closing Date.

2.5   Excluded Liabilities.   Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Claim against or obligation of Seller or Debtors of whatever nature, whether presently in existence or arising hereafter. All such other Claims and obligations, whether known or unknown, direct or contingent, in litigation or threatened, or not yet asserted, shall be retained by and remain obligations and Liabilities of Seller or Debtors (all such Liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

(a)   all Liabilities related to any Excluded Assets;

(b)   Trade Payables;

(c)   all Liabilities for (i) Taxes of Seller and (ii) any Taxes relating to or arising from the Business or one or more Purchased Assets for any Pre-Closing Tax Periods, provided that this shall exclude Transfer Taxes, which are addressed in Section 7.2;

(d)   all Post-Retirement Liabilities;

(e)   all Employee Benefit Plans and all Liabilities thereunder; and

(f)   any Liability based on successor liability theories, including, without limitation, product liability claims.

2.6   Assumption/Assignment of Contracts and Rights.

(a)   To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts shall be assumed by Seller and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code. If such assignment is not effectuated pursuant to the Approval Order, Seller shall, at the request of Purchaser, seek an Order from the Bankruptcy Court after the Closing Date to assign such Assumed Contract to Purchaser. All Cure Costs relating to the Assumed Contracts shall be paid by Seller.

(b)   Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract that, after giving effect to the provisions of Section 365 of the Bankruptcy Code, is not assignable or transferable without the consent of any Person, other than the Debtors, Seller and Purchaser, to the extent that such consent shall not have been given prior to the Closing, provided, however, that the Seller and Debtors shall use, whether

13

before or after the Closing, reasonable efforts to obtain all necessary consents to the assignment and transfer thereof.

2.7 Consideration; Allocation of Consideration.

(a) In addition to the assumption of the Assumed Liabilities, the aggregate consideration (the "Purchase Price") for the sale, transfer and delivery of the Purchased Assets, at the Closing, shall be Eight Million One Hundred Thousand Dollars ($8,100,000) payable as follows: (i) Eight Hundred Ten Thousand Dollars ($810,000) (the "Deposit") payable upon the execution of this Agreement and (ii) Seven Million Two Hundred Ninety Thousand Dollars ($7,290,000) payable at the Closing.

(b) Purchaser and Seller agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with the allocation schedule (the "Allocation Schedule") to be mutually determined by Purchaser and Seller on or before the Closing. Purchaser and Seller shall (and shall cause their respective Affiliates to) file all Tax Returns (including IRS Form 8954) and other Tax-related information reports in a manner consistent with the Allocation Schedule and not take any position inconsistent with such Allocation Schedule in any Tax-related audit, examination or other proceeding (whether administrative or judicial) unless required by applicable Law. If any Party receives any notice from a Taxing Authority in respect of an audit, examination or other proceeding (whether administrative or judicial) regarding any allocation of the Purchase Price or otherwise proposing an allocation different from the Allocation Schedule, such Party shall notify the other Parties of such notice and provide such other Parties with a copy of such notice, and the Parties hereto shall cooperate with each other in good faith regarding the resolution of any such matter.

(c) Following the Approval Hearing and up to Closing, Purchaser shall inspect the Purchased Assets to confirm that they are present and accounted for. If Purchaser determines that there are vehicles or fuel inventory that are listed on Schedule 2.1(h) and Schedule 2.1(c), respectively, but are missing ("Missing Assets") with an aggregate value determined in good faith that exceeds Thirty Thousand Dollars ($30,000), Purchaser may make a written demand on Seller for reimbursement and credit against the Purchase Price for the aggregate value of such Missing Assets that exceeds Thirty Thousand Dollars ($30,000), and further describing such Missing Assets in reasonable detail and the expected location or quantity (a "Reimbursement Demand"). Upon receipt of a Reimbursement Demand, Seller shall have up to Closing to investigate the Missing Assets. If Seller agrees with the Reimbursement Demand, or fails to oppose the Reimbursement Demand (as described in the following sentence), such reimbursement for the amount that exceeds Thirty Thousand Dollars ($30,000) shall be made as a credit against the Purchase Price at Closing. If Seller opposes the Reimbursement Demand, it shall notify Purchaser in writing prior to Closing, and describe its opposition in reasonable detail. If Purchaser and Seller are unable to resolve Seller's opposition to the Reimbursement Demand, either party may submit its

14

claim to the Bankruptcy Court for disposition as its sole means of recourse. If Seller has vehicles or fuel inventory wherever located that are not listed on Schedule 2.1(h) and Schedule 2.1(c), respectively (the "Additional Assets") with an aggregate value determined in good faith that exceeds Thirty Thousand Dollars ($30,000), the Purchase Price shall be increased by the aggregate value of such Additional Assets that exceeds Thirty Thousand Dollars ($30,000).

2.8    Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, PA 19103-3222 on the date of the Approval Order, or at such other time or place as Purchaser and Seller may agree.    The Parties may mutually agree to consummate the Closing electronically.

2.9    Deliveries by Seller. At the Closing, Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)    the Approval Order;

(b)    a Bill of Sale, Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit A (the "Assignment and Assumption Agreement"), duly executed by Seller;

(c)    duly executed quitclaim deeds transferring fee simple title to the Acquired Owned Real Property to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(d)    originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto);

(e)    physical possession of all of the Purchased Assets capable of passing by delivery, with the intent that title in such Purchased Assets shall pass by and upon delivery;

(f)    a duly executed assignment agreement or agreements transferring the Intellectual Property Rights to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(g)    an affidavit from Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance satisfactory to Purchaser, issued pursuant to Section 1445 of the Code and the Treasury regulations thereunder stating that Seller is not a foreign person as defined in Section 1445 of the Code;

(h)    certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

15

(i)     all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing pursuant to this Agreement, in each case in form and substance reasonably acceptable to Seller.

2.10    Deliveries by Purchaser. At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

(a)     any unpaid portion of the Purchase Price;

(b)     the Assignment and Assumption Agreement, duly executed by Purchaser; and

(c)     all other documents, instruments and writings reasonably requested by Seller to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

3.      **Representations and Warranties of Seller.** Subject to the terms, conditions and limitations set forth in this Agreement, Seller hereby represents and warrants to Purchaser as of the date of this Agreement as follows:

3.1     Power. Subject to the entry of an Approval Order (as defined below) by the Bankruptcy Court, Seller has full legal capacity, right, power and authority to enter into this Agreement.

3.2     Authorization. The execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions are within Seller's powers and have been duly authorized by all necessary actions on the part of Seller. Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Cases, this Agreement constitutes a valid and binding agreement of Seller that is enforceable in accordance with its terms.

3.3     Governmental Authorization. The execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions by Seller require no action by or in respect of, or filing with, any Governmental Authority other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

3.4     Non-contravention. Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Cases, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions do not and will not, to the Knowledge of Seller (a) assuming compliance with the matters referred to in Section 3.3, violate any applicable Law or (b) result in the creation or imposition of any Lien on any Purchased Asset, except for Assumed Liabilities, Permitted Encumbrance, or Liens that will be released at or prior to Closing.

3.5     Required Consents. Except as disclosed on Schedule 3.5 (which may be modified prior to the Closing Date), and except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, to the Knowledge of Seller, there

16

is no agreement or other instrument binding upon Seller requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement.

3.6     Litigation.     Except as disclosed on Schedule 3.6 and except for the Bankruptcy Cases, as of the date hereof, there is no action, suit, investigation or legal or administrative proceeding pending or, to the Knowledge of Seller, threatened against or affecting, the Purchased Assets (by any Governmental Authority or Person), including real estate tax assessment appeals, which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

3.7     Permits.   Schedule 2.1(f) sets forth a list of all Permits required to conduct and operate the Business in a manner consistent with the pre-Petition Date practices of the Debtors. Except as set forth on Schedule 3.7, to the Knowledge of the Seller, no written notice of violation of any Permit has been received from any Governmental Authority, and no proceeding is pending seeking to revoke or limit any such Permit.

3.8     Compliance with Laws and Court Orders.  Seller is not in material violation of any Law applicable to the Purchased Assets or the conduct of the Business.

3.9     Intellectual Property Rights.     To the Knowledge of Seller, (a) Schedule 2.1(g) sets forth an accurate and complete list of all registered Intellectual Property Rights included in the Purchased Assets, and (b) there are no outstanding challenges to the ownership and use by Seller of the Intellectual Property Rights, nor any alleged infringements of such Intellectual Property Rights by third parties. To the Knowledge of Seller, none of the Intellectual Property Rights included in the Purchased Assets has been licensed by Seller to any other Person.

3.10    Environmental Matters.  To the Knowledge of Seller, and other than as described on Schedule 3.10: (a) neither the Seller nor the Debtors have received any notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the Acquired Owned Real Property which remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Acquired Owned Real Property which remains unperformed, and (b) the Acquired Owned Real Property is in compliance, in all respects, with applicable Environmental Laws.

3.11    Real Property.  Schedule 2.1(a) sets forth the address and description of all Acquired Owned Real Property. With respect to each parcel of Acquired Owned Real Property, to the Knowledge of Seller and except as set forth on Schedule 2.1(a), (a) there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Acquired Owned Real Property; (b) there are no outstanding options, rights of first offer or rights of first refusal to purchase such Acquired Owned Real Property (other than the right of Purchaser pursuant to this Agreement), or any portion thereof or interest therein; and (c) there are no condemnation or eminent domain proceedings pending or threatened with respect to all or any part of the Acquired Owned Real Property.

17

3.12 <u>Employment Matters and Employee Benefits</u>. To the Knowledge of Seller, (a) <u>Schedule 3.12</u> sets forth a complete and accurate list of Seller's Employee Benefit Plans; (b) with respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law; (c) there are no pending audits or investigations by any Governmental Authority involving any Employee Benefit Plan, and there are no pending or threatened claims (except for individual claims for benefits payable in the normal operation of the Employee Benefit Plans), suits or proceedings involving any Employee Benefit Plan, any trust or other funding medium thereof, fiduciary thereof or service provider thereto, nor is there any reasonable basis for any such claim, suit or proceeding; and (d) the Debtors have performed all material obligations required to be performed by them and are not in any material respect in default under or in violation of any Employee Benefit Plan, nor has there been any such material default or violation by any other party to any Employee Benefit Plan.

3.13 <u>Taxes</u>. To the Knowledge of Seller, all Tax Returns (including any IRS Forms W-2 or Forms 1099) required to be filed by or on behalf of the Debtors (or any predecessor of the Debtors) and all Tax Returns required to be filed in respect of any Purchased Asset have been timely filed; *provided, however*, Seller makes no representations regarding the accuracy of such Tax Returns.

3.14 <u>Sufficiency of and Title to the Purchased Assets</u>. Seller will have at Closing good and marketable title to, or a valid leasehold interest in (or license or other right to use), all the Purchased Assets.

3.15 <u>Insurance</u>. As of the date hereof, to the Knowledge of Seller, all material property and liability insurance policies set forth on <u>Schedule 3.15</u> are in full force and effect, and no written notice of cancellation, termination or revocation or other written notice that any such insurance policy is no longer in full force or effect or that the issuer of any such insurance policy is not willing or able to perform its obligations thereunder has been received by Seller. All premiums due and payable on such insurance policies have been paid in full.

3.16 <u>Service of Bankruptcy Documents</u>. Seller shall appropriately and timely serve all parties in interest with copies of the Sale and Bidding Procedures Motion and applicable notices as may be required by the Federal Rules of Bankruptcy Procedure and Local Rules of the Bankruptcy Court.

3.17 <u>Certain Fees</u>. No agent, broker, investment banker or other person or firm acting on behalf of Seller or the Debtors, or under her or their authority is or will be entitled to any broker's or finder's fee or any other commission or similar fee or the reimbursement of expenses, directly or indirectly, from Seller in connection with this Agreement or the Transactions.

Except as specifically set forth in this <u>Section 3</u>, Seller does not make any representations or warranties of any kind to Purchaser.

18

4.    **Representations and Warranties of Purchaser.** Purchaser represents and warrants to Seller as follows:

4.1    Organization. Purchaser is a Delaware limited liability company duly organized, validly existing and in good standing and has all requisite authority to carry on its business.

4.2    Corporate Authorization. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions are within the requisite power and authority of Purchaser and have been duly authorized by all necessary actions on the part of Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

4.3    Governmental Authorization. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a material effect on Purchaser or its ability to close the Transactions.

4.4    Non-contravention. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of organizational documents of Purchaser; (b) require any filing with, or the obtaining of any Permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, Seller.

4.5    Litigation. There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

4.6    Adequacy of Funds. Purchaser has and at the time of Closing will have available to it on an unconditional basis cash proceeds in an amount sufficient to satisfy its monetary and other obligations under this Agreement, including, without limitation, the obligation to pay the Purchase Price in accordance herewith.

19

5.     **Covenants of Seller.** Seller agrees that:

5.1     Access to Information. From the date hereof until the earlier of the termination of this Agreement pursuant to Section 9.1 or the Closing Date, Seller shall reasonably afford to Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal business hours) to and all properties, books, accounts, records and documents of, or relating to, the Business.

5.2     Sales of *De Minimis* Assets. From the execution of the Term Sheet through the Closing Date, Seller shall cease all asset sales, including *de minimis* asset sales, through the Bankruptcy Court or otherwise.

5.3     Notices of Certain Events. Seller shall promptly notify Purchaser of:

(a)     any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b)     any material written communication from any Governmental Authority in connection with or relating to the Transactions; and

(c)     the commencement of any actions, suits, investigations or proceedings relating to Seller, the Debtors, any Purchased Asset or the Business that, if pending on the date of this Agreement, would have resulted in a breach of any representation contained in Section 3.

6.     **Covenants of Purchaser and Seller.** Purchaser and Seller agree that:

6.1     Efforts; Further Assurances. Subject to the terms and conditions of this Agreement, Purchaser and Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the Transactions contemplated by this Agreement. Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

6.2     Certain Filings. Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking to timely obtain any such actions, consents, approvals or waivers.

20

6.3    Bankruptcy Issues.

(a)    Filing of Sale and Bidding Procedures Motion.  Within three (3) Business Days of the date of this Agreement, Seller shall file with the Bankruptcy Court a motion (the "Sale and Bidding Procedures Motion") seeking, among other things, the entry of (i) the Approval Order, and (ii) an Order (the "Bidding Procedures Order") approving the bidding and auction procedures set forth in Sections 6.3(b) and (c) (the "Bidding Procedures").

(b)    Bidding Procedures.  In the Sale and Bidding Procedures Motion, Seller shall seek, among other things, approval of the following Bidding Procedures, which shall be incorporated into the Bidding Procedures Order:

(i)    Bidding Deadline.  Any third party (other than Purchaser) (a "Bidder") must submit a bid (the "Bid") in accordance with the terms of the Bidding Procedures so that the Bid is actually received by each of the Notice Parties no later than 10:00 a.m. (prevailing Eastern time) on September 13, 2018 (the "Bid Deadline").  Written copies of all Bids shall be delivered by the Bid Deadline to:  (A) counsel to Seller, Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, PA  19103-3222, Attn:  Michael Menkowitz, Esq., mmenkowitz@foxrothschild.com; (B) counsel to the Purchaser, Vedder Price P.C., 222 N. LaSalle Street, Chicago, IL 60601, Attn: Michael M. Eidelman, Esq., meidelman@vedderprice.com; and (C) counsel to Fulton Bank, N.A., Reed Smith LLP, 3 Logan Square, Suite 3100, 1717 Arch Street, Philadelphia, PA 19103, Attn: Brian M. Schenker; (D) (collectively, the "Notice Parties").  A Bid received after the Bid Deadline shall not constitute a Qualified Bid.  A Bid shall be delivered to all Notice Parties at the same time.  Seller shall deliver to the Notice Parties, at least forty-eight (48) hours prior to the Auction, written confirmation from the Seller that she has a good faith basis to believe the Bidder has a sufficient commitment for financing pursuant to Section  6.3(b)(ii)(D) hereof.  Interested Bidders requesting information about the qualification process, including a copy of this Agreement, and information in connection with their due diligence, should contact Seller's counsel at the above address.

(ii)    Designation as Qualified Bidder.    To participate in the Auction, a Bidder must submit a Bid that is determined by Seller to satisfy each of the following conditions (a "Qualified Bid" and the entity submitting such Qualified Bid, a "Qualified Bidder"):

(A)    Written Submission of Modified APA and Commitment to Close.  Bidders must submit a Bid by the Bid Deadline in the form of an executed mark-up of this Agreement (each a "Modified APA") reflecting such Bidder's proposed changes to this Agreement (together with a blackline of the Modified APA against this Agreement), and a written and binding commitment to close on the terms and conditions

21

set forth therein. Seller may discuss the Modified APA of any Bidder after submission with such Bidder including, for clarification, the terms and conditions of the Modified APA. Each Modified APA shall (I) have substantially similar terms and conditions (provided that no Bid other than this Agreement may provide for payment of any break-up fee, expense reimbursement, or similar type of payment) as this Agreement except with higher and better consideration; and (II) contain terms and conditions in the aggregate no less favorable to the Debtors' estates than the terms and conditions in this Agreement; provided, however, the Seller shall have the sole discretion to sell the Debtors' assets in the lots described in Section 6.3(c)(iv) (each, a "Lot Bid") in accordance with the Bidding Procedures Order and the Bidding Procedures. In order for a Modified APA to be deemed a Qualified Bid, it must provide for the acquisition of all of the Purchased Assets or contain a Lot Bid;

(B)     Irrevocable. A Bid must be irrevocable until four (4) Business Days after entry of the approval order, 2018 (the "Termination Date");

(C)     Contingencies. A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence. Any other contingencies associated with a Bid may not, in the aggregate, be materially more burdensome than those set forth in this Agreement;

(D)     Financing Sources and Evidence of Financial Ability to Close. A Bid must identify the actual Bidder and owners and ultimate parent company of the Bidder and contain written evidence of a commitment for financing or other evidence of the ability to fund and consummate the Sale on or before a closing date satisfactory to Seller with appropriate contact information for such financing or funding sources;

(E)     No Fees Payable to Bidder. A Bid may not request, be conditioned on or otherwise entitle the Bidder (other than Purchaser) to any break-up fee, expense reimbursement or similar type of payment. A Bidder shall be deemed to waive the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid or the Bidding Procedures;

(F)     Good-Faith Deposit. Each Bid must be accompanied by a cash deposit in an amount equal to ten (10%) percent in cash of the cash and the value of the non-cash purchase price allocated to the Purchased Assets under the Modified APA, which shall be paid to Seller to be held in an escrow account established at United Bank, ABA Number 211170318; Account No. 710000007408; Name: Worley & Obetz, Inc.; Reference – Christine C. Shubert, Trustee in accordance with the Bidding Procedures;

22

(G) <u>Minimum Initial Overbid</u>. The aggregate consideration in a Bid must have (I) a cash purchase price for the Purchased Assets of the amount payable for the Purchased Assets under this Agreement, being Eight Million One Hundred Thousand Dollars ($8,100,000), <u>plus</u> (II) the amount of the Bid Protection, <u>plus</u> (III) the amount of the Break-Up Fee (the "<u>Minimum Initial Overbid</u>");

(H) <u>List of Executory Contracts and Unexpired Leases</u>. Each Bid must be accompanied by a list of Debtors' executory and unexpired leases that the Bidder desires to assume and a packet of information, including financial information, that will be provided to the non-Debtor parties to such executory contracts and unexpired leases sufficient to demonstrate adequate assurance of future performance; and

(I) <u>Fulton Bank</u>. Notwithstanding anything set forth hereunder, Fulton Bank, N.A. shall automatically be deemed to be a Qualified Bidder hereunder without taking any actions otherwise required to be taken under this <u>Section 6.3</u>, shall have consultation rights throughout the Bid process, shall have the right to attend and participate at the Auction without having submitted a Qualified Bid, and shall be a third-party beneficiary to the Bid procedure in the same way as Purchaser. Notwithstanding anything set forth hereunder, nothing herein shall alter or modify the rights of Fulton Bank, N.A. under section 363(k) of the Bankruptcy Code; <u>provided</u>, <u>however</u>; (i) Fulton Bank N.A. shall not exercise its credit bid rights to make the Minimum Initial Overbid; and (ii) any credit bid by Fulton Bank shall contain a stipulation and agreement with Seller providing for the consensual use of cash collateral by Seller to pay the Break-Up Fee to Purchaser and Fulton Bank shall enter into a stipulation and agreement with Seller that Fulton Bank shall pay all amounts due under the First Amended Stipulation and Order.

(iii) <u>Due Diligence from Bidders</u>. Each Qualified Bidder shall comply with all reasonable requests for additional information by Seller regarding such Bidder and its contemplated transaction. Failure by a Bidder to comply with requests for additional information will be a basis for Seller to determine that the Bidder is not a Qualified Bidder. Seller acknowledges that Purchaser is a Qualified Bidder and that this Agreement constitutes a Qualified Bid.

(c) <u>Auction</u>. The Seller shall conduct an auction sale of the Purchased Assets to determine the highest and/or best Bid with respect to the Purchased Assets (the "<u>Auction</u>") only if she receives, prior to the Bid Deadline, (1) a Qualified Bid (other than this Agreement) for the entirety of the Purchased Assets or (2) a combination of Lot Bids (each of which must be a Qualified Bid) providing for, in the aggregate, a Purchase Price that exceeds the Minimum Initial Overbid. The Auction shall commence on September 17, 2018, at 9:00 a.m. (Eastern Standard Time) at the offices of Fox Rothschild LLP, 2000 Market Street, 20th Floor,

23

Philadelphia, PA 19103. If no such Qualified Bid(s) is/are received by the Bid Deadline, then the Auction shall not take place, Purchaser shall be declared the Successful Bidder, and Seller shall seek approval of, and authority to consummate, this Agreement and the Transactions at the Approval Hearing. If a Qualified Bid(s) is/are received in accordance with these Bidding Procedures, the Auction shall be conducted according to the following procedures:

(i)     Participation at the Auction.  Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction.  For greater certainty, Purchaser is a Qualified Bidder and eligible to participate at the Auction.  Only the authorized representatives (including counsel and other advisors) of each of the Purchaser, Qualified Bidders and Seller and any other party in interest or its representative who provide Seller with written notice forty-eight (48) hours prior to the Auction shall be permitted to attend the Auction.  During the Auction, the bidding shall begin with the highest Qualified Bid (the "Opening Bid") and each subsequent round of bidding shall continue in minimum increments of at least the Subsequent Overbid Increment.  At least one (1) Business Day prior to the start of the Auction, Seller shall provide a copy of the Opening Bid to all participating Qualified Bidders attending the Auction and a blackline of the Opening Bid to this Agreement.  Seller shall select the Opening Bid, in her discretion. The determination of which Qualified Bid constitutes the Opening Bid shall take into account any factors Seller reasonably deems relevant to the value of the Qualified Bid to Seller including, among other things, the following: (A) the amount and nature of the consideration;  (B) the proposed assumption of liabilities, if any;  (C) the ability of the Qualified Bidder to close the proposed transaction;  (D) the proposed closing date and the likelihood, extent and impact of any potential delays in closing;  (E) any purchase price adjustments;  (F) the impact of the contemplated transaction on any actual or potential litigation;  (G) the net economic effect of any changes from this Agreement, if any, contemplated by the contemplated transaction documents (the "Contemplated Transaction Documents"); (H) the net after-Tax consideration to be received by Seller;  (I) the net amounts to be paid to the Debtors' estates, taking into account, among other things, payment of the Break-Up Fee and Cure Costs; and (J) such other considerations as Seller deems relevant in her reasonable business judgment (collectively, the "Bid Assessment Criteria").

(ii)     Authority to Bid.  All representatives of Qualified Bidders who submit any bids at the Auction shall represent on the record that they have authority to bid and that the Bid they submit is binding on the Qualified Bidder.

(iii)     Conduct of the Auction.  Seller and her advisors shall direct and preside over the Auction.  All Bids made after the Opening Bid shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all

24

other Qualified Bidders that are participating in the Auction. Each Qualified Bidder will be permitted a fair, but limited amount of time to respond to each Overbid. Seller shall maintain a transcript of the Opening Bid and all Overbids made and announced at the Auction, including the Successful Bid and the Back-up Bid;

(iv)   Lots. Qualified Bidders may submit a Lot Bid for one (1) or more of the following Lots and the associated assets listed below, to the extent they are not expired or revoked:

(1).   Lot No. 1 – Worley & Obetz, Inc., Retail Division. Lot No. 1 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Retail Division, which was engaged in the business of delivery of heating oil to local residences, and diesel, kerosene, and gasoline fuel to local farms and businesses. Such assets include certain (a) real property located across the street from 85 White Oak Road, Manheim, PA 17545 (Tax Parcel No. 500-04089-0-0000), and any building structure and improvements thereon, and all personal property and fuel inventory located on the premises to the extent personal property is not assigned and/or included in other lots/divisions, (b) real property located at 24 New Charlotte Street, Manheim, PA 17545, and any building, warehouse, structure, and improvements thereon, and all personal property and fuel inventory located on the premises to the extent personal property is not assigned and/or included in other lots/divisions, (c) two (2) leases for tank storage, (d) other storage and skid tanks, (e) access to Cargas Energy system for customer information and location, (f) retail tankwagon trucks and any fuel inventory located therein, and (g) other related assets used in the business operations of Worley & Obetz, Inc.'s Retail Division.

(2).   Lot No. 2 – Worley & Obetz, Inc., Propane Division. Lot No. 2 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Propane Division, which was engaged in the business of delivery of propane fuel to local residences, local farms and businesses. Such assets include (a) three (3) propane tank storage property leases, (b) certain customer tanks owned by Worley & Obetz, Inc., (c) certain bulk storage tanks and any fuel inventory included therein, (d) various customer supply and delivery agreements, (e) access to Cargas Energy system for customer information and location, (f) certain propane tank parts and installation equipment, (g) two (2) 2018 Ford F-350 Supercab propane crane trucks, (h) one (1) 2015 Peterbilt 348 retail propane truck and any fuel inventory located therein, (i) one (1) 2017 Peterbilt retail propane truck and any fuel inventory located therein, (j) certain retail propane trucks, propane utility trucks, propane crane tricks, and trailers for propane tanks and any fuel or other

25

inventory located therein, and (k) other related assets used in the business operations of Worley & Obetz, Inc.'s Propane Division.

(3).    Lot No. 3 – Worley & Obetz, Inc., Service & Installation Division. Lot No. 3 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Service & Installation Division, which was engaged in the business of installation and maintenance of residential and small commercial HVAC systems for commercial customers, which systems utilize heating oil and propane, electric heat pumps, or natural gas. Such assets include (a) certain HVAC service equipment, parts and sundry inventory stored at 85 White Oak Road, Manheim, PA, (b) certain service contracts for customer HVAC systems, (c) access to Cargas Energy system for customer information and location, (d) one (1) 2017 Ford Transit 250 Service Van and any HVAC service part inventory located therin, (e) certain service vans and utility trailers and any HVAC service part inventory located therein, and (f) other related assets used in the business operations of Worley & Obetz, Inc.'s Service & Installation Division.

(4).    Lot No. 4 – Worley & Obetz, Inc., Value Energy North Division. Lot No. 4 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Value Energy North Division, which was engaged in the business of (a) delivery of heating oil and propane to local residences, and diesel, kerosene, and gasoline fuel to local farms and businesses, and (b) maintenance and service of residential HVAC systems. Such assets include (a) leases for the office space located at 318 N. Elmer Avenue and 417 North Lehigh Street, Sayre, PA 18840, (b) one (1) propane storage property tank lease, (c) one (1) copier lease, (d) certain customer tanks owned by Worley & Obetz, Inc., (e) certain bulk storage tanks and any fuel inventory located therein, (f) certain HVAC equipment and supplies used for the maintenance and service residential customer HVAC systems, (g) certain miscellaneous truck parts and maintenance equipment, (h) access to Cargas Energy system for customer information and location, (i) one (1) 2017 Peterbilt retail propane truck and any fuel inventory located therein, (j) certain service vans, retail tankwagons, retail propane trucks, employee trucks and vehicles and any fuel or HVAC service part inventory located therein, and (k) other related assets used in the business operations of Worley & Obetz, Inc.'s Value Energy North Division.

(5).    Lot No. 5 – Worley & Obetz, Inc., Value Energy South Division. Lot No. 5 consists of substantially all of the assets necessary to operate W&O's Value Energy South Division, which was engaged in the business of delivery of heating oil and propane to local residences, and diesel, kerosene, and gasoline fuel to local farms and

26

businesses. Such assets include (a) access to Cargas Energy system for customer information and location, (b) one (1) 2015 Peterbilt 348 retail tankwagon and any fuel inventory located therein, (c) certain retail propane trucks and retail tankwagons and any fuel inventory located therein, and (d) other related assets used in the business operations of Worley & Obetz, Inc.'s Value Energy South Division.

(6).    Lot No. 6 – Worley & Obetz, Inc., Fleet Fueling Division. Lot No. 6 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Fleet Fueling Division, which was engaged in the business of delivery of gasoline, diesel and diesel exhaust fluid to customer sites and directly into customer fuel trucks. Such assets include (a) access to Fleetcor system for customer information and location, (b) 6,500 gallon diesel exhaust fluid storage tank and any inventory located therein, (c) two (2) 2018 Mack GU713 fleet fueling trucks and any fuel inventory located therein, (d) certain fleet fueling trucks, fleet fueling diesel exhaust fluid delivery trucks and vans, and utility trailer and any fuel inventory located therein, and (e) other related assets used in the business operations of Worley & Obetz, Inc.'s Fleet Fueling Division.

(7).    Lot No. 7 – Worley & Obetz, Inc., Wholesale Division. Lot No. 7 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Wholesale Division, which was engaged in the business of delivery of gasoline, diesel and propane to resellers and large users. Such assets include (a) six (6) leases for truck parking lots at various locations, (b) one (1) lease for electronic logs with Vendor Services Group, (c) access to Cargas Energy system for customer information and location, (d) two (2) 2019 Peterbilt 567 Wholesale Tractors, (e) two (2) 2019 Heil Tank Trailers and any fuel inventory located therein, (f) one (1) 2007 Heil Petroleum Tank Trailer and any fuel inventory located therein, (g) two (2) 2014 Peterbilt 388 wholesale tractors, (h) one (1) 2014 Freightliner Coronado wholesale tractor, (i) three (3) 2016 Freightliner Coronado wholesale tractors, (j) three (3) 2014 Heil DOT 406 wholesale tank trailers and any fuel inventory located therein, (k) one (1) 2017 Heil DOT 406 wholesale tank trailer and any fuel inventory located therein, (l) seven (7) International wholesale tractors (years 1999, 2007, 2010 (2), 2015, 2016), (m) seven (7) Heil Trailer wholesale tank trailers (years 2001 (2), 2002 (2), 2012, 2013, and 2014) and any fuel inventory located therein, (n) three (3) 2015 Heil Trailer wholesale tank trailers and any fuel inventory located therein, (o) two (2) 2017 Freightliner CA125DC wholesale tractors, (p) one (1) 2017 Mack CXU613 wholesale tractor, (q) one (1) 2017 Westmor Proline MC-331 wholesale propane trailer and any fuel

27

inventory located therein, (r) one (1) 2016 Beall Petroleum Trailer and any fuel inventory located therein, (s) certain wholesale tractors, wholesale tank trailers, wholesale propane trailers, and utility trailers and any fuel inventory located therein, and (t) other related assets used in the business operations of Worley & Obetz, Inc.'s Wholesale Division.

(8).     Lot No. 8 – Worley & Obetz, Inc., Pickup Truck Passenger Vehicles. Lot No. 8 consists of Pickup Truck Passenger Vehicles owned by Worley & Obetz, which vehicles include (a) five (5) Ford F-150 (years 2001, 2013, 2013, 2015, and 2016), (b) four (4) Ford F-250 (years 2003, 2011, 2014, and 2015), (c) one (1) 2008 Ford F-150 Supercab, (d) three (3) Dodge Ram 1500 (years 2014 (1) and 2015 (2)), (e) one (1) 2017 Dodge Ram 2500, and (f) one (1) 2007 Dodge Dakota.

(9).     Lot No. 9 – Worley & Obetz, Inc., Premium Passenger Vehicles. Lot No. 9 consists of Premium Passenger Vehicles owned by Worley & Obetz, which vehicles include (a) six (6) Jeep Grand Cherokee (years 2014 (2) and 2015 (4)), (b) one (1) 2015 Jeep Cherokee, (c) one (1) 2015 Audi Q7, (d) one (1) 2008 Cadillac Escalade, (e) one (1) 2013 Volkswagen Toureg, (f) one (1) 2018 Range Rover, and (g) one (1) 2016 Ford Explorer.

(10).    Lot No. 10 – Worley & Obetz, Inc., Economy Passenger Vehicles. Lot No. 10 consists of Premium Passenger Vehicles owned by Worley & Obetz, which vehicles include (a) seven (7) Ford Escape (years 2010 (2), 2016 (2), 2017 (3)), (b) two (2) 2018 Chevrolet Equinox, (c) one (1) 2005 Jeep Liberty Sport, (d) one (1) 2008 Jeep Cherokee, (e) one (1) 2003 Ford Excursion, (f) one (1) 2015 Chevrolet Cruze, and (g) one (1) 2017 Chevrolet Bolt.

(11).    Lot No. 11 – Amerigreen Propane, LLC, Wholesale Division. Lot No. 11 consists of substantially all of the assets necessary to operate Amerigreen Propane, LLC's Wholesale Division, which was engaged in the business of wholesale sales of propane to other petroleum distributors. Such assets include (a) certain terminal transloader agreements, (b) certain propane throughput agreements, (c) fuel inventory located at certain third party locations, (d) access to Cargas Energy system for customer information and location, (e) one (1) truck and one (1) trailer for transloader owned by Amerigreen Propane, LLC, and (f) other related assets used in the business operations of Amerigreen Propane, LLC's Wholesale Division.

(12).    Lot No. 12 – Amerigreen Energy, Inc., Renewables Division. Lot No. 12 consists of substantially all of the assets necessary to operate

28

Amerigreen Energy, Inc.'s Renewables Division, which was engaged in the business of wholesale sales of renewable fuels, including biodiesel and ethanol, to other petroleum distributors. Such assets include certain (a) terminal service and throughput agreements at fifty (50) terminal locations, (b) biodiesel storage, blending, and throughput agreements, (c) fuel inventory located at certain third party locations, (d) access to Cargas Energy system for customer information and location, and (e) other related assets used in the business operations of Amerigreen Energy, Inc.'s Renewables Division.

(13).    Lot No. 13 – Amerigreen Energy, Inc., Petroleum Division. Lot No. 13 consists of substantially all of the assets necessary to operate Amerigreen Energy, Inc.'s Petroleum Division, which was engaged in the business of wholesale sales of diesel, heating oil and gasoline to other petroleum distributors. Such assets include (a) one (1) tank storage lease, (b) certain terminal agreements, (c) certain terminal throughput agreements, (d) certain terminal storage and throughput agreements, (e) fuel inventory located at certain third party locations, (f) certain marketing agreements, (g) access to Cargas Energy system for customer information and location, and (h) other related assets used in the business operations of Amerigreen Energy, Inc.'s Petroleum Division.

(14).    Lot No. 14 – Amerigreen Energy, Inc., Electricity Supply & Brokerage Divisions. Lot No. 14 consists of substantially all of the assets necessary to operate Amerigreen Energy, Inc.'s Electricity Supply & Brokerage Divisions, which were engaged in the businesses of (a) supplying electricity purchased from wholesale market for delivery to residential and commercial customers through public utility companies, and (b) brokerage for sale of electricity to residential and commercial customers for third party suppliers. Such assets include (a) certain unexpired brokerage contracts with future annuity payment stream, (b) brokerage area covering any deregulated electricity state, (c) access to utility billing information and brokerage contracts, and (d) other related assets used in the businesses of Amerigreen Energy, Inc.'s Electricity Supply & Brokerage Divisions.

(15).    Lot No. 15 – Amerigreen Energy, Inc., Natural Gas Division. Lot No. 15 consists of substantially all of the assets necessary to operate Amerigreen Energy, Inc.'s Natural Gas Division, which was engaged in the business of supplying natural gas purchased from wholesale market for delivery to residential and commercial customers through ten (10) public utility companies. Such assets include (a) the supply area for residential and commercial customers across Pennsylvania, New York and New Jersey, (b) access to utility

29

billing information and brokerage contracts, and (c) other related assets used in the business of Amerigreen Energy, Inc.'s Natural Gas Division.

(16). <u>Lot No. 16 – Amerigreen Energy, Inc., Passenger Vehicles</u>. Lot No. 16 consists of Passenger Vehicles owned by Amerigreen Energy, Inc., which vehicles include (a) six (6) Jeep Grand Cherokee (years 2010 (2), 2014 (3), and 2015), (b) two (2) 2016 Ford Escape, (c) one (1) 2015 Chevrolet Tahoe, and (d) one (1) 2011 Ford F-650 Box Truck.

(17). <u>Lot No. 17 – Worley & Obetz, Inc., Real Property and Improvements at 107 Maytown Road, Elizabethtown, PA</u>. Lot No. 17 consists of the real property located at 107 Maytown Road, Elizabethtown, PA, and all buildings, improvements, and personal property located thereon.

(18). <u>Lot No. 18 – Worley & Obetz, Real Property, Office Building, and Warehouse located at 85 White Oak Road, Manheim, PA 17545</u>. Lot No. 18 consists of the real property located at 85 White Oak Road, Manheim, PA 17545 (Tax Parcel No. 500-27334-0-0000), the office building, warehouse, and improvements thereon, and all personal property located on the premises to the extent personal property is not assigned and/or included in other lots/divisions. Lot No. 18 specifically excludes the retail storage area located across the street. Lot No. 18 also includes (a) one (1) electric motorcycle, (b) one (1) 2010 John Deere Gator, (c) one (1) custom motorcycle, (d) one (1) Hyster Towmotor forklift, and (e) one (1) 2014 John Deere Z950R LP Mower.

(v)    <u>Terms of Overbids</u>. An "<u>Overbid</u>" is any Bid made at the Auction subsequent to Sellers' announcement of (A) the Opening Bid, and (B) the then highest and/or best Overbid at the beginning of each subsequent round of bidding (the "<u>Round Leading Bid</u>"). To submit an Overbid, in any round of the Auction, a Qualified Bidder must comply with the following conditions:

(A)    <u>Subsequent Overbid Increment</u>. Any Overbid shall be made in increments of at least two hundred fifty thousand dollars ($250,000.00) (the "<u>Subsequent Overbid Increment</u>"). The amount of the Purchase Price of any Overbid shall not be less than the Purchase Price of the Opening Bid or the Round Leading Bid, as applicable.

(B)    <u>Remaining Terms the Same as for Qualified Bids</u>. Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid and the Minimum Initial Overbid requirements shall be replaced with the Subsequent Overbid Increment requirements set forth

30

above; provided, however, that the Bid Deadline shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until the Termination Date. Seller shall credit the amount of the Break-Up Fee to each and every Overbid submitted by Purchaser at the Auction, meaning that if Purchaser's subsequent Overbid is the Round Leading Bid, any subsequent Overbid must exceed Purchaser's Overbid by the amount of the Break-Up Fee and Subsequent Overbid Increment. To the extent not previously provided (which shall be determined by Seller), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement acceptable to Seller in her reasonable business judgment) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

(C) Announcing Overbids. At the start of each round of bidding, Seller shall announce the Round Leading Bid, the basis for calculating the total consideration offered in the Round Leading Bid, and the resulting benefit to Seller based on, among other things, the Bid Assessment Criteria.

(vi) Closing the Auction. Upon conclusion of the bidding, the Auction shall be closed, and Seller shall identify the highest and/or best Overbid or Opening Bid (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder"), and the next highest and/or best Overbid or Opening Bid, after the Successful Bid (the "Back-up Bid"), and advise the remaining Qualified Bidders of such determination. All bidding for the Purchased Assets will be concluded at the Auction and there will be no further bidding at the Bankruptcy Court hearing held in the Bankruptcy Cases to approve the highest or best bid for the Purchased Assets (the "Approval Hearing"). If the Successful Bidder fails to close on the Successful Bid, the Back-up Bid shall automatically be deemed to be the winning Bidder; provided, however, the Back-up Bid shall be recalculated to an amount that would have been the Successful Bid had the Successful Bidder not participated at the Auction, plus an additional $100,000.

(d) Consent to Jurisdiction as Condition to Bid. All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable. Qualified Bidders (other than Purchaser) shall not be deemed third party beneficiaries of these Bidding Procedures and shall not have standing to object to the administration of the Bidding Procedures by Seller.

(e) Reimbursement of Deposit; Break-Up Fee. Upon consummation of a sale of all or substantially all of the Purchased Assets to any third party (other

31

than Purchaser) who submits the Successful Bid for the Purchased Assets, upon the occurrence of the actions set forth in Section 9.1(a), 9.1(b), 9.1(d), or 9.1(f), or if Seller commits a material breach of this Agreement or unilaterally abandons consummation of the Transactions contemplated by this Agreement, Seller shall (i) pay to Purchaser in immediately available funds an amount equal to the Break-Up Fee, and (ii) refund the Deposit. The provisions of this Section 6.3(e) shall survive any termination of this Agreement. The Break-Up Fee shall be treated as a Chapter 7 administrative expense claim in the Bankruptcy Cases, and shall be paid to Purchaser upon the earlier to occur from (x) the closing of the sale of all or substantially all of the Purchased Assets to any third party (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Break-Up Fee), or (y) the Closing of the Bankruptcy Cases. The obligation to pay the Break-Up Fee and Deposit under this Agreement shall be absolute and unconditional and shall not be subject to any defense, claim, counterclaim, offset, recoupment or reduction of any kind whatsoever, provided, however, that, for the avoidance of doubt and notwithstanding anything herein to the contrary, the Break-Up Fee shall only be payable if approved by the Bankruptcy Court. Purchaser's right to the Break-Up Fee shall be the sole and exclusive remedy of Purchaser in the event Seller materially breaches this Agreement or if this Agreement is terminated by Seller.

(f)     Bankruptcy Court Approval of Sale. Seller and Purchaser shall each use their reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order (the "Approval Order") of the Bankruptcy Court in the Bankruptcy Cases in form and substance acceptable to Seller and Purchaser containing provisions, including without limitation, (i) approving this Agreement, (ii) authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code, (iii) authorizing the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, (iv) authorizing the Transactions, (v) approving the Break-Up Fee and Bid Protection and (vi) providing that this Agreement and the Transactions are undertaken by Purchaser and Seller at arm's length, without collusion, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, that Purchaser and Seller are entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code are not applicable. Seller and Purchaser shall cooperate with one another in good faith regarding pleadings that either of them intends to file, or positions either of them intends to take, with the Bankruptcy Court in connection with or that might reasonably affect the Bankruptcy Court's entry of the Approval Order.

6.4     Notices. If at any time (a) Purchaser becomes aware of any material breach by Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Seller, or (b) Seller becomes aware of any breach by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with Section 10.1, in writing of such breach. Upon such notice of breach, the breaching Party shall have until the earlier

32

of (y) ten (10) days after receiving such notice, and (z) the End Date, to cure such breach prior to the exercise of any remedies in connection therewith.

## 7.    Tax Matters.

7.1    Tax Cooperation.  Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of any Tax Returns, the making of any election relating to Taxes, the preparation for any audit or examination by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax.  Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business (each, a "Tax Claim"), provided that Seller shall (a) promptly notify Purchaser of any notice received in respect to any Tax Claim, (b) promptly notify Purchaser of any significant developments regarding such Tax Claim, (c) permit Purchaser (if Purchaser so chooses) to control the defense and/or resolution of any Tax Claim if any resolution or settlement of such Tax Claim reasonably could be expected to have an effect on Purchaser, any of Purchaser's Affiliates or any Purchased Asset for any taxable period, (d) take all actions and cooperation reasonably necessary in furtherance of the immediately preceding clause (c), and (e) not settle or otherwise resolve any Tax Claim without the prior written consent of Purchaser.

7.2    Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest thereon) incurred in connection with this Agreement (collectively, "Transfer Taxes") shall be split equally between Seller and Purchaser, and Purchaser shall file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other taxes and fees, and if required by applicable law, the Seller and the Debtors shall join in the execution of any such Tax Returns and other documentation.  The cost of filing any such tax returns shall be split equally between Seller and Purchaser.

7.3    Real Property Taxes.  Real estate Taxes and water and sewer rents, if any, shall be apportioned and pro-rated between Seller and Purchaser as of the Closing Date. All state, county and local realty, conveyance, recordation and/or documentary Transfer Taxes shall be split equally between the Purchaser and Seller. Any real estate Taxes not known or estimated at the Closing and/or real estate Taxes readjusted by municipal authorities after the Closing shall be re-prorated when the amount thereof becomes known.

7.4    Personal Property, Ad Valorem and Excise Taxes.  Purchaser shall not be liable for any unpaid personal property, ad valorem or excise taxes assessed or due to be paid prior to the Closing Date.

33

8.    **Closing Conditions.**

8.1    <u>Conditions to Obligations of Purchaser and Seller</u>. The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction at or before Closing of each and every one of the following conditions:

(a)    The Bankruptcy Court shall have entered the Approval Order in the Bankruptcy Cases, and the Bankruptcy Court shall have waived the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Approval Order, authorizing the Transactions and approving this Agreement under Sections 105(a), 363 and 365 of the Bankruptcy Code, in form and substance reasonably acceptable to Seller and Purchaser, and the Approval Order shall contain findings that Purchaser acquired the Purchased Assets in good faith, for fair value, in an arm's length transaction, and as of the Closing Date the Approval Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed; and

(b)    No injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

8.2    <u>Conditions to Obligations of Purchaser</u>. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)    Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date;

(b)    the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date);

(c)    Seller shall not be in default in any material respect under the provisions of this Agreement; and

(d)    Purchaser shall have received all of the documents required to be delivered by Seller under <u>Section 2.9</u>.

8.3    <u>Conditions to Obligations of Seller</u>. The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a)    Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

34

(b)     the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date);

(c)     Purchaser shall not be in default in any material respect under the provisions of this Agreement; and

(d)     Seller shall have received all of the documents required to be delivered by Purchaser under Section 2.10.

## 9.     Termination.

9.1     Grounds for Termination. This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of Seller and Purchaser;

(b)     by Seller or Purchaser, if the Closing shall not have been consummated on or before [●], 2018 (the "End Date"), unless the Party seeking termination is in breach of its obligations hereunder;

(c)     by Seller or Purchaser, if any condition set forth in Section 8.1 is not satisfied, and such condition is incapable of being satisfied by the End Date;

(d)     by Purchaser, if any condition set forth in Section 8.2 has not been satisfied, and such condition is incapable of being satisfied by the End Date;

(e)     by Seller, if any condition set forth in Section 8.3 has not been satisfied, and such condition is incapable of being satisfied by the End Date; or

(f)     by Seller, if (i) Seller executes a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Cases approving such definitive agreement.

The Party desiring to terminate this Agreement pursuant to this Section 9.1 (other than pursuant to Section 9.1(a)) shall give notice of such termination to the other Party in accordance with Section 10.1.

9.2     Effect of Termination. If this Agreement is terminated as permitted by Section 9.1, such termination shall be without Liability of any Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly provided in Section 6.3(e). The provisions of Section 6.3(e) shall survive any termination hereof pursuant to Section 9.1.

35

9.3    Fees and Expenses.  Except as otherwise set forth expressly herein, all costs and expenses incurred by the Parties in connection with obtaining Bankruptcy Court approval and consummation of this Agreement and the Transactions contemplated hereby shall be paid by the Party incurring such cost or expense.

**10.    Miscellaneous.**

10.1    Notices.  All notices, requests and other communications to any Party hereunder shall be in writing (including via electronic mail) and shall be given,

if to Purchaser, to:

> Wiggins Gas Propane & Alternative Fuels LLC
> c/o
> Vedder Price P.C.
> 222 North LaSalle Street
> Chicago, Illinois 60601
> Attention:  Michael M. Eidelman, Esq.
> e-mail:  meidelman@vedderprice.com

with a copy to (which shall not constitute notice):

> Vedder Price P.C.
> 222 North LaSalle Street
> Chicago, Illinois 60601
> Attention:  Michael M. Eidelman, Esq.
> e-mail:  meidelman@vedderprice.com

if to Seller, to:

> Christine C. Shubert
> 821 Wesley Avenue
> Ocean City, NJ 08226
> e-mail:  Christine.shubert@bmstrustee.onmicrosoft.com

with a copy to (which shall not constitute notice):

> Fox Rothschild LLP
> 2000 Market Street
> 20th Floor
> Philadelphia, PA  19103
> Attn:  Michael Menkowitz
> e-mail:  mmenkowitz@foxrothschild.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication

36

shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

10.2 <u>Limitation on Damages</u>. No Party shall be authorized to recover from the other Party any special, consequential, exemplary or punitive damages on account of any breach of this Agreement, AND ANY SUCH CLAIM, RIGHT, OR CAUSE OF ACTION FOR ANY SUCH DAMAGES IS HEREBY FULLY WAIVED, RELEASED AND FOREVER DISCHARGED.

10.3 <u>Waivers</u>. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative.

10.4 <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, however, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party; provided further that Purchaser shall have the right to designate one or more wholly owned subsidiaries or Affiliates to take title to the Purchased Assets at the Closing, so long as Purchaser remains liable for all of its obligations hereunder and provided such designation does not violate any consent or other approval which has been obtained by Seller.

10.5 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the Commonwealth of Pennsylvania and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

10.6 <u>Jurisdiction</u>.

(a) Prior to the closing of the Bankruptcy Cases, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 10.1</u> shall be deemed effective service of process on such Party.

37

(b) After the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the Commonwealth of Pennsylvania, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 10.1 shall be deemed effective service of process on such Party.

10.7 Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

10.8 No Third-Party Beneficiaries. Other than as set forth in Section 10.10(a), no provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

10.9 Entire Agreement; Amendments; Counterparts. This Agreement (including the Schedules and Exhibits hereto) sets forth the entire agreement between the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Seller. This Agreement may be executed in counterparts, each of which when taken together shall constitute an original. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto. In the event of any conflict or inconsistency between the statements in this Agreement and the Bidding Procedures, the statements in this Agreement shall control.

10.10 Pre-Petition Secured Party.

(a) Notwithstanding anything to the contrary herein, Fulton Bank, N.A. (the "Pre-Petition Secured Party") will be deemed a third-party beneficiary hereunder entitled to exercise and enforce any and all rights, powers, privileges and remedies of Seller pursuant to this Agreement or any other agreement, instrument or document executed in connection herewith. Without limiting the generality of

38

the foregoing, and notwithstanding anything to the contrary in this Agreement or in any other agreement, instrument or document executed in connection herewith, Seller will not exercise any right to terminate, or execute and deliver or otherwise provide any waivers, consents or amendments under, this Agreement or any of the other agreements, instruments or documents executed in connection herewith, without the prior written consent of the Pre-Petition Secured Party (which shall not be unreasonably withheld, conditioned or delayed).

(b)  Notwithstanding anything to the contrary in this Agreement or any other agreement, instrument or document executed in connection herewith, the Pre-Petition Secured Party (i) is not making any representations or warranties to any or all of Seller, Purchaser or any of their respective Affiliates in connection with this Agreement or any other agreement, instrument or document executed in connection herewith, or the transactions contemplated herein or therein, (ii) will not be liable to any Person for any breach by any or all of Seller, Purchaser or any of their respective Affiliates or any of their respective representations, warranties, covenants or other agreements in connection with this Agreement or any other agreement, instrument or document executed in connection herewith or any of the Transactions contemplated herein or therein, and (iii) will not have any obligations or liabilities under or in respect of any of this Agreement or any other agreement, instrument or document executed in connection herewith or any of the Transactions contemplated herein or therein, other than the release of any mortgages, security interests, Liens and the like. Without limiting the generality of the foregoing, provided the Approval Order is entered, under no circumstances will the Pre-Petition Secured Party be obligated to return or otherwise disgorge to or for the benefit of Purchaser or any Affiliate thereof any proceeds remitted to the Pre-Petition Secured Party, other than the Break-Up Fee (if applicable).

10.11  Headings: Interpretation.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement. Unless the context otherwise clearly requires, references herein to words importing the masculine gender shall include the feminine and neutral genders and vice versa.

*[Signature page follows.]*

39

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

WIGGINS GAS PROPANE &
ALTERNATIVE FUELS LLC

By: Barbara Bouchard
Name: Barbara Bouchard
Title: Authorized Representative

CHRISTINE C. SHUBERT, SOLELY IN
HER CAPACITY AS CHAPTER 7
TRUSTEE FOR THE ESTATES OF
WORLEY & OBETZ, INC., ET AL.

By:

ACTIVE\61006163.v15

# EXHIBIT A

Form of Bill of Sale, Assignment and Assumption Agreement

Exhibit A – Page 1

# Exhibit "C"

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| WORLEY & OBETZ, INC., *et al.*,[1] | : | Case No. 18-13774 (REF) |
| | : | (Jointly Administered) |
| | : | |
| | : | **AUCTION: Sept. 17, 2018 @ 9:00 a.m. ET** |
| | : | **@ Fox Rothschild LLP, 2000 Market Street,** |
| | : | **20th Floor, Philadelphia, PA 19103** |
| | : | |
| | : | **APPROVAL HEARING:** |
| Debtors. | : | **Hearing Date: Sept. 18, 2018 @ 11:00 a.m. ET** |
| | : | **Obj. Date: Sept. 10, 2018 @ 4:00 p.m. ET** |

## NOTICE OF BID DEADLINE, AUCTION AND APPROVAL HEARING FOR THE APPROVAL OF THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS

PLEASE TAKE NOTICE THAT on August 29, 2018, the United States Bankruptcy Court

for the Eastern District of Pennsylvania (the "Bankruptcy Court") entered an order (the "Bidding

Procedures Order") approving certain bidding and auction procedures (the "Bidding Procedures")

and related schedules and deadlines for the Sale by Christine C. Shubert (the "Trustee"), the

chapter 7 Trustee for the estates of Worley & Obetz, Inc., *et al.* (collectively, the "Debtors"), of

certain of the Debtors' assets and related personal property (the "Purchased Assets").

---

[1] The Debtors is these cases, along with the last four digits of their federal tax identification numbers are (i) Worley & Obetz, Inc. (6576) (Case No. 18-13774-REF); (ii) Americomfort, Inc. (7605) (Case No. 18-13775-REF); (iii) Ranck Plumbing Heating & Air Conditioning, Inc. (9625) (Case No. 18-13776-REF); (iv) Amerigreen Energy, Inc. (6284) (Case No. 18-13777-REF); (v) Advance Air, Inc. (8111) (Case No. 18-13778-REF); (vi) Amerigreen Energy Brokers, LLC (2358) (Case No. 18-13779-REF); (vii) Amerigreen Electricity, LLC (8977) (Case No. 18-13780-REF); (viii) Amerigreen Hedging Services, LLC (8549) (Case No. 18-13781-REF); (ix) Amerigreen Lubricants, LLC (7489) (Case No. 18-13782-REF); (x) Amerigreen Natural Gas, LLC (3222) (Case No. 18-13783-REF); and (xi) Amerigreen Propane, LLC (Case No. 18-13784-REF).

For purposes of the Sale and Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures, the Agreement, and the Transactions contemplated therein, (i) the defined term "Debtors" does not include Debtor Ranck Plumbing Heating & Air Conditioning, Inc. (Case No. 18-13776-REF), and (ii) the defined term "Purchased Assets" does not include and specifically excludes any and all assets, fixtures, furniture, machinery, equipment, properties, interests, and any other rights of Debtor Ranck Plumbing Heating & Air Conditioning, Inc.

PLEASE TAKE FURTHER NOTICE THAT all interested parties are invited to seek to become a Qualified Bidder and submit a Qualified Bid to purchase the Purchased Assets in accordance with the terms of the Bidding Procedures Order and the Bidding Procedures. Only Qualified Bidders who have submitted Qualified Bids shall be eligible to participate in the Auction. *All interested potential Bidders should carefully read the Bidding Procedures. All interested potential Bidders should contact counsel for the Trustee for a copy of the proposed Asset Purchase Agreement (the "Agreement") referenced in the Bidding Procedures.*[2]

PLEASE TAKE FURTHER NOTICE THAT the following dates and times shall apply with respect to the Bidding Procedures:

| | |
|---|---|
| **Bid Deadline:** | September 13, 2018 at 10:00 a.m. (prevailing ET) |
| **Auction:** | September 17, 2018 at 9:00 a.m. (prevailing ET) |
| **Approval Hearing:** | September 18, 2018 at 11:00 a.m. (prevailing ET) |
| **Sale Closing:** | On the Date of the Approval Order, or at such other time or place as Purchaser and Seller may agree |

PLEASE TAKE FURTHER NOTICE THAT PURSUANT TO 11 U.S.C. §§ 363(b) AND (f), THE PROPOSED SALE IS FREE AND CLEAR OF LIABILITIES (OTHER THAN ASSUMED LIABILITIES AND PERMITTED ENCUMBRANCES) OF OTHERS, AND ALL SUCH LIABILITIES SHALL ATTACH TO THE PROCEEDS OF THE SALE WITH THE SAME VALIDITY AND PRIORITY THAT EXISTED IMMEDIATELY PRIOR TO THE SALE.

PLEASE TAKE FURTHER NOTICE THAT the Bankruptcy Court shall hold a sale hearing (the "Approval Hearing") **on September 18, 2018 at 11:00 a.m. (Eastern Time)**, or such

---

[2] Any capitalized terms not defined herein shall have the meanings ascribed to them in the Agreement, Bidding Procedures Order and/or the Bidding Procedures.

other date and time as may be convenient to the Bankruptcy Court, or as may be announced at the Approval Hearing without further notice. At the Approval Hearing, the Trustee intends to request that the Bankruptcy Court enter an order approving, among other things, the Successful Bid for the Purchased Assets, and under that Approval Order the Trustee will transfer the Purchased Assets to the entity or entities submitting such Successful Bid (the "Successful Bidder") free and clear of Liabilities (other than Liabilities assumed by the Successful Bidder), including Assumed Contracts. At the Approval Hearing, the Bankruptcy Court may enter such orders as it deems appropriate under applicable law and as required by the circumstances and equities of the Bankruptcy Cases.

PLEASE TAKE FURTHER NOTICE THAT any objections to either (x) the Sale of the Purchased Assets to the proposed Purchaser under the Agreement, to the Successful Bidder at Auction under a Modified APA, the Agreement submitted by the proposed Purchaser, or to the Modified APA submitted by the Successful Bidder, or (y) the assumption and assignment of Assumed Contracts and Cure Costs amount shall (a) be in writing, (b) conform to the Bankruptcy Rules and Local Rules, (c) set forth the name of the objecting party, the nature and amount of any claims or interest held or asserted against the Debtors' estates or their properties, the basis for the objection and the specific grounds therefor and (d) be filed with the Court and served on the following (collectively, the "Objection Notice Parties"): (i) the Office of the United States Trustee, Attn: Dave P. Adams, Esq., 833 Chestnut Street, Suite 500, Philadelphia, PA 19107; (ii) counsel to the Trustee, Fox Rothschild LLP, Attn: Michael J. Menkowitz, Esq., 2000 Market Street, 20th Floor, Philadelphia, PA 19103, Email: mmenkowitz@foxrothschild.com; (iii) counsel to the Purchaser, Vedder Price, P.C., 222 N. LaSalle Street, Chicago, IL 60601, Attn: Michael M. Eidelman, Esq., Email: meidelman@vedderprice.com; (iv) counsel to Fulton Bank, N.A., Reed

3

Smith LLP, Attn: Brian M. Schenker, 1717 Arch Street, Suite 3100, Philadelphia, PA 19103, Email:bschenker@reedsmith.com; (v) counsel for the Purchaser; and (vi) counsel for the Successful Bidder, so as to be received no later than **4:00 p.m. (Eastern Time) on September 10, 2018** (the "Approval Objection Deadline").

**PLEASE TAKE FURTHER NOTICE THAT any entity failing to timely file and serve an objection on the Objection Notice Parties before the expiration of the Approval Objection Deadline and otherwise in accordance with the Bidding Procedures Order shall be barred and prohibited from asserting at the Approval Hearing or at any time thereafter any objection to the Sale and Bidding Procedures Motion, the consummation and performance of the Sale as contemplated by the terms of the Agreement or Modified APA submitted by the Successful Bidder, including the transfer of the Purchased Assets free and clear of all liens, claims, encumbrances and interests ("Liabilities") (other than any Assumed Liabilities by the Successful Bidder), or the proposed Cure Costs and the assumption, sale and assignment of any Assumed Contract to the Successful Bidder.**

PLEASE TAKE FURTHER NOTICE THAT if a copy of the Sale and Bidding Procedures Motion to approve the Sale of the Purchased Assets is not enclosed, you may obtain a copy by contacting counsel for the Trustee at the address set forth above.

PLEASE TAKE FURTHER NOTICE THAT this Notice is subject to the full terms and conditions of the Bidding Procedures and the Bidding Procedures Order, which shall control in the event of any conflict, and the Trustee encourages parties in interest to review such documents in their entirety.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER NOTICE OR HEARING.

Respectfully submitted

**FOX ROTHSCHILD LLP**

By: /s/ *Jason C. Manfrey*
Michael G. Menkowitz
Jason C. Manfrey
Jesse M. Harris
2000 Market Street, Twentieth Floor
Philadelphia, PA 19103-3291
Phone (215) 299-2000/Fax (215) 299-2150
*Counsel for Christine C. Shubert,*
*Chapter 7 Trustee for the Debtors*

Dated:

# Exhibit "D"

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| WORLEY & OBETZ, INC., *et al.*,[1] | : | Case No. 18-13774 (REF) |
| | : | (Jointly Administered) |
| Debtors. | : | |

## NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

TO:   ALL NON-DEBTOR PARTIES TO CONTRACTS AND/OR LEASES WITH DEBTORS WORLEY & OBETZ, INC., *et al.*

PLEASE TAKE NOTICE THAT on August 29, 2018, the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order") approving certain bidding and auction procedures (the "Bidding Procedures") and related schedules and deadlines for the Sale by Christine C. Shubert (the "Trustee"), the chapter 7 Trustee for the estates of Worley & Obetz, Inc., *et al.* (collectively, the "Debtors"), of certain of the Debtors' assets and related personal property (the "Purchased Assets") and the procedure for the fixing of the cure costs (the "Cure Costs") related to the Trustee's assumption,

---

[1] The Debtors is these cases, along with the last four digits of their federal tax identification numbers are (i) Worley & Obetz, Inc. (6576) (Case No. 18-13774-REF); (ii) Americomfort, Inc. (7605) (Case No. 18-13775-REF); (iii) Ranck Plumbing Heating & Air Conditioning, Inc. (9625) (Case No. 18-13776-REF); (iv) Amerigreen Energy, Inc. (6284) (Case No. 18-13777-REF); (v) Advance Air, Inc. (8111) (Case No. 18-13778-REF); (vi) Amerigreen Energy Brokers, LLC (2358) (Case No. 18-13779-REF); (vii) Amerigreen Electricity, LLC (8977) (Case No. 18-13780-REF); (viii) Amerigreen Hedging Services, LLC (8549) (Case No. 18-13781-REF); (ix) Amerigreen Lubricants, LLC (7489) (Case No. 18-13782-REF); (x) Amerigreen Natural Gas, LLC (3222) (Case No. 18-13783-REF); and (xi) Amerigreen Propane, LLC (Case No. 18-13784-REF).

For purposes of this Notice of Assumption and Assignment, the Sale and Bidding Procedures Motion, the Bidding Procedures, the Agreement, and the Transactions contemplated therein, (i) the defined term "Debtors" does not include Debtor Ranck Plumbing Heating & Air Conditioning, Inc. (Case No. 18-13776-REF), and (ii) the defined term "Purchased Assets" does not include and specifically excludes any and all assets, fixtures, furniture, machinery, equipment, properties, interests, and any other rights of Debtor Ranck Plumbing Heating & Air Conditioning, Inc.

sale and assignment of certain executory contracts and unexpired leases (the "Assumed Contracts") as set forth herein.

PLEASE TAKE FURTHER NOTICE that the Trustee will assume, sell and assign the Assumed Contracts to the Successful Bidder under the terms of the Asset Purchase Agreement, as submitted by the Successful Bidder after the Auction (as amended, together with the exhibits and schedules thereto, the "Agreement"),[2] as determined under the Bidding Procedures Order. In addition, under the Agreement, Qualified Bidders, and ultimately, the Successful Bidder, may designate any contract listed on Schedule A1 (which is attached hereto) (the "Contracts") to be included as an Assumed Contract at any time after the Auction, if one is held, and up to two (2) Business Days before the Approval Hearing in accordance with the Bidding Procedures and the Agreement.[3] Accordingly, any Qualified Bidder, and ultimately the Successful Bidder, may elect to assume or not assume any of the Contracts at any time after the Auction, if one is held, and up to two (2) Business Days before the Approval Hearing, in accordance with the Bidding Procedures and the Agreement, in which case the contents of the Assumed Contracts list contained herein and the Contracts list in Schedule A1 will change. A supplemental and revised notice in the same form as this Notice of Assumption and Assignment will be filed with the Bankruptcy Court and served on all affected non-Debtor counter-parties to the Contracts and shall identify any such changes. Any Contract that becomes an Assumed Contract will be assumed, sold and assigned to the

---

[2] Any capitalized terms not defined herein shall have the meanings ascribed to them in the Agreement, the Bidding Procedures and/or the Bidding Procedures Order, unless otherwise noted herein.

[3] The Agreement provides that the Successful Bidder may elect to assume or not assume any of the Assumed Contracts and/or any of the Contracts, not previously rejected pursuant to 11 U.S.C. § 365; provided, however, that the Successful Bidder may advise the Trustee of additions or deletions to the contents of the Assumed Contracts list contained herein and Contracts list in Schedule A1 up to two (2) Business Days before the Approval Hearing. Any changes to the contents of the Assumed Contracts list contained herein and the Contracts list in Schedule A1, will require the Trustee to file and serve a supplemental and revised notice in the same form as this Notice on all affected non-Debtor counter-parties to the Contracts, which such notice shall identify any changes.

2

Successful Bidder under the terms and conditions of the Agreement submitted by the Successful Bidder.

PLEASE TAKE FURTHER NOTICE that the Trustee believes that any and all defaults (other than the commencement of these Bankruptcy Cases) and actual pecuniary losses in respect of particular Assumed Contracts will be cured by the payment of the respective Cure Costs set forth in the following chart and, in respect of any Contract that is designated as an Assumed Contract, by payment of the respective Cure Cost set forth for each Contract on Schedule A1.

## CHART OF CURE AMOUNTS FOR ASSUMED CONTRACTS

| Assumed Contract Counter-Party | Assumed Contract Descriptions | Assumed Contract Cure Cost |
|---|---|---|
| *None at this time* | *None at this time* | |
| | | |

PLEASE TAKE FURTHER NOTICE THAT the following procedures shall apply with respect to the Assumed Contracts:

1.  Except as otherwise provided herein, all objections to the assumption, sale and assignment of any Assumed Contract or to any Cure Cost (each, an "Assumption and/or Cure Objection") must be in writing, state with specificity the nature of such objection and the amount of cure being claimed by the objecting party with appropriate documentation in support thereof.

2.  If an Assumption and/or Cure Objection is timely filed, served, and challenges a Cure Cost set forth above in this Notice of Assumption and Assignment or on Schedule A1 (for any Contract that is subsequently designated as an Assumed Contract), such objection must set forth the amount of cure being claimed by the objecting party (the "Claimed Cure Cost") with appropriate documentation in support thereof. Upon receipt of a timely filed and served objection to a Cure Cost, the Trustee shall include in a post-closing cure reserve amount (the "Post-Closing Cure Reserve Amount") an amount equal to the Claimed Cure Cost, which amount may be released and paid to such counterparty by the Trustee after the Cure Cost is fixed by the Bankruptcy Court or agreed upon by the Trustee and the objecting party as the Claimed Cure Cost. So long as the Claimed Cure Cost shall have been set aside in an escrow account (the "Escrow Account"), the Trustee shall be authorized, without further delay, to assume, sell and assign the Assumed Contract that is the subject of such Cure Objection to the Successful Bidder. Due to the

3

timing and nature of the Sale process set forth in the Bidding Procedures and the Bidding Procedures Order, non-Debtor parties to Assumed Contracts may file objections to adequate assurance of future performance under the Assumed Contracts at the Approval Hearing.

3. An Assumption and/or Cure Objection, must be filed with the Bankruptcy Court and served upon the Objection Parties (as defined below) so as to be actually received by no later than **4:00 p.m. (Eastern Time) on September 10, 2018** (the "Approval Objection Deadline"). An Assumption and/or Cure Objection must be served on the following (collectively, the "Objection Notice Parties"): (i) the Office of the United States Trustee, Attn: Dave P. Adams, Esq., 833 Chestnut Street, Suite 500, Philadelphia, PA 19107; (ii) counsel to the Trustee, Fox Rothschild LLP, Attn: Michael J. Menkowitz, Esq., 2000 Market Street, 20th Floor, Philadelphia, PA 19103, Email: mmenkowitz@foxrothschild.com; (iii) counsel to the Purchaser, Vedder Price, P.C., 222 N. LaSalle Street, Chicago, IL 60601, Attn: Michael M. Eidelman, Esq., Email: meidelman@vedderprice.com; (iv) counsel to Fulton Bank, N.A., Reed Smith LLP, Attn: Brian M. Schenker, 1717 Arch Street, Suite 3100, Philadelphia, PA 19103, Email:bschenker@reedsmith.com; (v) counsel for the Purchaser; and (vi) counsel for the Successful Bidder. An Assumption and/or Cure Objection may be heard by the Bankruptcy Court at the hearing (the "Approval Hearing") **on September 18, 2018 at 11:00 a.m. (Eastern Time)** or such other date and time as the Trustee may schedule with the Bankruptcy Court.

4. If no objection to the Cure Cost or the proposed assumption, sale and assignment in respect of an Assumed Contract is timely filed and served: (i) the Trustee may assume, sell and assign to the Successful Bidder such Assumed Contracts, (ii) the Cure Cost set forth in this Notice of Assumption and Assignment shall be binding upon the respective non-Debtor party to the Assumed Contract for all purposes in these Bankruptcy Cases, and (iii) the respective non-Debtor party shall be forever barred from objecting to the assumption, sale and assignment of the relevant Assumed Contract and/or Cure Cost, and from asserting against the Trustee or the Successful Bidder any right of setoff, condition to assignment and/or any additional cure or other amount with respect to such Assumed Contract.

5. The effective date of any assumption, sale and assignment of any Assumed Contract shall be the Closing (as defined in the Agreement). Accordingly, any Cure Cost to be paid under any Assumed Contract shall be paid in accordance with the Agreement with the Successful Bidder, upon or as soon as reasonably practicable after the Closing Date or as soon thereafter as the Cure Cost is fixed by the Court or agreed upon by the Trustee, the Successful Bidder, and the objecting party.

4

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE OF ASSUMPTION AND ASSIGNMENT, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT NOTICE OR HEARING.

Respectfully submitted

**FOX ROTHSCHILD LLP**

By: */s/ Jason C. Manfrey*
Michael G. Menkowitz
Jason C. Manfrey
Jesse M. Harris
2000 Market Street, Twentieth Floor
Philadelphia, PA 19103-3291
Phone (215) 299-2000/Fax (215) 299-2150
*Counsel for Christine C. Shubert,*
*Chapter 7 Trustee for the Debtors*

Dated: