## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| WORLEY & OBETZ, INC., *et al.*,[1] | : | Case No. 18-13774 (REF) |
| | : | (Jointly Administered) |
| Debtors. | : | **Hearing Date: Sept. 18, 2018 at 11:00 a.m.** |
| | : | **Obj. Deadline: Sept. 10, 2018 at 4:00 p.m.** |
| | : | **Related D.I.: 353 & 373** |

## ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS AND ENCUMBRANCES; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING CERTAIN RELATED RELIEF

Upon consideration of the Motion of Christine C. Shubert (the "Trustee"), the Chapter 7

Trustee for the estates of Worley & Obetz, Inc., et al. (the "Debtors"), for (I) an Order

(A) Approving Bidding Procedures, Including Break-Up Fee and Expense Reimbursement;

(B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Notice Thereof; and

(C) Approving Procedures to Fix Cure Amounts Related to Assumption and Assignment of Certain

Executory Contracts and Unexpired Leases and Approving Notice Thereof; and (II) an Order

Approving (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens,

Interests, Claims and Encumbrances and (B) the Assumption, Sale and Assignment to Purchaser

---

[1] The Debtors is these cases, along with the last four digits of their federal tax identification numbers are (i) Worley & Obetz, Inc. (6576) (Case No. 18-13774-REF); (ii) Americomfort, Inc. (7605) (Case No. 18-13775-REF); (iii) Ranck Plumbing Heating & Air Conditioning, Inc. (9625) (Case No. 18-13776-REF); (iv) Amerigreen Energy, Inc. (6284) (Case No. 18-13777-REF); (v) Advance Air, Inc. (8111) (Case No. 18-13778-REF); (vi) Amerigreen Energy Brokers, LLC (2358) (Case No. 18-13779-REF); (vii) Amerigreen Electricity, LLC (8977) (Case No. 18-13780-REF); (viii) Amerigreen Hedging Services, LLC (8549) (Case No. 18-13781-REF); (ix) Amerigreen Lubricants, LLC (7489) (Case No. 18-13782-REF); (x) Amerigreen Natural Gas, LLC (3222) (Case No. 18-13783-REF); and (xi) Amerigreen Propane, LLC (Case No. 18-13784-REF).

For purposes of this Sale and Bidding Procedures Motion, this Bidding Procedures Order, the Bidding Procedures, the Agreement, and the Transactions contemplated therein, (i) the defined term "Debtors" does not include Debtor Ranck Plumbing Heating & Air Conditioning, Inc. (Case No. 18-13776-REF), and (ii) the defined term "Purchased Assets" does not include and specifically excludes any and all assets, fixtures, furniture, machinery, equipment, properties, interests, and any other rights of Debtor Ranck Plumbing Heating & Air Conditioning, Inc.

of Certain Contracts of Debtors [Dkt. No. 353] (the "Motion") dated August 24, 2018 for, *inter alia*, entry of an order (the "Order") (A) approving the sale (the "Sale") of the Purchased Assets[2], free and clear of all liens, security interests, other interests, claims (as defined under the Bankruptcy Code) and encumbrances (collectively, the "Encumbrances and Interests") except for Permitted Encumbrances, except to the extent set forth in the Asset Purchase Agreement (as defined below), pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (B) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Contracts") as more fully described in that certain Asset Purchase Agreement dated September 13, 2018 (the "Asset Purchase Agreement") by and between the Trustee and Diesel Direct Holdings, Inc. (or its assignee, the "Purchaser") for the purchase of the Purchased Assets; and (C) granting certain related relief, and the Trustee having determined that the highest and otherwise best offer for the Sale of the Purchased Assets submitted at the Auction was made by the Purchaser in the form of the Asset Purchase Agreement; and this Court having held a hearing on September 18, 2018 (the "Sale Hearing") to approve the Asset Purchase Agreement; and the Court having reviewed and considered (i) the Motion, (ii) the objections thereto, if any, and (iii) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors, and other parties in interest; and upon the record of the Sale Hearing and these Chapter 7 Cases (defined below); and after due deliberation thereon; and good cause appearing therefor, it is hereby

---

[2] Capitalized terms not defined below shall have the meaning ascribed to such terms in the Asset Purchase Agreement.

**FOUND AND DETERMINED THAT:**[3]

A.   **Jurisdiction and Venue**.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  Venue of these cases and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

B.   **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion are Sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Bankruptcy Rules.

C.   **Petition Date**.  On June 6, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (these "Chapter 7 Cases").

D.   **Entry of Bidding Procedures Order**.  On August 29, 2018, this Court entered an order (the "Bidding Procedures Order") [Dkt. No. 373] (i) approving bidding and auction procedures (the "Bidding Procedures"); (ii) approving a Break-Up Fee and proposed expense reimbursement and bid protections to the Purchaser in accordance with the Asset Purchase Agreement; (iii) scheduling an auction (the "Auction") and the Sale Hearing (the "Sale Hearing") regarding the Sale of the Purchased Assets; (iv) permitting credit bidding pursuant to Section 363(k) of the Bankruptcy Code under certain circumstances; (v) establishing procedures for noticing and determining cure amounts (the "Cure Amounts"); (vi) approving the form and manner of notice of all procedures, protections, schedules and agreements; and (vii) granting certain related relief.

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, when appropriate. See Fed. R. Bankr. P. 7052.

E.      **Compliance with Bidding Procedures Order**.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Trustee marketed the Purchased Assets and conducted the sale process in compliance with the Bidding Procedures Order and the Auction was duly noticed and conducted in a non-collusive, fair and good-faith manner.  The Trustee and her professionals have actively marketed the Purchased Assets since the Petition Date, have conducted the sale process in compliance with the Bidding Procedures Order and have afforded potential purchasers a full and fair opportunity to make higher and better offers.

F.      **Notice**.  As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Sale, the assumption and assignment procedures for the Assumed Contracts (including the objection deadline with respect to any Cure Amount) and the assumption and assignment of the Assumed Contracts and the Cure Amounts has been provided in accordance with Sections 102(l), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and in compliance with the Bidding Procedures Order, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale or the assumption and assignment of the Assumed Contracts or the Cure Amounts is or shall be required.

G.      **Power and Authority**.  (i) the Trustee has full power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, (ii) the Trustee has the power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, (iii) the Trustee has taken all action necessary to authorize and approve the Asset Purchase Agreement and the consummation of the transactions contemplated thereby and (iv) no

consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Debtors to consummate such transactions.

H.    **Opportunity to Object**.    A fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including (a) all potential buyers previously identified or solicited by the Trustee and any additional parties who have previously expressed an interest in potentially acquiring some or all of the Purchased Assets, (b) the proposed Purchaser and its counsel, (c) all other potentially interested parties identified by the Trustee and her professionals, (d) the Office of the United States Trustee for the Eastern District of Pennsylvania, (e) each non-Debtor counterparty to the Debtors' executory contracts and unexpired leases (f) all parties who have requested notice in the Debtors' bankruptcy cases under Fed. R. Bankr. P. 2002, (g) Fulton Bank, N.A. ("Fulton Bank") and its counsel, (h) all parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Purchased Assets, (i) the Internal Revenue Service, (j) the Attorney General for the State of Pennsylvania, (k) the United States Attorney's Office, (l) all applicable federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested in the Motion and (m) the Securities and Exchange Commission.

I.    **Sale in Best Interest**.    Consummation of the Sale of the Purchased Assets at this time is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

J.    **Business Justification**.    Sound business reasons exist for the Sale. Entry into the Asset Purchase Agreement constitutes the Trustee's exercise of sound business judgment, and such acts are in the best interests of each Debtor, its estate and all parties in interest. The Court finds that the Trustee articulated good and sufficient business reasons justifying the Sale. Such business

reasons include, but are not limited to, the following: (i) the Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets; and (ii) the Asset Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Purchased Assets and avoid any further decline and devaluation of the Purchased Assets.

K.     **Arm's-Length Sale**. The Asset Purchase Agreement was negotiated, proposed and entered into by the Trustee and the Purchaser without collusion, in good faith and from arm's-length bargaining positions. Neither the Trustee nor the Purchaser has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under Section 363(n) of the Bankruptcy Code.

L.     **Good-Faith Purchaser**. The Purchaser is a good-faith purchaser for value and, as such, is entitled to all of the protections afforded under Section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and non-bankruptcy law. The Purchaser has been and will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Asset Purchase Agreement.

M.     **Consideration**. The consideration provided by the Purchaser for the Purchased Assets pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof or the District of Columbia.

N.     **Free and Clear**. The Trustee may sell the Purchased Assets free and clear of all Encumbrances and Interests (other than Permitted Encumbrances) because, with respect to each creditor asserting a lien, claim, encumbrance or interest, one or more of the standards set forth in

Section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Encumbrances and Interests who did not object or withdrew objections to the Sale are deemed to have consented to the Sale pursuant to Section 363(f)(2) of the Bankruptcy Code.

O.    **Assumption of Executory Contracts and Unexpired Leases**. The (i) transfer of the Purchased Assets to the Purchaser and (ii) assignment to the Purchaser of the Assumed Contracts will not subject the Purchaser to any liability whatsoever prior to the Closing Date (defined below) under the laws of the United States, any state, territory, or possession thereof or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust, successor or transferee liability. The Trustee has demonstrated that it is an exercise of her sound business judgment to assume and assign the Assumed Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Contracts is the best interests of the Debtors, their estates and their creditors. The Assumed Contracts being assigned to the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser and, accordingly, such assumption and assignment of Assumed Contracts is reasonable, enhances the value of the Debtors' estates and does not constitute unfair discrimination.

P.    **Cure/Adequate Assurance**. The Trustee, in accordance with the Asset Purchase Agreement, has cured, or will cure from proceeds of the Sale, any monetary default existing prior to the date hereof under any of the Assumed Contracts. The Purchaser has provided adequate assurance of future performance of and under the Assumed Contracts within the meaning of Section 365(b)(1)(C) of the Bankruptcy Code.

Q.     **Prompt Consummation**.  The Sale of the Purchased Assets must be approved and consummated promptly in order to preserve the value of the Purchased Assets.  Therefore, time is of the essence in consummating the Sale, and the Trustee and the Purchaser intend to close the Sale as soon as possible.

R.     **No Intentional Fraudulent Transfer**.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof or the District of Columbia.

S.     **Purchaser Not an Insider and No Successor Liability**.  The Purchaser is not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders exists between the Purchaser and the Debtors.  Pursuant to the Asset Purchase Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets, and the Purchaser is not holding itself out to the public as a continuation of the Debtors.  The Sale does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or to the Debtors' estates.

T.     **Legal, Valid Transfer**.  The transfer of the Purchased Assets to the Purchaser will be a legal, valid and effective transfer of the Purchased Assets and will vest the Purchaser with all right, title and interest of the Debtors to the Purchased Assets free and clear of all Encumbrances and Interests, except as expressly set forth in the Asset Purchase Agreement.

U.   **Asset Purchase Agreement Not Modified**.  The terms of the Asset Purchase Agreement, including any amendments, supplements and modifications thereto, are fair and reasonable in all respects, and the terms of the Order shall not modify the terms of the Asset Purchase Agreement.

It is therefore **ORDERED, ADJUDGED AND DECREED EFFECTIVE IMMEDIATELY THAT:**

**General Provisions**

      1.     The Motion is GRANTED and APPROVED as set forth herein.

      2.     All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are overruled on the merits and denied with prejudice.

**Approval of the Sale of the Purchased Assets**

      3.     The Asset Purchase Agreement, substantially in the form attached hereto as **Exhibit "A"**, including any amendments, supplements and modifications thereto, and all of the terms and conditions therein, is hereby approved in all respects.

      4.     Pursuant to Section 363(b) of the Bankruptcy Code, the Sale of the Purchased Assets to the Purchaser free and clear of all Encumbrances and Interests (except those specifically permitted by the Asset Purchase Agreement), and the transactions contemplated thereby, are approved in all respects.

      5.     Except as otherwise specifically provided in the Asset Purchase Agreement, the Purchaser shall not be liable for any Claims (as defined in Section 101 of the Bankruptcy Code) against the Debtors or any of their predecessors or affiliates, and the Purchaser shall have no successor or vicarious liability of any kind or character (including, without limitation, any of the Excluded Liabilities set forth in Section 2.5 of the Asset Purchase Agreement), whether known or

unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent,

with respect to the Debtors or their Business or any obligations of or Claims against the Debtors

arising at any time, except for the Assumed Liabilities, including, but not limited to, liabilities on

account of any taxes arising, accruing or payable under, out of, in connection with or in any way

relating to the Purchased Assets prior to the Closing Date.

6.    The transactions contemplated by the Asset Purchase Agreement are

undertaken by the Purchaser in good faith, as that term is used in Section 363(m) of the Bankruptcy

Code, and accordingly, the reversal or modification on appeal of the authorization provided herein

by this Order to consummate the Sale shall not affect the validity of the Sale to the Purchaser. The

Purchaser is a purchaser in good faith of the Purchased Assets and is entitled to all the protections

afforded by Section 363(m) of the Bankruptcy Code.

7.    As a good-faith purchaser of the Purchased Assets, the Purchaser has not

entered into an agreement with any other potential bidders at the Sale, and has not colluded with

any of the other bidders, and other potential bidders or any other parties interested in the Purchased

Assets, and therefore neither the Trustee nor any other successor in interest to the Debtors' estates

shall be entitled to bring an action against the Purchaser, and the Sale may not be avoided pursuant

to Section 363(n) of the Bankruptcy Code.

**Sale and Transfer of Purchased Assets**

8.    Pursuant to Section 363(b) of the Bankruptcy Code, the Trustee is hereby

authorized to sell the Purchased Assets to the Purchaser and consummate the Sale in accordance

with and subject to the terms and conditions of the Asset Purchase Agreement, and to transfer and

assign all right, title and interest (including common-law rights) to all property, licenses and rights

to be conveyed in accordance with and subject to the terms and conditions of the Asset Purchase

Agreement, and the Trustee is further authorized and directed to execute and deliver, and is

empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, including without limitation the related documents, exhibits and schedules, and to take all further actions as may be reasonably requested by the Purchaser for the purposes of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession the Purchased Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Asset Purchase Agreement.

9.    Pursuant to Section 363(b) and (f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser upon consummation of the Asset Purchase Agreement (the "Closing Date") free and clear of all Encumbrances and Interests (except the Assumed Liabilities and Permitted Encumbrances) of any kind or nature whatsoever including, but not limited to, Encumbrances and Interests in respect of the following:  (1) any labor agreements; (2) all mortgages, deeds of trust and security interests; (3) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (4) any other employee, worker's compensation, occupational disease, wage and hour, wage payment or unemployment or temporary-disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination in Employment Act of 1967, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination

laws, (k) state unemployment compensation laws or any other similar state laws, (l) state wage payment or wage and hour laws, or (m) any other state or federal benefits or claims relating to any employment with any of the Debtors or any of their respective predecessors; (5) any bulk sales or similar law; (6) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (7) any theories of successor or products liability; (8) any Environmental Laws (as defined in the Asset Purchase Agreement) or (9) claims asserted by Amy Daveler and Marco Perez on behalf of themselves and a putative class of similarly situated former employees of Worley & Obetz, Inc., AMERIgreen Energy, Inc., and AMERIgreen Propane, LLC in Adv. No. 18-00132 (REF), Adv. No. 18-00133 (REF), and Adv. No. 18-00134 (REF), currently pending before this Court. All such Encumbrances and Interests of any kind or nature whatsoever (other than Permitted Encumbrances) shall attach (effective upon the transfer of the Purchased Assets to the Purchaser) to the proceeds of the Sale with the same force, validity, priority and effect, if any, as the claims, liens, encumbrances and interests formerly had against the Purchased Assets, if any, subject to the Trustee's ability to challenge the extent, validity, priority and effect of the Encumbrances and Interests (subject to the First and Second Amended Stipulation and Order Pursuant to Fed. R. Bankr. P. 4001(B) and 11 U.S.C. § 363(c)(2)(B) Authorizing Use of Cash Collateral on a Limited Basis and Providing Adequate Protection [D.I. 103, 344]), and subject to and as otherwise provided in any other order of this Court in these Chapter 7 Cases.

10.    On the Closing Date, this Order will be construed and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to the Purchaser. On the Closing Date, and subject to Section 365 of the Bankruptcy Code, this Order also shall be construed and constitute for any and all purposes a complete and general assignment

of all right, title and interest of the Trustee and each bankruptcy estate to the Purchaser in the Assumed Contracts.

11.     All persons and entities who are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of such Purchased Assets to the Purchaser on the Closing Date. Purchaser shall have ninety (90) days from and after the Closing Date to remove the Purchased Assets from any real property not conveyed to the Purchaser under the Asset Purchase Agreement, and the owner of such real property shall not be entitled to assert against Purchaser payment for rent, storage or the like.

12.     The Trustee shall pay Manufacturers and Traders Trust Company at Closing $1,148,000 USD from the proceeds of the Purchase Price (the "M&T Payment"). The M&T Payment shall be in full and final satisfaction of any and all liens, claims, interests and encumbrances of Manufacturers and Traders Trust Company on the following vehicles: (1) 2017 Ford Transit 250, VIN# 1FTYR2CM4HKB43259; (2) 2018 Mack GU713, VIN# 1M2AX07C9JM039692; (3) 2018 Mack GU713, VIN# 1M2AX07C0JM039693; (4) 2014 Peterbilt 388, VIN# 1XPWDP9X2ED236428; (5) 2014 Peterbilt 388, VIN# 1XPWDP9X5ED238464; (6) 2014 Freightliner Coronado, VIN# 3AKJGND10EDFT8496; (7) 2014 Heil DOT 406, VIN# 5HTAB4329E7H79298; (8) 2014 Heil DOT 406, VIN# 5HTAB4329E7H79299; (9) 2014 Heil DOT 406, VIN# 5HTAB4321E7H79456; (10) 1999 International wholesale tractor, VIN# 2HSFHASRXXCO31142; (11) 2002 International wholesale tractor, VIN# 2HSCHAER32CO38246; (12) 2007 International wholesale tractor, VIN# 2HSCHAPR37C432012; (13) 2010 International wholesale tractor, VIN# 3HSCUAPROAN243190; (14) 2015 International wholesale tractor, VIN# 3HSDMAPR6FN572598; (15) 2010 International wholesale tractor, VIN#

- 13 -

2HSCXAPR7AC168576;    (16)    2016    International    wholesale    tractor,    VIN#
3HSCXAPR5GN276413; (17) 2001 Heil Trailer, VIN# 5HTAM442517H64994; (18) 2002 Heil
Trailer, VIN# 5HTAM432227H66690; (19) 2002 Heil Trailer, VIN# 5HTAM432027H66686;
(20) 2012 Heil Trailer, VIN# 5HTAM4527C7H76517; (21) 2013 Heil Trailer, VIN#
5HTAM4524D7H77691; (22) 2014 Heil Trailer, VIN# 5HTAM4525E7H79273; and (23) 2001
Heil Trailer, VIN# 5HTAB452317H64593. The Trustee is authorized to remit and pay, by wire
transfer or any other means the Trustee deems appropriate, to Manufacturers and Traders Trust
Company, the full amount of the M&T Payment at any time after Closing.

13.    The Trustee shall pay S&T Bank at Closing $475,000 USD from the
proceeds of the Purchase Price (the "S&T Payment"). The S&T Payment shall be in full and final
satisfaction of any and all liens, claims, interests, and encumbrances of S&T Bank on the following
vehicles: (1) 2018 Ford F-350 Supercab, VIN# 1FD8X3H67JEB66427; (2) 2018 Ford F-350
Supercab, VIN# 1FD8X3H67JEB66428; (3) 2019 Peterbilt 567, VIN# 1XPCD49X1KD261365;
(4) 2019 Peterbilt 567, VIN# 1XPCD49X3KD261366; (5) 2019 Heil Tank Trailer, VIN#
5HTSA4323K7601502; (6) 2019 Heil Tank Trailer, VIN# 5HTSA4323K7601503; and (7) 2007
Heil Petroleum Tank Trailer, VIN# 5HTAM452477L72688. The Trustee is authorized to remit
and pay, by wire transfer or any other means the Trustee deems appropriate, to S&T Bank, the full
amount of the S&T Payment at any time after Closing.

14.    The Trustee shall pay Fulton Bank at Closing $1,306,000.00 USD from
proceeds of the Purchase Price (the "Fulton Bank Payment"). The Fulton Bank Payment shall be
in full and final satisfaction of any and all liens, claims, interests, and encumbrances of Fulton
Bank on the following vehicles: (1) 2015 Peterbilt 348, VIN# 2NP3LJ9X3FM304907; (2) 2017
Peterbilt with Tri-State Tank Body, VIN# 2NP2HJ7X4HM409345; (3) 2017 Peterbilt 348, VIN#

2NP2HJ7X6HM409346; (4) 2015 Peterbilt 348, VIN# 2NP3LJ9X4FM305239; (5) 2017 Freightliner CA125DC, VIN# 1FUJGEDR6HLHZ7415; (6) 2017 Freightliner CA125DC, VIN# 1FUJGEDR4HLHZ7414; (7) 2017 Mack CXU613, VIN# 1M1AW07Y8HM082286; (8) 2017 Westmor Proline MC-331, VIN# 1W9P14323GM350051; (9) 2017 Heil DOT 406, VIN# 5HTAB4320H7081972; (10) 2016 Beall Petroleum Trailer, VIN# 10BEA9236HF0D4608; (11) 2016 Freightliner, VIN# 3AKJGND12GDGX3465; (12) 2016 Freightliner, VIN# 1FUJGED57GLGX4492; (13) 2016 Freightliner, VIN# 1FUJGED57GLGX4493; (14) 2015 Heil Trailer, VIN# 5HTAB4321F7H80771; (15) 2015 Heil Trailer, VIN# 5HTAB4323F7H80772; and (16) 2015 Heil Trailer, VIN# 5HTAB4325F7H80773. The Trustee is authorized to remit and pay, by wire transfer or any other means the Trustee deems appropriate, to Fulton Bank, the full amount of the Fulton Bank Payment at any time after Closing.

15.    At the Closing of the Sale, the Trustee shall pay Transteck, Inc. the sum of $5,669.50 in satisfaction of Transteck's secured claim arising out of repair work to 1 FTL Coronado (VIN #xxxxxxxxxxxBJ6238) (the "Vehicle"). If the Closing occurs and the Vehicle is removed from Transteck's premises on or before October 1, 2018, Transteck will waive any rent claim which it might assert against the estates.

16.    Except as expressly permitted by the Asset Purchase Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade, products liability and other creditors, holding Encumbrances and Interests of any kind or nature whatsoever against or in the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated, now existing or hereinafter arising), arising under or out of or in connection with, or in any way relating to, the Debtors, the

Purchased Assets or the transfer of the Purchased Assets to the Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against the Purchaser, its successor or assign, its property or the Purchased Assets, such persons' or entities' Encumbrances and Interests.

17.    On the Closing Date, each of the Debtors' creditors is authorized and directed to promptly execute such documents and take all other actions as may be necessary to release its Encumbrances and Interests in the Purchased Assets, if any, as such Encumbrances and Interests may have been recorded or otherwise exist.

18.    Subject to the terms and conditions of this Order and the Asset Purchase Agreement, the transfer of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title and interest of the Debtors in and to the Purchased Assets free and clear of all Encumbrances and Interests of any kind or nature whatsoever.

**Assumption and Assignment of Assumed Contracts**

19.    Pursuant to Sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the Trustee's assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Asset Purchase Agreement, of the Assumed Contracts is hereby approved, and the requirements of Section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

20.    The Trustee is hereby authorized and directed in accordance with Sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing Date of the Sale, the Assumed Contracts free and clear of all Encumbrances and Interests of any kind or nature whatsoever (other than Permitted Encumbrances) and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Purchaser.

- 16 -

21.     The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in Section 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer and, pursuant to Section 365(k) of the Bankruptcy Code, the Debtors' estates shall be relieved from any further liability with respect to the Assumed Contracts after such assignment to and assumption by the Purchaser, except as provided in the Asset Purchase Agreement and this Order.

22.     The Trustee is authorized to remit and pay, by wire transfer or any other means the Trustee deems appropriate, to each counter-party to an Assumed Contract, the full undisputed Cure Amount four (4) business days after the Closing of the Sale.

23.     Each non-Debtor party to an Assigned Contract hereby is forever barred, estopped and permanently enjoined from asserting against the Trustee or the Purchaser, or the property of either of them, any default existing as of the Closing Date of the Sale.

**Additional Provisions**

24.     The consideration provided by the Purchaser for the Purchased Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory possession thereof or the District of Columbia.

25.     This Order (a) shall be effective as a determination that, upon payment by the Purchaser of the Purchase Price under the Asset Purchase Agreement, on the Closing Date, all Encumbrances and Interests of any kind or nature whatsoever existing as to the Debtors or the Purchased Assets prior to the Closing Date (other than Permitted Encumbrances) have been unconditionally released, discharged and terminated, and that the conveyances described herein

- 17 -

have been effected, and (b) shall be binding upon and shall govern the acts of all entities, including

without limitation all filing agents, filing officers, title agents, title companies, recorders of

mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental

departments, secretaries of state, federal, state and local officials, and all other persons and entities

who may be required, by operation of law, the duties of their office or contract, to accept, file,

register or otherwise record or release any documents or instruments, or who may be required to

report or insure any title or state of title in or to any of the Purchased Assets. Each and every

federal, state and local governmental agency or department is hereby directed to accept any and

all documents and instruments necessary and appropriate to consummate the transactions

contemplated by the Asset Purchase Agreement. The Purchaser and the Trustee shall take such

further steps and execute such further documents, assignments, instruments and papers as shall be

reasonably requested by the other to implement and effectuate the transactions contemplated in

this paragraph. All Encumbrances and Interests of record as of the date of this Order, other than

Permitted Encumbrances, shall be forthwith removed and stricken as against the Purchased Assets.

All entities described in this paragraph are authorized and specifically directed to strike all such

recorded Encumbrances and Interests against the Purchased Assets from their records, official and

otherwise.

26.     If any person or entity that has filed statements or other documents or

agreements evidencing Encumbrances and Interests in any of the Purchased Assets does not deliver

to the Trustee or the Purchaser prior to the Closing Date or promptly thereafter, in proper form for

filing and executed by the appropriate parties, termination statements, instruments of satisfaction,

releases of liens and easements, and any other documents necessary for the purpose of

documenting the release of all interests and other interests that the person or entity has asserted or

may assert with respect to any of the Purchased Assets, the Trustee and/or the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to any of the Purchased Assets.

27.     As specifically provided in the Asset Purchase Agreement, the Trustee will cooperate with the Purchaser, and the Purchaser will cooperate with the Trustee, in a commercially reasonable manner, in each case to ensure that the transactions contemplated in the Asset Purchase Agreement are consummated, and the Trustee will make such modifications or supplements to any bill of sale or other document executed in connection with the closing to facilitate such consummation as contemplated by the Asset Purchase Agreement (including, without limitation, adding such specific assets, to such documents as may be reasonably requested by the Purchaser pursuant to the terms of the Asset Purchase Agreement).

28.     The Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Purchased Assets other than for the Assumed Liabilities and the Assumed Contracts to the extent provided under the Asset Purchase Agreement.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Asset Purchase Agreement, the Purchaser shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser shall have no successor liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereinafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of or in connection with, or in any way relating to, the operation of the business prior to the Closing Date, and all parties are hereby forever barred,

estopped and permanently enjoined from asserting any such claims against the Purchaser and its

successors and assigns or against the Purchased Assets.

29.    Except for Assumed Liabilities and Assumed Contracts as set forth in the

Asset Purchase Agreement, under no circumstances shall the Purchaser be deemed a successor of

or to the Debtors for any Encumbrances and Interests against or in the Debtors or the Purchased

Assets of any kind or nature whatsoever.  Except for Assumed Liabilities and Assumed Contracts

as set forth in the Asset Purchase Agreement, the sale, transfer, assignment and delivery of the

Purchased Assets and the Assumed Contracts shall not be subject to any Encumbrances and

Interests and Encumbrances and Interests of any kind or nature whatsoever shall remain with, and

continue to be obligations of, the Debtors.  All persons holding Encumbrances and Interests against

or in the Debtors or the Purchased Assets of any kind or nature whatsoever shall be, and hereby

are, forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise

pursuing such Encumbrances and Interests of any kind or nature whatsoever against the Purchaser,

its officers, directors, shareholders and professionals, its property, its successors and assigns, or

the Purchased Assets with respect to any Interest or Encumbrances and Interests of any kind or

nature whatsoever (other than Permitted Encumbrances) such person or entity had, has or may

have against or in the Debtors, their estates, officers, directors or shareholders, or the Purchased

Assets.  Following the Closing Date, no holder of an Encumbrance and Interest in the Debtors

shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets and the

Assumed Contracts based on or related to such Encumbrance and Interest, or any actions that the

Debtors may take in these Chapter 7 Cases.

30.    This Court shall retain jurisdiction to enforce and implement the terms and

provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents

thereunder, except as otherwise provided therein, and each of the agreements executed in connections therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Purchaser free and clear of Encumbrances and Interests (other than Permitted Encumbrances), or compel the performance of other obligations owed by the Trustee, (b) compel delivery of the Purchase Price or performance of other obligations owed to the Trustee, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, except as otherwise provided therein, (d) interpret, implement and enforce the provisions of this Order and (e) protect the Purchaser against (i) claims made related to any of the Excluded Liabilities (as defined in the Asset Purchase Agreement), (ii) any claims of successor liability related to the Purchased Assets or the Assumed Contracts, or (iii) any claims of Encumbrances and Interests (other than Permitted Encumbrances) asserted against the Purchased Assets, of any kind or nature whatsoever, and (f) require delivery of (i) any Purchased Assets or proceeds thereof by the Trustee or any third-party to the Purchaser or (ii) any Excluded Assets or proceeds thereof by the Purchaser to the Trustee.

31.     The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Trustee and any subsequently appointed successor Trustee, the Debtors' estates and their creditors, the Purchaser, the Purchaser's affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Encumbrances and Interests in the Purchased Assets to be sold to the Purchaser pursuant to the Asset Purchase Agreement.

32.     The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision,

it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

33.    The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or creditors.

34.    The Trustee was authorized to remit and pay, by wire transfer or any other means the Trustee deems appropriate, to each Bidder that the Trustee deemed was not a Qualified Bidder, the full amount of their respective Good Faith Deposit immediately.

35.    The Trustee is authorized to remit and pay, by wire transfer or any other means the Trustee deems appropriate, to each Qualified Bidder (other than the Purchaser and Back-up Bidder), the full amount of their respective Good Faith Deposit at any time within four (4) business days of entry this Order.

36.    The Trustee is authorized to remit and pay, by wire transfer or any other means the Trustee deems appropriate, to the Back-up Bidder the full amount of its Good Faith Deposit four (4) business days after the Closing of the Sale, unless the Successful Bidder does not close on the Sale of the Purchased Assets.

37.    The Trustee is authorized to remit and pay, by wire transfer or any other means the Trustee deems appropriate, to the Wiggins Gas Propane & Alternative Fuels, LLC (the "Stalking Horse Bidder") the full amount of the Break-up Fee four (4) business days after the Closing of the Sale.

38.    Nothing contained in any order entered in these Chapter 7 Cases subsequent to entry of this Order shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

39.    Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order, including, but not limited to, liability under any applicable state or federal law and the rules and regulations promulgated thereunder; <u>provided</u> that, notwithstanding the foregoing, nothing herein shall be construed to permit a governmental unit to assert, assess or obtain penalties, fines, or other fees from Purchaser for violations of any such requirement that occurred prior to the Closing Date as a result of the operation of the Purchased Assets; <u>provided</u>, further, if any such violation continues after the Closing Date such governmental unit may seek to assert, assess or obtain penalties, fines or other fees from Purchaser for the period of time after the Closing Date that such violations occurred.

40.    Nothing in this Order and Asset Purchase Agreement limits or modifies any of the Debtors' obligations or releases, nullifies, precludes or enjoins the enforcement of any police power or regulatory liability by a government unit against any Debtor, including, but not limited to, under any applicable state or federal law and the rules and regulations promulgated thereunder.

41.    Nothing in this Order or Asset Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.

- 23 -

42.    Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

43.    This Order shall be effective and enforceable immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h) and 6006(d) and any other provision of the Bankruptcy Code or the Bankruptcy Rules shall not apply.

44.    The provisions of this Order are non-severable and mutually dependent.

45.    To the extent applicable, the automatic stay pursuant to Section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, without further order of the Court, to allow the Purchaser to take any and all actions permitted by the Asset Purchase Agreement.

46.    To the extent a counterparty to an Assigned Contract failed to timely object to a Cure Amount (as defined in the Bidding Procedures and the Bidding Procedures Order), such Cure Amount shall be deemed to be finally determined, and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Amount at any time, and such Cure Amount, when paid, shall completely revive any Assigned Contract to which it relates.

47.    The Sale shall not be subject to any bulk sales laws.

48.    The Trustee and each other person having duties or responsibilities under the Asset Purchase Agreement or this Order, and her respective agents, representatives and attorneys, are authorized and empowered to carry out all of the provisions of the Asset Purchase Agreement, to issue, execute, deliver, file and record, as appropriate, the Asset Purchase Agreement, and any related agreements, and to take any action contemplated by the Asset Purchase Agreement or this Order, and to issue, execute, deliver, file and record, as appropriate, such other

contracts, instruments, releases, deeds, bills of sale, assignments or other agreements, and to

perform such other acts, as are consistent with, and necessary or appropriate to, implement,

effectuate and consummate the Asset Purchase Agreement and this Order and the transactions

contemplated thereby and hereby, all without further application to, or order of, the Court. Without

limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if

any, required by applicable business corporation, trust and other laws of applicable governmental

units with respect to the implementation and consummation of the Asset Purchase Agreement and

this Order and the transactions contemplated thereby and hereby.

49.    To the extent that any provision of this Order conflicts with the Asset

Purchase Agreement, this Order shall control.

Dated: September 18, 2018

THE HONORABLE RICHARD E. FEHLING
CHIEF UNITED STATES BANKRUPTCY
JUDGE

# Exhibit "A"

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**DIESEL DIRECT HOLDINGS, INC.**

**AND**

**CHRISTINE C. SHUBERT, IN HER CAPACITY AS CHAPTER 7 TRUSTEE
FOR THE ESTATES OF WORLEY & OBETZ, INC., ET AL.**

**September 17, 2018**

## TABLE OF CONTENTS

Page

1. DEFINITIONS .................................................................................................. 2
   1.1 Definitions .......................................................................................... 2
   1.2 Cross References ................................................................................ 6

2. PURCHASE AND SALE ............................................................................... 7
   2.1 Purchase and Sale ............................................................................. 7
   2.2 Excluded Assets ................................................................................ 9
   2.3 "AS IS, WHERE IS" SALE .............................................................. 11
   2.4 Assumed Liabilities ......................................................................... 12
   2.5 Excluded Liabilities ......................................................................... 13
   2.6 Assumption/Assignment of Contracts and Rights. ......................... 13
   2.7 Consideration; Allocation of Consideration ................................... 14
   2.8 Closing ............................................................................................. 15
   2.9 Deliveries by Seller ......................................................................... 15
   2.10 Deliveries by Purchaser ................................................................. 16

3. REPRESENTATIONS AND WARRANTIES OF SELLER ........................ 16
   3.1 Power ............................................................................................... 16
   3.2 Authorization ................................................................................... 16
   3.3 Governmental Authorization ........................................................... 16
   3.4 Non-contravention ........................................................................... 16
   3.5 Required Consents ........................................................................... 16
   3.6 Litigation ......................................................................................... 17
   3.7 Permits ............................................................................................. 17
   3.8 Compliance with Laws and Court Orders ....................................... 17
   3.9 Intellectual Property Rights ............................................................ 17
   3.10 Environmental Matters ................................................................... 17
   3.11 Real Property ................................................................................. 17
   3.12 Employment Matters and Employee Benefits ................................ 18
   3.13 Taxes .............................................................................................. 18
   3.14 Sufficiency of and Title to the Purchased Assets .......................... 18
   3.15 Insurance ........................................................................................ 18
   3.16 Service of Bankruptcy Documents ................................................ 18
   3.17 Certain Fees ................................................................................... 18

4. REPRESENTATIONS AND WARRANTIES OF PURCHASER ................. 19
   4.1 Organization .................................................................................... 19
   4.2 Corporate Authorization .................................................................. 19
   4.3 Governmental Authorization ........................................................... 19
   4.4 Non-contravention ........................................................................... 19
   4.5 Litigation ......................................................................................... 19
   4.6 Adequacy of Funds .......................................................................... 19

5. COVENANTS OF SELLER ........................................................................... 20

ACTIVE\64374627.v4

**Page**

|   |   |   |   |
|---|---|---|---|
| | 5.1 | Access to Information | 20 |
| | 5.2 | Sales of De Minimis Assets | 20 |
| | 5.3 | Notices of Certain Events | 20 |
| 6. | | COVENANTS OF PURCHASER AND SELLER | 20 |
| | 6.1 | Efforts; Further Assurances | 20 |
| | 6.2 | Certain Filings | 20 |
| | 6.3 | Bankruptcy Issues | 21 |
| | 6.4 | Notices | 32 |
| 7. | | TAX MATTERS | 33 |
| | 7.1 | Tax Cooperation | 33 |
| | 7.2 | Transfer Taxes | 33 |
| | 7.3 | Real Property Taxes | 33 |
| | 7.4 | Personal Property, Ad Valorem and Excise Taxes | 33 |
| 8. | | CLOSING CONDITIONS | 33 |
| | 8.1 | Conditions to Obligations of Purchaser and Seller | 33 |
| | 8.2 | Conditions to Obligations of Purchaser | 34 |
| | 8.3 | Conditions to Obligations of Seller | 34 |
| 9. | | TERMINATION | 35 |
| | 9.1 | Grounds for Termination | 35 |
| | 9.2 | Effect of Termination | 35 |
| | 9.3 | Fees and Expenses | 35 |
| 10. | | MISCELLANEOUS | 36 |
| | 10.1 | Notices | 36 |
| | 10.2 | Limitation on Damages | 36 |
| | 10.3 | Waivers | 37 |
| | 10.4 | Successors and Assigns | 37 |
| | 10.5 | Governing Law | 37 |
| | 10.6 | Jurisdiction | 37 |
| | 10.7 | Waiver of Jury Trial | 38 |
| | 10.8 | No Third Party Beneficiaries | 38 |
| | 10.9 | Entire Agreement; Amendments; Counterparts | 38 |
| | 10.10 | Pre-Petition Secured Party | 38 |
| | 10.11 | Headings; Interpretation | 39 |

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** dated as of August 24, 2018 (this "Agreement") is entered into by and between Christine C. Shubert, in her capacity as Chapter 7 Trustee ("Seller") for the estates of (i) Worley & Obetz, Inc. (Case No. 18-13774-REF); (ii) Americomfort, Inc., Case No. 18-13775-REF); (iii) Amerigreen Energy, Inc. (Case No. 18-13777-REF); (iv) Advance Air, Inc. (Case No. 18-13778-REF); (v) Amerigreen Energy Brokers, LLC (Case No. 18- 13779-REF); (vi) Amerigreen Electricity, LLC (Case No. 18-13780-REF); (vii) Amerigreen Hedging Services, LLC (Case No. 18-13781-REF); (viii) Amerigreen Lubricants, LLC (Case No. 18-13782-REF); (ix) Amerigreen Natural Gas, LLC (Case No. 18-13783-REF); and (x) Amerigreen Propane, LLC (Case No. 18-13784-REF) (collectively, the "Debtors") and Diesel Direct Holdings, Inc., a Delaware corporation ("Diesel") or its assignees, which shall be Affiliates of Diesel or Jerome H. Rhoads, Inc. and which shall be identified in writing by Diesel to Seller prior to the Closing Date (the "Assignees", and together with Diesel, the "Purchaser"). Purchaser and Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

**WHEREAS**, prior to the Petition Date (as defined below), Debtor Worley & Obetz, Inc. ("W&O"), and certain Affiliates (as defined below) provided certain energy products and services to their commercial and residential clients, including fuel, bio-heating oil, biodiesel, propane, gasoline, natural gas and electricity (the "W&O Business");

**WHEREAS**, prior to the Petition Date, Debtor Amerigreen Energy, Inc. and certain Affiliates operated as an energy wholesaler to retail distributors operating in the Mid-Atlantic and New England markets and provided certain energy products and services to their retail fuel distributors, fuel stations, commercial clients, and commercial and residential clients of W&O, including ethanol, biodiesel, biofuels, and petroleum, as well as hedging and marketing services, and electricity and gas plans (together with the W&O Business, the "Business");

**WHEREAS**, on June 6, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court");

**WHEREAS**, Seller is the duly appointed and acting Chapter 7 trustee for each of the Debtors' bankruptcy cases which are now jointly administered under Case No. 18-13774 (REF) (Jointly Administered) (collectively, the "Bankruptcy Cases");

**WHEREAS**, Seller desires to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of and acquire such Purchased Assets and to assume such Assumed Liabilities, in each case on an "AS IS, WHERE IS" basis except for the representations and warranties expressly set forth in Section 3 below and upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to an Approval Order (as defined below) to be entered in the Bankruptcy Cases pursuant to §§ 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.    **Definitions**.

    1.1    Definitions.    The following terms, as used herein, have the following meanings:

    (a)    "Acquired Owned Real Property" means all of the real property, together with all Improvements located thereon and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights and interests appurtenant thereto, owned in fee by Seller, and any part or parcel thereof set forth on Schedule 2.1(a).

    (b)    "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such other Person.

    (c)    "Bid Protection" means an amount equal to 3% of the Purchase Price, or $243,000.

    (d)    "Break-Up Fee" means an amount equal to 3% of the Purchase Price, or $243,000.

    (e)    "Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in Pennsylvania are authorized or required by Law to close.

    (f)    "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any Laws promulgated thereunder.

    (g)    "Claim" means a "claim" as defined in Section 101 of the Bankruptcy Code.

    (h)    "Closing Date" means the date of the Closing.

    (i)    "Code" means the Internal Revenue Code of 1986, as amended.

    (j)    "Cure Costs" means all amounts that must be paid and all obligations    that    otherwise    must    be    satisfied,    including    pursuant    to

2

Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Contracts to Purchaser as provided herein.

(k)    "Employee" means an individual who is employed by the Debtors, whether on a full-time or a part-time basis, whether active or inactive as of the Closing Date, and includes an employee on short-term or long-term disability leave.

(l)    "Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA §3(3)) and any other benefit or compensation plan, program, agreement, arrangement or payroll practice (whether written or unwritten) maintained, sponsored, or contributed or required to be contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any liability as set forth on Schedule 3.12(a).

(m)    "Environmental Laws" means, whenever in effect, all federal, state, and local Laws and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all contractual obligations and all common Law, in each case concerning public or employee health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state Laws).

(n)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

(o)    "ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with Seller for purposes of Code § 414.

(p)    "Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority, or arbitral body.

(q)    "Hazardous Substances" means any substance, material or waste regulated by any Governmental Authority, including any material, substance or waste which is defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "contaminant," "toxic waste," "pollutant" or "toxic substance" under any provision of Environmental Law, and including petroleum, petroleum products, asbestos, presumed asbestos-containing material or asbestos-containing material, urea formaldehyde and polychlorinated biphenyls.

3

(r)   "Improvements" means all buildings, improvements, structures, streets, roads and fixtures located, placed, constructed or installed on or under the Acquired Owned Real Property or the Leased Real Property, including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration systems, facilities, lines, installations and conduits.

(s)   "Intellectual Property Rights" means all of Seller's intellectual property rights including, but not limited to: (i) patents, patent applications, patent rights, patent disclosures and inventions (whether or not patentable or reduced to practice); (ii) trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, websites, domain names and other indicia of source and all goodwill associated therewith; (iii) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (iv) know-how, trade secrets, customer lists (including all wholesale, retail and commercial customer account lists, whether active or inactive including complete contact information), proprietary information, proprietary processes and formulae, databases and data collections; (v) all source and object code, software (including front and back office software, customer management and fuel management systems, accounting and billing systems, POS inventory systems and fleet management systems), algorithms, architecture, structure, display screens, layouts, inventions and development tools; and (vi) all documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records.

(t)   "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means the actual knowledge of Christine C. Shubert.

(u)   "Law" means any law, statute, regulation, rule, code, decree, constitution, ordinance, treaty, rule of common law or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(v)   "Leased Real Property" means all land, Improvements or other interests in real property leased or subleased by Seller, as lessee, which is used or intended to be used in, or otherwise related to, the Business and set forth on Schedule 1.1(v), unless previously rejected pursuant to section 365 of the Bankruptcy Code.

(w)   "Liability" means any claim, debt, liability, obligation, Tax or commitment of any nature whatsoever (whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated or due or to become due), whenever or however arising (including those arising out of any contract or tort, whether based on negligence, strict liability or otherwise), and including all costs and expenses related thereto.

4

(x)   "Lien" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), pledge, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or noncontingent, material or nonmaterial, known or unknown.  For the avoidance of doubt, the definition of Lien shall not include any license or sublicense of Intellectual Property Rights granted by Seller or any lease or sublease by Seller (as lessor or sublessor) of real property.

(y)   "Order" means any award, decision, decree, order, directive, injunction, ruling, judgment or consent of or entered, issued, made or rendered by any Governmental Authority.

(z)   "Permits" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and other similar documents and authorizations issued by any Governmental Authority to Seller, in each case to the extent transferable without the consent of any Governmental Authority.

(aa)   "Permitted Encumbrances" means (i) Liens included in the Assumed Liabilities; (ii) encumbrances waived in writing by Purchaser; (ii) all restrictions on the use of the Purchased Assets arising as a result of the application of zoning and similar laws; (iv) all exceptions, restrictions, easements, charges, rights-of-way, and other encumbrances that are set forth in any Permit; and (v) other imperfections in title, if any, or conditions, reservations, restrictions, easements, encroachments, or rights of way, if any, none of which, individually or in the aggregate, materially detracts from the value, or impairs in any significant way the use of the property subject thereto;

(bb)   "Person" means an individual, corporation, partnership, limited liability Debtors, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(cc)   "Post-Retirement Liabilities" means with respect to all Employees and retirees, all Liabilities for the post-retirement benefits, including those provided under the Employee Benefit Plans, as applicable.

(dd)   "Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date; and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(ee)   "Property Taxes" means all real and personal property Taxes levied with respect to the Purchased Assets for any taxable period or portion thereof.

(ff)   "Real Estate" means the Acquired Owned Real Property and the Leased Real Property.

5

(gg)    "<u>Release</u>" has the meaning set forth in CERCLA.

(hh)    "<u>Tax</u>" means (i) any federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority (a "<u>Taxing Authority</u>") responsible for the imposition thereof (whether domestic or foreign), whether or not disputed, and (ii) Liability for the payment of any amounts of the type described in clause (i) as a result of being a transferee, party to any agreement or any express or implied obligation to indemnify any other Person.

(ii)    "<u>Tax Returns</u>" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

(jj)    "<u>Trade Payables</u>" means all trade payables incurred by the Debtors in the ordinary course of business.

1.2    <u>Cross References</u>. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Allocation Schedule | 2.7(b) |
| Approval Hearing | 6.3(c)(vi) |
| Approval Order | 6.3(f) |
| Assignment and Assumption Agreement | 2.9(b) |
| Assumed Contracts | 2.1(b) |
| Assumed Contracts A/R | 2.1(d) |
| Assumed Liabilities | 2.4 |
| Auction | 6.3(c) |
| Back-up Bid | 6.3(c)(vi) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid | 6.3(b)(i) |
| Bid Assessment Criteria | 6.3(c)(i) |
| Bid Deadline | 6.3(b)(i) |
| Bidder | 6.3(b)(i) |

6

| Term | Section |
|------|---------|
| Bidding Procedures | 6.3(a) |
| Bidding Procedures Order | 6.3(a) |
| Business | Recitals |
| Closing | 2.8 |
| Contemplated Transaction Documents | 6.3(c)(i) |
| Debtors | Preamble |
| Deposit | 2.7(a) |
| End Date | 9.1(b) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.5 |
| Lot Bid | 6.3(b)(ii)(A) |
| Minimum Initial Overbid | 6.3(b)(ii)(G) |
| Missing Assets | 2.7(c) |
| Modified APA | 6.3(b)(ii)(A) |
| Notice Parties | 6.3(b)(i) |
| Opening Bid | 6.3(c)(i) |
| Overbid | 6.3(c)(v) |
| Party or Parties | Preamble |
| Petition Date | Recitals |
| Purchase Price | 2.7(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Qualified Bid | 6.3(b)(ii) |
| Qualified Bidder | 6.3(b)(ii) |
| Reimbursement Demand | 2.7(c) |
| Round Leading Bid | 6.3(c)(v) |
| Sale and Bidding Procedures Motion | 6.3(a) |
| Seller | Preamble |
| Subsequent Overbid Increment | 6.3(c)(v)(A) |
| Successful Bid | 6.3(c)(v) |
| Successful Bidder | 6.3(c)(vi) |
| Tax Claim | 7.1 |
| Taxing Authority | 1.1(gg) |
| Termination Date | 6.3(b)(ii)(B) |
| Term Sheet | 2.2(h) |
| Transactions | Recitals |
| Transfer Taxes | 7.2 |

## 2.    Purchase and Sale.

2.1    <u>Purchase and Sale</u>.  Subject to the terms and conditions set forth in this Agreement and the Approval Order, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all right, title and interest of Seller as of the Closing Date in and to all of Seller's and Debtors' properties and assets, real, personal or mixed, tangible and intangible, of

7

every kind and description, wherever located and whether or not carried or reflected on the books and records of Seller, that are listed in subsections (a) - (l) below, other than the Excluded Assets (the "Purchased Assets"), free and clear of all Liens (other than the Assumed Liabilities and Permitted Encumbrances). The cost of collecting and removing the Purchased Assets from their various locations shall be borne by Purchaser; *provided, however*, Seller shall, at her cost, use commercially reasonable efforts to assist Seller's efforts by enforcing the terms of this Agreement and the Approval Order against third parties. Subject to Section 2.2, the Purchased Assets purchased hereunder shall include the following:

(a)     the Acquired Owned Real Property set forth on Schedule 2.1(a); provided Purchaser may advise Seller of any deletions to Schedule 2.1(a) prior to the Closing Date;

(b)     all rights of Seller under the executory contracts and unexpired leases of Seller that are set forth on Schedule 2.1(b) not previously rejected pursuant to section 365 of the Bankruptcy Code (collectively, the "Assumed Contracts"); provided Purchaser may advise Seller of any deletions to Schedule 2.1(b) prior to the Closing Date;

(c)     all inventory, including, without limitation, that set forth on Schedule 2.1(c), including, but not limited to, propane, gasoline, kerosene, diesel, diesel exhaust fluid, retail and wholesale inventory for sale or distribution of any kind except to the extent contained in an Excluded Asset;

(d)     any accounts receivable and all proceeds arising therefrom arising from and after the Petition Date and out of or in connection with the Assumed Contracts (collectively, the "Assumed Contracts A/R");

(e)     all tangible personal property and intangible property whether located on Acquired Owned Real Property, Leased Real Property, other real property, in transit, or in the possession of any Person, including, but not limited to, all machinery, equipment, storage tanks and vessels, pumps, dispensers, displays, spare parts, signage, industry memorabilia, tools, vehicles, computers (but excluding laptops), mobile phones, personal digital assistants, computer equipment (but excluding laptops), hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, other miscellaneous supplies and other tangible personal property of any kind, including, without limitation, that set forth on Schedule 2.1(e);

(f)     all Permits set forth on Schedule 2.1(f) to the extent the same may be assigned consistent with their terms;

(g)     all Intellectual Property Rights, including, without limitation, the items set forth on Schedule 2.1(g); provided that Purchaser may advise Seller of

8

any additions or deletions to Schedule 2.1(g) within two (2) Business Days before the Approval Hearing;

(h)     all cars, trucks, trailers, forklifts, other industrial vehicles, other motor vehicles, and boats and watercrafts whether powered or unpowered, including, without limitation, those set forth on Schedule 2.1(h), and any personal property located on or within such vehicles, boats and watercrafts;

(i)     all deposit or prepaid charges and expenses paid exclusively in connection with or relating exclusively to any Purchased Asset;

(j)     all books, records, files and papers of Seller relating to the Business or the Purchased Assets, including equipment logs, service books and records, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records (all in the state in which such records and information currently exist), provided that Seller shall be entitled to access such books, records, files, computer systems, and papers with reasonable notice;

(k)     all goodwill directly arising from, related to or resulting from the Business; and

(l)     All Lots of Purchased Assets set forth in Section 6.3(c)(iv)(1) – (18) of this Agreement.

2.2     Excluded Assets. Notwithstanding any other provision of this Agreement to the contrary, the following assets (the "Excluded Assets") shall not be transferred, conveyed, sold or assigned to Purchaser, and the Purchased Assets shall not include any of the following assets of Debtors or Seller:

(a)     all cash, cash equivalents and bank deposits (including, without limitation, deposits posted as collateral for letters of credit) or similar cash items;

(b)     all deposit or prepaid charges and expenses paid exclusively in connection with or relating exclusively to any Excluded Assets;

(c)     any accounts receivable and all proceeds of Seller other than the Assumed Contracts A/R;

(d)     all of the Seller's rights under this Agreement and/or other documents and agreements executed in connection with the Transactions contemplated herein;

(e)     any and all right, title, leasehold interest, leases and any other interest in and with respect to the following property (collectively known as the "Wo-Go Stations"): (i) Molly's Convenience Store and Wo-Go located at 35 Doe Run Road, Manheim, PA 17545; (ii) the Ephrata Wo-Go & Pacific Pride, located at 1634 W. Main Street, Ephrata, PA 17522; (iii) the Lancaster Wo-Go & Pacific

9

Pride, located at 202 Greenfield Road, Lancaster, PA 17602; (iv) the Lititz Wo-Go and bulk underground storage facility, located at 746 Rothsville Road, Lititz, PA 17543; (v) the Harrisburg Wo-Go Station and bulk underground storage facility, located at 854 South 16th Street, Harrisburg, PA 17104; (vi) the Elizabethtown Pacific Pride, located at 101 East Cherry Street, Elizabethtown, PA 17022; and (vii) the Mount Joy Pacific Pride, located at 30 Orchard Road, Mount Joy, PA 17552;

(f)      all tangible personal property associated with the Wo-Go Stations, including, but not limited to, all machinery, equipment, storage tanks and vessels, pumps, dispensers, displays, spare parts, signage, industry memorabilia, tools, vehicles, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, other miscellaneous supplies and other tangible personal property of any kind, including, without limitation, that set forth on Schedule 2.2(f);

(g)      all intercompany obligations, liabilities and indebtedness between the Debtors including, but not limited to, any and all promissory notes between the Debtors, any Affiliates and/or insiders and any note indebtedness owed to Debtors by any Affiliates or insiders;

(h)      any (i) confidential personnel and medical records pertaining to any Employee of the Debtors; (ii) other books and records that Trustee determines are necessary or advisable to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Debtors or any of the Purchased Assets; (iii) minute books, stock or membership interest records and corporate seals; and (iv) documents relating to proposals to acquire the Purchased Assets by Persons other than Purchaser;

(i)      all Tax losses and Tax loss carry forwards of the Debtors and the rights to receive Tax refunds, credits and credit carry forwards with respect to any Taxes of the Debtors;

(j)      any claim, right or interest of the Seller and the Debtors in or to any refund, rebate, abatement or other recovery for Taxes of the Debtors, together with any interest due thereon or penalty rebate arising therefrom, and all Tax credits and other Tax attributes of the Debtors, for the Pre-Closing Tax Period, but only to the extent the Tax in respect of which such refund or reimbursement is made was not borne by Purchaser or any of its Affiliates;

(k)      all insurance policies or rights to proceeds thereof relating to the Purchased Assets;

10

(l)    any stock or other equity interests in Debtors or any subsidiaries or Affiliates of the Debtors;

(m)    all claims, actions, liabilities, debts, demands, damages and causes of action, whatsoever, whether in law or in equity, whether known or unknown, which the Seller and/or the Debtors have, may have had, may have in the future accrue to them, arising out of or in connection with, in whole or in part, and relating to the Debtors including, any and all claims, actions, liabilities, debts, demands, damages and causes of action against any of the Debtors' subsidiaries, Affiliates, predecessors and successors in interest, insiders, members, managers, officers, directors, shareholders, investors, employees, representatives, professionals, consultants, accountants, servants, attorneys or other agents;

(n)    all avoidance actions and other causes of action under the Bankruptcy Code or similar state insolvency law;

(o)    all assets, fixtures, furniture, machinery, equipment, properties, interests and rights of the Seller or the Debtors which were previously sold, transferred, conveyed, including, but not limited to, the assets of Debtor Ranck Plumbing, Heating & Air Conditioning, Inc., or otherwise abandoned; and

(p)    all laptops.

2.3    **"AS IS, WHERE IS" SALE**.

(a)    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN **SECTION 3** BELOW, THE PURCHASED ASSETS ARE BEING SOLD IN AN "AS IS" CONDITION, ON A "WHERE IS" BASIS AND "WITH ALL FAULTS" AS OF THE CLOSING DATE (AS DEFINED BELOW), AND SUCH SALE IS WITHOUT RECOURSE, REPRESENTATION, OR WARRANTY OF ANY KIND TO OR BY THE SELLER, WHETHER EXPRESS, IMPLIED OR IMPOSED BY LAW, WHICH RECOURSE, REPRESENTATIONS, AND WARRANTIES (EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN **SECTION 3** BELOW) ARE HEREBY EXPRESSLY DISCLAIMED BY PURCHASER.

(b)    PURCHASER ACKNOWLEDGES THAT IT IS FULLY RELYING ON ITS OWN (OR ITS REPRESENTATIVES') INSPECTIONS, EXAMINATIONS AND EVALUATIONS OF THE REAL ESTATE AND NOT UPON ANY STATEMENTS (ORAL OR WRITTEN) THAT MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY THE DEBTORS OR SELLER OR ANY OF THEIR RESPECTIVE REPRESENTATIVES, AGENTS OR ATTORNEYS. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS (OR PURCHASER'S REPRESENTATIVES HAVE), OR PRIOR TO THE CLOSING DATE WILL HAVE, THOROUGHLY INSPECTED AND EXAMINED THE REAL ESTATE TO THE EXTENT DEEMED

11

NECESSARY BY PURCHASER IN ORDER TO ENABLE PURCHASER TO EVALUATE THE CONDITION OF THE REAL ESTATE AND ALL OTHER ASPECTS OF THE REAL ESTATE (INCLUDING, BUT NOT LIMITED TO, THE ENVIRONMENTAL CONDITION OF THE REAL ESTATE), AND PURCHASER ACKNOWLEDGES THAT PURCHASER IS RELYING SOLELY UPON ITS OWN (OR ITS REPRESENTATIVES') INSPECTION, EXAMINATION AND EVALUATION OF THE REAL ESTATE AND IS QUALIFIED TO MAKE SUCH INSPECTION, EXAMINATION AND EVALUATION. AS A MATERIAL PART OF THE CONSIDERATION OF THIS AGREEMENT AND THE PURCHASE OF THE ACQUIRED OWNED REAL PROPERTY, PURCHASER HEREBY AGREES TO ACCEPT THE ACQUIRED OWNED REAL PROPERTY ON THE CLOSING DATE IN ITS "AS IS, WHERE IS" CONDITION, WITH ALL FAULTS AND, WITHOUT REPRESENTATIONS AND WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES AGREE THAT THE SALE OF THE ACQUIRED OWNED REAL PROPERTY IS WITHOUT ANY WARRANTY, AND THAT THE SELLER AND DEBTORS HAVE NOT MADE ANY, AND EXPRESSLY AND SPECIFICALLY DISCLAIM ANY AND ALL, REPRESENTATIONS, GUARANTIES OR WARRANTIES, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW OR RELATING TO THE ACQUIRED OWNED REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, OF OR RELATING TO: (A) THE OWNERSHIP, USE, INCOME, POTENTIAL, EXPENSES, OPERATION, CHARACTERISTICS OR CONDITION OF THE ACQUIRED OWNED REAL PROPERTY OR ANY PORTION THEREOF, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF SUITABILITY, HABITABILITY, MERCHANTABILITY, DESIGN OR FITNESS FOR ANY SPECIFIC PURPOSE OR A PARTICULAR PURPOSE; (B) THE NATURE, MANNER, OR CONDITION (PHYSICAL, STRUCTURAL OR OTHERWISE) OF THE ACQUIRED OWNED REAL PROPERTY, OR THE SURFACE OR SUBSURFACE THEREOF, WHETHER OR NOT OBVIOUS, VISIBLE OR APPARENT; (C) THE ENVIRONMENTAL CONDITION OF THE ACQUIRED OWNED REAL PROPERTY AND THE PRESENCE OR ABSENCE OF OR CONTAMINATION BY HAZARDOUS MATERIALS, OR THE COMPLIANCE OF THE ACQUIRED OWNED REAL PROPERTY WITH ALL REGULATIONS OR LAWS PERTAINING TO HEALTH OR THE ENVIRONMENT, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL LAWS; AND (D) THE SOIL CONDITIONS, DRAINAGE, FLOODING CHARACTERISTICS, UTILITIES OR OTHER CONDITIONS EXISTING IN, ON OR UNDER THE ACQUIRED OWNED REAL PROPERTY. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

2.4    Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the liabilities

12

and obligations of Seller or the Business related to or arising under all (i) Purchased Assets, including, without limitation, the Assumed Contracts, Permits, and Intellectual Property Rights, that accrue after the Closing, (ii) liabilities related to the Permitted Encumbrances, (iii) one half of the Transfer Taxes, and (iv) any and all liabilities for Taxes, if any, attributable to Purchaser's ownership of the Purchased Assets after the Closing Date (collectively, the "Assumed Liabilities") in each case, but in no event to include any Liabilities or obligations of any Debtor or its Affiliates that relate to any breach of representation, warranty, covenant or agreement that arose on or prior to the Closing Date.

2.5    Excluded Liabilities.    Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Claim against or obligation of Seller or Debtors of whatever nature, whether presently in existence or arising hereafter. All such other Claims and obligations, whether known or unknown, direct or contingent, in litigation or threatened, or not yet asserted, shall be retained by and remain obligations and Liabilities of Seller or Debtors (all such Liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

(a)    all Liabilities related to any Excluded Assets;

(b)    Trade Payables;

(c)    all Liabilities for (i) Taxes of Seller and (ii) any Taxes relating to or arising from the Business or one or more Purchased Assets for any Pre-Closing Tax Periods, provided that this shall exclude Transfer Taxes, which are addressed in Section 7.2;

(d)    all Post-Retirement Liabilities;

(e)    all Employee Benefit Plans and all Liabilities thereunder; and

(f)    any Liability based on successor liability theories, including, without limitation, product liability claims.

2.6    Assumption/Assignment of Contracts and Rights.

(a)    To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts shall be assumed by Seller and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code. If such assignment is not effectuated pursuant to the Approval Order, Seller shall, at the request of Purchaser, seek an Order from the Bankruptcy Court after the Closing Date to assign such Assumed Contract to Purchaser. All Cure Costs relating to the Assumed Contracts shall be paid by Seller.

(b)    Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract that, after giving effect to the provisions of Section 365 of the Bankruptcy Code, is not

13

assignable or transferable without the consent of any Person, other than the Debtors, Seller and Purchaser, to the extent that such consent shall not have been given prior to the Closing, provided, however, that the Seller and Debtors shall use, whether before or after the Closing, reasonable efforts to obtain all necessary consents to the assignment and transfer thereof.

2.7    Consideration; Allocation of Consideration.

(a)    In addition to the assumption of the Assumed Liabilities, the aggregate consideration (the "Purchase Price") for the sale, transfer and delivery of the Purchased Assets, at the Closing, shall be Ten Million Six Hundred Seventy Thousand Dollars ($10,670,000) payable as follows: (i) Eight Hundred Sixty-Two Thousand Five Hundred Dollars ($862,500) (the "Deposit") payable upon the execution of this Agreement and (ii) Nine Million Eight Hundred Seven Thousand Five Hundred Dollars ($9,807,500) payable at the Closing.

(b)    Purchaser and Seller agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with the allocation schedule (the "Allocation Schedule") to be mutually determined by Purchaser and Seller on or before the Closing. Purchaser and Seller shall (and shall cause their respective Affiliates to) file all Tax Returns (including IRS Form 8954) and other Tax-related information reports in a manner consistent with the Allocation Schedule and not take any position inconsistent with such Allocation Schedule in any Tax-related audit, examination or other proceeding (whether administrative or judicial) unless required by applicable Law. If any Party receives any notice from a Taxing Authority in respect of an audit, examination or other proceeding (whether administrative or judicial) regarding any allocation of the Purchase Price or otherwise proposing an allocation different from the Allocation Schedule, such Party shall notify the other Parties of such notice and provide such other Parties with a copy of such notice, and the Parties hereto shall cooperate with each other in good faith regarding the resolution of any such matter.

(c)    Following the Approval Hearing and up to Closing, Purchaser shall inspect the Purchased Assets, including, without limitation, the vehicles, to confirm that they are present and accounted for, provided that Purchaser shall have up to thirty (30) days after the Closing (the "Inventory Expiration Date") to count the fuel inventory and further provided that a Seller representative must be present at all times during Purchased Assets inspection, including, without limitation, during vehicles and fuel inventory counts. Purchaser shall provide to Seller a written count of the vehicles at Closing and of the fuel inventory on or prior to the Inventory Expiration Date (collectively the "Inventory Count"). Seller shall have up to ten (10) business days after the Inventory Expiration Date to investigate the Inventory Count (the expiration of such ten (10) business day period is referred to as the "Adjustment Date"). If Seller agrees with the Inventory Count, or fails to oppose the Inventory Count on or before the Adjustment Date, the Inventory Count shall be deemed final (the "Final Inventory Count"). If Seller opposes the Inventory Count, it shall notify Purchaser in writing prior to the Adjustment Date, and

14

describe its opposition in reasonable detail. If Purchaser and Seller resolve such opposition, the Inventory Count shall be deemed to be a Final Inventory Count upon such resolution. If Purchaser and Seller are unable to resolve Seller's opposition to the Inventory Count, either party may submit its claim to the Bankruptcy Court for disposition as its sole means of recourse. The Inventory Count shall be deemed to be a Final Inventory Count upon such resolution.

(d) If the Final Inventory Count indicates that there are vehicles or fuel inventory that are listed on Schedule 2.1(h) and Schedule 2.1(c), respectively, but are missing ("Missing Assets") with an aggregate value determined in good faith that exceeds Thirty Thousand Dollars ($30,000), Seller shall reimburse Purchaser and credit against the Purchase Price the aggregate value of such Missing Assets that exceeds Thirty Thousand Dollars ($30,000) promptly after the Final Inventory Count is determined. If the Inventory Count indicates that there are vehicles or fuel inventory wherever located that are not listed on Schedule 2.1(h) and Schedule 2.1(c), respectively (the "Additional Assets") with an aggregate value determined in good faith that exceeds Thirty Thousand Dollars ($30,000), the Purchase Price shall be increased by the aggregate value of such Additional Assets that exceeds Thirty Thousand Dollars ($30,000) and Purchaser shall pay such increase to Seller promptly after the Final Inventory Count is determined.

2.8     Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, PA 19103-3222 on September 25, 2018, or at such other time or place as Purchaser and Seller may agree. The Parties may mutually agree to consummate the Closing electronically.

2.9     Deliveries by Seller. At the Closing, Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)     the Approval Order;

(b)     a Bill of Sale, Assignment and Assumption Agreement duly executed by Seller;

(c)     duly executed quitclaim deeds transferring fee simple title to the Acquired Owned Real Property to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(d)     originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto);

(e)     physical possession of all of the Purchased Assets capable of passing by delivery, with the intent that title in such Purchased Assets shall pass by and upon delivery;

15

(f)      a duly executed assignment agreement or agreements transferring the Intellectual Property Rights to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(g)      an affidavit from Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance satisfactory to Purchaser, issued pursuant to Section 1445 of the Code and the Treasury regulations thereunder stating that Seller is not a foreign person as defined in Section 1445 of the Code;

(h)      certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

(i)      all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing pursuant to this Agreement, in each case in form and substance reasonably acceptable to Seller.

2.10    Deliveries by Purchaser. At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

(a)      any unpaid portion of the Purchase Price;

(b)      the Assignment and Assumption Agreement, duly executed by Purchaser; and

(c)      all other documents, instruments and writings reasonably requested by Seller to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

**3.      Representations and Warranties of Seller**. Subject to the terms, conditions and limitations set forth in this Agreement, Seller hereby represents and warrants to Purchaser as of the date of this Agreement as follows:

3.1    Power. Subject to the entry of an Approval Order (as defined below) by the Bankruptcy Court, Seller has full legal capacity, right, power and authority to enter into this Agreement.

3.2    Authorization. The execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions are within Seller's powers and have been duly authorized by all necessary actions on the part of Seller. Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Cases, this Agreement constitutes a valid and binding agreement of Seller that is enforceable in accordance with its terms.

3.3    Governmental Authorization. The execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions by Seller require no action by or in respect of, or filing with, any Governmental Authority other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

16

3.4    Non-contravention.   Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Cases, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions do not and will not, to the Knowledge of Seller (a) assuming compliance with the matters referred to in Section 3.3, violate any applicable Law or (b) result in the creation or imposition of any Lien on any Purchased Asset, except for Assumed Liabilities, Permitted Encumbrance, or Liens that will be released at or prior to Closing.

3.5    Consents.   Except as disclosed on Schedule 3.5 (which may be modified prior to the Closing Date), and except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, to the Knowledge of Seller, there is no agreement or other instrument binding upon Seller requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement. Notwithstanding the foregoing, nothing set forth herein shall affect any right of the Seller to assume and assign the agreements listed on Schedule 3.5 pursuant to Section 365 of the Bankruptcy Code.

3.6    Litigation.   Except as disclosed on Schedule 3.6 and except for the Bankruptcy Cases, as of the date hereof, there is no action, suit, investigation or legal or administrative proceeding pending or, to the Knowledge of Seller, threatened against or affecting, the Purchased Assets (by any Governmental Authority or Person), including real estate tax assessment appeals, which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

3.7    Permits.   Schedule 2.1(f) sets forth a list of all Permits required to conduct and operate the Business in a manner consistent with the pre-Petition Date practices of the Debtors.  Except as set forth on Schedule 3.7, to the Knowledge of the Seller, no written notice of violation of any Permit has been received from any Governmental Authority, and no proceeding is pending seeking to revoke or limit any such Permit.

3.8    Compliance with Laws and Court Orders.   Seller is not in material violation of any Law applicable to the Purchased Assets or the conduct of the Business.

3.9    Intellectual Property Rights.    To the Knowledge of Seller, (a) Schedule 2.1(g) sets forth an accurate and complete list of all registered Intellectual Property Rights included in the Purchased Assets, and (b) there are no outstanding challenges to the ownership and use by Seller of the Intellectual Property Rights, nor any alleged infringements of such Intellectual Property Rights by third parties.   To the Knowledge of Seller, none of the Intellectual Property Rights included in the Purchased Assets has been licensed by Seller to any other Person.

3.10    Environmental Matters.   To the Knowledge of Seller, and other than as described on Schedule 3.10: (a) neither the Seller nor the Debtors have received any notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the Acquired Owned Real Property which remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Acquired Owned Real Property which remains unperformed, and

17

(b) the Acquired Owned Real Property is in compliance, in all respects, with applicable Environmental Laws.

3.11    Real Property.    Schedule 2.1(a) sets forth the address and description of all Acquired Owned Real Property.  With respect to each parcel of Acquired Owned Real Property, to the Knowledge of Seller and except as set forth on Schedule 2.1(a), (a) there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Acquired Owned Real Property; (b) there are no outstanding options, rights of first offer or rights of first refusal to purchase such Acquired Owned Real Property (other than the right of Purchaser pursuant to this Agreement), or any portion thereof or interest therein; and (c) there are no condemnation or eminent domain proceedings pending or threatened with respect to all or any part of the Acquired Owned Real Property.

3.12    Employment Matters and Employee Benefits.  To the Knowledge of Seller, (a) Schedule 3.12 sets forth a complete and accurate list of Seller's Employee Benefit Plans; (b) with respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law; (c) there are no pending audits or investigations by any Governmental Authority involving any Employee Benefit Plan, and there are no pending or threatened claims (except for individual claims for benefits payable in the normal operation of the Employee Benefit Plans), suits or proceedings involving any Employee Benefit Plan, any trust or other funding medium thereof, fiduciary thereof or service provider thereto, nor is there any reasonable basis for any such claim, suit or proceeding; and (d) the Debtors have performed all material obligations required to be performed by them and are not in any material respect in default under or in violation of any Employee Benefit Plan, nor has there been any such material default or violation by any other party to any Employee Benefit Plan.

3.13    Taxes.    To the Knowledge of Seller, all Tax Returns (including any IRS Forms W-2 or Forms 1099) required to be filed by or on behalf of the Debtors (or any predecessor of the Debtors) and all Tax Returns required to be filed in respect of any Purchased Asset have been timely filed; *provided, however,* Seller makes no representations regarding the accuracy of such Tax Returns.

3.14    Sufficiency of and Title to the Purchased Assets.  Seller will have at Closing good and marketable title to, or a valid leasehold interest in (or license or other right to use), all the Purchased Assets.

3.15    Insurance.  As of the date hereof, to the Knowledge of Seller, all material property and liability insurance policies set forth on Schedule 3.15 are in full force and effect, and no written notice of cancellation, termination or revocation or other written notice that any such insurance policy is no longer in full force or effect or that the issuer of any such insurance policy is not willing or able to perform its obligations thereunder has been received by Seller.  All premiums due and payable on such insurance policies have been paid in full.

18

3.16    <u>Service of Bankruptcy Documents</u>. Seller shall appropriately and timely serve all parties in interest with copies of the Sale and Bidding Procedures Motion and applicable notices as may be required by the Federal Rules of Bankruptcy Procedure and Local Rules of the Bankruptcy Court.

3.17    <u>Certain Fees</u>. No agent, broker, investment banker or other person or firm acting on behalf of Seller or the Debtors, or under her or their authority is or will be entitled to any broker's or finder's fee or any other commission or similar fee or the reimbursement of expenses, directly or indirectly, from Seller in connection with this Agreement or the Transactions.

Except as specifically set forth in this <u>Section 3</u>, Seller does not make any representations or warranties of any kind to Purchaser.

**4.    Representations and Warranties of Purchaser**. Purchaser represents and warrants to Seller as follows:

4.1    <u>Organization</u>. Purchaser is a Delaware limited liability company duly organized, validly existing and in good standing and has all requisite authority to carry on its business.

4.2    <u>Corporate Authorization</u>. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions are within the requisite power and authority of Purchaser and have been duly authorized by all necessary actions on the part of Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

4.3    <u>Governmental Authorization</u>. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a material effect on Purchaser or its ability to close the Transactions.

4.4    <u>Non-contravention</u>. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of organizational documents of Purchaser; (b) require any filing with, or the obtaining of any Permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of Purchaser to

19

consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, Seller.

4.5    <u>Litigation</u>. There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

4.6    <u>Adequacy of Funds</u>. Purchaser has and at the time of Closing will have available to it on an unconditional basis cash proceeds in an amount sufficient to satisfy its monetary and other obligations under this Agreement, including, without limitation, the obligation to pay the Purchase Price in accordance herewith.

**5.    Covenants of Seller**. Seller agrees that:

5.1    <u>Access to Information</u>. From the date hereof until the earlier of the termination of this Agreement pursuant to <u>Section 9.1</u> or the Closing Date, Seller shall reasonably afford to Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal business hours) to and all properties, books, accounts, records and documents of, or relating to, the Business.

5.2    <u>Sales of *De Minimis* Assets</u>. From the execution of the Term Sheet through the Closing Date, Seller shall cease all asset sales, including *de minimis* asset sales, through the Bankruptcy Court or otherwise.

5.3    <u>Notices of Certain Events</u>. Seller shall promptly notify Purchaser of:

(a)    any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b)    any material written communication from any Governmental Authority in connection with or relating to the Transactions; and

(c)    the commencement of any actions, suits, investigations or proceedings relating to Seller, the Debtors, any Purchased Asset or the Business that, if pending on the date of this Agreement, would have resulted in a breach of any representation contained in <u>Section 3</u>.

**6.    Covenants of Purchaser and Seller**. Purchaser and Seller agree that:

6.1    <u>Efforts; Further Assurances</u>. Subject to the terms and conditions of this Agreement, Purchaser and Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the Transactions contemplated by this Agreement. Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary in order

20

to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

6.2    Certain Filings.  Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking to timely obtain any such actions, consents, approvals or waivers.

6.3    Bankruptcy Issues.

(a)    Filing of Sale and Bidding Procedures Motion.  Within three (3) Business Days of the date of this Agreement, Seller shall file with the Bankruptcy Court a motion (the "Sale and Bidding Procedures Motion") seeking, among other things, the entry of (i) the Approval Order, and (ii) an Order (the "Bidding Procedures Order") approving the bidding and auction procedures set forth in Sections 6.3(b) and (c) (the "Bidding Procedures").

(b)    Bidding Procedures.  In the Sale and Bidding Procedures Motion, Seller shall seek, among other things, approval of the following Bidding Procedures, which shall be incorporated into the Bidding Procedures Order:

(i)    Bidding Deadline. Any third party (other than Purchaser) (a "Bidder") must submit a bid (the "Bid") in accordance with the terms of the Bidding Procedures so that the Bid is actually received by each of the Notice Parties no later than 10:00 a.m. (prevailing Eastern time) on September 13, 2018 (the "Bid Deadline"). Written copies of all Bids shall be delivered by the Bid Deadline to:  (A) counsel to Seller, Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, PA  19103-3222, Attn:  Michael Menkowitz, Esq., mmenkowitz@foxrothschild.com; (B) counsel to the Purchaser, Vedder Price P.C., 222 N. LaSalle Street, Chicago, IL 60601, Attn: Michael M. Eidelman, Esq., meidelman@vedderprice.com; and (C) counsel to Fulton Bank, N.A., Reed Smith LLP, 3 Logan Square, Suite 3100, 1717 Arch Street, Philadelphia, PA 19103, Attn: Brian M. Schenker; (D) (collectively, the "Notice Parties").  A Bid received after the Bid Deadline shall not constitute a Qualified Bid.  A Bid shall be delivered to all Notice Parties at the same time.  Seller shall deliver to the Notice Parties, at least forty-eight (48) hours prior to the Auction, written confirmation from the Seller that she has a good faith basis to believe the Bidder has a sufficient commitment for financing pursuant to Section 6.3(b)(ii)(D) hereof.  Interested Bidders requesting information about the qualification process, including a copy of this Agreement, and information in connection with their due diligence, should contact Seller's counsel at the above address.

21

(ii)    Designation as Qualified Bidder.  To participate in the Auction, a Bidder must submit a Bid that is determined by Seller to satisfy each of the following conditions (a "Qualified Bid" and the entity submitting such Qualified Bid, a "Qualified Bidder"):

(A)    Written Submission of Modified APA and Commitment to Close.  Bidders must submit a Bid by the Bid Deadline in the form of an executed mark-up of this Agreement (each a "Modified APA") reflecting such Bidder's proposed changes to this Agreement (together with a blackline of the Modified APA against this Agreement), and a written and binding commitment to close on the terms and conditions set forth therein.  Seller may discuss the Modified APA of any Bidder after submission with such Bidder including, for clarification, the terms and conditions of the Modified APA.  Each Modified APA shall (I) have substantially similar terms and conditions (provided that no Bid other than this Agreement may provide for payment of any break-up fee, expense reimbursement, or similar type of payment) as this Agreement except with higher and better consideration; and (II) contain terms and conditions in the aggregate no less favorable to the Debtors' estates than the terms and conditions in this Agreement; provided, however, the Seller shall have the sole discretion to sell the Debtors' assets in the lots described in Section 6.3(c)(iv) (each, a "Lot Bid") in accordance with the Bidding Procedures Order and the Bidding Procedures.  In order for a Modified APA to be deemed a Qualified Bid, it must provide for the acquisition of all of the Purchased Assets or contain a Lot Bid;

(B)    Irrevocable.  A Bid must be irrevocable until four (4) Business Days after entry of the approval order, 2018 (the "Termination Date");

(C)    Contingencies.  A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence.  Any other contingencies associated with a Bid may not, in the aggregate, be materially more burdensome than those set forth in this Agreement;

(D)    Financing Sources and Evidence of Financial Ability to Close.  A Bid must identify the actual Bidder and owners and ultimate parent company of the Bidder and contain written evidence of a commitment for financing or other evidence of the ability to fund and consummate the Sale on or before a closing date satisfactory to Seller with appropriate contact information for such financing or funding sources;

(E)    No Fees Payable to Bidder.  A Bid may not request, be conditioned on or otherwise entitle the Bidder (other than Purchaser) to any break-up fee, expense reimbursement or similar type of payment.  A Bidder shall be deemed to waive the right to pursue a substantial

22

contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid or the Bidding Procedures;

       (F)    <u>Good-Faith Deposit</u>. Each Bid must be accompanied by a cash deposit in an amount equal to ten (10%) percent in cash of the cash and the value of the non-cash purchase price allocated to the Purchased Assets under the Modified APA, which shall be paid to Seller to be held in an escrow account established at United Bank, ABA Number 211170318; Account No. 710000007408; Name: Worley & Obetz, Inc.; Reference – Christine C. Shubert, Trustee in accordance with the Bidding Procedures;

       (G)    <u>Minimum Initial Overbid</u>.  The aggregate consideration in a Bid must have (I) a cash purchase price for the Purchased Assets of the amount payable for the Purchased Assets under this Agreement, being Eight Million One Hundred Thousand Dollars ($8,100,000), <u>plus</u> (II) the amount of the Bid Protection, <u>plus</u> (III) the amount of the Break-Up Fee (the "<u>Minimum Initial Overbid</u>");

       (H)    <u>List of Executory Contracts and Unexpired Leases</u>. Each Bid must be accompanied by a list of Debtors' executory and unexpired leases that the Bidder desires to assume and a packet of information, including financial information, that will be provided to the non-Debtor parties to such executory contracts and unexpired leases sufficient to demonstrate adequate assurance of future performance; and

       (I)    <u>Fulton Bank</u>. Notwithstanding anything set forth hereunder, Fulton Bank, N.A. shall automatically be deemed to be a Qualified Bidder hereunder without taking any actions otherwise required to be taken under this <u>Section 6.3</u>, shall have consultation rights throughout the Bid process, shall have the right to attend and participate at the Auction without having submitted a Qualified Bid, and shall be a third-party beneficiary to the Bid procedure in the same way as Purchaser. Notwithstanding anything set forth hereunder, nothing herein shall alter or modify the rights of Fulton Bank, N.A. under section 363(k) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, (i) Fulton Bank N.A. shall not exercise its credit bid rights to make the Minimum Initial Overbid; and (ii) any credit bid by Fulton Bank shall contain a stipulation and agreement with Seller providing for the consensual use of cash collateral by Seller to pay the Break-Up Fee to Purchaser and Fulton Bank shall enter into a stipulation and agreement with Seller that Fulton Bank shall pay all amounts due under the First Amended Stipulation and Order.

       (iii)    <u>Due Diligence from Bidders</u>. Each Qualified Bidder shall comply with all reasonable requests for additional information by Seller regarding such Bidder and its contemplated transaction.  Failure by a Bidder to comply with requests for additional information will be a basis for Seller to determine that the Bidder is not a Qualified Bidder.  Seller acknowledges

that Purchaser is a Qualified Bidder and that this Agreement constitutes a Qualified Bid.

(c)    Auction. The Seller shall conduct an auction sale of the Purchased Assets to determine the highest and/or best Bid with respect to the Purchased Assets (the "Auction") only if she receives, prior to the Bid Deadline, (1) a Qualified Bid (other than this Agreement) for the entirety of the Purchased Assets or (2) a combination of Lot Bids (each of which must be a Qualified Bid) providing for, in the aggregate, a Purchase Price that exceeds the Minimum Initial Overbid. The Auction shall commence on September 17, 2018, at 9:00 a.m. (Eastern Standard Time) at the offices of Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, PA 19103. If no such Qualified Bid(s) is/are received by the Bid Deadline, then the Auction shall not take place, Purchaser shall be declared the Successful Bidder, and Seller shall seek approval of, and authority to consummate, this Agreement and the Transactions at the Approval Hearing. If a Qualified Bid(s) is/are received in accordance with these Bidding Procedures, the Auction shall be conducted according to the following procedures:

(i)    Participation at the Auction. Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. For greater certainty, Purchaser is a Qualified Bidder and eligible to participate at the Auction. Only the authorized representatives (including counsel and other advisors) of each of the Purchaser, Qualified Bidders and Seller and any other party in interest or its representative who provide Seller with written notice forty-eight (48) hours prior to the Auction shall be permitted to attend the Auction. During the Auction, the bidding shall begin with the highest Qualified Bid (the "Opening Bid") and each subsequent round of bidding shall continue in minimum increments of at least the Subsequent Overbid Increment. At least one (1) Business Day prior to the start of the Auction, Seller shall provide a copy of the Opening Bid to all participating Qualified Bidders attending the Auction and a blackline of the Opening Bid to this Agreement. Seller shall select the Opening Bid, in her discretion. The determination of which Qualified Bid constitutes the Opening Bid shall take into account any factors Seller reasonably deems relevant to the value of the Qualified Bid to Seller including, among other things, the following: (A) the amount and nature of the consideration; (B) the proposed assumption of liabilities, if any; (C) the ability of the Qualified Bidder to close the proposed transaction; (D) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (E) any purchase price adjustments; (F) the impact of the contemplated transaction on any actual or potential litigation; (G) the net economic effect of any changes from this Agreement, if any, contemplated by the contemplated transaction documents (the "Contemplated Transaction Documents"); (H) the net after-Tax consideration to be received by Seller; (I) the net amounts to be paid to the Debtors' estates, taking into account, among other things, payment of the Break-Up Fee and Cure Costs; and (J) such other

24

considerations as Seller deems relevant in her reasonable business judgment (collectively, the "Bid Assessment Criteria").

(ii)      Authority to Bid.  All representatives of Qualified Bidders who submit any bids at the Auction shall represent on the record that they have authority to bid and that the Bid they submit is binding on the Qualified Bidder.

(iii)      Conduct of the Auction.  Seller and her advisors shall direct and preside over the Auction.  All Bids made after the Opening Bid shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders that are participating in the Auction.  Each Qualified Bidder will be permitted a fair, but limited amount of time to respond to each Overbid.  Seller shall maintain a transcript of the Opening Bid and all Overbids made and announced at the Auction, including the Successful Bid and the Back-up Bid;

(iv)      Lots.  Qualified Bidders may submit a Lot Bid for one (1) or more of the following Lots and the associated assets listed below, to the extent they are not expired or revoked:

(1).      Lot No. 1 – Worley & Obetz, Inc., Retail Division.  Lot No. 1 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Retail Division, which was engaged in the business of delivery of heating oil to local residences, and diesel, kerosene, and gasoline fuel to local farms and businesses.  Such assets include certain (a) real property located across the street from 85 White Oak Road, Manheim, PA 17545 (Tax Parcel No. 500-04089-0-0000), and any building structure and improvements thereon, and all personal property and fuel inventory located on the premises to the extent personal property is not assigned and/or included in other lots/divisions,  (b) real property located at 24 New Charlotte Street, Manheim, PA 17545, and any building, warehouse, structure, and improvements thereon, and all personal property and fuel inventory located on the premises to the extent personal property is not assigned and/or included in other lots/divisions, (c) two (2) leases for tank storage, (d) other storage and skid tanks, (e) access to Cargas Energy system for customer information and location, (f) retail tankwagon trucks and any fuel inventory located therein, and (g) other related assets used in the business operations of Worley & Obetz, Inc.'s Retail Division.

(2).      Lot No. 2 – Worley & Obetz, Inc., Propane Division.  Lot No. 2 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Propane Division, which was engaged in the business of delivery of propane fuel to local residences, local farms

25

ACTIVE\64374627.v4

and businesses. Such assets include (a) three (3) propane tank storage property leases, (b) certain customer tanks owned by Worley & Obetz, Inc., (c) certain bulk storage tanks and any fuel inventory included therein, (d) various customer supply and delivery agreements, (e) access to Cargas Energy system for customer information and location, (f) certain propane tank parts and installation equipment, (g) two (2) 2018 Ford F-350 Supercab propane crane trucks, (h) one (1) 2015 Peterbilt 348 retail propane truck and any fuel inventory located therein, (i) one (1) 2017 Peterbilt retail propane truck and any fuel inventory located therein, (j) certain retail propane trucks, propane utility trucks, propane crane tricks, and trailers for propane tanks and any fuel or other inventory located therein, and (k) other related assets used in the business operations of Worley & Obetz, Inc.'s Propane Division.

(3).   Lot No. 3 – Worley & Obetz, Inc., Service & Installation Division. Lot No. 3 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Service & Installation Division, which was engaged in the business of installation and maintenance of residential and small commercial HVAC systems for commercial customers, which systems utilize heating oil and propane, electric heat pumps, or natural gas. Such assets include (a) certain HVAC service equipment, parts and sundry inventory stored at 85 White Oak Road, Manheim, PA, (b) certain service contracts for customer HVAC systems, (c) access to Cargas Energy system for customer information and location, (d) one (1) 2017 Ford Transit 250 Service Van and any HVAC service part inventory located therin, (e) certain service vans and utility trailers and any HVAC service part inventory located therein, and (f) other related assets used in the business operations of Worley & Obetz, Inc.'s Service & Installation Division.

(4).   Lot No. 4 – Worley & Obetz, Inc., Value Energy North Division. Lot No. 4 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Value Energy North Division, which was engaged in the business of (a) delivery of heating oil and propane to local residences, and diesel, kerosene, and gasoline fuel to local farms and businesses, and (b) maintenance and service of residential HVAC systems. Such assets include (a) leases for the office space located at 318 N. Elmer Avenue and 417 North Lehigh Street, Sayre, PA 18840, (b) one (1) propane storage property tank lease, (c) one (1) copier lease, (d) certain customer tanks owned by Worley & Obetz, Inc., (e) certain bulk storage tanks and any fuel inventory located therein, (f) certain HVAC equipment and supplies used for the maintenance and service residential customer HVAC systems, (g) certain miscellaneous truck parts and maintenance equipment, (h) access to Cargas Energy system for customer

26

information and location, (i) one (1) 2017 Peterbilt retail propane truck and any fuel inventory located therein, (j) certain service vans, retail tankwagons, retail propane trucks, employee trucks and vehicles and any fuel or HVAC service part inventory located therein, and (k) other related assets used in the business operations of Worley & Obetz, Inc.'s Value Energy North Division.

(5).    Lot No. 5 – Worley & Obetz, Inc., Value Energy South Division. Lot No. 5 consists of substantially all of the assets necessary to operate W&O's Value Energy South Division, which was engaged in the business of delivery of heating oil and propane to local residences, and diesel, kerosene, and gasoline fuel to local farms and businesses. Such assets include (a) access to Cargas Energy system for customer information and location, (b) one (1) 2015 Peterbilt 348 retail tankwagon and any fuel inventory located therein, (c) certain retail propane trucks and retail tankwagons and any fuel inventory located therein, and (d) other related assets used in the business operations of Worley & Obetz, Inc.'s Value Energy South Division.

(6).    Lot No. 6 – Worley & Obetz, Inc., Fleet Fueling Division. Lot No. 6 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Fleet Fueling Division, which was engaged in the business of delivery of gasoline, diesel and diesel exhaust fluid to customer sites and directly into customer fuel trucks. Such assets include (a) access to Fleetcor system for customer information and location, (b) 6,500 gallon diesel exhaust fluid storage tank and any inventory located therein, (c) two (2) 2018 Mack GU713 fleet fueling trucks and any fuel inventory located therein, (d) certain fleet fueling trucks, fleet fueling diesel exhaust fluid delivery trucks and vans, and utility trailer and any fuel inventory located therein, and (e) other related assets used in the business operations of Worley & Obetz, Inc.'s Fleet Fueling Division.

(7).    Lot No. 7 – Worley & Obetz, Inc., Wholesale Division. Lot No. 7 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Wholesale Division, which was engaged in the business of delivery of gasoline, diesel and propane to resellers and large users. Such assets include (a) six (6) leases for truck parking lots at various locations, (b) one (1) lease for electronic logs with Vendor Services Group, (c) access to Cargas Energy system for customer information and location, (d) two (2) 2019 Peterbilt 567 Wholesale Tractors, (e) two (2) 2019 Heil Tank Trailers and any fuel inventory located therein, (f) one (1) 2007 Heil Petroleum Tank Trailer and any fuel inventory located therein, (g) two (2) 2014 Peterbilt 388 wholesale tractors, (h) one (1) 2014 Freightliner

27

Coronado wholesale tractor, (i) three (3) 2016 Freightliner
Coronado wholesale tractors, (j) three (3) 2014 Heil DOT 406
wholesale tank trailers and any fuel inventory located therein, (k)
one (1) 2017 Heil DOT 406 wholesale tank trailer and any fuel
inventory located therein, (l) seven (7) International wholesale
tractors (years 1999, 2007, 2010 (2), 2015, 2016), (m) seven (7) Heil
Trailer wholesale tank trailers (years 2001 (2), 2002 (2), 2012, 2013,
and 2014) and any fuel inventory located therein, (n) three (3) 2015
Heil Trailer wholesale tank trailers and any fuel inventory located
therein, (o) two (2) 2017 Freightliner CA125DC wholesale tractors,
(p) one (1) 2017 Mack CXU613 wholesale tractor, (q) one (1) 2017
Westmor Proline MC-331 wholesale propane trailer and any fuel
inventory located therein, (r) one (1) 2016 Beall Petroleum Trailer
and any fuel inventory located therein, (s) certain wholesale tractors,
wholesale tank trailers, wholesale propane trailers, and utility
trailers and any fuel inventory located therein, and (t) other related
assets used in the business operations of Worley & Obetz, Inc.'s
Wholesale Division.

(8).     Lot No. 8 – Worley & Obetz, Inc., Pickup Truck Passenger
Vehicles. Lot No. 8 consists of Pickup Truck Passenger Vehicles
owned by Worley & Obetz, which vehicles include (a) five (5) Ford
F-150 (years 2001, 2013, 2013, 2015, and 2016), (b) four (4) Ford
F-250 (years 2003, 2011, 2014, and 2015), (c) one (1) 2008 Ford F-
150 Supercab, (d) three (3) Dodge Ram 1500 (years 2014 (1) and
2015 (2)), (e) one (1) 2017 Dodge Ram 2500, and (f) one (1) 2007
Dodge Dakota.

(9).     Lot No. 9 – Worley & Obetz, Inc., Premium Passenger Vehicles.
Lot No. 9 consists of Premium Passenger Vehicles owned by
Worley & Obetz, which vehicles include (a) six (6) Jeep Grand
Cherokee (years 2014 (2) and 2015 (4)), (b) one (1) 2015 Jeep
Cherokee, (c) one (1) 2015 Audi Q7, (d) one (1) 2008 Cadillac
Escalade, (e) one (1) 2013 Volkswagen Toureg, (f) one (1) 2018
Range Rover, and (g) one (1) 2016 Ford Explorer.

(10).    Lot No. 10 – Worley & Obetz, Inc., Economy Passenger Vehicles.
Lot No. 10 consists of Premium Passenger Vehicles owned by
Worley & Obetz, which vehicles include (a) seven (7) Ford Escape
(years 2010 (2), 2016 (2), 2017 (3)), (b) two (2) 2018 Chevrolet
Equinox, (c) one (1) 2005 Jeep Liberty Sport, (d) one (1) 2008 Jeep
Cherokee, (e) one (1) 2003 Ford Excursion, (f) one (1) 2015
Chevrolet Cruze, and (g) one (1) 2017 Chevrolet Bolt.

(11).    Lot No. 11 – Amerigreen Propane, LLC, Wholesale Division. Lot
No. 11 consists of substantially all of the assets necessary to operate
Amerigreen Propane, LLC's Wholesale Division, which was

28

engaged in the business of wholesale sales of propane to other petroleum distributors. Such assets include (a) certain terminal transloader agreements, (b) certain propane throughput agreements, (c) fuel inventory located at certain third party locations, (d) access to Cargas Energy system for customer information and location, (e) one (1) truck and one (1) trailer for transloader owned by Amerigreen Propane, LLC, and (f) other related assets used in the business operations of Amerigreen Propane, LLC's Wholesale Division.

(12).    <u>Lot No. 12 – Amerigreen Energy, Inc., Renewables Division</u>. Lot No. 12 consists of substantially all of the assets necessary to operate Amerigreen Energy, Inc.'s Renewables Division, which was engaged in the business of wholesale sales of renewable fuels, including biodiesel and ethanol, to other petroleum distributors. Such assets include certain (a) terminal service and throughput agreements at fifty (50) terminal locations, (b) biodiesel storage, blending, and throughput agreements, (c) fuel inventory located at certain third party locations, (d) access to Cargas Energy system for customer information and location, and (e) other related assets used in the business operations of Amerigreen Energy, Inc.'s Renewables Division.

(13).    <u>Lot No. 13 – Amerigreen Energy, Inc., Petroleum Division</u>. Lot No. 13 consists of substantially all of the assets necessary to operate Amerigreen Energy, Inc.'s Petroleum Division, which was engaged in the business of wholesale sales of diesel, heating oil and gasoline to other petroleum distributors. Such assets include (a) one (1) tank storage lease, (b) certain terminal agreements, (c) certain terminal throughput agreements, (d) certain terminal storage and throughput agreements, (e) fuel inventory located at certain third party locations, (f) certain marketing agreements, (g) access to Cargas Energy system for customer information and location, and (h) other related assets used in the business operations of Amerigreen Energy, Inc.'s Petroleum Division.

(14).    <u>Lot No. 14 – Amerigreen Energy, Inc., Electricity Supply & Brokerage Divisions</u>. Lot No. 14 consists of substantially all of the assets necessary to operate Amerigreen Energy, Inc.'s Electricity Supply & Brokerage Divisions, which were engaged in the businesses of (a) supplying electricity purchased from wholesale market for delivery to residential and commercial customers through public utility companies, and (b) brokerage for sale of electricity to residential and commercial customers for third party suppliers. Such assets include (a) certain unexpired brokerage contracts with future annuity payment stream, (b) brokerage area covering any deregulated electricity state, (c) access to utility billing

29

information and brokerage contracts, and (d) other related assets used in the businesses of Amerigreen Energy, Inc.'s Electricity Supply & Brokerage Divisions.

(15). <u>Lot No. 15 – Amerigreen Energy, Inc., Natural Gas Division</u>. Lot No. 15 consists of substantially all of the assets necessary to operate Amerigreen Energy, Inc.'s Natural Gas Division, which was engaged in the business of supplying natural gas purchased from wholesale market for delivery to residential and commercial customers through ten (10) public utility companies. Such assets include (a) the supply area for residential and commercial customers across Pennsylvania, New York and New Jersey, (b) access to utility billing information and brokerage contracts, and (c) other related assets used in the business of Amerigreen Energy, Inc.'s Natural Gas Division.

(16). <u>Lot No. 16 – Amerigreen Energy, Inc., Passenger Vehicles</u>. Lot No. 16 consists of Passenger Vehicles owned by Amerigreen Energy, Inc., which vehicles include (a) six (6) Jeep Grand Cherokee (years 2010 (2), 2014 (3), and 2015), (b) two (2) 2016 Ford Escape, (c) one (1) 2015 Chevrolet Tahoe, and (d) one (1) 2011 Ford F-650 Box Truck.

(17). <u>Lot No. 17 – Worley & Obetz, Inc., Real Property and Improvements at 107 Maytown Road, Elizabethtown, PA</u>. Lot No. 17 consists of the real property located at 107 Maytown Road, Elizabethtown, PA, and all buildings, improvements, and personal property located thereon.

(18). <u>Lot No. 18 – Worley & Obetz, Real Property, Office Building, and Warehouse located at 85 White Oak Road, Manheim, PA 17545</u>. Lot No. 18 consists of the real property located at 85 White Oak Road, Manheim, PA 17545 (Tax Parcel No. 500-27334-0-0000), the office building, warehouse, and improvements thereon, and all personal property located on the premises to the extent personal property is not assigned and/or included in other lots/divisions. Lot No. 18 specifically excludes the retail storage area located across the street. Lot No. 18 also includes (a) one (1) electric motorcycle, (b) one (1) 2010 John Deere Gator, (c) one (1) custom motorcycle, (d) one (1) Hyster Towmotor forklift, and (e) one (1) 2014 John Deere Z950R LP Mower.

(v)    <u>Terms of Overbids</u>.  An "<u>Overbid</u>" is any Bid made at the Auction subsequent to Sellers' announcement of (A) the Opening Bid, and (B) the then highest and/or best Overbid at the beginning of each subsequent round of bidding (the "<u>Round Leading Bid</u>").  To submit an Overbid, in any

30

round of the Auction, a Qualified Bidder must comply with the following conditions:

(A)    Subsequent Overbid Increment.  Any Overbid shall be made in increments of at least two hundred fifty thousand dollars ($250,000.00) (the "Subsequent Overbid Increment").  The amount of the Purchase Price of any Overbid shall not be less than the Purchase Price of the Opening Bid or the Round Leading Bid, as applicable.

(B)    Remaining Terms the Same as for Qualified Bids. Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid and the Minimum Initial Overbid requirements shall be replaced with the Subsequent Overbid Increment requirements set forth above; provided, however, that the Bid Deadline shall not apply.  Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until the Termination Date.  Seller shall credit the amount of the Break-Up Fee to each and every Overbid submitted by Purchaser at the Auction, meaning that if Purchaser's subsequent Overbid is the Round Leading Bid, any subsequent Overbid must exceed Purchaser's Overbid by the amount of the Break-Up Fee and Subsequent Overbid Increment.  To the extent not previously provided (which shall be determined by Seller), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement acceptable to Seller in her reasonable business judgment) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

(C)    Announcing Overbids.  At the start of each round of bidding, Seller shall announce the Round Leading Bid, the basis for calculating the total consideration offered in the Round Leading Bid, and the resulting benefit to Seller based on, among other things, the Bid Assessment Criteria.

(vi)    Closing the Auction.  Upon conclusion of the bidding, the Auction shall be closed, and Seller shall identify the highest and/or best Overbid or Opening Bid (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder"), and the next highest and/or best Overbid or Opening Bid, after the Successful Bid (the "Back-up Bid"), and advise the remaining Qualified Bidders of such determination.  All bidding for the Purchased Assets will be concluded at the Auction and there will be no further bidding at the Bankruptcy Court hearing held in the Bankruptcy Cases to approve the highest or best bid for the Purchased Assets (the "Approval Hearing").  If the Successful Bidder fails to close on the Successful Bid, the Back-up Bid shall automatically be deemed to be the winning Bidder; provided, however, the Back-up Bid shall be recalculated to an amount that would have been the Successful Bid had

31

the Successful Bidder not participated at the Auction, <u>plus</u> an additional $100,000.

(d)     <u>Consent to Jurisdiction as Condition to Bid</u>. All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable. Qualified Bidders (other than Purchaser) shall not be deemed third party beneficiaries of these Bidding Procedures and shall not have standing to object to the administration of the Bidding Procedures by Seller.

(e)     <u>Reimbursement of Deposit; Break-Up Fee</u>. Upon consummation of a sale of all or substantially all of the Purchased Assets to any third party (other than Purchaser) who submits the Successful Bid for the Purchased Assets, upon the occurrence of the actions set forth in <u>Section 9.1(a)</u>, <u>9.1(b)</u>, <u>9.1(d)</u>, or <u>9.1(f)</u>, or if Seller commits a material breach of this Agreement or unilaterally abandons consummation of the Transactions contemplated by this Agreement, Seller shall (i) pay to Purchaser in immediately available funds an amount equal to the Break-Up Fee, and (ii) refund the Deposit. The provisions of this <u>Section 6.3(e)</u> shall survive any termination of this Agreement. The Break-Up Fee shall be treated as a Chapter 7 administrative expense claim in the Bankruptcy Cases, and shall be paid to Purchaser upon the earlier to occur from (x) the closing of the sale of all or substantially all of the Purchased Assets to any third party (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Break-Up Fee), or (y) the Closing of the Bankruptcy Cases. The obligation to pay the Break-Up Fee and Deposit under this Agreement shall be absolute and unconditional and shall not be subject to any defense, claim, counterclaim, offset, recoupment or reduction of any kind whatsoever, <u>provided</u>, <u>however</u>, that, for the avoidance of doubt and notwithstanding anything herein to the contrary, the Break-Up Fee shall only be payable if approved by the Bankruptcy Court. Purchaser's right to the Break-Up Fee shall be the sole and exclusive remedy of Purchaser in the event Seller materially breaches this Agreement or if this Agreement is terminated by Seller.

(f)     <u>Bankruptcy Court Approval of Sale</u>. Seller and Purchaser shall each use their reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order (the "<u>Approval Order</u>") of the Bankruptcy Court in the Bankruptcy Cases in form and substance acceptable to Seller and Purchaser containing provisions, including without limitation, (i) approving this Agreement, (ii) authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code, (iii) authorizing the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, (iv) authorizing the Transactions, (v) approving the Break-Up Fee and Bid Protection and (vi) providing that this Agreement and the Transactions are undertaken by Purchaser and Seller at arm's length, without collusion, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, that Purchaser and Seller are entitled to the protections of Section 363(m) of the Bankruptcy Code, and that

32

the provisions of Section 363(n) of the Bankruptcy Code are not applicable. Seller and Purchaser shall cooperate with one another in good faith regarding pleadings that either of them intends to file, or positions either of them intends to take, with the Bankruptcy Court in connection with or that might reasonably affect the Bankruptcy Court's entry of the Approval Order.

6.4    Computer Systems. After Closing, Purchaser shall afford Seller and Debtors, their respective employees, consultants, accountants, attorneys, or other advisors, agents, or other representatives (collectively, the "Seller Representatives"), full access (remote or on-site access) to any and all books and records, computer hardware, computer peripherals, computer software and data, computer systems, personnel records, paper or electronic files, data generated by and/or stored on either Purchaser computer systems and storage media (e.g., backups, hard drives, flash or "thumb" drives, CD's, DVD's, etc.), or any other electronically stored documents, information and/or data, and any and all other records and files concerning the Debtors, the Business, the Purchased Assets, and personnel (collectively, the "Records"), and shall furnish such Records to the Seller Representatives, as Seller and the Debtors may request. Purchaser will also allow the Debtors' computer consultant to access and monitor the Records. Purchaser shall preserve any and all Records from destruction or alteration until the date that is ninety (90) days after Purchaser provides written notice to Seller and Debtors pursuant to Section 6.9 below of Purchaser's request to destroy any Records; provided, however, that Purchaser may not provide such written notice during the first 120 days after Closing and further provided that Seller or the Debtors shall have the right to purchase back such Records at fair market value upon receipt of such written notice before such Records are destroyed.

6.5    Personally Identifiable Information. Purchaser acknowledges that Purchaser is acquiring certain personally identifiable information as part of the Purchased Assets, including, without limitation, names, addresses, email addresses, telephone numbers, Social Security numbers, government identification numbers. Purchaser hereby agrees and covenants to remain in compliance with all applicable Law, including, without limitation, applicable data and/or privacy Laws, concerning the ownership, possession, and treatment of such personally identifiable information.

6.6    Office Access. For a period of thirty (30) days after Closing, Purchaser shall allow Seller and the Debtors full access to the offices located at 85 White Oak Road, Manheim, PA 17545 during business hours.

6.7    Cooperation. The parties hereto shall cooperate fully with each other and their respective counsel and agents and representatives in connection with all steps to be taken as part of their obligations under this Agreement.

6.8    Assignees. Diesel shall cause the Assignees to comply with all Purchaser obligations hereunder to Seller and Diesel shall remain liable for all Purchaser obligations to Seller and Liabilities hereunder.

33

6.9    <u>Notices</u>. If at any time (a) Purchaser becomes aware of any material breach by Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Seller, or (b) Seller becomes aware of any breach by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with <u>Section 10.1</u>, in writing of such breach. Upon such notice of breach, the breaching Party shall have until the earlier of (y) ten (10) days after receiving such notice, and (z) the End Date, to cure such breach prior to the exercise of any remedies in connection therewith.

## 7.    Tax Matters.

7.1    <u>Tax Cooperation</u>. Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of any Tax Returns, the making of any election relating to Taxes, the preparation for any audit or examination by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax. Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business (each, a "<u>Tax Claim</u>"), provided that Seller shall (a) promptly notify Purchaser of any notice received in respect to any Tax Claim, (b) promptly notify Purchaser of any significant developments regarding such Tax Claim, (c) permit Purchaser (if Purchaser so chooses) to control the defense and/or resolution of any Tax Claim if any resolution or settlement of such Tax Claim reasonably could be expected to have an effect on Purchaser, any of Purchaser's Affiliates or any Purchased Asset for any taxable period, (d) take all actions and cooperation reasonably necessary in furtherance of the immediately preceding clause (c), and (e) not settle or otherwise resolve any Tax Claim without the prior written consent of Purchaser.

7.2    <u>Transfer Taxes</u>. All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest thereon) incurred in connection with this Agreement (collectively, "<u>Transfer Taxes</u>") shall be split equally between Seller and Purchaser, and Purchaser shall file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other taxes and fees, and if required by applicable law, the Seller and the Debtors shall join in the execution of any such Tax Returns and other documentation. The cost of filing any such tax returns shall be split equally between Seller and Purchaser.

7.3    <u>Real Property Taxes</u>. Real estate Taxes and water and sewer rents, if any, shall be apportioned and pro-rated between Seller and Purchaser as of the Closing Date. All state, county and local realty, conveyance, recordation and/or documentary Transfer Taxes shall be split equally between the Purchaser and Seller. Any real estate Taxes not known or estimated at the Closing and/or real estate Taxes readjusted by municipal authorities after the Closing shall be re-prorated when the amount thereof becomes known.

ACTIVE\64374627.v4

7.4    <u>Personal Property, Ad Valorem and Excise Taxes</u>.  Purchaser shall not be liable for any unpaid personal property, ad valorem or excise taxes assessed or due to be paid prior to the Closing Date.

**8.    Closing Conditions**.

8.1    <u>Conditions to Obligations of Purchaser and Seller</u>.  The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction at or before Closing of each and every one of the following conditions:

(a)    The Bankruptcy Court shall have entered the Approval Order in the Bankruptcy Cases, and the Bankruptcy Court shall have waived the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Approval Order, authorizing the Transactions and approving this Agreement under Sections 105(a), 363 and 365 of the Bankruptcy Code, in form and substance reasonably acceptable to Seller and Purchaser, and the Approval Order shall contain findings that Purchaser acquired the Purchased Assets in good faith, for fair value, in an arm's length transaction, and as of the Closing Date the Approval Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed; and

(b)    No injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

8.2    <u>Conditions to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)    Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date;

(b)    the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date);

(c)    Seller shall not be in default in any material respect under the provisions of this Agreement; and

(d)    Purchaser shall have received all of the documents required to be delivered by Seller under <u>Section 2.9</u>.

8.3    <u>Conditions to Obligations of Seller</u>.  The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

35

(a)    Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

(b)    the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date);

(c)    Purchaser shall not be in default in any material respect under the provisions of this Agreement; and

(d)    Seller shall have received all of the documents required to be delivered by Purchaser under Section 2.10.

9.    **Termination.**

9.1    Grounds for Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of Seller and Purchaser;

(b)    by Seller or Purchaser, if the Closing shall not have been consummated on or before October 16, 2018 (the "End Date"), unless the Party seeking termination is in breach of its obligations hereunder;

(c)    by Seller or Purchaser, if any condition set forth in Section 8.1 is not satisfied, and such condition is incapable of being satisfied by the End Date;

(d)    by Purchaser, if any condition set forth in Section 8.2 has not been satisfied, and such condition is incapable of being satisfied by the End Date;

(e)    by Seller, if any condition set forth in Section 8.3 has not been satisfied, and such condition is incapable of being satisfied by the End Date; or

(f)    by Seller, if (i) Seller executes a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Cases approving such definitive agreement.

The Party desiring to terminate this Agreement pursuant to this Section 9.1 (other than pursuant to Section 9.1(a)) shall give notice of such termination to the other Party in accordance with Section 10.1.

9.2    Effect of Termination.  If this Agreement is terminated as permitted by Section 9.1, such termination shall be without Liability of any Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other

36

Party to this Agreement except as expressly provided in Section 6.3(e). The provisions of Section 6.3(e) shall survive any termination hereof pursuant to Section 9.1.

    9.3    <u>Fees and Expenses</u>. Except as otherwise set forth expressly herein, all costs and expenses incurred by the Parties in connection with obtaining Bankruptcy Court approval and consummation of this Agreement and the Transactions contemplated hereby shall be paid by the Party incurring such cost or expense.

**10.**    **Miscellaneous**.

    10.1    <u>Notices</u>. All notices, requests and other communications to any Party hereunder shall be in writing (including via electronic mail) and shall be given,

    if to Purchaser, to:

        Diesel Direct Holdings, Inc.
        c/o
        John T. McLaughlin
        Berluti McLaughlin & Kutchin LLP
        44 School Street, Boston, MA 02108
        T: (617) 557-3030
        Email: jmclaughlin@bmklegal.com

    if to Seller, to:

        Christine C. Shubert
        821 Wesley Avenue
        Ocean City, NJ 08226
        e-mail:  Christine.shubert@bmstrustee.onmicrosoft.com

    with a copy to (which shall not constitute notice):

        Fox Rothschild LLP
        2000 Market Street
        20th Floor
        Philadelphia, PA  19103
        Attn:  Michael Menkowitz
        e-mail:  mmenkowitz@foxrothschild.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

    10.2    <u>Limitation on Damages</u>. No Party shall be authorized to recover from the other Party any special, consequential, exemplary or punitive damages on account of any breach of this Agreement, AND ANY SUCH CLAIM, RIGHT, OR CAUSE OF ACTION

37

FOR ANY SUCH DAMAGES IS HEREBY FULLY WAIVED, RELEASED AND FOREVER DISCHARGED.

10.3    Waivers. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative.

10.4    Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, however, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party; provided further that Purchaser shall have the right to designate one or more wholly owned subsidiaries or Affiliates to take title to the Purchased Assets at the Closing, so long as Purchaser remains liable for all of its obligations hereunder and provided such designation does not violate any consent or other approval which has been obtained by Seller.

10.5    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the Commonwealth of Pennsylvania and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

10.6    Jurisdiction.

(a)    Prior to the closing of the Bankruptcy Cases, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 10.1 shall be deemed effective service of process on such Party.

(b)    After the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the Commonwealth of Pennsylvania, and

38

each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 10.1</u> shall be deemed effective service of process on such Party.

10.7    <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

10.8    <u>No Third-Party Beneficiaries</u>.  Other than as set forth in <u>Section 10.10(a)</u>, no provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

10.9    <u>Entire Agreement; Amendments; Counterparts</u>.  This Agreement (including the Schedules and Exhibits hereto) sets forth the entire agreement between the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Seller.  This Agreement may be executed in counterparts, each of which when taken together shall constitute an original.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.  This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.  In the event of any conflict or inconsistency between the statements in this Agreement and the Bidding Procedures, the statements in this Agreement shall control.

10.10    <u>Pre-Petition Secured Party</u>.

(a)    Notwithstanding anything to the contrary herein, Fulton Bank, N.A. (the "<u>Pre-Petition Secured Party</u>") will be deemed a third-party beneficiary hereunder entitled to exercise and enforce any and all rights, powers, privileges and remedies of Seller pursuant to this Agreement or any other agreement, instrument or document executed in connection herewith. Without limiting the generality of the foregoing, and notwithstanding anything to the contrary in this Agreement or in any other agreement, instrument or document executed in connection herewith, Seller will not exercise any right to terminate, or execute and deliver or otherwise provide any waivers, consents or amendments under, this Agreement or any of the other agreements, instruments or documents executed in connection herewith, without the prior written consent of the Pre-Petition Secured Party (which shall not be unreasonably withheld, conditioned or delayed).

39

(b)    Notwithstanding anything to the contrary in this Agreement or any other agreement, instrument or document executed in connection herewith, the Pre-Petition Secured Party (i) is not making any representations or warranties to any or all of Seller, Purchaser or any of their respective Affiliates in connection with this Agreement or any other agreement, instrument or document executed in connection herewith, or the transactions contemplated herein or therein, (ii) will not be liable to any Person for any breach by any or all of Seller, Purchaser or any of their respective Affiliates or any of their respective representations, warranties, covenants or other agreements in connection with this Agreement or any other agreement, instrument or document executed in connection herewith or any of the Transactions contemplated herein or therein, and (iii) will not have any obligations or liabilities under or in respect of any of this Agreement or any other agreement, instrument or document executed in connection herewith or any of the Transactions contemplated herein or therein, other than the release of any mortgages, security interests, Liens and the like. Without limiting the generality of the foregoing, provided the Approval Order is entered, under no circumstances will the Pre-Petition Secured Party be obligated to return or otherwise disgorge to or for the benefit of Purchaser or any Affiliate thereof any proceeds remitted to the Pre-Petition Secured Party, other than the Break-Up Fee (if applicable).

10.11    Headings; Interpretation.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.  Unless the context otherwise clearly requires, references herein to words importing the masculine gender shall include the feminine and neutral genders and vice versa.

*[**Signature page follows.**]*

ACTIVE\64374627.v4

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

DIESEL DIRECT HOLDINGS, INC.

By: _Walter J. McNamara_

Name:   Walter J. McNamara
Title:   Chief Financial Officer


CHRISTINE C. SHUBERT, SOLELY IN
HER CAPACITY AS CHAPTER 7
TRUSTEE FOR THE ESTATES OF
WORLEY & OBETZ, INC., ET AL.

By: _____.

ACTIVE\64374627.v4

## DISCLOSURE SCHEDULES

The following schedules (the "**Disclosure Schedules**") are furnished by the Seller and Debtors to the Purchaser pursuant to and as part of the Asset Purchase Agreement dated as of August 24, 2018 (the "**Agreement**") by and between Christine C. Shubert, in her capacity as Chapter 7 Trustee ("**Seller**") for the estates of (i) Worley & Obetz, Inc. (Case No. 18-13774-REF); (ii) Americomfort, Inc., Case No. 18-13775-REF); (iii) Amerigreen Energy, Inc. (Case No. 18-13777-REF); (iv) Advance Air, Inc. (Case No. 18-13778-REF); (v) Amerigreen Energy Brokers, LLC (Case No. 18- 13779-REF); (vi) Amerigreen Electricity, LLC (Case No. 18-13780-REF); (vii) Amerigreen Hedging Services, LLC (Case No. 18-13781-REF); (viii) Amerigreen Lubricants, LLC (Case No. 18-13782-REF); (ix) Amerigreen Natural Gas, LLC (Case No. 18-13783-REF); and (x) Amerigreen Propane, LLC (Case No. 18-13784-REF) (collectively, the "**Debtors**") and Wiggins Gas Propane & Alternative Fuels LLC, a Delaware limited liability company (or its Assignee, "**Purchaser**"). All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

Unless otherwise noted, the references to section numbers in the Disclosure Schedules correspond to the section numbers of the representations, warranties, covenants or conditions in the Agreement. An exception or qualification set forth in the Disclosure Schedules with respect to a particular representation or warranty will be deemed to be an exception or qualification with respect to all other applicable representations and warranties to the extent the description of the facts regarding the event, item or matter disclosed is adequate so as to make reasonably clear or otherwise make the Purchaser reasonably aware that such exception or qualification is applicable to such other representations and warranties whether or not such exception or qualification is so numbered or such other representations and warranties expressly refer to a Schedule. Each disclosure made in a Disclosure Schedule shall be deemed incorporated into each other Schedule in which the applicability of such disclosure is readily apparent on its face. Attachments and annexes delivered in connection with these Disclosure Schedules are incorporated by reference in and constitute a part of these Disclosure Schedules.

Nothing in the Disclosure Schedules is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. Inclusion of any item in the Disclosure Schedules: (i) does not represent a determination that such item is material or establish a standard of materiality, (ii) does not represent a determination that such item did not arise in the ordinary course of business, (iii) shall not constitute, or be deemed to be, an admission to any third party concerning such item or (iv) does not represent a determination that the consummation of the transactions contemplated by the Agreement requires the consent of any third party except where such a representation or disclosure so provides.

### Schedule 1.1(v)

### Leased Real Property

902 Strasburg Pike, Strasburg, PA 17579 (Rineer Sons Real Estate, LLC) – lease for land only. Seller owns underground petroleum storage tanks, truck rack, pumps, and canopy.

709 Hartman Station Road, Lancaster, PA 17602 (Hartman Station Road, Inc.) – two separate leases:

1.  Land lease only for placement of two large propane storage tanks on concrete saddles, associated pumps and meters.
2.  Lease for use of underground petroleum storage tank owned by Lessor.

16 Lititz Road, Lititz, PA 17543 (Rohrer's Quarry, Inc.) – land lease only for placement of two large propane storage tanks on concrete saddles, associated pumps and meters.

2388 North Market Street, Elizabethtown, PA 17022 (Crowe Realty, LLC) - land lease only for placement of large propane storage tank on concrete saddles, associated pumps and meters.

316-318 North Elmer Avenue, 413-417 North Lehigh Avenue, Sayre, PA 18840 (JW Bishop Properties, LLC) – lease for office building, storage building, maintenance building, rental house used in Seller's Value Energy North division. Seller owns above ground storage tanks situated on property.

685 Broad Street Ext, Waverly, NY 14892 (Waverly Trade Center, LLC) – land lease only for placement of large propane storage tank on concrete saddles, associated pumps and meters as well as vehicle storage.

35 Doe Run Road, Manheim, PA 17545 (Robert Seth Obetz) – lease for land only. Building improvements consisting of: convenience store, car wash, underground petroleum storage tanks, gasoline/diesel dispensers and pumps, propane above ground storage tank and dispenser, canopies, etc. are the property of the Seller. **Cardlock Asset – Excluded.**

202 Greenfield Road, Lancaster, PA 17602 (202 Greenfield, LP) – lease for land and building. Significant building improvements made by Seller. Also property consists of shed, underground storage tanks, gasoline/diesel dispensers and pumps, above-ground storage tank and dispenser for propane, above-ground storage tank and dispenser for diesel exhaust fluid, canopy that is property of the Seller. **Cardlock Asset – Excluded.**

1634 West Main Street, Ephrata, PA 17522 (Charles Rutt) – gasoline/diesel dispensers and pumps, above-ground storage tank and dispenser for diesel exhaust fluid, above-ground storage tank and dispenser for propane, canopy. **Cardlock Asset – Excluded.**

PA Route 272 and Garden Spot Road, Ephrata, PA 17522 (Lester R. Summers, Inc.) - parking space for two trucks.

43

1575 Ferndale Avenue, Johnstown, PA 15905 (Tri-County Motor Sales) – parking space for seven trucks.

7043 Ellenberger Drive, Altoona, PA 16601 (Sel-Lo Oil, Inc.) - parking space for one truck.

1425 North Maxwell Street, Allentown, PA 18109 (Shadow Group Three, LLC) - parking space for one truck.

101 East Cherry Street, Elizabethtown, PA 17022 (Lime Ridge Farm Properties, LP) – lease of land and underground storage tanks, gasoline/diesel pumps and canopy owned by Seller. **Cardlock Asset – Excluded.**

854 South 16th Street, Harrisburg, PA 17104 (Scheler Realty, LLC) – lease of land, underground storage tanks, diesel and diesel exhaust fluid dispensers.  **Cardlock Asset – Excluded.**

ACTIVE\64374627.v4

## Schedule 2.1(a)

### Acquired Owned Real Property

Real estate property at 107 Maytown Road & all buildings, improvements, and personal property located thereon

Real estate property at 85 White Oak Road: office building, warehouse, improvements thereon, and all personal property located on the premises to the extent personal property is not assigned and/or included in other lots/divisions. Excludes the retail storage area across the street..

Real estate located at 24 New Charlotte, Manheim, PA including any personal property thereon

Real estate located at White Oak Road, Manheim, PA (across the street from 85 White Oak Road, Manheim, PA 17545) (Tax Parcel No. 500-04089-0-0000) including tanks and any other personal property thereon.

ACTIVE\64374627.v4

## Schedule 2.1(b)

## Executory Contracts and Unexpired Leases

| PDF name | Location(If other than description) | Agreement Type | Landlord/Lessor/"seller" | Regarding | Rent/Payment | Other note |
|---|---|---|---|---|---|---|
| Vendor Services Group - Fleet Log ELD (November 2016) | 202 Greenfield Road, Lancaster PA | Equipment Rental | Vendor Services Group | 11/16 - 11/19; (37) Fleet Manager with Diagnostics (Jbus) & (BYOD)ELD | $1,850/mo | |
| N/A | Sayre | Leased Equipment | Marlin Business Bank | ONGOING; regarding a leased "sayre copier" | N/A | on US Bankruptcy court list, and not in data room provided to us |
| HC Rineer Sons Partnership (May 2006) | 902 Strasburg Pike, Strasburg | Leased Premises | H.C. Rineer Sons Partnership | 05/06 - 05/11, renew for 10 years total | $7,500/mo, +~3% per year | |
| HL Wiker NRLM Lease Addendum (January 2018) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | Hartman Station, Inc (prev. H.L Wiker) | Amendment to 08/08 lease; extension | $0.055/gallon | |
| JW Bishop Properties, LLC (March 2013) | 318 N Elmer, 417 N Lehigh, 413 & 415 N Lehigh, and 316 N Elmer (Sayre) | Leased Premises | J.W. Bishop Properties, LLC | 03/13 - 03/23; renewal options | $6,940.11/mo | |
| Lester R Summers Inc - Ephrata (September 2016) | Summers Yard, Rt. 272 & Garden Spot Rd, Ephrata | Leased Premises | Lester R. Summers | 09/16 - 09/17; renewal of lease | $150/mo, $150 sec. deposit | |
| Lyons Obetz - 55 Doe Run Road (September 2016) | 55 Doe Run Road Suite 104 w/ ext. | Leased Premises | Lyons & Obetz | 09/16 - 09/19, option to extend | $8,500/mo | |
| Rohrer's Quarry (June 2014) | 16 Lititz Road, lititz PA (Property to North side of main shop, with 30,000gal | Leased Premises | Rohrer's Quarry, Inc. | 06/14 - 06/15, auto renew 3 times (06/18). Permission to install a second 30,000 gal tank in 2014 | $1,000/mo | W&O Bankruptcy Case notes this as |
| Waverly Trade Center, LLC (May 2013) | 69,750 sq ft lot on 685 Broad Street Extension, Waverly, New | Leased Premises | Waverly Trade Center, LLC | 05/13 - 05/18, option to renew | $2,000/mo | |
| N/A | 2388 N. Market St., Elizabethtown PA | Leased Premises | Crowe Transportation | EXPIRES 12/31/21 | N/A | on US Bankruptcy court list, and not in data room provided to us |
| N/A | 1575 Ferndale Ave, Johnstown, PA | Leased Premises | Tri-County Motor Sales | ONGOING | N/A | on US Bankruptcy court list, and not in data room provided to us |
| Se-Lo Oil Inc - Altoona (September 2017) | 7043 Ellenberger Drive, Altoona, PA | Leased Premises - Parking | Se-Lo Oil Inc | 08/22/17, month-month | $100/mo | |
| Shadow Group Three LLC - Allentown (November 2017) | 1425 North Maxwell St., Allentown, PA | Leased Premises - Parking | Shadow Group Three, LLC | 11/17 - no end in agreement | $150/mo | |
| Biodiesel Thruput Agreement - General Bangtson LLC (February 2018) | 3 Washington Parkway, Hicksville NY | Throughput Agreement | General Bangston, LLC | 01/18 - 07/19 | $0.06/gal | unsigned doc; automatically renews for another year unless terminated |

46

| | | | | | | |
|---|---|---|---|---|---|---|
| Boyle Energy - West Grove (March 2017) | 40 West Manoa Road, Havertown, PA | Throughput Agreement | Boyle Energy | 3/17 - 03/20 | $0.05/gal | |
| Propane Throughput Agreement - UGI Energy (May 2018) | Steelton, Williamsport, Hunlock, | Throughput Agreement | UGI Energy Services, LLC | 05/18 - 04/30/19; 4 locations for throughput agreement | $0.035/gal | |
| RF Ohl - Lehighton (July 2017) | 7505 Interchange Rd, Lehighton, PA | Throughput Agreement | RF Ohl Fuel Oil, Inc | 07/17 - 05/30/20 | $0.04/gal - $0.05/gal | |

47

| PDF name | Location(if other than description) | Agreement Type | Landlord/Lessor/"seller" | Regarding | Rent/Payment | Other note | | |
|---|---|---|---|---|---|---|---|---|
| Lease Assumption - Waverly Trade Center, LLC (March 2013) | Refer to 08/15 lease between JW Bishop and Waverly Trade Center | Lease assumption - purchase | JW Bishop Company; Waverly Trade Cent | RE: 08/15/12 lease between JW Bishop and Waverly Trade Center - assets to be assumed | | | | |
| Pitney Bowes (08/10) | Delivered to 55 Doe Run Rd, Manheim | Leased Equipment | N/A | Lease#6036736-001; 42 months | $156/quarter | | | |
| Wysox (03/18) Amendment | | Leased Equipment | Elbow River Marketing USA LTD. | 07/17 - 03/18, extending to 03/19 | | | | |
| Wysox (07/17) Transloader | | Leased Equipment | Elbow River Marketing USA LTD. | 07/17 - 03/18, extending to 03/19 | $1.00/month, .02c/gallon for throughputted propane | | | |
| Tank Storage Agreement - Colmar Terminal | 3251 Trewigtown Road, Colmar, PA | Leased Equipment - Tank Storage | Colmar Terminal, Inc. | 01/14 - 12/18; extension options | $2,000/mo, additional charges depending on gallon usage | | | |
| Crowe Realty LLC (January 2005) | 85 White Oak Road, PO Box 429, Manheim | Leased Premises | Crowe Realty | 09/05 - 09/06, renewing | | | | |
| HL Wiker - NRLM (August 2008) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | H.L. Wiker, Inc. | housing fuel; 07/08 - 07/09, 1 year renewal | | | | |
| HL Wiker - Propane (January 2008) | northeast of Hartman Station Road | Leased Premises | H.L. Wiker, Inc. | Lease propane storage tank area; 01/08 - 01/13, renewal terms up until 01/18 | $0.015/gallon, + base rent ~$1,160/mo | | | |
| HL Wiker Addendum (January 2018) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | Hartman Station, Inc (prev. H.L Wiker) | Amendment to 08/08 lease; extension | $0.015/gallon, + base rent $1,345/mo | | | |
| HL Wiker NRLM Lease Addendum (January 2014) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | Hartman Station, Inc (prev. H.L Wiker) | Amendment to 08/08 lease; extension | $0.045/gallon | | | |
| HL Wiker NRLM Lease Addendum (January 2015) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | Hartman Station, Inc (prev. H.L Wiker) | Amendment to 08/08 lease; extension | $0.045/gallon | | | |
| HL Wiker NRLM Lease Addendum (January 2017) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | Hartman Station, Inc (prev. H.L Wiker) | Amendment to 08/08 lease; extension | $0.045/gallon | | | |
| HL Wiker Propane Addendum (January 2013) | northeast of Hartman Station Road | Leased Premises | H.L. Wiker, Inc. | True Up; extend through 01/13 | $62,700 at signing in prepaid rent | | | |
| HL Wiker Propane Addendum (January 2015) | northeast of Hartman Station Road | Leased Premises | H.L. Wiker, Inc. | Amendment to original lease; extension through | $1,231 base rent | | | |
| HL Wiker Propane Addendum (January 2016) | northeast of Hartman Station Road | Leased Premises | H.L. Wiker, Inc. | Amendment to original lease; extension through | $0.015/gal + $1,268/mo base rent | | | |
| HL Wiker Propane Addendum (January 2017) | northeast of Hartman Station Road | Leased Premises | H.L. Wiker, Inc. | Amendment to original lease; extension through | $0.015/gal + $1,306/mo base rent | | | |
| Lester R Summers Inc - Ephrata (July 2015) | Summers Yard, Rt. 272 & Garden Spot Rd, Ephrata | Leased Premises | Lester R. Summers | 07/15 - 07/16; lease of parking space | $150/mo, $150 sec. deposit | | | |
| Lyons Obetz (September 2009) | 55 Doe Run Road Suite 104: The Building | Leased Premises | Lyons & Obetz | 09/09 - 09/10, option to extend | $13,000/mo | | | |
| Lyons Obetz Renewal (September 2013) | 55 Doe Run Road Building 2 Suite 104 | Leased Premises | Lyons & Obetz | 3 year renewal | $13,000/mo | | | |
| Rineer Sons Real Estate Investments, LLC Renewal (June 2015) | 902 Stasburg Pike, Strasburg, PA | Leased Premises | Rineer Sons Real Estate Investments, LLC | 06/15 - 05/18 | $3,300/mo | | | |
| Rineer Sons Real Estate Investments, LLC Renewal (May 2011) | 902 Stasburg Pike, Strasburg, PA | Leased Premises | Rineer Sons Real Estate Investments, LLC | 05/11 - 05/13, extension through 05/30/15 | $3,300/mo | | | |
| Crowe Realty LLC Amendment (January 2017) | 85 white oak road, "east side" of building with 30,000 gal tank | Leased premises; extension | Crowe Realty | | | | | |
| Crowe Realty LLC (October 2010) | 85 white oak road, "east side" of building with 30,000 gal tank | Leased Premises; terminate sept. 2010 lease and re-lease | Crowe Realty | 10/12 - 10/13, 12 month renewal | $450/mo | | | |
| Pitney Bowes Postage Meter (May 2012) | | postage meter rental | Pitney Bowes | receipts for meter rental, ended 05/2016 | | | | |
| Biodiesel Blending Agreement - Duck Island Terminal | 1463 Lamberton Road, Trenton, NJ | Terminal Agreement | Duck Island Terminal, inc. | Blending of fuel | — | | | |
| First Amendment (August 2016) | | Amendment to 2016 Terminal agreement | Arc Terminals Pennsylvania Holdings | | | | | |
| Assignment of Agreement - Plains to PBF Logistics (April 2016) | All US locations | Terminal Agreements; | Plains Products Terminals LLC | 04/16 closing | | | | |
| August 2017 Price Update | | Terminal Price Change | Arc Terminal Holdings | | | | | |
| Biodiesel - Westmore Fuels - Port Chester (October 2014) | 2 Purdy Ave, Port Chester, NY | Terminal Storage & Throughput | Westmore Fuel Co., Inc., Inc., | Use of 20,000 gal AST | $0.03 / gal | | | |
| Crowe Realty LLC (October 2010) | 85 white oak road, "east side" of building with 30,000 gal tank | Terminate rental lease, purchase | Crowe Realty | | $32,500 for the tank | | | |
| Amendment 1 to Throughput Agreement; AMG Biofuels | All PA Locations | Throughput Agreement | Gulf Oil LP | 01/17, pricing amendment | .0035/gallon/gallon for heating oil, and/or 500 ppm diesel additized with lubricity | | | |
| Propane Throughput Agreement - UGI Energy (May 2014) | Swatara Township Dauphin County PA, Rt 412; Signet Ave., Hellertown, PA.; 2550 Trenton Ave. Williamsport, PA.; 390 Route 11, Hunlock, PA | Throughput Agreement | UGI Energy Services, LLC | 05/14 - 04/15; 4 locations for throughput | $0.035/gal | | | |
| Propane Throughput Agreement - UGI Energy (May 2015) | Swatara Township Dauphin County PA, Rt 412; Signet Ave., Hellertown, PA.; 2550 Trenton Ave. Williamsport, PA.; 390 Route 11, Hunlock, PA | Throughput Agreement | UGI Energy Services, LLC | 05/14 - 04/16; 4 locations for throughput | $0.035/gal | | | |
| Propane Throughput Agreement - UGI Energy (May 2016) | Swatara Township Dauphin County PA, Rt 412; Signet Ave., Hellertown, PA.; 2550 Trenton Ave. Williamsport, PA.; 390 Route 11, Hunlock, PA | Throughput Agreement | UGI Energy Services, LLC | 05/16 - 04/17; 4 locations for throughput | $0.035/gal | | | |
| Propane Throughput Agreement - UGI Energy (May 2017) | Steelton, Williamsport, Hunlock, Bethlehem | Throughput Agreement | UGI Energy Services, LLC | 06/17 - 04/18; 4 locations for throughput | $0.035/gal | | | |
| RF Ohl - Lehighton (July 2014) | 7505 Interchange Rd, Lehighton, PA | Throughput Agreement | RF Ohl Fuel Oil, Inc | 07/14 - 06/17 | $0.04/gal - $0.05/gal | | | |
| Storage Thruput Agreement Renewal - IPT, LLC (January 2012) | 140 American Oil Road, Rensselaer, NY | Throughput Agreement | IPT, LLC | 01/12 - 06/12 | $0.007/gal | | | |
| Storage Thruput Agreement Renewal - IPT, LLC (July 2012) | 140 American Oil Road, Rensselaer, NY | Throughput Agreement | IPT, LLC | 07/12 - 06/13 | $0.007/gal | | | |
| Storage Thruput Agreement Renewal - IPT, LLC (November 2014) | 140 American Oil Road, Rensselaer, NY | Throughput Agreement | IPT, LLC | 11/14 - 10/15 | $0.00737/gal | | | |
| Storage Thruput Agreement Renewal - IPT, LLC (November 2016) | 140 American Oil Road, Rensselaer, NY | Throughput Agreement | IPT, LLC | 11/16 - 10/17 | $0.00756/gal | | | |
| Storage Thruput Agreement Renewal - IPT, LLC (November 2017) | 140 American Oil Road, Rensselaer, NY | Throughput Agreement | IPT, LLC | 11/17 - 10/18 | $0.00765/gal | | | |

48

ACTIVE\64374627.v4

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sweetwater - Ephrata (May 2015) | Ephrata Terminal of Sweetwater Propane | Throughput Agreement | Sweetwater Propane, Inc. | 05/15 - 04/16 | $0.01/gal | | | |
| Terminal Agreement - ARC Terminals (July 2016) | Mechanicsburg, Dupont, Altoona, S. Williamsport terminals | Throughput Agreement | Arc Terminals Pennsylvania Holdings LLC | 07/16 - 12/16; auto renew for (3) 3 month | $0.03/gal | | | |
| Terminal Agreement - Plains Philadelphia South (May 2010) | 6850 Essington Ave, Philadelphia PA | Throughput Agreement | Plains Products Terminals LLC | 05/10 - 04/11, auto renew each month | | | | |
| Terminal Agreement - PPC (February 2010) | Sinking Spring, Highspire, Altoona terminals | Throughput Agreement | Petroleum Products Corp. | 02/10 - 12-10 | | | | |
| Terminal Agreement - Sunoco Partners (November 2014) | Altoona, Baltimore, Belmont, Blawnox, Delmont, Eagle Point, Exton, Kingston, Malvern, Manassas terminals | Throughput Agreement | Sunoco Partners Marketing & Terminals, L.P. | 12/14 - ongoing unless terminated; appears to be terminated | | | | |
| Terminal Agreement - Windsor Fuels (September 2015) | 80 Windsor Ave, Mineola, NY | Throughput Agreement | Windsor Fuel Co., Inc. | 08/15 - 06/16; auto renew unless terminated - appears to be terminated | $0.03/gal | | | |
| Throughput Agreement - Lucknow-Highspire (August 2005) | many PA terminals | Throughput Agreement | Lucknow-Highspire Terminals Corp. | 08/05 - 07/06, auto renew unless terminated - appears to be terminated | | | | |
| Thruput Agreement - Fred Schildwachter Sons (October 2015) | 1400 Ferris Place, Bronx, NY | Throughput Agreement | Fred M. Schildwachter & Sons, Inc. | 10/15 - ongoing unless terminated | | | | |
| Thruput Agreement - Fred Schildwachter Sons (September 2014) | 1401 Ferris Place, Bronx, NY | Throughput Agreement | Fred M. Schildwachter & Sons, Inc. | 09/14 - 09/15 | | | | |
| Throughput Amendment - Lucknow-Highspire (March 2010) | many PA terminals | Throughput Agreement - Price | Lucknow-Highspire Terminals Corp. | amendment to 08/05 contract | additional $0.001/gal | | | |
| Throughput Amendment - Lucknow-Highspire (October 2008) | many PA terminals | Throughput Agreement - Price Amendment | Lucknow-Highspire Terminals Corp. | Allows customer to pull winterized | $0.0325/gal for each gal with winter additive | | | |
| Throughput Amendment - Lucknow-Highspire (October 2011) | many PA terminals | Throughput Agreement - Price Amendment | Lucknow-Highspire Terminals Corp. | adjusting fee for winter additive | $0.0230/gal | | | |
| Updated Lease Amounts - 2017 | 318 North Elmer Ave, Sayre PA | Updated Rent | W&O | Descriptions of new rent payments - goes until 2017/2018 year | $2,206.67/mo | | | |
| Plains Marketing L.P. - Purchase Agreement - Contract #AMJ18TSPNP0001 dated Feb. 21, 2018 | Schaefferstown, PA | Propane purchase agreement | Plains Marketing L.P. | Purchase | $0.82/gal | | | |

49

ACTIVE\64374627.v4

**Schedule 2.1(c)**

**Inventory**

**Fuel inventory, wherever located as follows:**

| | |
|---|---|
| Tank and Bulk Fuel Inventory | 424,593.03 gallons |
| Truck Fuel Inventory | 44,191.00 gallons |

## Schedule 2.1(e)

### Tangible Personal Property

**Storage and Skid Tanks**

- 2 X 300,000 Gallon AST- Across from 85 White Oak Road, Manheim, PA (Tank and land OWNED)
- 10,000 Gallon UST - Across from 85 White Oak Road, Manheim, PA (Tank and land OWNED)
- 20,000 Gallon UST - 24 New Charlotte St, Manheim, PA (Tank and land OWNED)
- 4 X 20,000 Gallon UST & 5 X 30,000 Gallon UST - 902 Strasburg Pike (tanks owned but on LEASED site)
- UST - 709 Hartman Station Road (underground tank and site LEASED)
  - o  2, 30,000 gallon above ground propane storage tanks owned by Worley & Obetz
- 1.35 million Gallon AST - 3251 Trewigtown Road, Colmar, PA (tank and site LEASED)
- 1974 Riley Beard 30,000 Gallon Propane Tank (AST) and Highland 30,000 Gallon Propane Tank (AST) located at 16 Lititz Rd., Lititz, PA 17543 (tank owned but on LEASED property)
- 1971 Trinity 30,000 Gallon Propane Tank located at 2388 N. Market St., Elizabethtown, PA (tank owned but on leased property)
- 500 gallon and (5) 300 gallon skid tanks at High Concrete in Denver, PA (tanks owned but on customer site, W&O rights subject to customer negotiation)
- (Above) (3) 10,000 gallon petrolum tanks, (Above) (1) 15,000 gallon petroleum tank, (A bove) (1) 2,500 gallon DEF tank, 318 N. Elmer Ave., Sayre, PA (tanks owned but in lease site)
- 6,500 Gallon diesel exhaust fluid storage tank, 85 White Oak Road, Manheim, PA
- Customer Tanks owned by Worley & Obetz, Inc., 4000 tanks (count estimated not confirmed, certain tanks have been removed and location is now not known)
- Certain Storage Tanks New and replaced propane tanks for customer locations are stored at 35 Doe Run Road, Manheim, PA
  - o  Customer tanks owned by Worley & Obetz, Inc. Customer tanks are owned by the company and customers–pricing of product depends on tank ownership and contract terms
- Miscellaneous truck parts and maintenance equipment
- Propane tank parts and installation equipment in 85 White Oak Road warehouse and in/on any trucks
- HVAC service equipment, parts and sundry inventory stored at 85 White Oak Road, Man heim, PA
- Other related assets used in the business operations of Worley & Obetz, Inc.'s Retail division
- Other related assets used in business operations of W&O Propane Division

ACTIVE\64374627.v4

- Other related assets used in the business operations of W&O Inc,'s Service and Installation division
- Other related assets used in the business operations of W&O's Value Energy North Division (Sayre)
- Other related assets used in the business operations of W&O's Value Energy South Division
- Other related assets used in business operations of AMG propane, Wholesale division
- Other related assets used in the business operations of W&O Fleet Fueling Division
- Other related assets used in business operations of W&O's Wholesale Division
- Other related assets used in business operations of AMG Renewables Division
- Other related assets used in the business operations of AMG's Petroleum division
- Other related assets used in business operations of AMG's Electricity Supply and Brokerage Division (subject to contract calculations and regulatory controls and restrictions)
- Other related assets used in the business operations of AMG Natural Gas division (subject to contract calculations and regulatory controls and restrictions)
- Other Property, Maintenance Equipment (Lawn tractors, trimmers, etc.) on site
- Related assets including parts, inventory, supplies, furniture/fixtures, tools, equipment, etc.

**The items listed above do not include previously sold assets, expired or cancelled leases, and expired or rescinded permits or licenses.**

**Note that owned or leased tanks are subject to terms of lease and may require removal or abandonment.**

52

## Schedule 2.1(f)

## Permits


**AMERIGREEN ENERGY INC**
**LIST OF STATE LICENSES**

Number

Electricity Supplier

Pennsylvania Public Utility Commission                    A-2014-2451720
State of New York Department of Public Service

Electricity Brokerage

State of Delaware Public Service Commission
State of Illinois Commerce Commission
Commonwealth of Massachusetts Department of Public Utilities    EB-442
State of Maryland Public Service Commission              IR-3568
State of New Jersey                                       PA-0165    Private Aggreg
                                                         EA-0318    Energy Agent
                                                         EC-0101    Energy Consuls
Public Utilities Commission of the State of Ohio          18-1304E(1)
Public Utility Commission of Texas

Natural Gas Supplier

Commonwealth of Massachusetts Department of Public        RA-205
State of Maryland Public Service Commission               IR-3569
State of New Jersey                                        GSL-0124
Pennsylvania Public Utility                               A-2014-2451710
State of New York Department of Public              Brooklyn Union Gas Service Territory - National
Service                                            Grid NY
                                                   Keyspan Gas East Service Territory - National Grid
                                                   Orange & Rockland Utilities
                                                   Consolidated Edison Company

Natural Gas Brokerage

Public Utilities Commission of the State of Ohio          18-651G(1)

**Note: Transferability of the above licenses is subject to the rules of each state's
utility commission. Some or all of the licenses may be non-transferrable and so
reapplication to the state commission would be necessary for the buyer.**

ACTIVE\64374627.v4

**Schedule 2.1(g)**

**Intellectual Property Rights**

All Intellectual Property including:

Patents, patent applications, patent rights, patent disclosures and inventions (whether or not patentable or reduced to practice)

Trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, websites, domain names and other indicia of source and all goodwill associated therewith

Works of authorship, copyrights, copyright registrations and applications for registration, and moral rights

Know-how, trade secrets, customer lists (including all wholesale, retail and commercial customer account lists, whether active or inactive including complete contact information), proprietary information, proprietary processes and formulas, databases and data collections

All source and object code, software (including front and back office software, customer management and fuel management systems, accounting and billing systems, POS inventory systems and fleet management systems), algorithms, architecture, structure, display screens, layouts, inventions and development tools

All documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records.

### Schedule 2.1(h)

### Vehicles

| No. | VIN | Yea | Make | Title Number | Owner |
|---|---|---|---|---|---|
| 12 | 1FT7W2BT0BEA54209 | 2011 | FORD | 68788426801 WO | Worley and Obetz |
| 13 | 1FTYR2CV6GKA85114 | 2016 | FORD | 75952610401 WO | Worley and Obetz |
| 14 | JL6BNG1A3CK004246 | 2012 | MITSUBISHI | 70777185402 WO | Worley and Obetz |
| 15 | 3GNAXUEU8JS563348 | 2018 | CHEVORLET | 78444261701WO | Worley and Obetz |
| 16 | 3C6TRVCD2EE123187 | 2014 | RAM | 74203430601 WO | Worley and Obetz |
| 17 | 1C4RJFBM7EC310160 | 2014 | JEEP | 72720870601 WO | Worley and Obetz |
| 18 | 3C6UR5NJ6HG547522 | 2017 | DODGE | 76794490101WO | Worley and Obetz |
| 19 | 1J4GL48555W600525 | 2005 | JEEP | 61677819901WO | Worley and Obetz |
| 20 | WD0PE745085304790 | 2008 | DODGE | 67277253401 WO | Worley and Obetz |
| 21 | 1FTRX18L11NA30958 | 2001 | FORD | 56181080502 WO | Worley and Obetz |
| 22 | 1XPFDB9X61N566239 | 2001 | PETERBILT | 55580038902 WO | Worley and Obetz |
| 27 | 3BPNHD7X8WF462096 | 1998 | PETERBILT | 51600545903 WO | Worley and Obetz |
| 28 | 1XP5DB9X54N831880 | 2004 | PETERBILT | 60382629901 WO | Worley and Obetz |
| 29 | 1FT7W2B60FEC47217 | 2015 | FORD | 74330826401WO | Worley and Obetz |
| 30 | 1FDWF36L2XED91611 | 1999 | FORD | 53376098902 WO | Worley and Obetz |
| 32 | 1XP5D89X63N595660 | 2003 | PETERBILT | 58192412001 WO | Worley and Obetz |
| 34 | 1XP5DB9X35N855225 | 2005 | PETERBILT | 61317391401 WO | Worley and Obetz |
| 35 | 1XPFDU9X31N555808 | 2001 | PETERBILT | 54973076102 WO | Worley and Obetz |
| 36 | 1FTHE2423VHB77033 | 1997 | FORD | 51018722301 WO | Worley and Obetz |
| 37 | 1FTSE3EL2BDA48285 | 2011 | FORD | 69232776001WO | Worley and Obetz |
| 40 | 1FTSE3EL6BDA48287 | 2011 | FORD | 69232744101WO | Worley and Obetz |
| 41 | WA1LMAFEXFD024148 | 2015 | AUDI | 75035448401WO | Worley and Obetz |
| 42 | 1XPFDB9X01N561652 | 2001 | PETERBILT | 55424371002WO | Worley and Obetz |
| 43 | 1C6RR7VM1FS612732 | 2015 | DODGE RAM 1500 | | Worley and Obetz |
| 44 | 1HTMKADN62H511291 | 2002 | INTERNATIONAL | 56486648301WO | Worley and Obetz |
| 45 | 1XP5DB9X91N558325 | 2001 | PETERBILT | 56577248101WO | Worley and Obetz |
| 46 | 2NPNHD7X02M575044 | 2002 | PETERBILT | 56948005901WO | Worley and Obetz |
| 47 | 1C6RR7PM9FS575152 | 2015 | RAM | 74270937001WO | Worley and Obetz |
| 48 | 1FMSU45P63E866794 | 2003 | FORD | 59770667603WO | Worley and Obetz |
| 49 | 1XPWD49X2AD106075 | 2010 | PETERBILT | 67517054001WO | Worley and Obetz |
| 50 | 1XPFDU9X7XN504479 | 1999 | PETERBILT | 53197517402WO | Worley and Obetz |
| 51 | 2NPNHD7X11M561653 | 2001 | PETERBILT | 55673141402 WO | Worley and Obetz |
| 52 | 2NP3LJ9X3FM304907 | 2015 | PETERBILT | NO TITLE | Worley and Obetz |
| 53 | 1FTSE3EL4BDA48286 | 2011 | FORD | 69232764001WO | Worley and Obetz |
| 54 | 3C6TRVCD4EE123627 | 2014 | RAM | 74210863501WO | Worley and Obetz |

| 55 | 1D7HW48P27S144647 | 2007 | DODGE | 64307456601WO | Worley and Obetz |
| 56 | 1FVHCYDJ86HW08598 | 2006 | FREIGHTLINER | 63012924701WO | Worley and Obetz |
| 57 | 1C4RJFBM3FC716633 | 2015 | JEEP | 74852155101WO | Worley and Obetz |
| 58 | 1FDXF46F82EB61326 | 2002 | FORD | 56984961001WO | Worley and Obetz |
| 59 | 1XKW080X32J888526 | 2002 | KENWORTH | 58635449002 WO | Worley & Obetz Inc. |
| 60 | 2NP2HN7X1DM186103 | 2013 | PETERBILT | 71314854701WO | Worley and Obetz |
| 61 | 1GTHG39R921142233 | 2002 | GMC | 57070161501WO | Worley and Obetz |
| 62 | 1C4RJFBM0EC310159 | 2014 | JEEP | 72720918701WO | Worley and Obetz |
| 63 | 2NP2HN7X8DM179505 | 2013 | PETERBILT | 70803428701WO | Worley and Obetz |
| 64 | IXPWD49X4AD106076 | 2010 | PETERBILT | 67517345701WO | Worley and Obetz |
| 65 | IFDSF35S33EB39739 | 2003 | FORD | 58490271901WO | Worley and Obetz |
| 66 | 1GYFK66878R167767 | 2008 | CADILLAC | 692732013802WO | Worley and Obetz |
| 67 | 1FTYR2CVPGKA44573 | 2016 | FORD | 75792339501WO | Worley and Obetz |
| 68 | 1M2AX07CPJM039692 | 2018 | MACK | NO TITLE | Worley and Obetz |
| 69 | 1M2AX07C0JM039693 | 2018 | MACK | NO TITLE | Worley and Obetz |
| 70 | 1FVHCYBS4BDAU7722 | 2011 | FREIGHTLINER | 69142353401WO | Worley and Obetz |
| 72 | WD0PD644565949677 | 2006 | DODGE | 63775825201WO | Worley and Obetz |
| 73 | 1M1AA14Y4TW061280 | 1996 | MACK | 49589413002 | Worley & Obetz Inc. |
| 74 | 2NPLHD7X77M685006 | 2007 | PETERBILT | 63478910401WO | Worley and Obetz |
| 75 | NO VIN | | ELEC. | NO TITLE | Worley and Obetz |
| 76 | 1XPHD49XXAD795405 | 2010 | PETERBILT | 67888559401WO | Worley and Obetz |
| 78 | 1XP5DB9X37N668876 | 2007 | PETERBILT | 63693353701WO | |
| 79 | 1FTSE3EL0BDA48284 | 2011 | FORD | 69232734701WO | Worley and Obetz |
| 80 | 1FTFW1EF6DKD33776 | 2013 | FORD | 71546038401WO | Worley and Obetz |
| 81 | 2NP3LJ9X4FM305239 | 2015 | PETERBILT | NO TITLE | Worley and Obetz |
| 82 | VG6BAO9B1YB702396 | 2000 | MACK | 55029873603WO | Worley and Obetz |
| 83 | 2NPLHN7X68M764366 | 2008 | PETERBILT | 65782090601WO | Worley and Obetz |
| 84 | 2NP2HJ7X6HM409346 | 2017 | PETERBILT | NO TITLE | Worley and Obetz |
| 85 | 2NP2HJ7X4HM409345 | 2017 | PETERBILT | NO TITLE | Worley and Obetz |
| 86 | 1FMCU9EG3AKC81708 | 2010 | FORD | 68342709702WO | Worley and Obetz |
| 87 | 1G1P75SZ6F7255795 | 2015 | CHEVROLET | 75664528001WO | Worley and Obetz |
| 88 | WVGEP9BP4DD001050 | 2013 | VOLKSWAGEN | 71794005201WO | Worley and Obetz |
| 89 | 3C6TRVCD4EE123630 | 2014 | RAM | 74265170601WO | Worley and Obetz |
| 90 | WDOPE745285285613 | 2008 | DODGE | 66539537701WO | Worley and Obetz |
| 91 | WDOPE745485304789 | 2008 | DODGE | 67277246801WO | Worley and Obetz |
| 92 | 1FTFW1ET5DKD12407 | 2013 | FORD | 73149607901WO | Worley and Obetz |
| 93 | 1HTSG0005YH270796 | 2000 | INTERNATIONAL | 56829277002 WO | Worley and Obetz Inc. |
| 94 | WD2PD444755724901 | 2005 | DODGE | 61483617101 WO | Worley and Obetz Inc. |
| 96 | 2NPLLZ9X87M693284 | 2007 | PETERBILT | 64553232301 WO | Worley and Obetz Inc. |
| 97 | 1FMCU9GX1GUB28917 | 2016 | FORD | 75433916901 WO | Worley and Obetz Inc. |
| 98 | 1FMCU9GX7GUB29571 | 2016 | FORD | 75582927001 WO | Worley and Obetz Inc. |

ACTIVE\64374627.v4

| 99 | 1FTWE1EG1FFC83210 | 2015 | FORD | 75399456001 WO | Worley and Obetz Inc. |
|---|---|---|---|---|---|
| 100 | 1FM5K8B83GGA41933 | 2016 | FORD | 75273144201 WO | Worley and Obetz Inc. |
| 101 | 1NPALU0X26N884964 | 2006 | PETERBILT | 62703692302 WO | Worley and Obetz Inc. |
| 102 | 2NPLHD7X85M865253 | 2005 | PETERBILT | 62473459802 WO | Worley and Obetz Inc. |
| 103 | 1FVX6EDBXYLF06572 | 2000 | FREIGHTLINER | 55898071602 WO | Worley and Obetz Inc. |
| 104 | 1FVX6EDBXXLA19161 | 1999 | FREIGHTLINER | 52853903802 WO | Worley and Obetz Inc. |
| 105 | 5HTAB4327V7H61284 | 1997 | HEIL | 56081085301 WO | Worley and Obetz |
| 105 | 1XP5DB9X5SN360410 | 1995 | PETERBILT | 47548035703 WO | Worley and Obetz Inc. |
| 106 | 1C4RJFBM3FC100429 | 2015 | JEEP | 75612762501 WO | Worley and Obetz Inc. |
| 107 | 1XP9DB9X9GP202830 | 1986 | PETERBILT | 44093177703 WO | Worley and Obetz Inc. |
| 108 | 1HTAA1954EHA14441 | 1984 | INTERNATIONAL | 35726181702 WO | Worley and Obetz Inc. |
| 109 | 3BPNHD7X1WF469035 | 1998 | PETERBILT | 51992584702 WO | Worley and Obetz Inc. |
| 110 | 1XP5DB9X5VN387532 | 1997 | PETERBILT | 49949115005 WO | Worley and Obetz Inc. |
| 111 | 1FTYR2CV4GKA44576 | 2016 | FORD | 75792086001 WO | Worley and Obetz Inc. |
| 112 | 1FMCU9GD4HUAD847 | 2017 | FORD | 76235998701 WO | Worley and Obetz Inc. |
| 113 | 2NP2HJ7X4EM241542 | 2014 | PETERBILT | 72894625201 WO | Worley and Obetz Inc. |
| 114 | 3C6TRVCD8EE123629 | 2014 | RAM | 74210911301 WO | Worley and Obetz |
| 115 | WD0PE745185236936 | 2008 | DODGE | 65723947901 WO | Worley and Obetz Inc. |
| 116 | 4P5L62023H3023913 | 2017 | PJ | 77569596501 WO | Worley and Obetz |
| 117 | 1FTSE3EL88DA48288 | 2011 | FORD | 69232721401 WO | Worley and Obetz Inc. |
| 118 | 1GCHG35RXY1237737 | 2000 | CHEVROLET | 5529365002 WO | Worley and Obetz Inc. |
| 119 | 1EMCU9GD1HUD2412 | 2017 | FORD | 77329876701WO | Worley & Obetz Inc. |
| 120 | 2NPRLNDX29M788250 | 2009 | PETERBILT | 66729081001 WO | Worley and Obetz Inc. |
| 121 | MOXUVGF080476 | 2010 | JOHN DEERE | NO TITLE | Worley and Obetz |
| 122 | 1HLA3A7B7C7H52109 | 1982 | HEIL TRAILER | 34426880502WO | Worley and Obetz |
| 123 | 1FTZW2B61EEA27387 | 2014 | FORD | 72791138801 WO | Worley and Obetz Inc. |
| 125 | 3BPNHD7X2WF469030 | 1998 | PETERBILT | 51992583402 WO | |
| 126 | 1HTWNAZT47J381180 | 2007 | INTERNATIONAL | 65087359301 WO | |
| 127 | 1FTPW14VW8FA68467 | 2008 | FORD | 66211444701WO | Worley and Obetz Inc. |
| 128 | 5HTAB432X37H67271 | 2003 | HEIL | 58753659601 WO | Worley and Obetz |
| 129 | SHTAB432XB7H73398 | 2008 | HEIL | 65351351201 WO | Worley and Obetz Inc. |
| 130 | 1E9BE26217E353763 | 2007 | HAUL MASTER | 65812309101 WO | Worley and Obetz |
| 131 | 1C4RJFBM0FC767149 | 2015 | JEEP | 74433593401 WO | Worley and Obetz |
| 132 | 5HTAB432X37H66816 | 2003 | HEIL | 58203491301 WO | Worley and Obetz |
| 133 | 1G1FW6S08H4160004 | 2017 | CHEVROLET | 78013622002 WO | Worley and Obetz |
| 134 | 5HTAB4426V7H61033 | 1997 | HEIL | 50307539102 WO | Worley and Obetz |
| 135 | 1FVHCYBS9BDAU7893 | 2011 | FREIGHTLINER | 69142337601 WO | Worley and Obetz |
| 136 | 2NP2HJ7XXEM241562 | 2014 | PETERBILT | 73264201601 WO | Worley and Obetz |
| 137 | 1HTSCABM2TH302663 | 1996 | INTERNATIONAL | 49525537504 WO | Worley and Obetz |
| 138 | 1FV6HFAA1SL629057 | 1995 | FREIGHTLINER | 48237495903 WO | Worley and Obetz |

ACTIVE\64374627.v4

| 139 | 1HTSDAAN11H336467 | 2001 | INTERNATIONAL | 57939742903 WO | Worley and Obetz |
|-----|-------------------|------|---------------|----------------|------------------|
| 140 | 1NPSL09X3BD116491 | 2011 | PETERBILT | 69456295001 WO | Worley and Obetz |
| 141 | 2NP3LN0X2AM109116 | 2010 | PETERBILT | 67917155001 WO | Worley and Obetz |
| 142 | 5HTAB442617H65058 | 2001 | HEIL TRAILER | 55597383902WO | Worley and Obetz |
| 143 | 1NPNHD7X7XS480327 | 1999 | PETERBILT | 53986157903 WO | Worley and Obetz |
| 144 | 1XPADU9X46N888486 | 2006 | PETERBILT | 63019821202 WO | Worley and Obetz |
| 145 | 4J8T043241T003802 | 2001 | FRUEHAUF | 56534358501WO | Worley and Obetz |
| 146 | 1FMCU9DG4AKC62912 | 2010 | FORD | 68326455601 WO | Worley and Obetz |
| 147 | 1FDAF5HR6AEB09808 | 2010 | FORD | 68384531301 WO | Worley and Obetz |
| 148 | 1FMCU9GX6GUA90133 | 2016 | FORD | 75272996101WO | Worley and Obetz |
| 149 | 5HTAB4322A7H75099 | 2010 | HEIL | 67797830601 WO | Worley and Obetz |
| 150 | 5HTAB4425X7H63066 | 1999 | HEIL TRAILER | 53156123502WO | Worley and Obetz |
| 153 | 1XPWD49X1CD142620 | 2012 | PETERBILT | 69935640201 WO | Worley and Obetz |
| 154 | 1XPWD49X5CD142619 | 2012 | PETERBILT | 69935772801 WO | Worley and Obetz |
| 155 | 1FMCU9GX3GUA80448 | 2016 | FORD | 75273120201 WO | Worley and Obetz |
| 156 | 1XPWDB9XXBD117508 | 2011 | PETERBILT | 69065086501 WO | Worley and Obetz |
| 157 | 1HLA3A7F6S7H58050 | 1995 | HEIL | 47727448204 WO | Worley and Obetz |
| 158 | 1NPSL09X1BD116490 | 2011 | PETERBILT | 69733761001 WO | Worley and Obetz |
| 159 | 1GRAA9623HB117611 | 1987 | GREAT DANE | 39351608402 WO | Worley and Obetz |
| 160 | 1FMCU9G9GUB19214 | 2016 | FORD | 75433844001WO | Worley and Obetz |
| 161 | 2NP3MN9XXCM16039 | 2012 | PETERBILT | 70123258301 WO | Worley and Obetz |
| 162 | 1FUJGPDR3CDBJ6237 | 2012 | FREIGHTLINER | 69987532601 WO | Worley and Obetz |
| 163 | 1FUJGPDR5CDBJ6238 | 2012 | FREIGHTLINER | 69987533901 WO | Worley and Obetz |
| 164 | 5HTAB4320A7H75098 | 2010 | HEIL | NO TITLE | Worley and Obetz |
| 165 | 1FUJGPDR7CDBJ6239 | 2012 | FREIGHTLINER | 69987534101 WO | Worley and Obetz |
| 166 | 5HTAB4320C7H76108 | 2012 | HEIL | 69991663001 WO | Worley and Obetz |
| 167 | 5HTAB4322C7H76109 | 2012 | HEIL | 69991672201 WO | Worley and Obetz |
| 168 | 2H9AECHF1CT002331 | 2012 | HUTCHINSON | 70224961901 WO | Worley and Obetz |
| 169 | 5HTAB432757H68770 | 2005 | HEIL | 61758082201 WO | Worley and Obetz |
| 170 | 2H9AECHF2CT002332 | 2012 | HUTCHINSON | 70224948901 WO | Worley and Obetz |
| 171 | 2HDAECHF5CT002333 | 2012 | HUTCHINSON | 70290507501 WO | Worley and Obetz |
| 172 | SW136084PA | | SP CONSTR | 54136084201 MC | Worley and Obetz |
| 173 | 5HTAB4421V7H60873 | 1997 | HEIL TRAILER | 49932174302WO | Worley and Obetz |
| 174 | 1C4RJFBM4FC677289 | 2015 | JEEP | 74852203001WO | Worley and Obetz |
| 175 | 5NHUCCV265N044399 | 2005 | CONTINENTAL | 70153771001 WO | Worley and Obetz |
| 176 | 5HTAB432877H71728 | 2007 | HEIL | 63872821701 WO | Worley and Obetz |
| 177 | NO VIN NUMBER | NO YEAR | HYSTER | NO TITLE | Worley and Obetz |
| 178 | 5HTAB432X77H71729 | 2007 | HEIL | 63950336501 WO | Worley and Obetz |
| 179 | 1XPWD49X3CD142621 | 2012 | PETERBILT | 71183409401 WO | Worley and Obetz |
| 180 | 1HLA3A7FXR7H57204 | 1994 | HEIL | 46504276603 WO | Worley and Obetz |

58

| 181 | 3C6JR7ET6EG127240 | 2014 | RAM | 72942113701 WO | Worley and Obetz |
|-----|-------------------|------|-----|----------------|------------------|
| 182 | 3GNAXUFU8JS545903 | 2018 | CHEVROLET | 78342947301WO | Worley and Obetz |
| 183 | 5HTAB4420T7H59159 | 1996 | HEIL | 49069392604 WO | Worley and Obetz |
| 184 | 1HLA3A7F7S7H58901 | 1995 | HEIL | 48152551403 WO | Worley and Obetz |
| 185 | 1FMCU9GDSHUD2412 | 2017 | FORD | 77369538201 WO | Worley and Obetz |
| 186 | 1FDUFSHT4DEB54033 | 2013 | FORD | 72373570401 WO | Worley and Obetz |
| 187 | 1XPWDP9X2ED236428 | 2014 | PETERBILT | NO TITLE | Worley and Obetz |
| 188 | 1XPWDP9X5ED238464 | 2014 | PETERBILT | NO TITLE | Worley and Obetz |
| 189 | 3AKJGND10EDFT8496 | 2014 | FREIGHTLINER | NO TITLE | Worley and Obetz |
| 190 | 5HTAB4329E7H79298 | 2014 | HEIL | NO TITLE | Worley and Obetz |
| 191 | 5HTAB4320E7H79299 | 2014 | HEIL | No Title | Worley and Obetz |
| 192 | 5HTAB4321E7H79456 | 2014 | HEIL | No Title | Worley and Obetz |
| 193 | 4P5B61829E3008905 | 2014 | PJ | 75532623101 WO | Worley and Obetz |
| 194 | 1TC950RGJET020007 | 2014 | John Deere | No Title | Worley and Obetz |
| 195 | 5HTAM4529C7H76423 | 2012 | HEIL | 73869848403 WO | Worley and Obetz Inc. |
| 196 | 5HTAM4520C7H76424 | 2012 | HEIL | 73869841503 WO | Worley and Obetz Inc. |
| 197 | 1GCGG25V271107808 | 2007 | CHEVROLET | 63782279004 WO | Worley and Obetz |
| 199 | 1GCHG35U741242800 | 2004 | CHEVROLET | 68743200203 WO | Worley and Obetz Inc. |
| 200 | 4U01C12122A011119 | 2002 | CARGO | 58069425203 WO | Worley and Obetz Inc. |
| 202 | 1FD8X3H67JEB66427 | 2018 | FORD F-350 SUPERCAB | | Worley and Obetz Inc. |
| 203 | 1FD8X3H67JEB66428 | 2018 | FORD F-350 SUPERCAB | | Worley and Obetz Inc. |
| 205 | 4V1VDBPE3SN705034 | 1995 | WHITE GMC | 55195556402 WO | Worley and Obetz |
| 206 | 4V4JDBGF1TR839058 | 1996 | VOLVO | 48737802203 WO | Worley and Obetz |
| 207 | 4V4JDBCF4TR839071 | 1996 | VOLVO | 48737964103 WO | Worley and Obetz |
| 208 | 1FV6HFBA8SL648719 | 1995 | FREIGHTLINER | 62043060502 WO | Worley and Obetz |
| 209 | 4VG7DARJEWN755084 | 1998 | VOLVO | 62085849902 WO | Worley and Obetz |
| 210 | 4VG7DARJXXN786608 | 1999 | VOLVO | 62420958802 WO | Worley and Obetz |
| 211 | 4V4ND2RH2YN241933 | 2000 | VOLVO | 62576648902 WO | Worley and Obetz |
| 213 | 4V4ND2RH4YN796107 | 2000 | VOLVO | 62735668102 WO | Worley and Obetz |
| 214 | 4V4ND2RH0YN796105 | 2000 | VOLVO | 62735727702 WO | Worley and Obetz |
| 215 | 4V4ND2RH2YN796106 | 2000 | VOLVO | 62793843202 WO | Worley and Obetz |
| 216 | 1FTYR2CM5GKB30230 | 2016 | FORD | 76328540001 WO | Worley and Obetz |
| 217 | 4VG7DARH6XN778423 | 1999 | VOLVO | 63420746202 QO | Worley and Obetz |
| 218 | 1FUJGEDR4HLHZ7414 | 2017 | FREIGHTLINER | NO TITLE | Worley and Obetz |
| 219 | 1FUJGEDR6HLHZ7415 | 2017 | FREIGHTLINER | NO TITLE | Worley and Obetz |
| 220 | 1M1AW07Y8HM08228 | 2017 | MACK | NO TITLE | Worley and Obetz |
| 221 | 1W9P14323GM350051 | 2016 | WESTMOR | NO TITLE | Worley and Obetz |
| 222 | UNT007703 | 1980 | FRUEHAUF | 50961419002 WO | Worley and Obetz |
| 223 | 1PMA24321V5001229 | 1997 | POLAR | 61742294302 WO | Worley and Obetz |

| 224 | 5HTAB4320H7081972 | 2017 | HEIL | NO TITLE | Worley and Obetz |
| 225 | 10BEA9236HF0D4608 | 2016 | BEALL TRAILER | NO TITLE | Worley and Obetz |
| 227 | 1ETYR2CM4HKB43259 | 2017 | FORD | NO TITLE | Worley and Obetz |
| 228 | 1XPCD49X1KD261365 | 2019 | PETERBILT 567 | | Worley and Obetz |
| 229 | 1XPCD49X3KD261366 | 2019 | PETERBILT 567 | | Worley and Obetz |
| 238 | 5HTSA4323K7601502 | 2019 | HEIL TANK TRAILER | | Worley and Obetz |
| 239 | 5HTSA4323K7601503 | 2019 | HEIL TANK TRAILER | | Worley and Obetz |
| 242 | 2HSCEAPR45C029758 | 2005 | INTERNATIONAL | 60848603302WO | Worley and Obetz |
| 243 | 3AKJGND12GDGX3465 | 2016 | FREIGHTLINER | NO TITLE | Worley and Obetz |
| 244 | 1C4RJFBM8FC796401 | 2015 | JEEP | 74852303601WO | Worley and Obetz |
| 245 | 1FTNM21P03EB6036 | 2003 | FORD | 72123328002WO | Worley and Obetz |
| 246 | 1B7KM2688LS711430 | 1990 | DODGE | 42932918707WO | Worley and Obetz |
| 248 | 5HTAM452477L72688 | 2007 | HEIL TRAILER | 75741011601WO | Worley and Obetz |
| 249 | 1GB0GRFG5G1309296 | 2016 | CHEVROLET | 77945784602WO | Worley and Obetz |
| 252 | HW13929 | 1979 | DORSEY TRAILER | 56022290603WO | Worley and Obetz |
| 253 | 1TKC02421HM038953 | 1987 | TRAIL KING | 69539336302WO | Worley and Obetz |
| 254 | 1FDWE3FL2DDA85254 | 2013 | FORD | 72476003402WO | Worley and Obetz |
| 255 | 1FUJGED57GLGX4492 | 2016 | FREIGHTLINER | NO TITLE | Worley and Obetz |
| 256 | 1FUJGED57GLGX4493 | 2016 | FRIGHTLINER | NO TITLE | Worley and Obetz |
| 257 | 5HTAB4321F7H80771 | 2015 | HEIL TRAILER | NO TITLE | Worley and Obetz |
| 258 | 5HTAB4323F7H80772 | 2015 | HEIL TRAILER | NO TITLE | Worley and Obetz |
| 259 | 5HTAB4325F7H80773 | 2015 | HEIIL TANK TRAILER | NO TITLE | Worley and Obetz |
| 260 | 2HSFHASRXXC031142 | 1999 | INTL | 52742318001 SH | Worley and Obetz Inc. |
| 261 | 2HSCHAER32C238246 | 2002 | INTL | 56915409002 SH | Worley and Obetz Inc. |
| 262 | 2HSCHAPR37C432012 | 2007 | INTL | 68890883001 SH | Worley and Obetz Inc. |
| 263 | 3HSCUAPR0AN243190 | 2010 | INTERNATIONAL | 67651633902 SH | Worley and Obetz Inc. |
| 264 | 3HSDMAPR6FN572598 | 2015 | INTERNATIONAL | 74271227001 MY | Worley and Obetz Inc. |
| 265 | 2HSCZAPR7AC168576 | 2010 | INTERNATIONAL | 66843032002 MY | Worley and Obetz Inc. |
| 266 | 3HSCXAPR5GN276413 | 2016 | INTERNATIONAL | 76327313201 MY | Worley and Obetz Inc. |
| 270 | 5HTAM442517H64994 | 2001 | HEIL | 66738761801 SH | Worley and Obetz Inc. |
| 271 | 5HTAM432227H66690 | 2002 | HEIL | 67785277301 SH | Worley and Obetz Inc. |
| 272 | 5HTAM432027H66686 | 2002 | HEIL | 68367796301 SH | Worley and Obetz Inc. |
| 273 | 5HTAM4527C7H76517 | 2012 | HEIL | 70246154501 SH | Worley and Obetz Inc. |
| 274 | 5HTAM4524D7H77691 | 2013 | HEIL | 71470522501 SH | Worley and Obetz Inc. |
| 275 | 5HTAM4525E7H79273 | 2014 | HEIL | 72444974001 SH | Worley and Obetz Inc. |
| 276 | 5HTAB452317H64593 | 2001 | HEIL | 73438147002 SH | Worley and Obetz Inc. |
| TRK-11 | 1FTYR2CV2GKA44575 | 2016 | FORD | 75792386001 WO | Worley and Obetz |
| TRK-24 | 2NPLHD7X57M685005 | 2007 | PETERBILT | 63478937201 WO | Worley and Obetz |
| TRK-25 | 1FTYR2CV0GKA44574 | 2016 | FORD | 75792237301 WO | Worley and Obetz |
| TRK-26 | 2NPLHD7X27M698200 | 2007 | PETERBILT | 63737176601 WO | Worley and Obetz |

ACTIVE\64374627.v4

| TRK-31 | WD0PE745X85236935 | 2008 | DODGE | 65729840301 WO | Worley and Obetz |
| TRL-124 | 1FTFX1EF4GFB61435 | 2016 | FORD | 76328568101 WO | Worley and Obetz |
| | 1GRAA902XCB062401 | 1982 | GREAT DANE TRLR | 58476978902WO | Worley and Obetz |
| | BB5142692 | 1932 | FORD | 36614733802 | Worley & Obetz Inc. |
| 95 | SALGS2RK2JA383212 | 2018 | LAND ROVER | 78895829001WO | Worley & Obetz Inc. |
| V-1 | 1C4RJFBMXFC112982 | 2015 | JEEP | 75819713601AM | AMERIGreen |
| V-2 | 1FMCU9GX5GUA48830 | 2016 | FORD | 75695910401AM | AMERIGreen |
| V-3 | 1J4PR4GK8AC108380 | 2010 | JEEP | 71951298802AM | AMERIGreen |
| V-4 | 1FMCU9G96GUC49962 | 2016 | FORD | 75829655501AM | AMERIGreen |
| V-6 | 1J4PR4GK4AC143515 | 2010 | JEEP | 72003492303AM | AMERIGreen |
| V-7 | 1C4RJFCM8EC384850 | 2014 | JEEP | 73330270501AM | AMERIGreen |
| V-9 | 1C4RJFBM5EC315793 | 2014 | JEEP | 74598477602AM | AMERIGreen |
| V-10 | 3FRNF6FC1BV411137 | 2011 | FORD | 76340525901AM | AMERIGreen |
| V-11 | 1GNSKCKC8FR505906 | 2015 | CHEVROLET | 75966360001AM | AMERIGreen |
| V-12 | 1C4RJFBM2EC521444 | 2014 | JEEP | 77909543502AM | AMERIGreen |
| 500 | 1FV6HJBAXXHA93594 | 1999 | FREIGHTLINER F70 | TRUCK FOR AVONDALE TRANSLOADER | AMG Propane |
| 501 | 431FS2529X1000515 | 1999 | CROSS COUNTRY TRAILER | TRAILER FOR AVONDALE TRANSLOADER | AMG Propane |

61

**Schedule 2.2(f)**

**Wo-Go Stations Tangible Personal Property**

**WOGO & PACIFIC PRIDE DIVISIONS**

<u>Description</u>

Retail fueling stations (unmanned) for use by customers who have cards that are on the respective networks.

Main office operations were from 202 Greenfield Road, Lancaster, PA (NO LONGER AVAILABLE)

| Leases Included: | 1634 W. Main St, Ephrata, PA (Charles Rutt) |
| | 101 E. Cherry St, Elizabethtown, PA (Lime Ridge Farm) |
| | 854 S. 16th St, Harrisburg, PA (Scheler Realty) |

Includes Franchise Agreement with Pacific Pride Services, LLC

| Locations: | Manheim WoGo - 35 Doe Run Road, Manheim, PA (LEASED) |
| | Lititz WoGo - 746 Rothsville Road, Lititz, PA (OWNED) |
| | Ephrata WoGo/Pacific Pride - 1634 West Main Street, Ephrata, PA (LEASED) |
| | Greenfield WoGo/Pacific Pride - 202 Greenfield Road, Lancaster, PA (LEASED) |
| | Mount Joy Pacific Pride - 30 Orchard Road, Mount Joy, PA (OWNED) |
| | Elizabethtown Pacific Pride - 101 East Cherry Street, Elizabethtown, PA (LEASED) |
| | Harrisburg WoGo - 854 South 16th Street, Harrisburg, PA (LEASED) |

All pumps, tanks and other equipment utilized in the operations of the Cardlock divisions, including remaining fuel inventory

Access to applicable Cardlock software systems for customer information

Trucks:

| No. | | Description | | VIN |
|-----|------|---------------|----------------------|-------------------|
| | | | | |
| 23 | 2014 | RAM PROMASTER | WOGO OPS VAN | 3C6TRVCD6EE123628 |
| 151 | 2002 | DODGE VAN | WOGO OPS VAN - SPARE | 2B7JB21Y92K110755 |

Any and all Intellectual Property relating to Wo-Go.

Exhibit A – Page 1

**Schedule 3.5**

**Required Consents**

The following agreements require written consent:

1. Lease Agreement between Worley & Obetz, Inc. and 202 Greenfield LP dated August 30, 2013
2. DEP Grant Agreement between Worley & Obetz, Inc. and the Commonwealth of Pennsylvania, Department of Environmental Protection, Office of Pollution Prevention and Energy Assistance
3. Lease Agreement between 333 Sylvan Avenue, LLC and Amerigreen Energy, Inc. dated April 26, 2013
4. Lease Agreement between 333 Sylvan Avenue, LLC and Amerigreen Energy, Inc. dated April 22, 2015
5. Commercial Lease Agreement between Lyons & Obetz and AmeriGreen dated April 1, 2014
   a. AmeriGreen has the right to assign the lease to a corporation with which AmeriGreen may merge or consolidate, to any subsidiary of AmeriGreen, to any corporation under common control with AmeriGreen or to a purchaser of substantially all of AmeriGreen's assets without consent.
6. Commercial Lease Agreement between Lyons & Obetz and AmeriGreen dated July 1, 2011
   a. AmeriGreen has the right to assign the lease to a corporation with which AmeriGreen may merge or consolidate, to any subsidiary of AmeriGreen, to any corporation under common control with AmeriGreen or to a purchaser of substantially all of AmeriGreen's assets without consent.
7. Lease Agreement between RZ Realty, LP and AmeriGreen Energy, Inc. dated November 25, 2014
   a. AmeriGreen Energy, Inc. has the right to assign the lease to an affiliate or successor by reason of merger, consolidation, asset or stock acquisition without consent.
8. Equipment Lease Agreement between Elbow River Marketing USA LTD and AmeriGreen Propane, LLC dated July 1, 2017
9. Biodiesel Terminal Storage and Thru Put Agreement between Westmore Fuel Co., Inc, and AmeriGreen Energy dated October 30, 2014
   a. AmeriGreen has the right to assign to an affiliate or subsidiary without consent.
10. Propane Throughput Agreement between AmeriGreen Energy and Boyle Energy
    a. Agreement states that Boyle Energy may assign without prior written consent, implying that AmeriGreen Energy cannot because the agreement can only be amended by written consent.
11. Thruput Agreement between General Bangtson LLC and AmeriGreen Energy, Inc.
12. Lease Agreement between Crowe Realty, LLC and Worley & Obetz dated September 8, 2005
13. Lease Agreement between Crowe Realty, LLC and Worley & Obetz dated October 1, 2010

ACTIVE\64374627.v4

14. Lease and Purchase Agreement between Crowe Realty, LLC and Worley & Obetz dated September 9, 2010

15. Commercial Lease Agreement between Doe Run Road LLC and Worley & Obetz Inc. dated January 1, 2012
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

16. Commercial Lease Agreement between Doe Run Road LLC and Worley & Obetz Inc. dated June 1, 2012
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

17. Commercial Lease Agreement between Doe Run Road LLC and Worley & Obetz Inc. dated September 1, 2011
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

18. Agreement between H. L. Wiker, Inc. and Worley & Obetz, Inc. dated August 2008
    a. Even if written consent is granted, Worley & Obetz is still liable for payment of all terms, conditions, and covenants.

19. Lease Agreement between H. L. Wiker, Inc. and Worley & Obetz, Inc. dated January 16, 2008
    a. Even if written consent is granted, Worley & Obetz is still liable for payment of all terms, conditions, and covenants.

20. Lease Agreement between J. W. Bishop Properties, LLC and Worley & Obetz, Inc. dated March 4, 2013

21. Commercial Lease Agreement between Lester R. Summers, Inc. and Worley & Obetz Inc. dated July 1, 2015

22. Commercial Lease Agreement between Lester R. Summers, Inc. and Worley & Obetz Inc. dated September 1, 2016

23. Commercial Lease Agreement between Lyons & Obetz and Worley & Obetz Inc. dated September 1, 2016 (41 Doe Run Road)
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

24. Commercial Lease Agreement between Lyons & Obetz and Worley & Obetz Inc. dated September 1, 2016 (55 Doe Run Road)
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

ACTIVE\64374627.v4

25. Commercial Lease Agreement between Lyons & Obetz and Worley & Obetz Inc. dated September 1, 2009
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.
26. Commercial Lease between Obetz Enterprises and Worley & Obetz Inc. dated April 24, 1997
27. DEP Grant Agreement Worley & Obetz, Inc. and the Commonwealth of Pennsylvania, Department of Environmental Protection, Office of Pollution Prevention and Energy Assistance dated July 6, 2017
28. Operating Agreement of PJM Interconnection, LLC (to which AmeriGreen Energy, Inc. is a member)
    a. The rights and obligations created by the Agreement shall inure to and bind the successors and assigns of AmeriGreen; provided, however, that the rights and obligations of AmeriGreen hereunder shall not be assigned without the approval of the Members Committee except as to a successor in operation of AmeriGreen's electric operating properties by reason of a merger, consolidation, reorganization, sale, spin-off, or foreclosure, as a result of which substantially all such electric operating properties are acquired by such a successor, and such successor becomes a Member.
29. Product Sales Agreement between UGI Energy Services, LLC and AmeriGreen Energy, Inc. dated May 19, 2014
    a. If AmeriGreen is assigning the agreement to an affiliate (who's creditworthiness is comparable to or higher than that of the AmeriGreen), or assigning the agreement to any person or entity succeeding to all or substantially all of the assets of the AmeriGreen, then only written notice is required.
30. Propane Throughput Agreement between AmeriGreen Energy, Inc. and UGI Energy Services, LLC dated May 1, 2014
    a. Agreement states that UGI Energy Services, LLC may assign without prior written consent, implying that AmeriGreen Energy, Inc. cannot because the agreement can only be amended by written consent.
31. Propane Throughput Agreement between AmeriGreen Energy, Inc. and UGI Energy Services, LLC dated May 1, 2015
    a. Agreement states that UGI Energy Services, LLC may assign without prior written consent, implying that AmeriGreen Energy, Inc. cannot because the agreement can only be amended by written consent.
32. Propane Throughput Agreement between AmeriGreen Energy, Inc. and UGI Energy Services, LLC dated May 1, 2016
    a. Agreement states that UGI Energy Services, LLC may assign without prior written consent, implying that AmeriGreen Energy, Inc. cannot because the agreement can only be amended by written consent.
33. Propane Throughput Agreement between AmeriGreen Energy, Inc. and UGI Energy Services, LLC dated June 1, 2017

3

      a. Agreement states that UGI Energy Services, LLC may assign without prior written consent, implying that AmeriGreen Energy, Inc. cannot because the agreement can only be amended by written consent.

34. Propane Throughput Agreement between AmeriGreen Energy, Inc. and UGI Energy Services, LLC dated May 3, 2018
    a. Agreement states that UGI Energy Services, LLC may assign without prior written consent, implying that AmeriGreen Energy, Inc. cannot because the agreement can only be amended by written consent.

35. Propane Throughput Agreement between AmeriGreen Energy and RF Ohl Fuel Oil, Inc. dated July 1, 2014
    a. Agreement states that RF Ohl Fuel Oil, Inc. may assign without prior written consent, implying that AmeriGreen Energy, Inc. cannot because the agreement can only be amended by written consent.

36. Propane Throughput Agreement between AmeriGreen Propane LLC and RF Ohl Fuel Oil, Inc. dated July 1, 2017
    a. Agreement states that RF Ohl Fuel Oil, Inc. may assign without prior written consent, implying that AmeriGreen Energy, Inc. cannot because the agreement can only be amended by written consent.

37. Lease Agreement between Rohrer's Quarry and Worley & Obetz dated June 1, 2014

38. Commercial Lease Agreement between Seth Obetz and Worley & Obetz Inc. dated January 1, 2010
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

39. Commercial Lease Agreement between Seth Obetz and Worley & Obetz Inc. dated January 1, 2011
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

40. Commercial Lease Agreement between Seth Obetz and Worley & Obetz Inc. dated September 1, 2012
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

41. Agreement between IPT, LLC and AmeriGreen Energy Inc. (January 2012)
    a. Written consent is not needed for an assignment to one or more of the assignor's wholly owned corporate affiliates or subsidiaries or to a successor of all or of substantially all of the assignor's entire business and assets or to a corporation which assignor merges into or consolidates with. However, an assignment to a corporate affiliate or subsidiary will not relieve the assignor of any of its obligations.

42. Agreement between IPT, LLC and AmeriGreen Energy Inc. (July 2012)

ACTIVE\64374627.v4

a. Written consent is not needed for an assignment to one or more of the assignor's wholly owned corporate affiliates or subsidiaries or to a successor of all or of substantially all of the assignor's entire business and assets or to a corporation which assignor merges into or consolidates with. However, an assignment to a corporate affiliate or subsidiary will not relieve the assignor of any of its obligations.

43. Agreement between IPT, LLC and AmeriGreen Energy Inc. (November 2014)

a. Written consent is not needed for an assignment to one or more of the assignor's wholly owned corporate affiliates or subsidiaries or to a successor of all or of substantially all of the assignor's entire business and assets or to a corporation which assignor merges into or consolidates with. However, an assignment to a corporate affiliate or subsidiary will not relieve the assignor of any of its obligations.

44. Agreement between IPT, LLC and AmeriGreen Energy Inc. (November 2016)

a. Written consent is not needed for an assignment to one or more of the assignor's wholly owned corporate affiliates or subsidiaries or to a successor of all or of substantially all of the assignor's entire business and assets or to a corporation which assignor merges into or consolidates with. However, an assignment to a corporate affiliate or subsidiary will not relieve the assignor of any of its obligations.

45. Agreement between IPT, LLC and AmeriGreen Energy Inc. (November 2017)

a. Written consent is not needed for an assignment to one or more of the assignor's wholly owned corporate affiliates or subsidiaries or to a successor of all or of substantially all of the assignor's entire business and assets or to a corporation which assignor merges into or consolidates with. However, an assignment to a corporate affiliate or subsidiary will not relieve the assignor of any of its obligations.

46. Tank Storage Agreement between Colmar Terminal, Inc. and AmeriGreen, Inc. dated February 19, 2014

a. Written consent is not needed for a merger, consolidation, or transfer of all of the transferor's assets for valid business purposes (other than the avoidance of obligations under the agreement).

47. Terminalling Agreement between AmeriGreen Energy and Arc Terminals Pennsylvania Holdings LLC dated July 25, 2016

a. AmeriGreen Energy may assign the agreement to an affiliate, but it will still be liable for the obligations.

48. Terminal Services Agreement between Plains Products Terminals LLC and AmeriGreen Energy Inc. dated May 1, 2010

a. AmeriGreen Energy may assign the agreement to an affiliate or subsidiary upon 10 days prior written notice, but it will still be liable for the obligations.

49. Product Terminal Services Agreement between Sunoco Partners Marketing & Terminals and AmeriGreen dated November 21, 2014

a. Written consent is not needed for an assignment to one or more of the assignor's affiliates or subsidiaries, or to a successor of all or of substantially all of the assignor's business and assets or to a corporation which assignor merges into or

5

consolidates with. However, an assignment will not relieve the assignor of any of its obligations.

50. Biodiesel Terminal Storage and Thru Put Agreement between Windsor Fuel Co., Inc. and AmeriGreen Energy dated August 1, 2015
   a. AmeriGreen Energy may assign the agreement to an affiliate or subsidiary.
51. Terminal Throughput Agreement between Fred M. Schildwachter & Sons, Inc. and AmeriGreen Energy, Inc. dated November 9, 2015
52. Terminal Throughput Agreement between Fred M. Schildwachter & Sons, Inc. and AmeriGreen Energy, Inc. dated September 2014
53. Master Agreement between Vendor Services Group and Worley & Obetz (December 2016)
54. Lease Agreement between Waverly Trade Center, LLC and Worley & Obetz dated May 1, 2013
55. Lease Agreement between H. C. Rineer Sons Partnership ("Landlord") and Worley & Obetz dated May 30, 2006
   a. Worley & Obetz remains liable to H. C. Rineer unless otherwise agreed to in writing by H. C. Rineer.
**56. Non-Exclusive Fee Agreement between Ecova, Inc. and AmeriGreen Energy, Inc. dated August 19, 2013**
**57. Channel Partner Agreement between Agera Holdings LLC and AmeriGreen Energy, Inc. [2017]**
**58. Confidential Marketing Agreement between EnerPenn USA, LLC and AmeriGreen Energy, Inc.**
   **a. Confidentiality Agreement between EnerPenn USA, LLC and AmeriGreen Energy, Inc. attached as Exhibit A**
**59. Non-Exclusive Fee Agreement between AmeriGreen and South Jersey Energy Company [2014]**
**60. Independent Contractor Agreement between AmeriGreen Energy, Inc. and NextEra Energy Services, LLC**
**61. Broker Agreement between AmeriGreen Energy, Direct Energy Business, LLC, and Direct Energy Business Marketing, LLC [2015]**
**62. Broker Agreement between AmeriGreen Energy and Energy Service Providers, Inc. dated October 6, 2015**
**63. Agent Services Agreement between Supreme Energy Inc. and AmeriGreen Energy, Inc.**
**64. Master Broker Agreement between AmeriGreen Energy, Inc. and Constellation NewEnergy, Inc., Constellation Energy Services, Inc., and Constellation Energy Services of New York, Inc.**
**65. Sales Agent Agreement between AmeriGreen Energy and U.S. Energy Partners LLC dated March 21, 2018**
**66. Brokerage Agreement between New York Energy Inc. and AmeriGreen Energy, Inc. dated May 24, 2018**
**67. Customer Referral Agreement between AmeriGreen Energy, Inc. and Mint Energy, LLC**
**68. Broker Agreement between AmeriGreen Energy, Inc. and TriEagle Energy, LP dated December 11, 2013**

6

ACTIVE\64374627.v4

69. **Payment Remittance Agreement between AmeriGreen Energy, Inc. and AP Gas & Electric (TX), LLC dated December 22, 2017**
70. **Broker Agreement between AmeriGreen Energy, Inc. and FPP Holdings, LLC dated October 12, 2016**
71. **Commodity Broker Agreement between AmeriGreen Energy, Inc. and Source Power & Gas LLC dated December 14, 2017**
72. **Commercial Sales Partnership Agreement between AmeriGreen Energy, Inc. and SFE Energy Inc.**
73. **Broker Agreement between AmeriGreen Energy, Inc. and Freepoint Energy Solutions LLC dated May 3, 2018**
74. **Sourcing Fee Agreement between AmeriGreen Energy, Inc. and Infinite Energy dated January 12, 2017**
75. **Agent Agreement between AmeriGreen Energy, Inc. and Spark Energy Gas, LLC**

The following agreements require approval, but it does not need to be written:
1. Franchise Agreement for a Pacific Pride Commercial Fueling System Territory between Pacific Pride Services, LLC and Worley & Obetz Inc.

The following agreements contain restrictions on sharing information and thus approval should be obtained:
1. Non-Disclosure Agreement between Mansfield Oil Company of Gainesville, Inc. and AmeriGreen Energy, Inc. dated July 28, 2017
2. Confidentiality Agreement between Elbow River Marketing LTD. and AmeriGreen Propane, LLC
3. Non-Disclosure Agreement between Superior Gas Liquids and AmeriGreen Propane, LLC
4. Confidentiality and Non-Disclosure Agreement (Letter form) between United Metro Energy Corp. and AmeriGreen Energy dated July 20, 2017
5. Confidentiality and Non-Disclosure Agreement (Letter form) between IPC(USA), Inc. and AmeriGreen Energy, Inc. dated January 2, 2018
6. Confidentiality Agreement between U.S. Venture Inc. and AmeriGreen Energy, Inc.
7. **Mutual Confidentiality Agreement between Summit Energy Services, Inc. and AmeriGreen Energy, Inc.**

7

## Schedule 3.6

## Litigation

None.

ACTIVE\64374627.v4

### Schedule 3.7

### Permits

None.

ACTIVE\64374627.v4

## Schedule 3.10

### Environmental Matters

None.

ACTIVE\64374627.v4

**Schedule 3.11**

**Real Property**

None.

ACTIVE\64374627.v4

**Schedule 3.12**

**Employment Matters**

- Worley & Obetz, Inc. 401k Plan
- Robert H. Ranck, Inc. 401k Plan – assumed on sale of Ranck Plumbing Heating & Air Conditioning, Inc.
- Worley & Obetz, Inc. Health Plan
- Amerigreen Energy, Inc. Health Plan – terminated for non-payment effective June 30, 2018

12

**Schedule 3.15**

**Insurance**

| WORLEY & OBETZ, INC. | | 2018 | |
|---|---|---|---|
| Updated 6/6/18 | | | |

| **CASUALTY/SUMMIT:** | | **Underwritten By: Old Republic/Effective 2/1/2018-19** | |
|---|---|---|---|
| Workers Compensation | $ | 1,000,000 | Accident/Disease/Employee |
| | $ | 15,000,000 | Payroll Projection |
| General Liability | $ | 1,000,000 | Occurrence |
| | $ | 2,000,000 | Aggregate |
| | $ | 1,000,000 | Employee Benefits Liability |
| | | | Sales |
| | $ | 537,500,000 | Projection |
| Automobile | $ | 1,000,000 | Bodily Injury/Property Damage Liability |
| | | $250 and $500 | Comprehensive/Collision Deductibles |
| | $ | 1,000 | Tractor Deductibles |
| | | 284 | Total Vehicles |

| **UMBRELLA:** | | **Underwritten By: Allied World/Effective 2/1/2018-19** | |
|---|---|---|---|
| | $ | 15,000,000 | Occurrence/Aggregate |
| | $ | 10,000 | Retention |

| **XS AUTO UMBRELLA:** | | **Underwritten By: Endurance/Effective 2/1/2018-19** | |
|---|---|---|---|
| | $ | 4,000,000 | Occurrence/Aggregate |
| | $ | - | Retention |

| **POLLUTION:** | | **Underwritten By: Chubb/Ace American/Effective 2/1/2018-20** | |
|---|---|---|---|
| | $ | 4,000,000 | Aggregate Program |
| | $ | 4,000,000 | Occurrence |
| | $ | 50,000 | Deductible |

| **EXECUTIVE PROTECTION:** | | **Underwritten By: Travelers/Effective 2/1/2018-19** | |
|---|---|---|---|
| | $ | 2,000,000 | Fiduciary |
| | $ | 2,000,000 | Employment Practices |
| | | | Employee |
| | $ | 50,000 | Theft |
| | $ | 1,000,000 | Cyber Liability - added to this policy 2/1/17 |
| | $ | 1,000,000 | Third Party |

| **PROPERTY:** | | **Underwritten By: XL Insurance/Effective 2/1/2018-19** | |
|---|---|---|---|
| | $ | 25,517,929 | Property Limits |
| | | | Business |
| | $ | 5,000,000 | Income |
| | $ | 2,500,000 | Earthquake |
| | $ | 1,000 | Property Deductible |
| | $ | 25,000 | Earthquake Deductible |
| | $ | 50,000 | Motor Truck Cargo/Filings Included |

13

ACTIVE\64374627.v4

|  |  |  |  |
|---|---|---|---|
|  | $ | 25,000 | Installation |
|  | $ | 87,900 | Contractors Equipment |
|  | $ | 1,700,000 | Electronic Data Processing |
| **BOILER & MACHINERY:** | **Underwritten By: Travelers/Effective  2/1/2018-19** | | |
|  | $ | 24,982,032 | Property Limit |
|  | $ | 5,000,000 | Business Interruption |
|  | $ | 2,500 | Deductible |
| **McConkey Service Fee** | $ | 500 | **Per Month 2/1/18-19** |
| **PERSONAL UMBRELLAS:** | **Effective 7/1/17-18** | | |
|  | $ | 5,000,000 | Jeff Lyons          **CHUBB** |

## **Amerigreen Energy, Inc.**

| **Coverages** | | | **2-1-2018** |
|---|---|---|---|
| Property (including floaters) | | | |
|  | Limits | $ | 6,155,500 |
|  | Premium (Incl. Tax/Fee) | $ | **13,365** |
| General Liability | | | |
|  | Gallons | $ | 60,000,000 |
|  | Sales (Lube) | $ | 200,000 |
|  | Premium | $ | **52,447** |
| Automobile | | | |
|  | # of Units | $ | 15 |
|  | Premium | $ | **15,409** |
| Workers' Compensation | | | |
|  | Payroll | $ | 2,775,000 |
|  | Premium | $ | **9,966** |
| Umbrella | | | |
|  | Limit | $ | 3,000,000 |
|  | Premium | $ | **12,198** |
| McConkey Energi Fee | | $ | **9,751** |

14

Executive Protection

|  | D&O & EPL | | |
|---|---|---|---|
|  | Limit | $ | 1,000,000 |
|  | Premium | $ | **10,339** |

| Pollution | | | 2/1/18 to 2/1/19 |
|---|---|---|---|
|  | Limit | $ | 2,000,000 |
|  | Premium | $ | **20,770** |

| Credit Insurance - 11-30-17/18 | | $ | **26,208** |
|---|---|---|---|

| **All policies are paid in full** | | $ | **170,453** |
|---|---|---|---|

ACTIVE\64374627.v4

## ASSET PURCHASE AGREEMENT

### BY AND BETWEEN

### ~~WIGGINS GAS PROPANE & ALTERNATIVE FUELS LLC~~DIESEL DIRECT HOLDINGS, INC.

### AND

### CHRISTINE C. SHUBERT, IN HER CAPACITY AS CHAPTER 7 TRUSTEE FOR THE ESTATES OF WORLEY & OBETZ, INC., ET AL.

~~August 24~~September 17, 2018

# TABLE OF CONTENTS

Page

1.   DEFINITIONS ................................................................................................ 2

    1.1   Definitions ............................................................................................. 2
    1.2   Cross References .................................................................................... 6

2.   PURCHASE AND SALE ............................................................................... 7

    2.1   Purchase and Sale .................................................................................. 7
    2.2   Excluded Assets ..................................................................................... 9
    2.3   "AS IS, WHERE IS" SALE ................................................................. 11
    2.4   Assumed Liabilities ............................................................................. 12
    2.5   Excluded Liabilities ............................................................................. 13
    2.6   Assumption/Assignment of Contracts and Rights. .............................. 13
    2.7   Consideration; Allocation of Consideration ........................................ 14
    2.8   Closing ................................................................................................. 15
    2.9   Deliveries by Seller ............................................................................. 15
    2.10  Deliveries by Purchaser ....................................................................... 16

3.   REPRESENTATIONS AND WARRANTIES OF SELLER ......................... 16

    3.1   Power .................................................................................................... 16
    3.2   Authorization ....................................................................................... 16
    3.3   Governmental Authorization ............................................................... 16
    3.4   Non-contravention ............................................................................... 16
    3.5   Required Consents ............................................................................... 16
    3.6   Litigation .............................................................................................. 17
    3.7   Permits ................................................................................................. 17
    3.8   Compliance with Laws and Court Orders ............................................ 17
    3.9   Intellectual Property Rights ................................................................. 17
    3.10  Environmental Matters ........................................................................ 17
    3.11  Real Property ....................................................................................... 17
    3.12  Employment Matters and Employee Benefits ..................................... 18
    3.13  Taxes .................................................................................................... 18
    3.14  Sufficiency of and Title to the Purchased Assets ................................ 18
    3.15  Insurance .............................................................................................. 18
    3.16  Service of Bankruptcy Documents ...................................................... 18
    3.17  Certain Fees ......................................................................................... 18

4.   REPRESENTATIONS AND WARRANTIES OF PURCHASER ................ 19

    4.1   Organization ......................................................................................... 19
    4.2   Corporate Authorization ...................................................................... 19
    4.3   Governmental Authorization ............................................................... 19
    4.4   Non-contravention ............................................................................... 19
    4.5   Litigation .............................................................................................. 19
    4.6   Adequacy of Funds .............................................................................. 19

5.   COVENANTS OF SELLER .......................................................................... 20

-i-

**Page**

|     | 5.1  | Access to Information | 20 |
|     | 5.2  | Sales of De Minimis Assets | 20 |
|     | 5.3  | Notices of Certain Events | 20 |
| 6.  |      | COVENANTS OF PURCHASER AND SELLER | 20 |
|     | 6.1  | Efforts; Further Assurances | 20 |
|     | 6.2  | Certain Filings | 20 |
|     | 6.3  | Bankruptcy Issues | 21 |
|     | 6.4  | Notices | 32 |
| 7.  |      | TAX MATTERS | 33 |
|     | 7.1  | Tax Cooperation | 33 |
|     | 7.2  | Transfer Taxes | 33 |
|     | 7.3  | Real Property Taxes | 33 |
|     | 7.4  | Personal Property, Ad Valorem and Excise Taxes | 33 |
| 8.  |      | CLOSING CONDITIONS | 33 |
|     | 8.1  | Conditions to Obligations of Purchaser and Seller | 33 |
|     | 8.2  | Conditions to Obligations of Purchaser | 34 |
|     | 8.3  | Conditions to Obligations of Seller | 34 |
| 9.  |      | TERMINATION | 35 |
|     | 9.1  | Grounds for Termination | 35 |
|     | 9.2  | Effect of Termination | 35 |
|     | 9.3  | Fees and Expenses | 35 |
| 10. |      | MISCELLANEOUS | 36 |
|     | 10.1  | Notices | 36 |
|     | 10.2  | Limitation on Damages | 36 |
|     | 10.3  | Waivers | 37 |
|     | 10.4  | Successors and Assigns | 37 |
|     | 10.5  | Governing Law | 37 |
|     | 10.6  | Jurisdiction | 37 |
|     | 10.7  | Waiver of Jury Trial | 38 |
|     | 10.8  | No Third Party Beneficiaries | 38 |
|     | 10.9  | Entire Agreement; Amendments; Counterparts | 38 |
|     | 10.10 | Pre-Petition Secured Party | 38 |
|     | 10.11 | Headings; Interpretation | 39 |

ACTIVE\64374627.v4
ACTIVE\64374627.v1

~~EXHIBITS~~

~~Exhibit A        Form of Bill of Sale, Assignment and Assumption Agreement~~

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** dated as of August 24, 2018 (this "**Agreement**") is entered into by and between Christine C. Shubert, in her capacity as Chapter 7 Trustee ("**Seller**") for the estates of (i) Worley & Obetz, Inc. (Case No. 18-13774-REF); (ii) Americomfort, Inc., Case No. 18-13775-REF); (iii) Amerigreen Energy, Inc. (Case No. 18-13777-REF); (iv) Advance Air, Inc. (Case No. 18-13778-REF); (v) Amerigreen Energy Brokers, LLC (Case No. 18- 13779-REF); (vi) Amerigreen Electricity, LLC (Case No. 18-13780-REF); (vii) Amerigreen Hedging Services, LLC (Case No. 18-13781-REF); (viii) Amerigreen Lubricants, LLC (Case No. 18-13782-REF); (ix) Amerigreen Natural Gas, LLC (Case No. 18-13783-REF); and (x) Amerigreen Propane, LLC (Case No. 18-13784-REF) (collectively, the "**Debtors**") and ~~Wiggins Gas Propane & Alternative Fuels LLC, a Delaware limited liability company (or its Assignee,~~ Diesel Direct Holdings, Inc., a Delaware corporation ("Diesel") or its assignees, which shall be Affiliates of Diesel or Jerome H. Rhoads, Inc. and which shall be identified in writing by Diesel to Seller prior to the Closing Date (the "Assignees", and together with Diesel, the "**Purchaser**"). Purchaser and Seller are sometimes individually referred to in this Agreement as a "**Party**" and collectively as the "**Parties**."

## RECITALS:

**WHEREAS**, prior to the Petition Date (as defined below), Debtor Worley & Obetz, Inc. ("W&O"), and certain Affiliates (as defined below) provided certain energy products and services to their commercial and residential clients, including fuel, bio-heating oil, biodiesel, propane, gasoline, natural gas and electricity (the "W&O Business");

**WHEREAS**, prior to the Petition Date, Debtor Amerigreen Energy, Inc. and certain Affiliates operated as an energy wholesaler to retail distributors operating in the Mid-Atlantic and New England markets and provided certain energy products and services to their retail fuel distributors, fuel stations, commercial clients, and commercial and residential clients of W&O, including ethanol, biodiesel, biofuels, and petroleum, as well as hedging and marketing services, and electricity and gas plans (together with the W&O Business, the "Business");

**WHEREAS**, on June 6, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court");

**WHEREAS**, Seller is the duly appointed and acting Chapter 7 trustee for each of the Debtors' bankruptcy cases which are now jointly administered under Case No. 18-13774 (REF) (Jointly Administered) (collectively, the "Bankruptcy Cases");

**WHEREAS**, Seller desires to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of and acquire such Purchased Assets and to assume such

Assumed Liabilities, in each case on an "AS IS, WHERE IS" basis except for the representations and warranties expressly set forth in Section 3 below and upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to an Approval Order (as defined below) to be entered in the Bankruptcy Cases pursuant to §§ 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.     **Definitions**.

1.1     Definitions.   The following terms, as used herein, have the following meanings:

(a)     "Acquired Owned Real Property" means all of the real property, together with all Improvements located thereon and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights and interests appurtenant thereto, owned in fee by Seller, and any part or parcel thereof set forth on Schedule 2.1(a).

(b)     "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such other Person.

(c)     "Bid Protection" means an amount equal to 3% of the Purchase Price, or $243,000.

(d)     "Break-Up Fee" means an amount equal to 3% of the Purchase Price, or $243,000.

(e)     "Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in Pennsylvania are authorized or required by Law to close.

(f)     "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any Laws promulgated thereunder.

(g)     "Claim" means a "claim" as defined in Section 101 of the Bankruptcy Code.

(h)     "Closing Date" means the date of the Closing.

2

(i)    "Code" means the Internal Revenue Code of 1986, as amended.

(j)    "Cure Costs" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Contracts to Purchaser as provided herein.

(k)    "Employee" means an individual who is employed by the Debtors, whether on a full-time or a part-time basis, whether active or inactive as of the Closing Date, and includes an employee on short-term or long-term disability leave.

(l)    "Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA §3(3)) and any other benefit or compensation plan, program, agreement, arrangement or payroll practice (whether written or unwritten) maintained, sponsored, or contributed or required to be contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any liability as set forth on Schedule 3.12(a).

(m)    "Environmental Laws" means, whenever in effect, all federal, state, and local Laws and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all contractual obligations and all common Law, in each case concerning public or employee health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state Laws).

(n)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

(o)    "ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with Seller for purposes of Code § 414.

(p)    "Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority, or arbitral body.

(q)    "Hazardous Substances" means any substance, material or waste regulated by any Governmental Authority, including any material, substance or waste which is defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "contaminant," "toxic waste," "pollutant" or "toxic substance" under any provision of Environmental Law, and including petroleum, petroleum products, asbestos,

3

presumed asbestos-containing material or asbestos-containing material, urea formaldehyde and polychlorinated biphenyls.

(r)    "Improvements" means all buildings, improvements, structures, streets, roads and fixtures located, placed, constructed or installed on or under the Acquired Owned Real Property or the Leased Real Property, including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration systems, facilities, lines, installations and conduits.

(s)    "Intellectual Property Rights" means all of Seller's intellectual property rights including, but not limited to: (i) patents, patent applications, patent rights, patent disclosures and inventions (whether or not patentable or reduced to practice); (ii) trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, websites, domain names and other indicia of source and all goodwill associated therewith; (iii) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (iv) know-how, trade secrets, customer lists (including all wholesale, retail and commercial customer account lists, whether active or inactive including complete contact information), proprietary information, proprietary processes and formulae, databases and data collections; (v) all source and object code, software (including front and back office software, customer management and fuel management systems, accounting and billing systems, POS inventory systems and fleet management systems), algorithms, architecture, structure, display screens, layouts, inventions and development tools; and (vi) all documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records.

(t)    "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means the actual knowledge of Christine C. Shubert.

(u)    "Law" means any law, statute, regulation, rule, code, decree, constitution, ordinance, treaty, rule of common law or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(v)    "Leased Real Property" means all land, Improvements or other interests in real property leased or subleased by Seller, as lessee, which is used or intended to be used in, or otherwise related to, the Business and set forth on Schedule 1.1(v), unless previously rejected pursuant to section 365 of the Bankruptcy Code.

(w)    "Liability" means any claim, debt, liability, obligation, Tax or commitment of any nature whatsoever (whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated or due or to become due), whenever or however arising (including those arising out of any contract or tort, whether based

4

on negligence, strict liability or otherwise), and including all costs and expenses related thereto.

(x)     "Lien" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), pledge, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or noncontingent, material or nonmaterial, known or unknown. For the avoidance of doubt, the definition of Lien shall not include any license or sublicense of Intellectual Property Rights granted by Seller or any lease or sublease by Seller (as lessor or sublessor) of real property.

(y)     "Order" means any award, decision, decree, order, directive, injunction, ruling, judgment or consent of or entered, issued, made or rendered by any Governmental Authority.

(z)     "Permits" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and other similar documents and authorizations issued by any Governmental Authority to Seller, in each case to the extent transferable without the consent of any Governmental Authority.

(aa)     "Permitted Encumbrances" means (i) Liens included in the Assumed Liabilities; (ii) encumbrances waived in writing by Purchaser; (ii) all restrictions on the use of the Purchased Assets arising as a result of the application of zoning and similar laws; (iv) all exceptions, restrictions, easements, charges, rights-of-way, and other encumbrances that are set forth in any Permit; and (v) other imperfections in title, if any, or conditions, reservations, restrictions, easements, encroachments, or rights of way, if any, none of which, individually or in the aggregate, materially detracts from the value, or impairs in any significant way the use of the property subject thereto;

(bb)     "Person" means an individual, corporation, partnership, limited liability Debtors, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(cc)     "Post-Retirement Liabilities" means with respect to all Employees and retirees, all Liabilities for the post-retirement benefits, including those provided under the Employee Benefit Plans, as applicable.

(dd)     "Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date; and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(ee)     "Property Taxes" means all real and personal property Taxes levied with respect to the Purchased Assets for any taxable period or portion thereof.

5

(ff)    "Real Estate" means the Acquired Owned Real Property and the Leased Real Property.

(gg)    "Release" has the meaning set forth in CERCLA.

(hh)    "Tax" means (i) any federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority (a "Taxing Authority") responsible for the imposition thereof (whether domestic or foreign), whether or not disputed, and (ii) Liability for the payment of any amounts of the type described in clause (i) as a result of being a transferee, party to any agreement or any express or implied obligation to indemnify any other Person.

(ii)    "Tax Returns" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

(jj)    "Trade Payables" means all trade payables incurred by the Debtors in the ordinary course of business.

1.2    Cross References. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Allocation Schedule | 2.7(b) |
| Approval Hearing | 6.3(c)(vi) |
| Approval Order | 6.3(f) |
| Assignment and Assumption Agreement | 2.9(b) |
| Assumed Contracts | 2.1(b) |
| Assumed Contracts A/R | 2.1(d) |
| Assumed Liabilities | 2.4 |
| Auction | 6.3(c) |
| Back-up Bid | 6.3(c)(vi) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid | 6.3(b)(i) |

6

| Term | Section |
|------|---------|
| Bid Assessment Criteria | 6.3(c)(i) |
| Bid Deadline | 6.3(b)(i) |
| Bidder | 6.3(b)(i) |
| Bidding Procedures | 6.3(a) |
| Bidding Procedures Order | 6.3(a) |
| Business | Recitals |
| Closing | 2.8 |
| Contemplated Transaction Documents | 6.3(c)(i) |
| Debtors | Preamble |
| Deposit | 2.7(a) |
| End Date | 9.1(b) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.5 |
| Lot Bid | 6.3(b)(ii)(A) |
| Minimum Initial Overbid | 6.3(b)(ii)(G) |
| Missing Assets | 2.7(c) |
| Modified APA | 6.3(b)(ii)(A) |
| Notice Parties | 6.3(b)(i) |
| Opening Bid | 6.3(c)(i) |
| Overbid | 6.3(c)(v) |
| Party or Parties | Preamble |
| Petition Date | Recitals |
| Purchase Price | 2.7(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Qualified Bid | 6.3(b)(ii) |
| Qualified Bidder | 6.3(b)(ii) |
| Reimbursement Demand | 2.7(c) |
| Round Leading Bid | 6.3(c)(v) |
| Sale and Bidding Procedures Motion | 6.3(a) |
| Seller | Preamble |
| Subsequent Overbid Increment | 6.3(c)(v)(A) |
| Successful Bid | 6.3(c)(v) |
| Successful Bidder | 6.3(c)(vi) |
| Tax Claim | 7.1 |
| Taxing Authority | 1.1(gg) |
| Termination Date | 6.3(b)(ii)(B) |
| Term Sheet | 2.2(h) |
| Transactions | Recitals |
| Transfer Taxes | 7.2 |

## 2. Purchase and Sale.

2.1    <u>Purchase and Sale</u>.  Subject to the terms and conditions set forth in this Agreement and the Approval Order, at the Closing, Seller shall sell, assign, transfer,

ACTIVE\64374627.v4
ACTIVE\64374627.v1

convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all right, title and interest of Seller as of the Closing Date in and to all of Seller's and Debtors' properties and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and whether or not carried or reflected on the books and records of Seller, that are listed in subsections (a) - (l) below, other than the Excluded Assets (the "Purchased Assets"), free and clear of all Liens (other than the Assumed Liabilities and Permitted Encumbrances).  The cost of collecting and removing the Purchased Assets from their various locations shall be borne by Purchaser; *provided, however*, Seller shall, at her cost, use commercially reasonable efforts to assist Seller's efforts by enforcing the terms of this Agreement and the Approval Order against third parties.  Subject to Section 2.2, the Purchased Assets purchased hereunder shall include the following:

(a)    the Acquired Owned Real Property set forth on Schedule 2.1(a); provided Purchaser may advise Seller of any ~~additions or~~ deletions to Schedule 2.1(a) ~~within two (2) Business Days before the Approval Hearing~~prior to the Closing Date;

(b)    all rights of Seller under the executory contracts and unexpired leases of Seller that are set forth on Schedule 2.1(b) not previously rejected pursuant to section 365 of the Bankruptcy Code (collectively, the "Assumed Contracts"); provided Purchaser may advise Seller of any ~~additions or~~ deletions to Schedule 2.1(b) ~~within two (2) Business Days before the Approval Hearing~~prior to the Closing Date;

(c)    all inventory, including, without limitation, that set forth on Schedule 2.1(c), including, but not limited to, propane, gasoline, kerosene, diesel, diesel exhaust fluid, retail and wholesale inventory for sale or distribution of any kind except to the extent contained in an Excluded Asset;

(d)    any accounts receivable and all proceeds arising therefrom arising from and after the Petition Date and out of or in connection with the Assumed Contracts (collectively, the "Assumed Contracts A/R");

(e)    all tangible personal property and intangible property whether located on Acquired Owned Real Property, Leased Real Property, other real property, in transit, or in the possession of any Person, including, but not limited to, all machinery, equipment, storage tanks and vessels, pumps, dispensers, displays, spare parts, signage, industry memorabilia, tools, vehicles, computers (but excluding laptops), mobile phones, personal digital assistants, computer equipment (but excluding laptops), hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, other miscellaneous supplies and other tangible personal property of any kind, including, without limitation, that set forth on Schedule 2.1(e);

8

ACTIVE\64374627.v4
~~ACTIVE\64374627.v1~~

(f)     all Permits set forth on Schedule 2.1(f) to the extent the same may be assigned consistent with their terms;

(g)     all Intellectual Property Rights, including, without limitation, the items set forth on Schedule 2.1(g); provided that Purchaser may advise Seller of any additions or deletions to Schedule 2.1(g) within two (2) Business Days before the Approval Hearing;

(h)     all cars, trucks, trailers, forklifts, other industrial vehicles, other motor vehicles, and boats and watercrafts whether powered or unpowered, including, without limitation, those set forth on Schedule 2.1(h), and any personal property located on or within such vehicles, boats and watercrafts;

(i)     all deposit or prepaid charges and expenses paid exclusively in connection with or relating exclusively to any Purchased Asset;

(j)     all books, records, files and papers of Seller relating to the Business or the Purchased Assets, including equipment logs, service books and records, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records (all in the state in which such records and information currently exist), provided that Seller shall be entitled to access such books, records, files, computer systems, and papers with reasonable notice;

(k)     all goodwill directly arising from, related to or resulting from the Business; and

(l)     All Lots of Purchased Assets set forth in Section 6.3(c)(iv)(1) – (18) of this Agreement.

2.2     Excluded Assets.  Notwithstanding any other provision of this Agreement to the contrary, the following assets (the "Excluded Assets") shall not be transferred, conveyed, sold or assigned to Purchaser, and the Purchased Assets shall not include any of the following assets of Debtors or Seller:

(a)     all cash, cash equivalents and bank deposits (including, without limitation, deposits posted as collateral for letters of credit) or similar cash items;

(b)     all deposit or prepaid charges and expenses paid exclusively in connection with or relating exclusively to any Excluded Assets;

(c)     any accounts receivable and all proceeds of Seller other than the Assumed Contracts A/R;

(d)     all of the Seller's rights under this Agreement and/or other documents and agreements executed in connection with the Transactions contemplated herein;

9

(e)      any and all right, title, leasehold interest, leases and any other interest in and with respect to the following property (collectively known as the "Wo-Go Stations"): (i) Molly's Convenience Store and Wo-Go located at 35 Doe Run Road, Manheim, PA 17545; (ii) the Ephrata Wo-Go & Pacific Pride, located at 1634 W. Main Street, Ephrata, PA 17522; (iii) the Lancaster Wo-Go & Pacific Pride, located at 202 Greenfield Road, Lancaster, PA 17602; (iv) the Lititz Wo-Go and bulk underground storage facility, located at 746 Rothsville Road, Lititz, PA 17543; (v) the Harrisburg Wo-Go Station and bulk underground storage facility, located at 854 South 16th Street, Harrisburg, PA 17104; (vi) the Elizabethtown Pacific Pride, located at 101 East Cherry Street, Elizabethtown, PA 17022; and (vii) the Mount Joy Pacific Pride, located at 30 Orchard Road, Mount Joy, PA 17552;

(f)      all tangible personal property associated with the Wo-Go Stations, including, but not limited to, all machinery, equipment, storage tanks and vessels, pumps, dispensers, displays, spare parts, signage, industry memorabilia, tools, vehicles, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, other miscellaneous supplies and other tangible personal property of any kind, including, without limitation, that set forth on Schedule 2.2(f);

(g)      all intercompany obligations, liabilities and indebtedness between the Debtors including, but not limited to, any and all promissory notes between the Debtors, any Affiliates and/or insiders and any note indebtedness owed to Debtors by any Affiliates or insiders;

(h)      any (i) confidential personnel and medical records pertaining to any Employee of the Debtors; (ii) other books and records that Trustee determines are necessary or advisable to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Debtors or any of the Purchased Assets; (iii) minute books, stock or membership interest records and corporate seals; and (iv) documents relating to proposals to acquire the Purchased Assets by Persons other than Purchaser;(v) documents prepared primarily in connection with the transactions contemplated by the Term Sheet dated as of July 26, 2018, by and between Purchaser and Trustee (the "Term Sheet");

(i)      all Tax losses and Tax loss carry forwards of the Debtors and the rights to receive Tax refunds, credits and credit carry forwards with respect to any Taxes of the Debtors;

(j)      any claim, right or interest of the Seller and the Debtors in or to any refund, rebate, abatement or other recovery for Taxes of the Debtors, together with any interest due thereon or penalty rebate arising therefrom, and all Tax credits and other Tax attributes of the Debtors, for the Pre-Closing Tax Period, but only to the

10

extent the Tax in respect of which such refund or reimbursement is made was not borne by Purchaser or any of its Affiliates;

(k)    all insurance policies or rights to proceeds thereof relating to the Purchased Assets;

(l)    any stock or other equity interests in Debtors or any subsidiaries or Affiliates of the Debtors;

(m)    all claims, actions, liabilities, debts, demands, damages and causes of action, whatsoever, whether in law or in equity, whether known or unknown, which the Seller and/or the Debtors have, may have had, may have in the future accrue to them, arising out of or in connection with, in whole or in part, and relating to the Debtors including, any and all claims, actions, liabilities, debts, demands, damages and causes of action against any of the Debtors' subsidiaries, Affiliates, predecessors and successors in interest, insiders, members, managers, officers, directors, shareholders, investors, employees, representatives, professionals, consultants, accountants, servants, attorneys or other agents;

(n)    all avoidance actions and other causes of action under the Bankruptcy Code or similar state insolvency law;

(o)    all assets, fixtures, furniture, machinery, equipment, properties, interests and rights of the Seller or the Debtors which were previously sold, transferred, conveyed, including, but not limited to, the assets of Debtor Ranck Plumbing, Heating & Air Conditioning, Inc., or otherwise abandoned; and

(p)    all laptops.

2.3    **"AS IS, WHERE IS" SALE.**

(a)    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN **SECTION 3** BELOW, THE PURCHASED ASSETS ARE BEING SOLD IN AN "AS IS" CONDITION, ON A "WHERE IS" BASIS AND "WITH ALL FAULTS" AS OF THE CLOSING DATE (AS DEFINED BELOW), AND SUCH SALE IS WITHOUT RECOURSE, REPRESENTATION, OR WARRANTY OF ANY KIND TO OR BY THE SELLER, WHETHER EXPRESS, IMPLIED OR IMPOSED BY LAW, WHICH RECOURSE, REPRESENTATIONS, AND WARRANTIES (EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN **SECTION 3** BELOW) ARE HEREBY EXPRESSLY DISCLAIMED BY PURCHASER.

(b)    PURCHASER ACKNOWLEDGES THAT IT IS FULLY RELYING ON ITS OWN (OR ITS REPRESENTATIVES') INSPECTIONS, EXAMINATIONS AND EVALUATIONS OF THE REAL ESTATE AND NOT UPON ANY STATEMENTS (ORAL OR WRITTEN) THAT MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY THE DEBTORS

11

OR SELLER OR ANY OF THEIR RESPECTIVE REPRESENTATIVES, AGENTS OR ATTORNEYS. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS (OR PURCHASER'S REPRESENTATIVES HAVE), OR PRIOR TO THE CLOSING DATE WILL HAVE, THOROUGHLY INSPECTED AND EXAMINED THE REAL ESTATE TO THE EXTENT DEEMED NECESSARY BY PURCHASER IN ORDER TO ENABLE PURCHASER TO EVALUATE THE CONDITION OF THE REAL ESTATE AND ALL OTHER ASPECTS OF THE REAL ESTATE (INCLUDING, BUT NOT LIMITED TO, THE ENVIRONMENTAL CONDITION OF THE REAL ESTATE), AND PURCHASER ACKNOWLEDGES THAT PURCHASER IS RELYING SOLELY UPON ITS OWN (OR ITS REPRESENTATIVES') INSPECTION, EXAMINATION AND EVALUATION OF THE REAL ESTATE AND IS QUALIFIED TO MAKE SUCH INSPECTION, EXAMINATION AND EVALUATION. AS A MATERIAL PART OF THE CONSIDERATION OF THIS AGREEMENT AND THE PURCHASE OF THE ACQUIRED OWNED REAL PROPERTY, PURCHASER HEREBY AGREES TO ACCEPT THE ACQUIRED OWNED REAL PROPERTY ON THE CLOSING DATE IN ITS "AS IS, WHERE IS" CONDITION, WITH ALL FAULTS AND, WITHOUT REPRESENTATIONS AND WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES AGREE THAT THE SALE OF THE ACQUIRED OWNED REAL PROPERTY IS WITHOUT ANY WARRANTY, AND THAT THE SELLER AND DEBTORS HAVE NOT MADE ANY, AND EXPRESSLY AND SPECIFICALLY DISCLAIM ANY AND ALL, REPRESENTATIONS, GUARANTIES OR WARRANTIES, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW OR RELATING TO THE ACQUIRED OWNED REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, OF OR RELATING TO: (A) THE OWNERSHIP, USE, INCOME, POTENTIAL, EXPENSES, OPERATION, CHARACTERISTICS OR CONDITION OF THE ACQUIRED OWNED REAL PROPERTY OR ANY PORTION THEREOF, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF SUITABILITY, HABITABILITY, MERCHANTABILITY, DESIGN OR FITNESS FOR ANY SPECIFIC PURPOSE OR A PARTICULAR PURPOSE; (B) THE NATURE, MANNER, OR CONDITION (PHYSICAL, STRUCTURAL OR OTHERWISE) OF THE ACQUIRED OWNED REAL PROPERTY, OR THE SURFACE OR SUBSURFACE THEREOF, WHETHER OR NOT OBVIOUS, VISIBLE OR APPARENT; (C) THE ENVIRONMENTAL CONDITION OF THE ACQUIRED OWNED REAL PROPERTY AND THE PRESENCE OR ABSENCE OF OR CONTAMINATION BY HAZARDOUS MATERIALS, OR THE COMPLIANCE OF THE ACQUIRED OWNED REAL PROPERTY WITH ALL REGULATIONS OR LAWS PERTAINING TO HEALTH OR THE ENVIRONMENT, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL LAWS; AND (D) THE SOIL CONDITIONS, DRAINAGE, FLOODING CHARACTERISTICS, UTILITIES OR OTHER CONDITIONS EXISTING IN, ON OR UNDER THE ACQUIRED OWNED REAL PROPERTY. THE PROVISIONS OF THIS

12

PARAGRAPH SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

2.4     Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the liabilities and obligations of Seller or the Business related to or arising under all (i) Purchased Assets, including, without limitation, the Assumed Contracts, Permits, and Intellectual Property Rights, that accrue after the Closing, (ii) liabilities related to the Permitted Encumbrances, (iii) one half of the Transfer Taxes, and (iv) any and all liabilities for Taxes, if any, attributable to Purchaser's ownership of the Purchased Assets after the Closing Date (collectively, the "Assumed Liabilities") in each case, but in no event to include any Liabilities or obligations of any Debtor or its Affiliates that relate to any breach of representation, warranty, covenant or agreement that arose on or prior to the Closing Date.

2.5     Excluded Liabilities.   Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Claim against or obligation of Seller or Debtors of whatever nature, whether presently in existence or arising hereafter.  All such other Claims and obligations, whether known or unknown, direct or contingent, in litigation or threatened, or not yet asserted, shall be retained by and remain obligations and Liabilities of Seller or Debtors (all such Liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

(a)     all Liabilities related to any Excluded Assets;

(b)     Trade Payables;

(c)     all Liabilities for (i) Taxes of Seller and (ii) any Taxes relating to or arising from the Business or one or more Purchased Assets for any Pre-Closing Tax Periods, provided that this shall exclude Transfer Taxes, which are addressed in Section 7.2;

(d)     all Post-Retirement Liabilities;

(e)     all Employee Benefit Plans and all Liabilities thereunder; and

(f)     any Liability based on successor liability theories, including, without limitation, product liability claims.

2.6     Assumption/Assignment of Contracts and Rights.

(a)     To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts shall be assumed by Seller and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code.  If such assignment is not effectuated pursuant to the Approval Order, Seller shall, at the request of Purchaser, seek an Order from the Bankruptcy Court after the Closing Date to assign such

13

Assumed Contract to Purchaser. All Cure Costs relating to the Assumed Contracts shall be paid by Seller.

(b)      Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract that, after giving effect to the provisions of Section 365 of the Bankruptcy Code, is not assignable or transferable without the consent of any Person, other than the Debtors, Seller and Purchaser, to the extent that such consent shall not have been given prior to the Closing, provided, however, that the Seller and Debtors shall use, whether before or after the Closing, reasonable efforts to obtain all necessary consents to the assignment and transfer thereof.

2.7      Consideration; Allocation of Consideration.

(a)      In addition to the assumption of the Assumed Liabilities, the aggregate consideration (the "Purchase Price") for the sale, transfer and delivery of the Purchased Assets, at the Closing, shall be ~~Eight~~ Ten Million ~~One~~ Six Hundred Seventy Thousand Dollars ($~~8,100,000~~10,670,000) payable as follows: (i) Eight Hundred ~~Ten~~ Sixty-Two Thousand Five Hundred Dollars ($~~810,000~~$862,500) (the "Deposit") payable upon the execution of this Agreement and (ii) ~~Seven~~ Nine Million ~~Two~~ Eight Hundred ~~Ninety~~ Seven Thousand Five Hundred Dollars ($~~7,290,000~~9,807,500) payable at the Closing.

(b)      Purchaser and Seller agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with the allocation schedule (the "Allocation Schedule") to be mutually determined by Purchaser and Seller on or before the Closing. Purchaser and Seller shall (and shall cause their respective Affiliates to) file all Tax Returns (including IRS Form 8954) and other Tax-related information reports in a manner consistent with the Allocation Schedule and not take any position inconsistent with such Allocation Schedule in any Tax-related audit, examination or other proceeding (whether administrative or judicial) unless otherwise required by applicable Law. If any Party receives any notice from a Taxing Authority in respect of an audit, examination or other proceeding (whether administrative or judicial) regarding any allocation of the Purchase Price or otherwise proposing an allocation different from the Allocation Schedule, such Party shall notify the other Parties of such notice and provide such other Parties with a copy of such notice, and the Parties hereto shall cooperate with each other in good faith regarding the resolution of any such matter.

(c)      Following the Approval Hearing and up to Closing, Purchaser shall inspect the Purchased Assets, including, without limitation, the vehicles, to confirm that they are present and accounted for, provided that Purchaser shall have up to thirty (30) days after the Closing (the "Inventory Expiration Date") to count the fuel inventory and further provided that a Seller representative must be present at all times during Purchased Assets inspection, including, without limitation, during vehicles and fuel inventory counts. Purchaser shall provide to Seller a written count of the vehicles at Closing and of the fuel inventory on or prior to the Inventory

14

Expiration Date (collectively the "Inventory Count").  Seller shall have up to ten (10) business days after the Inventory Expiration Date to investigate the Inventory Count (the expiration of such ten (10) business day period is referred to as the "Adjustment Date").  If Seller agrees with the Inventory Count, or fails to oppose the Inventory Count on or before the Adjustment Date, the Inventory Count shall be deemed final (the "Final Inventory Count"). If Seller opposes the Inventory Count, it shall notify Purchaser in writing prior to the Adjustment Date, and describe its opposition in reasonable detail.  If Purchaser and Seller resolve such opposition, the Inventory Count shall be deemed to be a Final Inventory Count upon such resolution.  If Purchaser and Seller are unable to resolve Seller's opposition to the Inventory Count, either party may submit its claim to the Bankruptcy Court for disposition as its sole means of recourse.  The Inventory Count shall be deemed to be a Final Inventory Count upon such resolution.

(d)    (c)Following the Approval Hearing and up to Closing, Purchaser shall inspect the Purchased Assets to confirm that they are present and accounted for.  If Purchaser determines If the Final Inventory Count indicates that there are vehicles or fuel inventory that are listed on Schedule 2.1(h) and Schedule 2.1(c), respectively,  but are missing ("Missing Assets") with an aggregate value determined in good faith that exceeds Thirty Thousand Dollars ($30,000), Seller shall reimburse Purchaser may make a written demand on Seller for reimbursement and credit against the Purchase Price for the aggregate value of such Missing Assets that exceeds Thirty Thousand Dollars ($30,000), and further describing such Missing Assets in reasonable detail and the expected location or quantity (a "Reimbursement Demand").  Upon receipt of a Reimbursement Demand, Seller shall have up to Closing to investigate the Missing Assets.  If Seller agrees with the Reimbursement Demand, or fails to oppose the Reimbursement Demand (as described in the following sentence), such reimbursement for the amount that exceeds Thirty Thousand Dollars ($30,000) shall be made as a credit against the Purchase Price at Closing. If Seller opposes the Reimbursement Demand, it shall notify Purchaser in writing prior to Closing, and describe its opposition in reasonable detail.  If Purchaser and Seller are unable to resolve Seller's opposition to the Reimbursement Demand, either party may submit its claim to the Bankruptcy Court for disposition as its sole means of recourse.  If Seller has promptly after the Final Inventory Count is determined.  If the Inventory Count indicates that there are vehicles or fuel inventory wherever located that are not listed on Schedule 2.1(h) and Schedule 2.1(c), respectively (the "Additional Assets") with an aggregate value determined in good faith that exceeds Thirty Thousand Dollars ($30,000), the Purchase Price shall be increased by the aggregate value of such Additional Assets that exceeds Thirty Thousand Dollars ($30,000) and Purchaser shall pay such increase to Seller promptly after the Final Inventory Count is determined.

2.8    Closing.  The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, PA 19103-3222 on the date of the Approval Order September 25, 2018, or at such other time or place

15

as Purchaser and Seller may agree. The Parties may mutually agree to consummate the Closing electronically.

2.9    <u>Deliveries by Seller</u>.  At the Closing, Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)    the Approval Order;

(b)    a Bill of Sale, Assignment and Assumption Agreement ~~substantially in the form attached hereto as Exhibit A (the "Assignment and Assumption Agreement"),~~ duly executed by Seller;

(c)    duly executed quitclaim deeds transferring fee simple title to the Acquired Owned Real Property to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(d)    originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto);

(e)    physical possession of all of the Purchased Assets capable of passing by delivery, with the intent that title in such Purchased Assets shall pass by and upon delivery;

(f)    a duly executed assignment agreement or agreements transferring the Intellectual Property Rights to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(g)    an affidavit from Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance satisfactory to Purchaser, issued pursuant to Section 1445 of the Code and the Treasury regulations thereunder stating that Seller is not a foreign person as defined in Section 1445 of the Code;

(h)    certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

(i)    all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing pursuant to this Agreement, in each case in form and substance reasonably acceptable to Seller.

2.10    <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

(a)    any unpaid portion of the Purchase Price;

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser; and

16

(c)     all other documents, instruments and writings reasonably requested by Seller to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

**3.     Representations and Warranties of Seller**. Subject to the terms, conditions and limitations set forth in this Agreement, Seller hereby represents and warrants to Purchaser as of the date of this Agreement as follows:

3.1     <u>Power</u>. Subject to the entry of an Approval Order (as defined below) by the Bankruptcy Court, Seller has full legal capacity, right, power and authority to enter into this Agreement.

3.2     <u>Authorization</u>. The execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions are within Seller's powers and have been duly authorized by all necessary actions on the part of Seller. Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Cases, this Agreement constitutes a valid and binding agreement of Seller that is enforceable in accordance with its terms.

3.3     <u>Governmental Authorization</u>. The execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions by Seller require no action by or in respect of, or filing with, any Governmental Authority other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

3.4     <u>Non-contravention</u>. Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Cases, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions do not and will not, to the Knowledge of Seller (a) assuming compliance with the matters referred to in <u>Section 3.3</u>, violate any applicable Law or (b) result in the creation or imposition of any Lien on any Purchased Asset, except for Assumed Liabilities, Permitted Encumbrance, or Liens that will be released at or prior to Closing.

3.5     ~~Required~~ Consents. Except as disclosed on <u>Schedule 3.5</u> (which may be modified prior to the Closing Date), and except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, to the Knowledge of Seller, there is no agreement or other instrument binding upon Seller requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement. <u>Notwithstanding the foregoing, nothing set forth herein shall affect any right of the Seller to assume and assign the agreements listed on Schedule 3.5 pursuant to Section 365 of the Bankruptcy Code.</u>

3.6     <u>Litigation</u>. Except as disclosed on <u>Schedule 3.6</u> and except for the Bankruptcy Cases, as of the date hereof, there is no action, suit, investigation or legal or administrative proceeding pending or, to the Knowledge of Seller, threatened against or affecting, the Purchased Assets (by any Governmental Authority or Person), including real estate tax assessment appeals, which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

17

ACTIVE\64374627.v4
~~ACTIVE\64374627.v1~~

3.7    <u>Permits</u>. Schedule 2.1(f) sets forth a list of all Permits required to conduct and operate the Business in a manner consistent with the pre-Petition Date practices of the Debtors. Except as set forth on <u>Schedule 3.7</u>, to the Knowledge of the Seller, no written notice of violation of any Permit has been received from any Governmental Authority, and no proceeding is pending seeking to revoke or limit any such Permit.

3.8    <u>Compliance with Laws and Court Orders</u>. Seller is not in material violation of any Law applicable to the Purchased Assets or the conduct of the Business.

3.9    <u>Intellectual Property Rights</u>.    To the Knowledge of Seller, (a) Schedule 2.1(g) sets forth an accurate and complete list of all registered Intellectual Property Rights included in the Purchased Assets, and (b) there are no outstanding challenges to the ownership and use by Seller of the Intellectual Property Rights, nor any alleged infringements of such Intellectual Property Rights by third parties.    To the Knowledge of Seller, none of the Intellectual Property Rights included in the Purchased Assets has been licensed by Seller to any other Person.

3.10    <u>Environmental Matters</u>. To the Knowledge of Seller, and other than as described on <u>Schedule 3.10</u>: (a) neither the Seller nor the Debtors have received any notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the Acquired Owned Real Property which remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Acquired Owned Real Property which remains unperformed, and (b) the Acquired Owned Real Property is in compliance, in all respects, with applicable Environmental Laws.

3.11    <u>Real Property</u>. Schedule 2.1(a) sets forth the address and description of all Acquired Owned Real Property. With respect to each parcel of Acquired Owned Real Property, to the Knowledge of Seller and except as set forth on <u>Schedule 2.1(a)</u>, (a) there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Acquired Owned Real Property; (b) there are no outstanding options, rights of first offer or rights of first refusal to purchase such Acquired Owned Real Property (other than the right of Purchaser pursuant to this Agreement), or any portion thereof or interest therein; and (c) there are no condemnation or eminent domain proceedings pending or threatened with respect to all or any part of the Acquired Owned Real Property.

3.12    <u>Employment Matters and Employee Benefits</u>. To the Knowledge of Seller, (a) Schedule 3.12 sets forth a complete and accurate list of Seller's Employee Benefit Plans; (b) with respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law; (c) there are no pending audits or investigations by any Governmental Authority involving any Employee Benefit Plan, and there are no pending or threatened claims (except for individual claims for benefits payable in the normal operation of the Employee Benefit Plans), suits or proceedings involving any Employee Benefit Plan, any trust or other funding medium

18

thereof, fiduciary thereof or service provider thereto, nor is there any reasonable basis for any such claim, suit or proceeding; and (d) the Debtors have performed all material obligations required to be performed by them and are not in any material respect in default under or in violation of any Employee Benefit Plan, nor has there been any such material default or violation by any other party to any Employee Benefit Plan.

3.13    Taxes. To the Knowledge of Seller, all Tax Returns (including any IRS Forms W-2 or Forms 1099) required to be filed by or on behalf of the Debtors (or any predecessor of the Debtors) and all Tax Returns required to be filed in respect of any Purchased Asset have been timely filed; *provided, however,* Seller makes no representations regarding the accuracy of such Tax Returns.

3.14    Sufficiency of and Title to the Purchased Assets. Seller will have at Closing good and marketable title to, or a valid leasehold interest in (or license or other right to use), all the Purchased Assets.

3.15    Insurance. As of the date hereof, to the Knowledge of Seller, all material property and liability insurance policies set forth on Schedule 3.15 are in full force and effect, and no written notice of cancellation, termination or revocation or other written notice that any such insurance policy is no longer in full force or effect or that the issuer of any such insurance policy is not willing or able to perform its obligations thereunder has been received by Seller. All premiums due and payable on such insurance policies have been paid in full.

3.16    Service of Bankruptcy Documents. Seller shall appropriately and timely serve all parties in interest with copies of the Sale and Bidding Procedures Motion and applicable notices as may be required by the Federal Rules of Bankruptcy Procedure and Local Rules of the Bankruptcy Court.

3.17    Certain Fees. No agent, broker, investment banker or other person or firm acting on behalf of Seller or the Debtors, or under her or their authority is or will be entitled to any broker's or finder's fee or any other commission or similar fee or the reimbursement of expenses, directly or indirectly, from Seller in connection with this Agreement or the Transactions.

Except as specifically set forth in this Section 3, Seller does not make any representations or warranties of any kind to Purchaser.

**4.    Representations and Warranties of Purchaser.** Purchaser represents and warrants to Seller as follows:

4.1    Organization. Purchaser is a Delaware limited liability company duly organized, validly existing and in good standing and has all requisite authority to carry on its business.

4.2    Corporate Authorization. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions are within the requisite power and authority of Purchaser and have been duly authorized by all necessary

19

actions on the part of Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

4.3     Governmental Authorization. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a material effect on Purchaser or its ability to close the Transactions.

4.4     Non-contravention. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of organizational documents of Purchaser; (b) require any filing with, or the obtaining of any Permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, Seller.

4.5     Litigation. There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

4.6     Adequacy of Funds. Purchaser has and at the time of Closing will have available to it on an unconditional basis cash proceeds in an amount sufficient to satisfy its monetary and other obligations under this Agreement, including, without limitation, the obligation to pay the Purchase Price in accordance herewith.

5.     **Covenants of Seller**. Seller agrees that:

5.1     Access to Information. From the date hereof until the earlier of the termination of this Agreement pursuant to Section 9.1 or the Closing Date, Seller shall reasonably afford to Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal business hours) to and all properties, books, accounts, records and documents of, or relating to, the Business.

20

5.2     Sales of *De Minimis* Assets.  From the execution of the Term Sheet through the Closing Date, Seller shall cease all asset sales, including *de minimis* asset sales, through the Bankruptcy Court or otherwise.

5.3     Notices of Certain Events.  Seller shall promptly notify Purchaser of:

(a)     any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b)     any material written communication from any Governmental Authority in connection with or relating to the Transactions; and

(c)     the commencement of any actions, suits, investigations or proceedings relating to Seller, the Debtors, any Purchased Asset or the Business that, if pending on the date of this Agreement, would have resulted in a breach of any representation contained in Section 3.

**6.     Covenants of Purchaser and Seller.**  Purchaser and Seller agree that:

6.1     Efforts; Further Assurances.  Subject to the terms and conditions of this Agreement, Purchaser and Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the Transactions contemplated by this Agreement. Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

6.2     Certain Filings.  Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking to timely obtain any such actions, consents, approvals or waivers.

6.3     Bankruptcy Issues.

(a)     Filing of Sale and Bidding Procedures Motion.  Within three (3) Business Days of the date of this Agreement, Seller shall file with the Bankruptcy Court a motion (the "Sale and Bidding Procedures Motion") seeking, among other things, the entry of (i) the Approval Order, and (ii) an Order (the "Bidding Procedures Order") approving the bidding and auction procedures set forth in Sections 6.3(b) and (c) (the "Bidding Procedures").

ACTIVE\64374627.v4
ACTIVE\64374627.v1

(b)  Bidding Procedures.  In the Sale and Bidding Procedures Motion, Seller shall seek, among other things, approval of the following Bidding Procedures, which shall be incorporated into the Bidding Procedures Order:

(i)  Bidding Deadline.  Any third party (other than Purchaser) (a "Bidder") must submit a bid (the "Bid") in accordance with the terms of the Bidding Procedures so that the Bid is actually received by each of the Notice Parties no later than 10:00 a.m. (prevailing Eastern time) on September 13, 2018 (the "Bid Deadline").  Written copies of all Bids shall be delivered by the Bid Deadline to:  (A) counsel to Seller, Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, PA  19103-3222, Attn:  Michael Menkowitz, Esq., mmenkowitz@foxrothschild.com; (B) counsel to the Purchaser, Vedder Price P.C., 222 N. LaSalle Street, Chicago, IL 60601, Attn:  Michael M. Eidelman, Esq., meidelman@vedderprice.com; and (C) counsel to Fulton Bank, N.A., Reed Smith LLP, 3 Logan Square, Suite 3100, 1717 Arch Street, Philadelphia, PA 19103, Attn: Brian M. Schenker; (D) (collectively, the "Notice Parties").  A Bid received after the Bid Deadline shall not constitute a Qualified Bid.  A Bid shall be delivered to all Notice Parties at the same time.  Seller shall deliver to the Notice Parties, at least forty-eight (48) hours prior to the Auction, written confirmation from the Seller that she has a good faith basis to believe the Bidder has a sufficient commitment for financing pursuant to Section 6.3(b)(ii)(D) hereof.  Interested Bidders requesting information about the qualification process, including a copy of this Agreement, and information in connection with their due diligence, should contact Seller's counsel at the above address.

(ii)  Designation as Qualified Bidder.  To participate in the Auction, a Bidder must submit a Bid that is determined by Seller to satisfy each of the following conditions (a "Qualified Bid" and the entity submitting such Qualified Bid, a "Qualified Bidder"):

(A)  Written Submission of Modified APA and Commitment to Close.  Bidders must submit a Bid by the Bid Deadline in the form of an executed mark-up of this Agreement (each a "Modified APA") reflecting such Bidder's proposed changes to this Agreement (together with a blackline of the Modified APA against this Agreement), and a written and binding commitment to close on the terms and conditions set forth therein.  Seller may discuss the Modified APA of any Bidder after submission with such Bidder including, for clarification, the terms and conditions of the Modified APA.  Each Modified APA shall (I) have substantially similar terms and conditions (provided that no Bid other than this Agreement may provide for payment of any break-up fee, expense reimbursement, or similar type of payment) as this Agreement except with higher and better consideration; and (II) contain terms and conditions in the aggregate no less favorable to the Debtors' estates than the terms and conditions in this Agreement; provided, however, the Seller shall have the

22

ACTIVE\64374627.v4
ACTIVE\64374627.v1

sole discretion to sell the Debtors' assets in the lots described in <u>Section 6.3(c)(iv)</u> (each, a "<u>Lot Bid</u>") in accordance with the Bidding Procedures Order and the Bidding Procedures.  In order for a Modified APA to be deemed a Qualified Bid, it must provide for the acquisition of all of the Purchased Assets or contain a Lot Bid;

(B)    <u>Irrevocable</u>.  A Bid must be irrevocable until four (4) Business Days after entry of the approval order, 2018 (the "<u>Termination Date</u>");

(C)    <u>Contingencies</u>.  A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence.  Any other contingencies associated with a Bid may not, in the aggregate, be materially more burdensome than those set forth in this Agreement;

(D)    <u>Financing Sources and Evidence of Financial Ability to Close</u>.  A Bid must identify the actual Bidder and owners and ultimate parent company of the Bidder and contain written evidence of a commitment for financing or other evidence of the ability to fund and consummate the Sale on or before a closing date satisfactory to Seller with appropriate contact information for such financing or funding sources;

(E)    <u>No Fees Payable to Bidder</u>.  A Bid may not request, be conditioned on or otherwise entitle the Bidder (other than Purchaser) to any break-up fee, expense reimbursement or similar type of payment.  A Bidder shall be deemed to waive the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid or the Bidding Procedures;

(F)    <u>Good-Faith Deposit</u>.  Each Bid must be accompanied by a cash deposit in an amount equal to ten (10%) percent in cash of the cash and the value of the non-cash purchase price allocated to the Purchased Assets under the Modified APA, which shall be paid to Seller to be held in an escrow account established at United Bank, ABA Number 211170318; Account No. 710000007408; Name: Worley & Obetz, Inc.; Reference – Christine C. Shubert, Trustee in accordance with the Bidding Procedures;

(G)    <u>Minimum Initial Overbid</u>.    The aggregate consideration in a Bid must have (I) a cash purchase price for the Purchased Assets of the amount payable for the Purchased Assets under this Agreement, being Eight Million One Hundred Thousand Dollars ($8,100,000), <u>plus</u> (II) the amount of the Bid Protection, <u>plus</u> (III) the amount of the Break-Up Fee (the "<u>Minimum Initial Overbid</u>");

(H)    <u>List of Executory Contracts and Unexpired Leases</u>. Each Bid must be accompanied by a list of Debtors' executory and

23

ACTIVE\64374627.v4
ACTIVE\64374627.v1

unexpired leases that the Bidder desires to assume and a packet of information, including financial information, that will be provided to the non-Debtor parties to such executory contracts and unexpired leases sufficient to demonstrate adequate assurance of future performance; and

(I)    <u>Fulton Bank</u>. Notwithstanding anything set forth hereunder, Fulton Bank, N.A. shall automatically be deemed to be a Qualified Bidder hereunder without taking any actions otherwise required to be taken under this <u>Section 6.3</u>, shall have consultation rights throughout the Bid process, shall have the right to attend and participate at the Auction without having submitted a Qualified Bid, and shall be a third-party beneficiary to the Bid procedure in the same way as Purchaser. Notwithstanding anything set forth hereunder, nothing herein shall alter or modify the rights of Fulton Bank, N.A. under section 363(k) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, (i) Fulton Bank N.A. shall not exercise its credit bid rights to make the Minimum Initial Overbid; and (ii) any credit bid by Fulton Bank shall contain a stipulation and agreement with Seller providing for the consensual use of cash collateral by Seller to pay the Break-Up Fee to Purchaser and Fulton Bank shall enter into a stipulation and agreement with Seller that Fulton Bank shall pay all amounts due under the First Amended Stipulation and Order.

(iii)    <u>Due Diligence from Bidders</u>. Each Qualified Bidder shall comply with all reasonable requests for additional information by Seller regarding such Bidder and its contemplated transaction. Failure by a Bidder to comply with requests for additional information will be a basis for Seller to determine that the Bidder is not a Qualified Bidder. Seller acknowledges that Purchaser is a Qualified Bidder and that this Agreement constitutes a Qualified Bid.

(c)    <u>Auction</u>. The Seller shall conduct an auction sale of the Purchased Assets to determine the highest and/or best Bid with respect to the Purchased Assets (the "<u>Auction</u>") only if she receives, prior to the Bid Deadline, (1) a Qualified Bid (other than this Agreement) for the entirety of the Purchased Assets or (2) a combination of Lot Bids (each of which must be a Qualified Bid) providing for, in the aggregate, a Purchase Price that exceeds the Minimum Initial Overbid. The Auction shall commence on September 17, 2018, at 9:00 a.m. (Eastern Standard Time) at the offices of Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, PA 19103. If no such Qualified Bid(s) is/are received by the Bid Deadline, then the Auction shall not take place, Purchaser shall be declared the Successful Bidder, and Seller shall seek approval of, and authority to consummate, this Agreement and the Transactions at the Approval Hearing. If a Qualified Bid(s) is/are received in accordance with these Bidding Procedures, the Auction shall be conducted according to the following procedures:

(i)    <u>Participation at the Auction</u>. Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. For

24

greater certainty, Purchaser is a Qualified Bidder and eligible to participate at the Auction. Only the authorized representatives (including counsel and other advisors) of each of the Purchaser, Qualified Bidders and Seller and any other party in interest or its representative who provide Seller with written notice forty-eight (48) hours prior to the Auction shall be permitted to attend the Auction. During the Auction, the bidding shall begin with the highest Qualified Bid (the "Opening Bid") and each subsequent round of bidding shall continue in minimum increments of at least the Subsequent Overbid Increment. At least one (1) Business Day prior to the start of the Auction, Seller shall provide a copy of the Opening Bid to all participating Qualified Bidders attending the Auction and a blackline of the Opening Bid to this Agreement. Seller shall select the Opening Bid, in her discretion. The determination of which Qualified Bid constitutes the Opening Bid shall take into account any factors Seller reasonably deems relevant to the value of the Qualified Bid to Seller including, among other things, the following: (A) the amount and nature of the consideration; (B) the proposed assumption of liabilities, if any; (C) the ability of the Qualified Bidder to close the proposed transaction; (D) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (E) any purchase price adjustments; (F) the impact of the contemplated transaction on any actual or potential litigation; (G) the net economic effect of any changes from this Agreement, if any, contemplated by the contemplated transaction documents (the "Contemplated Transaction Documents"); (H) the net after-Tax consideration to be received by Seller; (I) the net amounts to be paid to the Debtors' estates, taking into account, among other things, payment of the Break-Up Fee and Cure Costs; and (J) such other considerations as Seller deems relevant in her reasonable business judgment (collectively, the "Bid Assessment Criteria").

(ii)     Authority to Bid. All representatives of Qualified Bidders who submit any bids at the Auction shall represent on the record that they have authority to bid and that the Bid they submit is binding on the Qualified Bidder.

(iii)     Conduct of the Auction. Seller and her advisors shall direct and preside over the Auction. All Bids made after the Opening Bid shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders that are participating in the Auction. Each Qualified Bidder will be permitted a fair, but limited amount of time to respond to each Overbid. Seller shall maintain a transcript of the Opening Bid and all Overbids made and announced at the Auction, including the Successful Bid and the Back-up Bid;

(iv)     Lots. Qualified Bidders may submit a Lot Bid for one (1) or more of the following Lots and the associated assets listed below, to the extent they are not expired or revoked:

25

(1).   Lot No. 1 – Worley & Obetz, Inc., Retail Division.  Lot No. 1 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Retail Division, which was engaged in the business of delivery of heating oil to local residences, and diesel, kerosene, and gasoline fuel to local farms and businesses.  Such assets include certain (a) real property located across the street from 85 White Oak Road, Manheim, PA 17545 (Tax Parcel No. 500-04089-0-0000), and any building structure and improvements thereon, and all personal property and fuel inventory located on the premises to the extent personal property is not assigned and/or included in other lots/divisions,  (b) real property located at 24 New Charlotte Street, Manheim, PA 17545, and any building, warehouse, structure, and improvements thereon, and all personal property and fuel inventory located on the premises to the extent personal property is not assigned and/or included in other lots/divisions, (c) two (2) leases for tank storage, (d) other storage and skid tanks, (e) access to Cargas Energy system for customer information and location, (f) retail tankwagon trucks and any fuel inventory located therein, and (g) other related assets used in the business operations of Worley & Obetz, Inc.'s Retail Division.

(2).   Lot No. 2 – Worley & Obetz, Inc., Propane Division.  Lot No. 2 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Propane Division, which was engaged in the business of delivery of propane fuel to local residences, local farms and businesses.  Such assets include (a) three (3) propane tank storage property leases, (b) certain customer tanks owned by Worley & Obetz, Inc., (c) certain bulk storage tanks and any fuel inventory included therein, (d) various customer supply and delivery agreements, (e) access to Cargas Energy system for customer information and location, (f) certain propane tank parts and installation equipment, (g) two (2) 2018 Ford F-350 Supercab propane crane trucks, (h) one (1) 2015 Peterbilt 348 retail propane truck and any fuel inventory located therein, (i) one (1) 2017 Peterbilt retail propane truck and any fuel inventory located therein, (j) certain retail propane trucks, propane utility trucks, propane crane tricks, and trailers for propane tanks and any fuel or other inventory located therein, and (k) other related assets used in the business operations of  Worley & Obetz, Inc.'s Propane Division.

(3).   Lot No. 3 – Worley & Obetz, Inc., Service & Installation Division.  Lot No. 3 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Service & Installation Division, which was engaged in the business of installation and maintenance of residential and small commercial HVAC systems for commercial customers, which systems utilize heating oil and propane, electric heat pumps, or natural gas.  Such assets include (a) certain HVAC

26

ACTIVE\64374627.v4
ACTIVE\64374627.v1

service equipment, parts and sundry inventory stored at 85 White Oak Road, Manheim, PA, (b) certain service contracts for customer HVAC systems, (c) access to Cargas Energy system for customer information and location, (d) one (1) 2017 Ford Transit 250 Service Van and any HVAC service part inventory located therin, (e) certain service vans and utility trailers and any HVAC service part inventory located therein, and (f) other related assets used in the business operations of Worley & Obetz, Inc.'s Service & Installation Division.

(4).   Lot No. 4 – Worley & Obetz, Inc., Value Energy North Division. Lot No. 4 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Value Energy North Division, which was engaged in the business of (a) delivery of heating oil and propane to local residences, and diesel, kerosene, and gasoline fuel to local farms and businesses, and (b) maintenance and service of residential HVAC systems. Such assets include (a) leases for the office space located at 318 N. Elmer Avenue and 417 North Lehigh Street, Sayre, PA 18840, (b) one (1) propane storage property tank lease, (c) one (1) copier lease, (d) certain customer tanks owned by Worley & Obetz, Inc., (e) certain bulk storage tanks and any fuel inventory located therein, (f) certain HVAC equipment and supplies used for the maintenance and service residential customer HVAC systems, (g) certain miscellaneous truck parts and maintenance equipment, (h) access to Cargas Energy system for customer information and location, (i) one (1) 2017 Peterbilt retail propane truck and any fuel inventory located therein, (j) certain service vans, retail tankwagons, retail propane trucks, employee trucks and vehicles and any fuel or HVAC service part inventory located therein, and (k) other related assets used in the business operations of Worley & Obetz, Inc.'s Value Energy North Division.

(5).   Lot No. 5 – Worley & Obetz, Inc., Value Energy South Division. Lot No. 5 consists of substantially all of the assets necessary to operate W&O's Value Energy South Division, which was engaged in the business of delivery of heating oil and propane to local residences, and diesel, kerosene, and gasoline fuel to local farms and businesses. Such assets include (a) access to Cargas Energy system for customer information and location, (b) one (1) 2015 Peterbilt 348 retail tankwagon and any fuel inventory located therein, (c) certain retail propane trucks and retail tankwagons and any fuel inventory located therein, and (d) other related assets used in the business operations of Worley & Obetz, Inc.'s Value Energy South Division.

(6).   Lot No. 6 – Worley & Obetz, Inc., Fleet Fueling Division. Lot No. 6 consists of substantially all of the assets necessary to operate

27

Worley & Obetz, Inc.'s Fleet Fueling Division, which was engaged in the business of delivery of gasoline, diesel and diesel exhaust fluid to customer sites and directly into customer fuel trucks. Such assets include (a) access to Fleetcor system for customer information and location, (b) 6,500 gallon diesel exhaust fluid storage tank and any inventory located therein, (c) two (2) 2018 Mack GU713 fleet fueling trucks and any fuel inventory located therein, (d) certain fleet fueling trucks, fleet fueling diesel exhaust fluid delivery trucks and vans, and utility trailer and any fuel inventory located therein, and (e) other related assets used in the business operations of Worley & Obetz, Inc.'s Fleet Fueling Division.

(7).   Lot No. 7 – Worley & Obetz, Inc., Wholesale Division. Lot No. 7 consists of substantially all of the assets necessary to operate Worley & Obetz, Inc.'s Wholesale Division, which was engaged in the business of delivery of gasoline, diesel and propane to resellers and large users. Such assets include (a) six (6) leases for truck parking lots at various locations, (b) one (1) lease for electronic logs with Vendor Services Group, (c) access to Cargas Energy system for customer information and location, (d) two (2) 2019 Peterbilt 567 Wholesale Tractors, (e) two (2) 2019 Heil Tank Trailers and any fuel inventory located therein, (f) one (1) 2007 Heil Petroleum Tank Trailer and any fuel inventory located therein, (g) two (2) 2014 Peterbilt 388 wholesale tractors, (h) one (1) 2014 Freightliner Coronado wholesale tractor, (i) three (3) 2016 Freightliner Coronado wholesale tractors, (j) three (3) 2014 Heil DOT 406 wholesale tank trailers and any fuel inventory located therein, (k) one (1) 2017 Heil DOT 406 wholesale tank trailer and any fuel inventory located therein, (l) seven (7) International wholesale tractors (years 1999, 2007, 2010 (2), 2015, 2016), (m) seven (7) Heil Trailer wholesale tank trailers (years 2001 (2), 2002 (2), 2012, 2013, and 2014) and any fuel inventory located therein, (n) three (3) 2015 Heil Trailer wholesale tank trailers and any fuel inventory located therein, (o) two (2) 2017 Freightliner CA125DC wholesale tractors, (p) one (1) 2017 Mack CXU613 wholesale tractor, (q) one (1) 2017 Westmor Proline MC-331 wholesale propane trailer and any fuel inventory located therein, (r) one (1) 2016 Beall Petroleum Trailer and any fuel inventory located therein, (s) certain wholesale tractors, wholesale tank trailers, wholesale propane trailers, and utility trailers and any fuel inventory located therein, and (t) other related assets used in the business operations of Worley & Obetz, Inc.'s Wholesale Division.

(8).   Lot No. 8 – Worley & Obetz, Inc., Pickup Truck Passenger Vehicles. Lot No. 8 consists of Pickup Truck Passenger Vehicles owned by Worley & Obetz, which vehicles include (a) five (5) Ford

28

ACTIVE\64374627.v4
ACTIVE\64374627.v1

F-150 (years 2001, 2013, 2013, 2015, and 2016), (b) four (4) Ford F-250 (years 2003, 2011, 2014, and 2015), (c) one (1) 2008 Ford F-150 Supercab, (d) three (3) Dodge Ram 1500 (years 2014 (1) and 2015 (2)), (e) one (1) 2017 Dodge Ram 2500, and (f) one (1) 2007 Dodge Dakota.

(9).    Lot No. 9 – Worley & Obetz, Inc., Premium Passenger Vehicles. Lot No. 9 consists of Premium Passenger Vehicles owned by Worley & Obetz, which vehicles include (a) six (6) Jeep Grand Cherokee (years 2014 (2) and 2015 (4)), (b) one (1) 2015 Jeep Cherokee, (c) one (1) 2015 Audi Q7, (d) one (1) 2008 Cadillac Escalade, (e) one (1) 2013 Volkswagen Toureg, (f) one (1) 2018 Range Rover, and (g) one (1) 2016 Ford Explorer.

(10).    Lot No. 10 – Worley & Obetz, Inc., Economy Passenger Vehicles. Lot No. 10 consists of Premium Passenger Vehicles owned by Worley & Obetz, which vehicles include (a) seven (7) Ford Escape (years 2010 (2), 2016 (2), 2017 (3)), (b) two (2) 2018 Chevrolet Equinox, (c) one (1) 2005 Jeep Liberty Sport, (d) one (1) 2008 Jeep Cherokee, (e) one (1) 2003 Ford Excursion, (f) one (1) 2015 Chevrolet Cruze, and (g) one (1) 2017 Chevrolet Bolt.

(11).    Lot No. 11 – Amerigreen Propane, LLC, Wholesale Division. Lot No. 11 consists of substantially all of the assets necessary to operate Amerigreen Propane, LLC's Wholesale Division, which was engaged in the business of wholesale sales of propane to other petroleum distributors. Such assets include (a) certain terminal transloader agreements, (b) certain propane throughput agreements, (c) fuel inventory located at certain third party locations, (d) access to Cargas Energy system for customer information and location, (e) one (1) truck and one (1) trailer for transloader owned by Amerigreen Propane, LLC, and (f) other related assets used in the business operations of Amerigreen Propane, LLC's Wholesale Division.

(12).    Lot No. 12 – Amerigreen Energy, Inc., Renewables Division. Lot No. 12 consists of substantially all of the assets necessary to operate Amerigreen Energy, Inc.'s Renewables Division, which was engaged in the business of wholesale sales of renewable fuels, including biodiesel and ethanol, to other petroleum distributors. Such assets include certain (a) terminal service and throughput agreements at fifty (50) terminal locations, (b) biodiesel storage, blending, and throughput agreements, (c) fuel inventory located at certain third party locations, (d) access to Cargas Energy system for customer information and location, and (e) other related assets used in the business operations of Amerigreen Energy, Inc.'s Renewables Division.

29

(13).  Lot No. 13 – Amerigreen Energy, Inc., Petroleum Division. Lot No. 13 consists of substantially all of the assets necessary to operate Amerigreen Energy, Inc.'s Petroleum Division, which was engaged in the business of wholesale sales of diesel, heating oil and gasoline to other petroleum distributors.  Such assets include (a) one (1) tank storage lease, (b) certain terminal agreements, (c) certain terminal throughput agreements, (d) certain terminal storage and throughput agreements, (e) fuel inventory located at certain third party locations, (f) certain marketing agreements, (g) access to Cargas Energy system for customer information and location, and (h) other related assets used in the business operations of Amerigreen Energy, Inc.'s Petroleum Division.

(14).  Lot No. 14 – Amerigreen Energy, Inc., Electricity Supply & Brokerage Divisions. Lot No. 14 consists of substantially all of the assets necessary to operate Amerigreen Energy, Inc.'s Electricity Supply & Brokerage Divisions, which were engaged in the businesses of (a) supplying electricity purchased from wholesale market for delivery to residential and commercial customers through public utility companies, and (b) brokerage for sale of electricity to residential and commercial customers for third party suppliers.  Such assets include (a) certain unexpired brokerage contracts with future annuity payment stream, (b) brokerage area covering any deregulated electricity state, (c) access to utility billing information and brokerage contracts, and (d) other related assets used in the businesses of Amerigreen Energy, Inc.'s Electricity Supply & Brokerage Divisions.

(15).  Lot No. 15 – Amerigreen Energy, Inc., Natural Gas Division. Lot No. 15 consists of substantially all of the assets necessary to operate Amerigreen Energy, Inc.'s Natural Gas Division, which was engaged in the business of supplying natural gas purchased from wholesale market for delivery to residential and commercial customers through ten (10) public utility companies.  Such assets include (a) the supply area for residential and commercial customers across Pennsylvania, New York and New Jersey, (b) access to utility billing information and brokerage contracts, and (c) other related assets used in the business of Amerigreen Energy, Inc.'s Natural Gas Division.

(16).  Lot No. 16 – Amerigreen Energy, Inc., Passenger Vehicles. Lot No. 16 consists of Passenger Vehicles owned by Amerigreen Energy, Inc., which vehicles include (a) six (6) Jeep Grand Cherokee (years 2010 (2), 2014 (3), and 2015), (b) two (2) 2016 Ford Escape, (c) one (1) 2015 Chevrolet Tahoe, and (d) one (1) 2011 Ford F-650 Box Truck.

ACTIVE\64374627.v4
ACTIVE\64374627.v1

(17).  <u>Lot No. 17 – Worley & Obetz, Inc., Real Property and
Improvements at 107 Maytown Road, Elizabethtown, PA.</u> Lot No.
17 consists of the real property located at 107 Maytown Road,
Elizabethtown, PA, and all buildings, improvements, and personal
property located thereon.

(18).  <u>Lot No. 18 – Worley & Obetz, Real Property, Office Building, and
Warehouse located at 85 White Oak Road, Manheim, PA 17545.</u>
Lot No. 18 consists of the real property located at 85 White Oak
Road, Manheim, PA 17545 (Tax Parcel No. 500-27334-0-0000), the
office building, warehouse, and improvements thereon, and all
personal property located on the premises to the extent personal
property is not assigned and/or included in other lots/divisions. Lot
No. 18 specifically excludes the retail storage area located across
the street. Lot No. 18 also includes (a) one (1) electric motorcycle,
(b) one (1) 2010 John Deere Gator, (c) one (1) custom motorcycle,
(d) one (1) Hyster Towmotor forklift, and (e) one (1) 2014 John
Deere Z950R LP Mower.

(v)  <u>Terms of Overbid</u>.  An "<u>Overbid</u>" is any Bid made at the
Auction subsequent to Sellers' announcement of (A) the Opening Bid, and
(B) the then highest and/or best Overbid at the beginning of each subsequent
round of bidding (the "<u>Round Leading Bid</u>"). To submit an Overbid, in any
round of the Auction, a Qualified Bidder must comply with the following
conditions:

(A)  <u>Subsequent Overbid Increment</u>.  Any Overbid shall
be made in increments of at least two hundred fifty thousand
dollars ($250,000.00) (the "<u>Subsequent Overbid Increment</u>"). The amount of the
Purchase Price of any Overbid shall not be less than the Purchase Price of
the Opening Bid or the Round Leading Bid, as applicable.

(B)  <u>Remaining Terms the Same as for Qualified Bids</u>.
Except as modified herein, an Overbid must comply with the conditions for
a Qualified Bid and the Minimum Initial Overbid requirements shall be
replaced with the Subsequent Overbid Increment requirements set forth
above; <u>provided, however</u>, that the Bid Deadline shall not apply.  Any
Overbid made by a Qualified Bidder must remain open and binding on the
Qualified Bidder until the Termination Date. Seller shall credit the amount
of the Break-Up Fee to each and every Overbid submitted by Purchaser at
the Auction, meaning that if Purchaser's subsequent Overbid is the Round
Leading Bid, any subsequent Overbid must exceed Purchaser's Overbid by
the amount of the Break-Up Fee and Subsequent Overbid Increment. To
the extent not previously provided (which shall be determined by Seller), a
Qualified Bidder submitting an Overbid must submit, as part of its Overbid,
written evidence (in the form of financial disclosure or credit-quality
support information or enhancement acceptable to Seller in her reasonable

31

business judgment) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

(C)   Announcing Overbids.  At the start of each round of bidding, Seller shall announce the Round Leading Bid, the basis for calculating the total consideration offered in the Round Leading Bid, and the resulting benefit to Seller based on, among other things, the Bid Assessment Criteria.

(vi)   Closing the Auction.  Upon conclusion of the bidding, the Auction shall be closed, and Seller shall identify the highest and/or best Overbid or Opening Bid (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder"), and the next highest and/or best Overbid or Opening Bid, after the Successful Bid (the "Back-up Bid"), and advise the remaining Qualified Bidders of such determination.  All bidding for the Purchased Assets will be concluded at the Auction and there will be no further bidding at the Bankruptcy Court hearing held in the Bankruptcy Cases to approve the highest or best bid for the Purchased Assets (the "Approval Hearing").  If the Successful Bidder fails to close on the Successful Bid, the Back-up Bid shall automatically be deemed to be the winning Bidder; provided, however, the Back-up Bid shall be recalculated to an amount that would have been the Successful Bid had the Successful Bidder not participated at the Auction, plus an additional $100,000.

(d)   Consent to Jurisdiction as Condition to Bid.  All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable.  Qualified Bidders (other than Purchaser) shall not be deemed third party beneficiaries of these Bidding Procedures and shall not have standing to object to the administration of the Bidding Procedures by Seller.

(e)   Reimbursement of Deposit; Break-Up Fee.  Upon consummation of a sale of all or substantially all of the Purchased Assets to any third party (other than Purchaser) who submits the Successful Bid for the Purchased Assets, upon the occurrence of the actions set forth in Section 9.1(a), 9.1(b), 9.1(d), or 9.1(f), or if Seller commits a material breach of this Agreement or unilaterally abandons consummation of the Transactions contemplated by this Agreement, Seller shall (i) pay to Purchaser in immediately available funds an amount equal to the Break-Up Fee, and (ii) refund the Deposit.  The provisions of this Section 6.3(e) shall survive any termination of this Agreement.  The Break-Up Fee shall be treated as a Chapter 7 administrative expense claim in the Bankruptcy Cases, and shall be paid to Purchaser upon the earlier to occur from (x) the closing of the sale of all or substantially all of the Purchased Assets to any third party (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Break-Up Fee),

32

or (y) the Closing of the Bankruptcy Cases. The obligation to pay the Break-Up Fee and Deposit under this Agreement shall be absolute and unconditional and shall not be subject to any defense, claim, counterclaim, offset, recoupment or reduction of any kind whatsoever, provided, however, that, for the avoidance of doubt and notwithstanding anything herein to the contrary, the Break-Up Fee shall only be payable if approved by the Bankruptcy Court. Purchaser's right to the Break-Up Fee shall be the sole and exclusive remedy of Purchaser in the event Seller materially breaches this Agreement or if this Agreement is terminated by Seller.

(f)     Bankruptcy Court Approval of Sale. Seller and Purchaser shall each use their reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order (the "Approval Order") of the Bankruptcy Court in the Bankruptcy Cases in form and substance acceptable to Seller and Purchaser containing provisions, including without limitation, (i) approving this Agreement, (ii) authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code, (iii) authorizing the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, (iv) authorizing the Transactions, (v) approving the Break-Up Fee and Bid Protection and (vi) providing that this Agreement and the Transactions are undertaken by Purchaser and Seller at arm's length, without collusion, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, that Purchaser and Seller are entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code are not applicable. Seller and Purchaser shall cooperate with one another in good faith regarding pleadings that either of them intends to file, or positions either of them intends to take, with the Bankruptcy Court in connection with or that might reasonably affect the Bankruptcy Court's entry of the Approval Order.

6.4     Computer Systems. After Closing, Purchaser shall afford Seller and Debtors, their respective employees, consultants, accountants, attorneys, or other advisors, agents, or other representatives (collectively, the "Seller Representatives"), full access (remote or on-site access) to any and all books and records, computer hardware, computer peripherals, computer software and data, computer systems, personnel records, paper or electronic files, data generated by and/or stored on either Purchaser computer systems and storage media (e.g., backups, hard drives, flash or "thumb" drives, CD's, DVD's, etc.), or any other electronically stored documents, information and/or data, and any and all other records and files concerning the Debtors, the Business, the Purchased Assets, and personnel (collectively, the "Records"), and shall furnish such Records to the Seller Representatives, as Seller and the Debtors may request. Purchaser will also allow the Debtors' computer consultant to access and monitor the Records. Purchaser shall preserve any and all Records from destruction or alteration until the date that is ninety (90) days after Purchaser provides written notice to Seller and Debtors pursuant to Section 6.9 below of Purchaser's request to destroy any Records; provided, however, that Purchaser may not provide such written notice during the first 120 days after Closing and further provided that Seller or the Debtors shall have the right to purchase back such Records at fair market value upon receipt of such written notice before such Records are destroyed.

33

6.5    Personally Identifiable Information.    Purchaser acknowledges that Purchaser is acquiring certain personally identifiable information as part of the Purchased Assets, including, without limitation, names, addresses, email addresses, telephone numbers, Social Security numbers, government identification numbers. Purchaser hereby agrees and covenants to remain in compliance with all applicable Law, including, without limitation, applicable data and/or privacy Laws, concerning the ownership, possession, and treatment of such personally identifiable information.

6.6    Office Access.    For a period of thirty (30) days after Closing, Purchaser shall allow Seller and the Debtors full access to the offices located at 85 White Oak Road, Manheim, PA 17545 during business hours.

6.7    Cooperation.    The parties hereto shall cooperate fully with each other and their respective counsel and agents and representatives in connection with all steps to be taken as part of their obligations under this Agreement.

6.8    Assignees. Diesel shall cause the Assignees to comply with all Purchaser obligations hereunder to Seller and Diesel shall remain liable for all Purchaser obligations to Seller and Liabilities hereunder.

6.9    6.4Notices.    If at any time (a) Purchaser becomes aware of any material breach by Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Seller, or (b) Seller becomes aware of any breach by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with Section 10.1, in writing of such breach.  Upon such notice of breach, the breaching Party shall have until the earlier of (y) ten (10) days after receiving such notice, and (z) the End Date, to cure such breach prior to the exercise of any remedies in connection therewith.

## 7.    Tax Matters.

7.1    Tax Cooperation.    Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of any Tax Returns, the making of any election relating to Taxes, the preparation for any audit or examination by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax.  Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business (each, a "Tax Claim"), provided that Seller shall (a) promptly notify Purchaser of any notice received in respect to any Tax Claim, (b) promptly notify Purchaser of any significant developments regarding such Tax Claim, (c) permit Purchaser (if Purchaser so chooses) to control the defense and/or resolution of any Tax Claim if any resolution or settlement of such Tax Claim reasonably could be expected to have an effect on Purchaser, any of Purchaser's Affiliates or any Purchased Asset for any taxable period, (d) take all actions and cooperation reasonably necessary in furtherance of the immediately preceding

34

clause (c), and (e) not settle or otherwise resolve any Tax Claim without the prior written consent of Purchaser.

7.2    <u>Transfer Taxes</u>. All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest thereon) incurred in connection with this Agreement (collectively, "<u>Transfer Taxes</u>") shall be split equally between Seller and Purchaser, and Purchaser shall file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other taxes and fees, and if required by applicable law, the Seller and the Debtors shall join in the execution of any such Tax Returns and other documentation. The cost of filing any such tax returns shall be split equally between Seller and Purchaser.

7.3    <u>Real Property Taxes</u>. Real estate Taxes and water and sewer rents, if any, shall be apportioned and pro-rated between Seller and Purchaser as of the Closing Date. All state, county and local realty, conveyance, recordation and/or documentary Transfer Taxes shall be split equally between the Purchaser and Seller. Any real estate Taxes not known or estimated at the Closing and/or real estate Taxes readjusted by municipal authorities after the Closing shall be re-prorated when the amount thereof becomes known.

7.4    <u>Personal Property, Ad Valorem and Excise Taxes</u>. Purchaser shall not be liable for any unpaid personal property, ad valorem or excise taxes assessed or due to be paid prior to the Closing Date.

**8.    Closing Conditions**.

8.1    <u>Conditions to Obligations of Purchaser and Seller</u>. The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction at or before Closing of each and every one of the following conditions:

(a)    The Bankruptcy Court shall have entered the Approval Order in the Bankruptcy Cases, and the Bankruptcy Court shall have waived the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Approval Order, authorizing the Transactions and approving this Agreement under Sections 105(a), 363 and 365 of the Bankruptcy Code, in form and substance reasonably acceptable to Seller and Purchaser, and the Approval Order shall contain findings that Purchaser acquired the Purchased Assets in good faith, for fair value, in an arm's length transaction, and as of the Closing Date the Approval Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed; and

(b)    No injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

8.2    <u>Conditions to Obligations of Purchaser</u>. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)    Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date;

(b)    the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date);

(c)    Seller shall not be in default in any material respect under the provisions of this Agreement; and

(d)    Purchaser shall have received all of the documents required to be delivered by Seller under <u>Section 2.9</u>.

8.3    <u>Conditions to Obligations of Seller</u>. The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a)    Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

(b)    the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date);

(c)    Purchaser shall not be in default in any material respect under the provisions of this Agreement; and

(d)    Seller shall have received all of the documents required to be delivered by Purchaser under <u>Section 2.10</u>.

**9.    Termination**.

9.1    <u>Grounds for Termination</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of Seller and Purchaser;

(b)    by Seller or Purchaser, if the Closing shall not have been consummated on or before [●]October 16, 2018 (the "End Date"), unless the Party seeking termination is in breach of its obligations hereunder;

(c)    by Seller or Purchaser, if any condition set forth in <u>Section 8.1</u> is not satisfied, and such condition is incapable of being satisfied by the End Date;

36

       (d)    by Purchaser, if any condition set forth in <u>Section 8.2</u> has not been satisfied, and such condition is incapable of being satisfied by the End Date;

       (e)    by Seller, if any condition set forth in <u>Section 8.3</u> has not been satisfied, and such condition is incapable of being satisfied by the End Date; or

       (f)    by Seller, if (i) Seller executes a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Cases approving such definitive agreement.

The Party desiring to terminate this Agreement pursuant to this <u>Section 9.1</u> (other than pursuant to <u>Section 9.1(a)</u>) shall give notice of such termination to the other Party in accordance with <u>Section 10.1</u>.

    9.2    <u>Effect of Termination</u>.  If this Agreement is terminated as permitted by <u>Section 9.1</u>, such termination shall be without Liability of any Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly provided in <u>Section 6.3(e)</u>.  The provisions of <u>Section 6.3(e)</u> shall survive any termination hereof pursuant to <u>Section 9.1</u>.

    9.3    <u>Fees and Expenses</u>.  Except as otherwise set forth expressly herein, all costs and expenses incurred by the Parties in connection with obtaining Bankruptcy Court approval and consummation of this Agreement and the Transactions contemplated hereby shall be paid by the Party incurring such cost or expense.

**10.**    **Miscellaneous**.

    10.1    <u>Notices</u>.  All notices, requests and other communications to any Party hereunder shall be in writing (including via electronic mail) and shall be given,

    if to Purchaser, to:

~~Wiggins Gas Propane & Alternative Fuels LLC~~
~~c/o~~
~~Vedder Price P.C.~~
~~222 North LaSalle Street~~
~~Chicago, Illinois 60601~~
~~Attention: Michael M. Eidelman, Esq.~~
~~e-mail: meidelman@vedderprice.com~~

~~with a copy to (which shall not constitute notice):~~

~~Vedder Price P.C.~~
~~222 North LaSalle Street~~
~~Chicago, Illinois 60601~~
~~Attention: Michael M. Eidelman, Esq.~~
~~e-mail: meidelman@vedderprice.com~~

<u>ACTIVE\64374627.v4</u>
~~ACTIVE\64374627.v1~~

Diesel Direct Holdings, Inc.
c/o
John T. McLaughlin
Berluti McLaughlin & Kutchin LLP
44 School Street, Boston, MA 02108
T: (617) 557-3030
Email: jmclaughlin@bmklegal.com

if to Seller, to:

Christine C. Shubert
821 Wesley Avenue
Ocean City, NJ 08226
e-mail: Christine.shubert@bmstrustee.onmicrosoft.com

with a copy to (which shall not constitute notice):

Fox Rothschild LLP
2000 Market Street
20th Floor
Philadelphia, PA 19103
Attn: Michael Menkowitz
e-mail: mmenkowitz@foxrothschild.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

10.2    Limitation on Damages. No Party shall be authorized to recover from the other Party any special, consequential, exemplary or punitive damages on account of any breach of this Agreement, AND ANY SUCH CLAIM, RIGHT, OR CAUSE OF ACTION FOR ANY SUCH DAMAGES IS HEREBY FULLY WAIVED, RELEASED AND FOREVER DISCHARGED.

10.3    Waivers. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative.

10.4    Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, however, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party; provided further that Purchaser shall have the right to designate one or more wholly owned subsidiaries or Affiliates to take title to the Purchased Assets at the Closing, so long as

38

Purchaser remains liable for all of its obligations hereunder and provided such designation does not violate any consent or other approval which has been obtained by Seller.

10.5    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the Commonwealth of Pennsylvania and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

10.6    <u>Jurisdiction</u>.

(a)    Prior to the closing of the Bankruptcy Cases, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 10.1</u> shall be deemed effective service of process on such Party.

(b)    After the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the Commonwealth of Pennsylvania, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 10.1</u> shall be deemed effective service of process on such Party.

10.7    <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY

39

LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

10.8    <u>No Third-Party Beneficiaries</u>.  Other than as set forth in <u>Section 10.10(a)</u>, no provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

10.9    <u>Entire Agreement; Amendments; Counterparts</u>.  This Agreement (including the Schedules and Exhibits hereto) sets forth the entire agreement between the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Seller.  This Agreement may be executed in counterparts, each of which when taken together shall constitute an original.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.  This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.  In the event of any conflict or inconsistency between the statements in this Agreement and the Bidding Procedures, the statements in this Agreement shall control.

10.10    <u>Pre-Petition Secured Party</u>.

(a)    Notwithstanding anything to the contrary herein, Fulton Bank, N.A. (the "<u>Pre-Petition Secured Party</u>") will be deemed a third-party beneficiary hereunder entitled to exercise and enforce any and all rights, powers, privileges and remedies of Seller pursuant to this Agreement or any other agreement, instrument or document executed in connection herewith. Without limiting the generality of the foregoing, and notwithstanding anything to the contrary in this Agreement or in any other agreement, instrument or document executed in connection herewith, Seller will not exercise any right to terminate, or execute and deliver or otherwise provide any waivers, consents or amendments under, this Agreement or any of the other agreements, instruments or documents executed in connection herewith, without the prior written consent of the Pre-Petition Secured Party (which shall not be unreasonably withheld, conditioned or delayed).

(b)    Notwithstanding anything to the contrary in this Agreement or any other agreement, instrument or document executed in connection herewith, the Pre-Petition Secured Party (i) is not making any representations or warranties to any or all of Seller, Purchaser or any of their respective Affiliates in connection with this Agreement or any other agreement, instrument or document executed in connection herewith, or the transactions contemplated herein or therein, (ii) will not be liable to any Person for any breach by any or all of Seller, Purchaser or any of their respective Affiliates or any of their respective representations, warranties, covenants or other agreements in connection with this Agreement or any other agreement, instrument or document executed in connection herewith or any of the Transactions contemplated herein or therein, and (iii) will not have any obligations or liabilities under or in respect of any of this Agreement or any other agreement, instrument or document executed in connection herewith or any of the Transactions

40

ACTIVE\64374627.v4
ACTIVE\64374627.v1

contemplated herein or therein, other than the release of any mortgages, security interests, Liens and the like. Without limiting the generality of the foregoing, provided the Approval Order is entered, under no circumstances will the Pre-Petition Secured Party be obligated to return or otherwise disgorge to or for the benefit of Purchaser or any Affiliate thereof any proceeds remitted to the Pre-Petition Secured Party, other than the Break-Up Fee (if applicable).

10.11   Headings; Interpretation.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.  Unless the context otherwise clearly requires, references herein to words importing the masculine gender shall include the feminine and neutral genders and vice versa.

*[**Signature page follows**.]*

ACTIVE\64374627.v4
ACTIVE\64374627.v1

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

~~WIGGINS GAS PROPANE &~~
~~ALTERNATIVE FUELS LLC~~

DIESEL DIRECT HOLDINGS, INC.

By: _Walter J. McNamara_
Name: __Walter J. McNamara__
Title: ___Chief Financial Officer__

**CHRISTINE C. SHUBERT, SOLELY IN HER CAPACITY AS CHAPTER 7 TRUSTEE FOR THE ESTATES OF WORLEY & OBETZ, INC., ET AL.**

By:_____.

ACTIVE\64374627.v1
ACTIVE\64374627.v4

## ~~EXHIBIT A~~

~~Form of Bill of Sale, Assignment and Assumption Agreement~~

## DISCLOSURE SCHEDULES

The following schedules (the "**Disclosure Schedules**") are furnished by the Seller and Debtors to the Purchaser pursuant to and as part of the Asset Purchase Agreement dated as of August 24, 2018 (the "**Agreement**") by and between Christine C. Shubert, in her capacity as Chapter 7 Trustee ("**Seller**") for the estates of (i) Worley & Obetz, Inc. (Case No. 18-13774-REF); (ii) Americomfort, Inc., Case No. 18-13775-REF); (iii) Amerigreen Energy, Inc. (Case No. 18-13777-REF); (iv) Advance Air, Inc. (Case No. 18-13778-REF); (v) Amerigreen Energy Brokers, LLC (Case No. 18- 13779-REF); (vi) Amerigreen Electricity, LLC (Case No. 18-13780-REF); (vii) Amerigreen Hedging Services, LLC (Case No. 18-13781-REF); (viii) Amerigreen Lubricants, LLC (Case No. 18-13782-REF); (ix) Amerigreen Natural Gas, LLC (Case No. 18-13783-REF); and (x) Amerigreen Propane, LLC (Case No. 18-13784-REF) (collectively, the "**Debtors**") and Wiggins Gas Propane & Alternative Fuels LLC, a Delaware limited liability company (or its Assignee, "**Purchaser**"). All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

Unless otherwise noted, the references to section numbers in the Disclosure Schedules correspond to the section numbers of the representations, warranties, covenants or conditions in the Agreement. An exception or qualification set forth in the Disclosure Schedules with respect to a particular representation or warranty will be deemed to be an exception or qualification with respect to all other applicable representations and warranties to the extent the description of the facts regarding the event, item or matter disclosed is adequate so as to make reasonably clear or otherwise make the Purchaser reasonably aware that such exception or qualification is applicable to such other representations and warranties whether or not such exception or qualification is so numbered or such other representations and warranties expressly refer to a Schedule. Each disclosure made in a Disclosure Schedule shall be deemed incorporated into each other Schedule in which the applicability of such disclosure is readily apparent on its face. Attachments and annexes delivered in connection with these Disclosure Schedules are incorporated by reference in and constitute a part of these Disclosure Schedules.

Nothing in the Disclosure Schedules is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. Inclusion of any item in the Disclosure Schedules: (i) does not represent a determination that such item is material or establish a standard of materiality, (ii) does not represent a determination that such item did not arise in the ordinary course of business, (iii) shall not constitute, or be deemed to be, an admission to any third party concerning such item or (iv) does not represent a determination that the consummation of the transactions contemplated by the Agreement requires the consent of any third party except where such a representation or disclosure so provides.

~~Exhibit A   Page 43~~

ACTIVE\64374627.v4

### Schedule 1.1(v)

### Leased Real Property

902 Strasburg Pike, Strasburg, PA 17579 (Rineer Sons Real Estate, LLC) – lease for land only. Seller owns underground petroleum storage tanks, truck rack, pumps, and canopy.

709 Hartman Station Road, Lancaster, PA 17602 (Hartman Station Road, Inc.) – two separate leases:

   1. Land lease only for placement of two large propane storage tanks on concrete saddles, associated pumps and meters.
   2. Lease for use of underground petroleum storage tank owned by Lessor.

16 Lititz Road, Lititz, PA 17543 (Rohrer's Quarry, Inc.) – land lease only for placement of two large propane storage tanks on concrete saddles, associated pumps and meters.

2388 North Market Street, Elizabethtown, PA 17022 (Crowe Realty, LLC) - land lease only for placement of large propane storage tank on concrete saddles, associated pumps and meters.

316-318 North Elmer Avenue, 413-417 North Lehigh Avenue, Sayre, PA 18840 (JW Bishop Properties, LLC) – lease for office building, storage building, maintenance building, rental house used in Seller's Value Energy North division. Seller owns above ground storage tanks situated on property.

685 Broad Street Ext, Waverly, NY 14892 (Waverly Trade Center, LLC) – land lease only for placement of large propane storage tank on concrete saddles, associated pumps and meters as well as vehicle storage.

35 Doe Run Road, Manheim, PA 17545 (Robert Seth Obetz) – lease for land only. Building improvements consisting of: convenience store, car wash, underground petroleum storage tanks, gasoline/diesel dispensers and pumps, propane above ground storage tank and dispenser, canopies, etc. are the property of the Seller. **Cardlock Asset – Excluded.**

202 Greenfield Road, Lancaster, PA 17602 (202 Greenfield, LP) – lease for land and building. Significant building improvements made by Seller. Also property consists of shed, underground storage tanks, gasoline/diesel dispensers and pumps, above-ground storage tank and dispenser for propane, above-ground storage tank and dispenser for diesel exhaust fluid, canopy that is property of the Seller. **Cardlock Asset – Excluded.**

1634 West Main Street, Ephrata, PA 17522 (Charles Rutt) – gasoline/diesel dispensers and pumps, above-ground storage tank and dispenser for diesel exhaust fluid, above-ground storage tank and dispenser for propane, canopy. **Cardlock Asset – Excluded.**

~~8 South Malin Road, Malvern, PA 19355 (Buckeye Terminals, LLC) – parking space for two trucks.~~

45

~~3760 Tank Farm Road, Emmaus, PA 18049 (Buckeye Energy Services, LLC) - parking space for one truck.~~

PA Route 272 and Garden Spot Road, Ephrata, PA 17522 (Lester R. Summers, Inc.) - parking space for two trucks.

1575 Ferndale Avenue, Johnstown, PA 15905 (Tri-County Motor Sales) – parking space for seven trucks.

7043 Ellenberger Drive, Altoona, PA 16601 (Sel-Lo Oil, Inc.) - parking space for one truck.

1425 North Maxwell Street, Allentown, PA 18109 (Shadow Group Three, LLC) - parking space for one truck.

101 East Cherry Street, Elizabethtown, PA 17022 (Lime Ridge Farm Properties, LP) – lease of land and underground storage tanks, gasoline/diesel pumps and canopy owned by Seller. **Cardlock Asset – Excluded.**

854 South 16th Street, Harrisburg, PA 17104 (Scheler Realty, LLC) – lease of land, underground storage tanks, diesel and diesel exhaust fluid dispensers. **Cardlock Asset – Excluded.**

ACTIVE\64374627.v4

### Schedule 2.1(a)

### Acquired Owned Real Property

Real estate property at 107 Maytown Road & all buildings, improvements, and personal property located thereon

Real estate property at 85 White Oak Road: office building, warehouse, improvements thereon, and all personal property located on the premises to the extent personal property is not assigned and/or included in other lots/divisions. Excludes the retail storage area across the street..

Real estate located at 24 New Charlotte, Manheim, PA including any personal property thereon

Real estate located at White Oak Road, Manheim, PA (across the street from 85 White Oak Road, Manheim, PA 17545) (Tax Parcel No. 500-04089-0-0000) including tanks and any other personal property thereon.

ACTIVE\64374627.v4

**Schedule 2.1(b)**

**Executory Contracts and Unexpired Leases**

| PDF name | Location(If other than description) | Agreement Type | Landlord/Lessor/"seller" | Regarding | Rent/Payment | Other note |
|---|---|---|---|---|---|---|
| Vendor Services Group - Fleet Log ELD (November 2016) | 202 Greenfield Road, Lancaster PA | Equipment Rental | Vendor Services Group | 11/16 - 11/19; (37) Fleet Manager with Diagnostics (Jbus) & (BYOD)ELD | $1,850/mo | |
| N/A | Sayre | Leased Equipment | Marlin Business Bank | ONGOING; regarding a leased "sayre copier" | N/A | on US Bankruptcy court list, and not in data room provided to us |
| HC Rineer Sons Partnership (May 2006) | 902 Strasburg Pike, Strasburg | Leased Premises | H.C. Rineer Sons Partnership | 05/06 - 05/11, renew for 10 years total | $7,500/mo, +~3% per year | |
| HL Wiker NRLM Lease Addendum (January 2018) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | Hartman Station, Inc (prev. H.L Wiker) | Amendment to 08/08 lease; extension | $0.055/gallon | |
| JW Bishop Properties, LLC (March 2013) | 318 N Elmer, 417 N Lehigh, 413 & 415 N Lehigh, and 316 N Elmer (Sayre) | Leased Premises | J.W. Bishop Properties, LLC | 03/13 - 03/23; renewal options | $6,940.11/mo | |
| Lester R Summers Inc - Ephrata (September 2016) | Summers Yard, Rt. 272 & Garden Spot Rd, Ephrata | Leased Premises | Lester R. Summers | 09/16 - 09/17; renewal of lease | $150/mo, $150 sec. deposit | |
| Lyons Obetz - 55 Doe Run Road (September 2016) | 55 Doe Run Road Suite 104 w/ ext. parking | Leased Premises | Lyons & Obetz | 09/16 - 09/19, option to extend | $8,500/mo | |
| Rohrer's Quarry (June 2014) | 16 Lititz Road, lititz PA (Property to North side of main shop, with 30,000gal tank) | Leased Premises | Rohrer's Quarry, Inc. | 06/14 - 06/15, auto renew 3 times (06/18). Permission to install a second 30,000 gal tank in 2014 | $1,000/mo | W&O Bankruptcy Case notes this as ongoing |
| Waverly Trade Center, LLC (May 2013) | 69,750 sq ft lot on 685 Broad Street Extension, Waverly, New York | Leased Premises | Waverly Trade Center, LLC | 05/13 - 05/18, option to renew | $2,000/mo | |
| N/A | 2388 N. Market St., Elizabethtown PA | Leased Premises | Crowe Transportation | EXPIRES 12/31/21 | N/A | on US Bankruptcy court list, and not in data room provided to us |
| N/A | 1575 Ferndale Ave, Johnstown, PA | Leased Premises | Tri-County Motor Sales | ONGOING | N/A | on US Bankruptcy court list, and not in data room provided to us |
| Se-Lo Oil Inc - Altoona (September 2017) | 7043 Ellenberger Drive, Altoona, PA | Leased Premises - Parking | Se-Lo Oil Inc | 08/22/17, month-month | $100/mo | |
| Shadow Group Three LLC - Allentown (November 2017) | 1425 North Maxwell St., Allentown, PA | Leased Premises - Parking | Shadow Group Three, LLC | 11/17 - no end in agreement | $150/mo | |

48

| | | | | | | |
|---|---|---|---|---|---|---|
| Biodiesel Thruput Agreement - General Bangtson LLC (February 2018) | 3 Washington Parkway, Hicksville NY | Throughput Agreement | General Bangston, LLC | 01/18 - 07/19 | $0.06/gal | unsigned doc; automatically renews for another year unless terminated by either party |
| Boyle Energy - West Grove (March 2017) | 40 West Manoa Road, Havertown, PA | Throughput Agreement | Boyle Energy | 3/17 - 03/20 | $0.05/gal | |
| ~~Buckeye Energy Services LLC - Macungie (June 2017); W&O~~ | ~~3760 Tank Farm Road, Emmaus, PA~~ | ~~Throughput Agreement~~ | ~~Buckeye Energy Services, LLC~~ | ~~ongoing~~ | | |
| Propane Throughput Agreement - UGI Energy (May 2018) | Steelton, Williamsport, Hunlock, Bethlehem | Throughput Agreement | UGI Energy Services, LLC | 05/18 - 04/30/19; 4 locations for throughput agreement | $0.035/gal | |
| RF Ohl - Lehighton (July 2017) | 7505 Interchange Rd, Lehighton, PA | Throughput Agreement | RF Ohl Fuel Oil, Inc | 07/17 - 05/30/20 | $0.04/gal - $0.05/gal | |
| ~~Storage Marketing Agreement - Buckeye Terminals LLC (December 2012)~~ | ~~Macungie, Malvern, South Williamsport, Tuckerton, Vestal Terminals~~ | ~~Throughput Agreement (Terminal and Marketing)~~ | ~~Buckeye Terminals, LLC~~ | ~~10/12 - 90 day interval auto renwal (ONGOING)~~ | ~~$0.035/gal~~ | |

49

| PDF name | Location(if other than description) | Agreement Type | Landlord/Lessor/"seller" | Regarding | Rent/Payment | Other note | | |
|---|---|---|---|---|---|---|---|---|
| Lease Assumption - Waverly Trade Center, LLC (March 2013) | Refer to 08/15 lease between JW Bishop and Waverly Trade Center | Lease assumption - purchase | JW Bishop Company; Waverly Trade Cent | RE: 08/15/12 lease between JW Bishop and Waverly Trade Center - assets to be assumed by W&O by | | | | |
| Pitney Bowes (08/10) | Delivered to 55 Doe Run Rd, Manheim | Leased Equipment | N/A | Lease#036736-001; 42 months | $156/quarter | | | |
| Wysox (03/18) Amendment | | Leased Equipment | Elbow River Marketing USA LTD. | 07/17 - 03/18, extending to 03/19 | | | | |
| Wysox (07/17) Transloader | | Leased Equipment | Elbow River Marketing USA LTD. | 07/17 -03/18; Transloader lease | $1.00/month, .02c/gallon for throughputted propane | | | |
| Tank Storage Agreement - Colmar Terminal | 3251 Trewigtown Road, Colmar, PA | Leased Equipment - Tank Storage | Colmar Terminal, Inc. | 01/14 - 12/18; extension options | $2,000/mo, additional charges depending on gallon usage | | | |
| Crowe Realty LLC (January 2005) | 85 White Oak Road, PO Box 429, Manheim | Leased Premises | Crowe Realty | 09/05 - 09/06, renewing | | | | |
| HL Wiker - NRLM (August 2008) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | H.L. Wiker, Inc. | housing fuel; 07/08 - 07/09, 1 year renewal | | | | |
| HL Wiker - Propane (January 2008) | northeast of Hartman Station Road | Leased Premises | H.L. Wiker, Inc. | Lease propane storage tank area; 01/08 - 01/13, renewal terms up until 01/18 | $0.015/gallon, + base rent ~$1,160/mo | | | |
| HL Wiker Addendum (January 2018) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | Hartman Station, Inc (prev. H.L Wiker) | Amendment to 08/08 lease; extension | $0.015/gallon, + base rent $1,345/mo | | | |
| HL Wiker NRLM Lease Addendum (January 2014) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | Hartman Station, Inc (prev. H.L Wiker) | Amendment to 08/08 lease; extension | $0.045/gallon | | | |
| HL Wiker NRLM Lease Addendum (January 2015) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | Hartman Station, Inc (prev. H.L Wiker) | Amendment to 08/08 lease; extension | $0.045/gallon | | | |
| HL Wiker NRLM Lease Addendum (January 2016) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | Hartman Station, Inc (prev. H.L Wiker) | Amendment to 08/08 lease; extension | $0.045/gallon | | | |
| HL Wiker NRLM Lease Addendum (January 2017) | 709 Hartman Station Rd, Lancaster, PA | Leased Premises | Hartman Station, Inc (prev. H.L Wiker) | Amendment to 08/08 lease; extension | $0.045/gallon | | | |
| HL Wiker Propane Addendum (January 2013) | northeast of Hartman Station Road | Leased Premises | H.L. Wiker, Inc. | True Up; extend through 01/13 | $62,700 at signing in prepaid rent | | | |
| HL Wiker Propane Addendum (January 2015) | northeast of Hartman Station Road | Leased Premises | H.L. Wiker, Inc. | Amendment to original lease; extension through 12/14 | $1,231 base rent | | | |
| HL Wiker Propane Addendum (January 2016) | northeast of Hartman Station Road | Leased Premises | H.L. Wiker, Inc. | Amendment to original lease; extension through 01/17 | $0.015/gal + $1,268/mo base rent | | | |
| HL Wiker Propane Addendum (January 2017) | northeast of Hartman Station Road | Leased Premises | H.L. Wiker, Inc. | Amendment to original lease; extension through 01/18 | $0.015/gal + $1,306/mo base rent | | | |
| Lester R Summers Inc - Ephrata (July 2015) | Summers Yard, Rt. 272 & Garden Spot Rd, Ephrata | Leased Premises | Lester R. Summers | 07/15 - 07/16; lease of parking space | $150/mo, $150 sec. deposit | | | |
| Lyons Obetz (September 2009) | 55 Doe Run Road Suite 104: The Building | Leased Premises | Lyons & Obetz | 09/09 - 09/10, option to extend | $13,000/mo | | | |
| Lyons Obetz Renewal (September 2013) | 55 Doe Run Road Building 2 Suite 104 | Leased Premises | Lyons & Obetz | 3 year renewal | $13,000/mo | | | |
| Rineer Sons Real Estate Investments, LLC Renewal (June 2015) | 902 Stasburg Pike, Strasburg, PA | Leased Premises | Rineer Sons Real Estate Investments, LLC | 06/15 - 05/18 | $3,300/mo | | | |
| Rineer Sons Real Estate Investments, LLC Renewal (May 2011) | 902 Stasburg Pike, Strasburg, PA | Leased Premises | Rineer Sons Real Estate Investments, LLC | 05/11 - 05/13, extension through 05/30/15 | $3,300/mo | | | |
| Crowe Realty LLC Amendment (January 2017) | 85 white oak road, "east side" of building with 30,000 gal tank | Leased premises; extension | Crowe Realty | | | | | |
| Crowe Realty LLC (October 2010) | 85 white oak road, "east side" of building with 30,000 gal tank | Leased Premises; terminate sept. 2010 lease and re-lease | Crowe Realty | 10/12 - 10/13, 12 mo renewing | $450/mo | | | |
| Pitney Bowes Postage Meter (May 2012) | | postage meter rental | Pitney Bowes | receipts for meter rental, ended 05/2016 | | | | |
| Biodiesel Blending Agreement - Duck Island Terminal | 1463 Lamberton Road, Trenton, NJ | Terminal Agreement | Duck Island Terminal, Inc. | Blending of fuel | --- | | | |
| First Amendment (August 2016) | Amendment to 2016 Terminal agreement | Terminal Agreement | Arc Terminals Pennsylvania Holdings | | | | | |
| Assignment of Agreement - Plains to PBF Logistics (April 2016) | | Terminal Agreements; Reassignment | Plains Products Terminals LLC | 04/16 closing | | | | |
| August 2017 Price Update | All US locations | Terminal Price Change | Arc Terminal Holdings | | | | | |

50

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Biodiesel - Westmore Fuels - Port Chester (October 2014) | 2 Purdy Ave, Port Chester, NY | Terminal Storage & Throughput | Westmore Fuel Co., inc., inc., | Use of 20,000 gal AST | $0.03 / gal | | | |
| First Amendment to Storage and Marketing Agreement (March 2018) | Pittsburgh & Indianola Terminals | Terminal/Marketing Agreement | Buckeye Terminals, LLC | Adding Pitts.- & Ind. Locations to 10/12 agrmt | | | | |
| Crowe Realty LLC (September 2010) | RS white oak road, "east side" of building with 30,000 gal tank | Terminate rental lease, purchase | Crowe Realty | | $32,500 for the tank | | | |
| Amendment 1 to Throughput Agreement; AMG Biofuels | All PA Locations | Throughput Agreement | Gulf Oil LP | 01/17, pricing amendment | .003%/gallon/gallon for heating oil, and/or 500 ppm diesel additised with lubricity | | | |
| Propane Throughput Agreement - UGI Energy (May 2014) | Swatara Township Dauphin County PA, Rt 412; Signet Ave., Hellertown, PA.; 2550 Trenton Ave. Williamsport, PA.; 390 Route 11, Hunlock, PA | Throughput Agreement | UGI Energy Services, LLC | 05/14 - 04/15; 4 locations for throughput agreement | $0.035/gal | | | |
| Propane Throughput Agreement - UGI Energy (May 2015) | Swatara Township Dauphin County PA, Rt 412; Signet Ave., Hellertown, PA.; 2550 Trenton Ave. Williamsport, PA.; 390 Route 11, Hunlock, PA | Throughput Agreement | UGI Energy Services, LLC | 05/14 - 04/16; 4 locations for throughput agreement | $0.035/gal | | | |
| Propane Throughput Agreement - UGI Energy (May 2016) | Swatara Township Dauphin County PA, Rt 412; Signet Ave., Hellertown, PA.; 2550 Trenton Ave. Williamsport, PA.; 390 Route 11, Hunlock, PA | Throughput Agreement | UGI Energy Services, LLC | 05/16 - 04/17; 4 locations for throughput agreement | $0.035/gal | | | |
| Propane Throughput Agreement - UGI Energy (May 2017) | Steelton, Williamsport, Hunlock, Bethlehem | Throughput Agreement | UGI Energy Services, LLC | 06/17 - 04/18; 4 locations for throughput agreement | $0.035/gal | | | |
| RF Ohl - Lehighton (July 2014) | 7505 Interchange Rd, Lehighton, PA | Throughput Agreement | RF Ohl Fuel Oil, Inc | 07/14 - 06/17 | $0.04/gal - $0.05/gal | | | |
| Storage Thruput Agreement Renewal - IPT, LLC (January 2012) | 140 American Oil Road, Rensselaer, NY | Throughput Agreement | IPT, LLC | 01/12 - 06/12 | $0.007/gal | | | |
| Storage Thruput Agreement Renewal - IPT, LLC (July 2012) | 140 American Oil Road, Rensselaer, NY | Throughput Agreement | IPT, LLC | 07/12 - 06/13 | $0.007/gal | | | |
| Storage Thruput Agreement Renewal - IPT, LLC (November 2014) | 140 American Oil Road, Rensselaer, NY | Throughput Agreement | IPT, LLC | 11/14 - 10/15 | $0.00737/gal | | | |
| Storage Thruput Agreement Renewal - IPT, LLC (November 2016) | 140 American Oil Road, Rensselaer, NY | Throughput Agreement | IPT, LLC | 11/16 - 10/17 | $0.00756/gal | | | |
| Storage Thruput Agreement Renewal - IPT, LLC (November 2017) | 140 American Oil Road, Rensselaer, NY | Throughput Agreement | IPT, LLC | 11/17 - 10/18 | $0.00765/gal | | | |
| Sweetwater - Ephrata (May 2015) | Ephrata Terminal of Sweetwater Propane | Throughput Agreement | Sweetwater Propane, Inc. | 05/15 - 04/16 | $0.01/gal | | | |
| Terminal Agreement - ARC Terminals (July 2016) | Mechanicsburg, Dupont, Altoona, S. Williamsport | Throughput Agreement | Arc Terminals Pennsylvania Holdings LLC | 07/16 - 12/16; auto renew for (3) 3 month periods | $0.03/gal | | | |
| Terminal Agreement - Plains Philadelphia South (May 2010) | 6850 Essington Ave, Philadelphia PA | Throughput Agreement | Plains Products Terminals LLC | 05/10 - 04/11, auto renew each month | | | | |
| Terminal Agreement - PPC (February 2010) | Sinking Spring, Highspire, Altoona terminals | Throughput Agreement | Petroleum Products Corp. | 02/10 - 12-10 | | | | |
| Terminal Agreement - Sunoco Partners (November 2014) | Altoona, Baltimore, Belmont, Blawnox, Delmont, Eagle Point, Exton, Kingston, Malvern, Manassas terminals | Throughput Agreement | Sunoco Partners Marketing & Terminals, L.P. | 12/14 - ongoing unless terminated; appears to be terminated | | | | |
| Terminal Agreement - Windsor Fuels (September 2015) | 80 Windsor Ave, Mineola, NY | Throughput Agreement | Windsor Fuel Co., inc. | 08/15 - 06/16; auto renew unless terminated - appears to be terminated | $0.03/gal | | | |
| Throughput Agreement - Lucknow-Highspire (August 2005) | many PA terminals | Throughput Agreement | Lucknow-Highspire Terminals Corp. | 08/05 - 07/06, auto renew unless terminated - appears to be terminated | | | | |
| Thruput Agreement - Fred Schildwachter Sons (October 2015) | 1400 Ferris Place, Bronx, NY | Throughput Agreement | Fred M. Schildwachter & Sons, Inc. | 10/15 - ongoing unless terminated | | | | |
| Thruput Agreement - Fred Schildwachter Sons (September 2014) | 1401 Ferris Place, Bronx, NY | Throughput Agreement | Fred M. Schildwachter & Sons, Inc. | 09/14 - 09/15 | | | | |
| Throughput Amendment - Lucknow-Highspire (March 2010) | many PA terminals | Throughput Agreement - Price Amendment | Lucknow-Highspire Terminals Corp. | amendment to 08/05 contract | additional $0.001/gal | | | |
| Throughput Amendment - Lucknow-Highspire (October 2008) | many PA terminals | Throughput Agreement - Price Amendment | Lucknow-Highspire Terminals Corp. | Allows customer to pull winterized distillates | $0.0325/gal for each gal with winter additive | | | |
| Throughput Amendment - Lucknow-Highspire (October 2011) | many PA terminals | Throughput Agreement - Price Amendment | Lucknow-Highspire Terminals Corp. | adjusting fee for winter additive | $0.0230/gal | | | |
| Updated Lease Amounts - 2017 | 318 North Elmer Ave, Sayre PA | Updated Rent | W&O | Descriptions of new rent payments - goes until 2017/2018 year | $2,206.67/mo | | | |
| Plains Marketing L.P. - Purchase Agreement - Contract #AMJ18TSPNP0001 dated Feb. 21, 2018 | Schaefferstown, PA | Propane purchase agreement | Plains Marketing L.P. | Purchase | $0.82/gal | | | |

51

ACTIVE\64374627.v4

### Schedule 2.1(c)

### Inventory

**Fuel inventory, wherever located as follows:**

| | |
|---|---|
| Tank and Bulk Fuel Inventory | 424,593.03 gallons |
| Truck Fuel Inventory | 44,191.00 gallons |

ACTIVE\64374627.v1
ACTIVE\64374627.v4

## Schedule 2.1(e)

### Tangible Personal Property

**Storage and Skid Tanks**

- 2 X 300,000 Gallon AST- Across from 85 White Oak Road, Manheim, PA (Tank and land OWNED)
- 10,000 Gallon UST - Across from 85 White Oak Road, Manheim, PA (Tank and land OWNED)
- 20,000 Gallon UST - 24 New Charlotte St, Manheim, PA (Tank and land OWNED)
- 4 X 20,000 Gallon UST & 5 X 30,000 Gallon UST - 902 Strasburg Pike (tanks owned but on LEASED site)
- UST - 709 Hartman Station Road (underground tank and site LEASED)
  - o  2, 30,000 gallon above ground propane storage tanks owned by Worley & Obetz
- 1.35 million Gallon AST - 3251 Trewigtown Road, Colmar, PA (tank and site LEASED)
- 1974 Riley Beard 30,000 Gallon Propane Tank (AST) and Highland 30,000 Gallon Propane Tank (AST) located at 16 Lititz Rd., Lititz, PA 17543 (tank owned but on LEASED property)
- 1971 Trinity 30,000 Gallon Propane Tank located at 2388 N. Market St., Elizabethtown, PA (tank owned but on leased property)
- 500 gallon and (5) 300 gallon skid tanks at High Concrete in Denver, PA (tanks owned but on customer site, W&O rights subject to customer negotiation)
- (Above) (3) 10,000 gallon petrolum tanks, (Above) (1) 15,000 gallon petroleum tank, (Above) (1) 2,500 gallon DEF tank, 318 N. Elmer Ave., Sayre, PA (tanks owned but in lease site)
- 6,500 Gallon diesel exhaust fluid storage tank, 85 White Oak Road, Manheim, PA
- Customer Tanks owned by Worley & Obetz, Inc., 4000 tanks (count estimated not confirmed, certain tanks have been removed and location is now not known)
- Certain Storage Tanks New and replaced propane tanks for customer locations are stored at 35 Doe Run Road, Manheim, PA
  - o  Customer tanks owned by Worley & Obetz, Inc. Customer tanks are owned by the company and customers–pricing of product depends on tank ownership and contract terms
- Miscellaneous truck parts and maintenance equipment
- Propane tank parts and installation equipment in 85 White Oak Road warehouse and in/on any trucks
- HVAC service equipment, parts and sundry inventory stored at 85 White Oak Road, Manheim, PA
- Other related assets used in the business operations of Worley & Obetz, Inc.'s Retail division

Exhibit A    Page 54

ACTIVE\64374627.v1
ACTIVE\64374627.v4

- Other related assets used in business operations of W&O Propane Division
- Other related assets used in the business operations of W&O Inc,'s Service and Installation division
- Other related assets used in the business operations of W&O's Value Energy North Division (Sayre)
- Other related assets used in the business operations of W&O's Value Energy South Division
- Other related assets used in business operations of AMG propane, Wholesale division
- Other related assets used in the business operations of W&O Fleet Fueling Division
- Other related assets used in business operations of W&O's Wholesale Division
- Other related assets used in business operations of AMG Renewables Division
- Other related assets used in the business operations of AMG's Petroleum division
- Other related assets used in business operations of AMG's Electricity Supply and Brokerage Division (subject to contract calculations and regulatory controls and restrictions)
- Other related assets used in the business operations of AMG Natural Gas division (subject to contract calculations and regulatory controls and restrictions)
- Other Property, Maintenance Equipment (Lawn tractors, trimmers, etc.) on site
- Related assets including parts, inventory, supplies, furniture/fixtures, tools, equipment, etc.

**The items listed above do not include previously sold assets, expired or cancelled leases, and expired or rescinded permits or licenses.**

**Note that owned or leased tanks are subject to terms of lease and may require removal or abandonment.**

55

## Schedule 2.1(f)

### Permits

**AMERIGREEN ENERGY INC**
**LIST OF STATE LICENSES**

|  | Number |  |
|---|---|---|
| **Electricity Supplier** |  |  |
| Pennsylvania Public Utility Commission | A-2014-2451720 |  |
| State of New York Department of Public Service |  |  |

**Electricity Brokerage**

| | | |
|---|---|---|
| State of Delaware Public Service Commission | | |
| State of Illinois Commerce Commission | | |
| Commonwealth of Massachusetts Department of Public Utilities | EB-442 | |
| State of Maryland Public Service Commission | IR-3568 | |
| State of New Jersey | PA-0165 | Private Aggreg |
| | EA-0318 | Energy Agent |
| | EC-0101 | Energy Consuls |
| Public Utilities Commission of the State of Ohio | 18-1304E(1) | |
| Public Utility Commission of Texas | | |

**Natural Gas Supplier**

| | |
|---|---|
| Commonwealth of Massachusetts Department of Public Utilities | RA-205 |
| State of Maryland Public Service Commission | IR-3569 |
| State of New Jersey | GSL-0124 |
| Pennsylvania Public Utility Commission | A-2014-2451710 |
| State of New York Department of Public Service | Brooklyn Union Gas Service Territory - National Grid NY |
| | Brooklyn Union Gas Service Territiry - National Grid NY |
| | Keyspan Gas East Service Territory - National Grid NY |
| | Orange & Rockland Utilities |
| | range & Rockland Utilities |
| | Consolidated Edison Company |
| | Consolidated Edison Company |

Exhibit A   Page 56

Natural Gas Brokerage

Public Utilities Commission of the State of Ohio          18-651G(1)

**Note: Transferability of the above licenses is subject to the rules of each state's utility commission. Some or all of the licenses may be non-transferrable and so reapplication to the state commission would be necessary for the buyer.**

ACTIVE\64374627.v4

### Schedule 2.1(g)

### Intellectual Property Rights

All Intellectual Property including:

Patents, patent applications, patent rights, patent disclosures and inventions (whether or not patentable or reduced to practice)

Trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, websites, domain names and other indicia of source and all goodwill associated therewith

Works of authorship, copyrights, copyright registrations and applications for registration, and moral rights

Know-how, trade secrets, customer lists (including all wholesale, retail and commercial customer account lists, whether active or inactive including complete contact information), proprietary information, proprietary processes and formulas, databases and data collections

All source and object code, software (including front and back office software, customer management and fuel management systems, accounting and billing systems, POS inventory systems and fleet management systems), algorithms, architecture, structure, display screens, layouts, inventions and development tools

All documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records.

## Schedule 2.1(h)

## Vehicles

| No. | VIN | Year | Make | Title Number | Owner |
|-----|-----|------|------|-------------|-------|
| 12 | 1FT7W2BT0BEA54209 | 2011 | FORD | 68788426801 WO | Worley and Obetz |
| 13 | 1FTYR2CV6GKA85114 | 2016 | FORD | 75952610401 WO | Worley and Obetz |
| 14 | JL6BNG1A3CK004246 | 2012 | MITSUBISHI | 70777185402 WO | Worley and Obetz |
| 15 | 3GNAXUEU8JS563348 | 2018 | CHEVORLET | 78444261701WO | Worley and Obetz |
| 16 | 3C6TRVCD2EE123187 | 2014 | RAM | 74203430601 WO | Worley and Obetz |
| 17 | 1C4RJFBM7EC310160 | 2014 | JEEP | 72720870601 WO | Worley and Obetz |
| 18 | 3C6UR5NJ6HG547522 | 2017 | DODGE | 76794490101WO | Worley and Obetz |
| 19 | 1J4GL48555W600525 | 2005 | JEEP | 61677819901WO | Worley and Obetz |
| 20 | WD0PE745085304790 | 2008 | DODGE | 67277253401 WO | Worley and Obetz |
| 21 | 1FTRX18L11NA30958 | 2001 | FORD | 56181080502 WO | Worley and Obetz |
| 22 | 1XPFDB9X61N566239 | 2001 | PETERBILT | 55580038902 WO | Worley and Obetz |
| 27 | 3BPNHD7X8WF462096 | 1998 | PETERBILT | 51600545903 WO | Worley and Obetz |
| 28 | 1XP5DB9X54N831880 | 2004 | PETERBILT | 60382629901 WO | Worley and Obetz |
| 29 | 1FT7W2B60FEC47217 | 2015 | FORD | 74330826401WO | Worley and Obetz |
| 30 | 1FDWF36L2XED91611 | 1999 | FORD | 53376098902 WO | Worley and Obetz |
| 32 | 1XP5D89X63N595660 | 2003 | PETERBILT | 58192412001 WO | Worley and Obetz |
| 34 | 1XP5DB9X35N855225 | 2005 | PETERBILT | 61317391401 WO | Worley and Obetz |
| 35 | 1XPFDU9X31N555808 | 2001 | PETERBILT | 54973076102 WO | Worley and Obetz |
| 36 | 1FTHE2423VHB77033 | 1997 | FORD | 51018722301 WO | Worley and Obetz |
| 37 | 1FTSE3EL2BDA48285 | 2011 | FORD | 69232776001WO | Worley and Obetz |
| 40 | 1FTSE3EL6BDA48287 | 2011 | FORD | 69232744101WO | Worley and Obetz |
| 41 | WA1LMAFEXFD024148 | 2015 | AUDI | 75035448401WO | Worley and Obetz |
| 42 | 1XPFDB9X01N561652 | 2001 | PETERBILT | 55424371002WO | Worley and Obetz |
| 43 | 1C6RR7VM1FS612732 | 2015 | DODGE RAM 1500 | | Worley and Obetz |
| 44 | 1HTMKADN62H511291 | 2002 | INTERNATIONAL | 56486648301WO | Worley and Obetz |
| 45 | 1XP5DB9X91N558325 | 2001 | PETERBILT | 56577248101WO | Worley and Obetz |
| 46 | 2NPNHD7X02M575044 | 2002 | PETERBILT | 56948005901WO | Worley and Obetz |
| 47 | 1C6RR7PM9FS575152 | 2015 | RAM | 74270937001WO | Worley and Obetz |
| 48 | 1FMSU45P63E866794 | 2003 | FORD | 59770667603WO | Worley and Obetz |
| 49 | 1XPWD49X2AD106075 | 2010 | PETERBILT | 67517054001WO | Worley and Obetz |
| 50 | 1XPFDU9X7XN504479 | 1999 | PETERBILT | 53197517402WO | Worley and Obetz |
| 51 | 2NPNHD7X11M561653 | 2001 | PETERBILT | 55673141402WO | Worley and Obetz |
| 52 | 2NP3LJ9X3FM304907 | 2015 | PETERBILT | NO TITLE | Worley and Obetz |
| 53 | 1FTSE3EL4BDA48286 | 2011 | FORD | 69232764001WO | Worley and Obetz |

Exhibit A — Page 59

| 54 | 3C6TRVCD4EE123627 | 2014 | RAM | 74210863501WO | Worley and Obetz |
| 55 | 1D7HW48P27S144647 | 2007 | DODGE | 64307456601WO | Worley and Obetz |
| 56 | 1FVHCYDJ86HW08598 | 2006 | FREIGHTLINER | 63012924701WO | Worley and Obetz |
| 57 | 1C4RJFBM3FC716633 | 2015 | JEEP | 74852155101WO | Worley and Obetz |
| 58 | 1FDXF46F82EB61326 | 2002 | FORD | 56984961001WO | Worley and Obetz |
| 59 | 1XKW080X32J888525 | 2002 | KENWORTH | 58635449002 WO | Worley & Obetz Inc. |
| 60 | 2NP2HN7X1DM186103 | 2013 | PETERBILT | 71314854701WO | Worley and Obetz |
| 61 | 1GTHG39R921142233 | 2002 | GMC | 57070161501WO | Worley and Obetz |
| 62 | 1C4RJFBM0EC310159 | 2014 | JEEP | 72720918701WO | Worley and Obetz |
| 63 | 2NP2HN7X8DM179505 | 2013 | PETERBILT | 70803428701WO | Worley and Obetz |
| 64 | IXPWD49X4AD106076 | 2010 | PETERBILT | 67517345701WO | Worley and Obetz |
| 65 | IFDSF35S33EB39739 | 2003 | FORD | 58490271901WO | Worley and Obetz |
| 66 | 1GYFK66878R167767 | 2008 | CADILLAC | 692732013802WO | Worley and Obetz |
| 67 | 1FTYR2CVPGKA44573 | 2016 | FORD | 75792339501WO | Worley and Obetz |
| 68 | 1M2AX07CPJM039692 | 2018 | MACK | NO TITLE | Worley and Obetz |
| 69 | 1M2AX07C0JM039693 | 2018 | MACK | NO TITLE | Worley and Obetz |
| 70 | 1FVHCYBS4BDAU7722 | 2011 | FREIGHTLINER | 69142353401WO | Worley and Obetz |
| 72 | WD0PD644565949677 | 2006 | DODGE | 63775825201WO | Worley and Obetz |
| 73 | 1M1AA14Y4TW061280 | 1996 | MACK | 49589413002 | Worley & Obetz Inc. |
| 74 | 2NPLHD7X77M685006 | 2007 | PETERBILT | 63478910401WO | Worley and Obetz |
| 75 | NO VIN | | ELEC. MOTORCYCLE | NO TITLE | Worley and Obetz |
| 76 | 1XPHD49XXAD795405 | 2010 | PETERBILT | 67888559401WO | Worley and Obetz |
| 78 | 1XP5DB9X37N668876 | 2007 | PETERBILT | 63693353701WO | |
| 79 | 1FTSE3EL0BDA48284 | 2011 | FORD | 69232734701WO | Worley and Obetz |
| 80 | 1FTFW1EF6DKD33776 | 2013 | FORD | 71546038401WO | Worley and Obetz |
| 81 | 2NP3LJ9X4FM305239 | 2015 | PETERBILT | NO TITLE | Worley and Obetz |
| 82 | VG6BAO9B1YB702396 | 2000 | MACK | 55029873603WO | Worley and Obetz |
| 83 | 2NPLHN7X68M764366 | 2008 | PETERBILT | 65782090601WO | Worley and Obetz |
| 84 | 2NP2HJ7X6HM409346 | 2017 | PETERBILT | NO TITLE | Worley and Obetz |
| 85 | 2NP2HJ7X4HM409345 | 2017 | PETERBILT | NO TITLE | Worley and Obetz |
| 86 | 1FMCU9EG3AKC81708 | 2010 | FORD | 68342709702WO | Worley and Obetz |
| 87 | 1G1P75SZ6F7255795 | 2015 | CHEVROLET | 75664528001WO | Worley and Obetz |
| 88 | WVGEP9BP4DD001050 | 2013 | VOLKSWAGEN | 71794005201WO | Worley and Obetz |
| 89 | 3C6TRVCD4EE123630 | 2014 | RAM | 74265170601WO | Worley and Obetz |
| 90 | WDOPE745285285613 | 2008 | DODGE | 66539537701WO | Worley and Obetz |
| 91 | WDOPE745485304789 | 2008 | DODGE | 67277246801WO | Worley and Obetz |
| 92 | 1FTFW1ET5DKD12407 | 2013 | FORD | 73149607901WO | Worley and Obetz |
| 93 | 1HTSG0005YH270796 | 2000 | INTERNATIONAL | 56829277002 WO | Worley and Obetz Inc. |
| 94 | WD2PD444755724901 | 2005 | DODGE | 61483617101 WO | Worley and Obetz Inc. |
| 96 | 2NPLLZ9X87M693284 | 2007 | PETERBILT | 64553232301 WO | Worley and Obetz Inc. |

60

| 97 | 1FMCU9GX1GUB28917 | 2016 | FORD | 75433916901 WO | Worley and Obetz Inc. |
|---|---|---|---|---|---|
| 98 | 1FMCU9GX7GUB29571 | 2016 | FORD | 75582927001 WO | Worley and Obetz Inc. |
| 99 | 1FTWE1EG1FFC83210 | 2015 | FORD | 75399456001 WO | Worley and Obetz Inc. |
| 100 | 1FM5K8B83GGA41933 | 2016 | FORD | 75273144201 WO | Worley and Obetz Inc. |
| 101 | 1NPALU0X26N884964 | 2006 | PETERBILT | 62703692302 WO | Worley and Obetz Inc. |
| 102 | 2NPLHD7X85M865253 | 2005 | PETERBILT | 62473459802 WO | Worley and Obetz Inc. |
| 103 | 1FVX6EDBXYLF06572 | 2000 | FREIGHTLINER | 55898071602 WO | Worley and Obetz Inc. |
| 104 | 1FVX6EDBXXLA19161 | 1999 | FREIGHTLINER | 52853903802 WO | Worley and Obetz Inc. |
| 105 | 5HTAB4327V7H61284 | 1997 | HEIL | 56081085301 WO | Worley and Obetz |
| 105 | 1XP5DB9X5SN360410 | 1995 | PETERBILT | 47548035703 WO | Worley and Obetz Inc. |
| 106 | 1C4RJFBM3FC100429 | 2015 | JEEP | 75612762501 WO | Worley and Obetz Inc. |
| 107 | 1XP9DB9X9GP202830 | 1986 | PETERBILT | 44093177703 WO | Worley and Obetz Inc. |
| 108 | 1HTAA1954EHA14441 | 1984 | INTERNATIONAL | 35726181702 WO | Worley and Obetz Inc. |
| 109 | 3BPNHD7X1WF469035 | 1998 | PETERBILT | 51992584702 WO | Worley and Obetz Inc. |
| 110 | 1XP5DB9X5VN387532 | 1997 | PETERBILT | 49949115005 WO | Worley and Obetz Inc. |
| 111 | 1FTYR2CV4GKA44576 | 2016 | FORD | 75792086001 WO | Worley and Obetz Inc. |
| 112 | 1FMCU9GD4HUAD8472 | 2017 | FORD | 76235998701 WO | Worley and Obetz Inc. |
| 113 | 2NP2HJ7X4EM241542 | 2014 | PETERBILT | 72894625201 WO | Worley and Obetz Inc. |
| 114 | 3C6TRVCD8EE123629 | 2014 | RAM | 74210911301 WO | Worley and Obetz |
| 115 | WD0PE745185236936 | 2008 | DODGE | 65723947901 WO | Worley and Obetz Inc. |
| 116 | 4P5L62023H3023913 | 2017 | PJ | 77569596501 WO | Worley and Obetz |
| 117 | 1FTSE3EL88DA48288 | 2011 | FORD | 69232721401 WO | Worley and Obetz Inc. |
| 118 | 1GCHG35RXY1237737 | 2000 | CHEVROLET | 5529365002 WO | Worley and Obetz Inc. |
| 119 | 1EMCU9GD1HUD24122 | 2017 | FORD | 77329876701WO | Worley & Obetz Inc. |
| 120 | 2NPRLNDX29M788250 | 2009 | PETERBILT | 66729081001 WO | Worley and Obetz Inc. |
| 121 | MOXUVGF080476 | 2010 | JOHN DEERE | NO TITLE | Worley and Obetz |
| 122 | 1HLA3A7B7C7H52109 | 1982 | HEIL TRAILER | 34426880502WO | Worley and Obetz |
| 123 | 1FTZW2B61EEA27387 | 2014 | FORD | 72791138801 WO | Worley and Obetz Inc. |
| 125 | 3BPNHD7X2WF469030 | 1998 | PETERBILT | 51992583402 WO | |
| 126 | 1HTWNAZT47J381180 | 2007 | INTERNATIONAL | 65087359301 WO | |
| 127 | 1FTPW14VW8FA68467 | 2008 | FORD | 66211444701WO | Worley and Obetz Inc. |
| 128 | 5HTAB432X37H67271 | 2003 | HEIL | 58753659601 WO | Worley and Obetz |
| 129 | SHTAB432XB7H73398 | 2008 | HEIL | 65351351201 WO | Worley and Obetz Inc. |
| 130 | 1E9BE26217E353763 | 2007 | HAUL MASTER | 65812309101 WO | Worley and Obetz |
| 131 | 1C4RJFBM0FC767149 | 2015 | JEEP | 74433593401 WO | Worley and Obetz |
| 132 | 5HTAB432X37H66816 | 2003 | HEIL | 58203491301 WO | Worley and Obetz |
| 133 | 1G1FW6S08H4160004 | 2017 | CHEVROLET | 78013622002 WO | Worley and Obetz |
| 134 | 5HTAB4426V7H61033 | 1997 | HEIL | 50307539102 WO | Worley and Obetz |
| 135 | 1FVHCYBS9BDAU7893 | 2011 | FREIGHTLINER | 69142337601 WO | Worley and Obetz |

ACTIVE\64374627.v4

| 136 | 2NP2HJ7XXEM241562 | 2014 | PETERBILT | 73264201601 WO | Worley and Obetz |
|-----|-------------------|------|-----------|----------------|-------------------|
| 137 | 1HTSCABM2TH302663 | 1996 | INTERNATIONAL | 49525537504 WO | Worley and Obetz |
| 138 | 1FV6HFAA1SL629057 | 1995 | FREIGHTLINER | 48237495903 WO | Worley and Obetz |
| 139 | 1HTSDAAN11H336467 | 2001 | INTERNATIONAL | 57939742903 WO | Worley and Obetz |
| 140 | 1NPSL09X3BD116491 | 2011 | PETERBILT | 69456295001 WO | Worley and Obetz |
| 141 | 2NP3LN0X2AM109116 | 2010 | PETERBILT | 67917155001 WO | Worley and Obetz |
| 142 | 5HTAB442617H65058 | 2001 | HEIL TRAILER | 55597383902WO | Worley and Obetz |
| 143 | 1NPNHD7X7XS480327 | 1999 | PETERBILT | 53986157903 WO | Worley and Obetz |
| 144 | 1XPADU9X46N888486 | 2006 | PETERBILT | 63019821202 WO | Worley and Obetz |
| 145 | 4J8T043241T003802 | 2001 | FRUEHAUF | 56534358501WO | Worley and Obetz |
| 146 | 1FMCU9DG4AKC62912 | 2010 | FORD | 68326455601 WO | Worley and Obetz |
| 147 | 1FDAF5HR6AEB09808 | 2010 | FORD | 68384531301 WO | Worley and Obetz |
| 148 | 1FMCU9GX6GUA90133 | 2016 | FORD | 75272996101WO | Worley and Obetz |
| 149 | 5HTAB4322A7H75099 | 2010 | HEIL | 67797830601 WO | Worley and Obetz |
| 150 | 5HTAB4425X7H63066 | 1999 | HEIL TRAILER | 53156123502WO | Worley and Obetz |
| 153 | 1XPWD49X1CD142620 | 2012 | PETERBILT | 69935640201 WO | Worley and Obetz |
| 154 | 1XPWD49X5CD142619 | 2012 | PETERBILT | 69935772801 WO | Worley and Obetz |
| 155 | 1FMCU9GX3GUA80448 | 2016 | FORD | 75273120201 WO | Worley and Obetz |
| 156 | 1XPWDB9XXBD117508 | 2011 | PETERBILT | 69065086501 WO | Worley and Obetz |
| 157 | 1HLA3A7F6S7H58050 | 1995 | HEIL | 47727448204 WO | Worley and Obetz |
| 158 | 1NPSL09X1BD116490 | 2011 | PETERBILT | 69733761001 WO | Worley and Obetz |
| 159 | 1GRAA9623HB117611 | 1987 | GREAT DANE | 39351608402 WO | Worley and Obetz |
| 160 | 1FMCU9G9GUB19214 | 2016 | FORD | 75433844001WO | Worley and Obetz |
| 161 | 2NP3MN9XXCM160398 | 2012 | PETERBILT | 70123258301 WO | Worley and Obetz |
| 162 | 1FUJGPDR3CDBJ6237 | 2012 | FREIGHTLINER | 69987532601 WO | Worley and Obetz |
| 163 | 1FUJGPDR5CDBJ6238 | 2012 | FREIGHTLINER | 69987533901 WO | Worley and Obetz |
| 164 | 5HTAB4320A7H75098 | 2010 | HEIL | NO TITLE | Worley and Obetz |
| 165 | 1FUJGPDR7CDBJ6239 | 2012 | FREIGHTLINER | 69987534101 WO | Worley and Obetz |
| 166 | 5HTAB4320C7H76108 | 2012 | HEIL | 69991663001 WO | Worley and Obetz |
| 167 | 5HTAB4322C7H76109 | 2012 | HEIL | 69991672201 WO | Worley and Obetz |
| 168 | 2H9AECHF1CT002331 | 2012 | HUTCHINSON | 70224961901 WO | Worley and Obetz |
| 169 | 5HTAB432757H68770 | 2005 | HEIL | 61758082201 WO | Worley and Obetz |
| 170 | 2H9AECHF2CT002332 | 2012 | HUTCHINSON | 70224948901 WO | Worley and Obetz |
| 171 | 2HDAECHF5CT002333 | 2012 | HUTCHINSON | 70290507501 WO | Worley and Obetz |
| 172 | SW136084PA | | SP CONSTR | 54136084201 MC | Worley and Obetz |
| 173 | 5HTAB4421V7H60873 | 1997 | HEIL TRAILER | 49932174302WO | Worley and Obetz |
| 174 | 1C4RJFBM4FC677289 | 2015 | JEEP | 74852203001WO | Worley and Obetz |
| 175 | 5NHUCCV265N044399 | 2005 | CONTINENTAL | 70153771001 WO | Worley and Obetz |
| 176 | 5HTAB432877H71728 | 2007 | HEIL | 63872821701 WO | Worley and Obetz |

62

| 177 | NO VIN NUMBER | NO YEAR | HYSTER | NO TITLE | Worley and Obetz |
|---|---|---|---|---|---|
| 178 | 5HTAB432X77H71729 | 2007 | HEIL | 63950336501 WO | Worley and Obetz |
| 179 | 1XPWD49X3CD142621 | 2012 | PETERBILT | 71183409401 WO | Worley and Obetz |
| 180 | 1HLA3A7FXR7H57204 | 1994 | HEIL | 46504276603 WO | Worley and Obetz |
| 181 | 3C6JR7ET6EG127240 | 2014 | RAM | 72942113701 WO | Worley and Obetz |
| 182 | 3GNAXUFU8JS545903 | 2018 | CHEVROLET | 78342947301WO | Worley and Obetz |
| 183 | 5HTAB4420T7H59159 | 1996 | HEIL | 49069392604 WO | Worley and Obetz |
| 184 | 1HLA3A7F7S7H58901 | 1995 | HEIL | 48152551403 WO | Worley and Obetz |
| 185 | 1FMCU9GDSHUD24124 | 2017 | FORD | 77369538201 WO | Worley and Obetz |
| 186 | 1FDUFSHT4DEB54033 | 2013 | FORD | 72373570401 WO | Worley and Obetz |
| 187 | 1XPWDP9X2ED236428 | 2014 | PETERBILT | NO TITLE | Worley and Obetz |
| 188 | 1XPWDP9X5ED238464 | 2014 | PETERBILT | NO TITLE | Worley and Obetz |
| 189 | 3AKJGND10EDFT8496 | 2014 | FREIGHTLINER | NO TITLE | Worley and Obetz |
| 190 | 5HTAB4329E7H79298 | 2014 | HEIL | NO TITLE | Worley and Obetz |
| 191 | 5HTAB4320E7H79299 | 2014 | HEIL | No Title | Worley and Obetz |
| 192 | 5HTAB4321E7H79456 | 2014 | HEIL | No Title | Worley and Obetz |
| 193 | 4P5B61829E3008905 | 2014 | PJ | 75532623101 WO | Worley and Obetz |
| 194 | 1TC950RGJET020007 | 2014 | John Deere | No Title | Worley and Obetz |
| 195 | 5HTAM4529C7H76423 | 2012 | HEIL | 73869848403 WO | Worley and Obetz Inc. |
| 196 | 5HTAM4520C7H76424 | 2012 | HEIL | 73869841503 WO | Worley and Obetz Inc. |
| 197 | 1GCGG25V271107808 | 2007 | CHEVROLET | 63782279004 WO | Worley and Obetz |
| 199 | 1GCHG35U741242800 | 2004 | CHEVROLET | 68743200203 WO | Worley and Obetz Inc. |
| 200 | 4U01C12122A011119 | 2002 | CARGO | 58069425203 WO | Worley and Obetz Inc. |
| 202 | 1FD8X3H67JEB66427 | 2018 | FORD F-350 SUPERCAB | | Worley and Obetz Inc. |
| 203 | 1FD8X3H67JEB66428 | 2018 | FORD F-350 SUPERCAB | | Worley and Obetz Inc. |
| 205 | 4V1VDBPE3SN705034 | 1995 | WHITE GMC | 55195556402 WO | Worley and Obetz |
| 206 | 4V4JDBGF1TR839058 | 1996 | VOLVO | 48737802203 WO | Worley and Obetz |
| 207 | 4V4JDBCF4TR839071 | 1996 | VOLVO | 48737964103 WO | Worley and Obetz |
| 208 | 1FV6HFBA8SL648719 | 1995 | FREIGHTLINER | 62043060502 WO | Worley and Obetz |
| 209 | 4VG7DARJEWN755084 | 1998 | VOLVO | 62085849902 WO | Worley and Obetz |
| 210 | 4VG7DARJXXN786608 | 1999 | VOLVO | 62420958802 WO | Worley and Obetz |
| 211 | 4V4ND2RH2YN241933 | 2000 | VOLVO | 62576648902 WO | Worley and Obetz |
| 213 | 4V4ND2RH4YN796107 | 2000 | VOLVO | 62735668102 WO | Worley and Obetz |
| 214 | 4V4ND2RH0YN796105 | 2000 | VOLVO | 62735727702 WO | Worley and Obetz |
| 215 | 4V4ND2RH2YN796106 | 2000 | VOLVO | 62793843202 WO | Worley and Obetz |
| 216 | 1FTYR2CM5GKB30230 | 2016 | FORD | 76328540001 WO | Worley and Obetz |
| 217 | 4VG7DARH6XN778423 | 1999 | VOLVO | 63420746202 QO | Worley and Obetz |

63

| 218 | 1FUJGEDR4HLHZ7414 | 2017 | FREIGHTLINER | NO TITLE | Worley and Obetz |
| 219 | 1FUJGEDR6HLHZ7415 | 2017 | FREIGHTLINER | NO TITLE | Worley and Obetz |
| 220 | 1M1AW07Y8HM082286 | 2017 | MACK | NO TITLE | Worley and Obetz |
| 221 | 1W9P14323GM350051 | 2016 | WESTMOR | NO TITLE | Worley and Obetz |
| 222 | UNT007703 | 1980 | FRUEHAUF | 50961419002 WO | Worley and Obetz |
| 223 | 1PMA24321V5001229 | 1997 | POLAR | 61742294302 WO | Worley and Obetz |
| 224 | 5HTAB4320H7081972 | 2017 | HEIL | NO TITLE | Worley and Obetz |
| 225 | 10BEA9236HF0D4608 | 2016 | BEALL TRAILER | NO TITLE | Worley and Obetz |
| 227 | 1ETYR2CM4HKB43259 | 2017 | FORD | NO TITLE | Worley and Obetz |
| 228 | 1XPCD49X1KD261365 | 2019 | PETERBILT 567 | | Worley and Obetz |
| 229 | 1XPCD49X3KD261366 | 2019 | PETERBILT 567 | | Worley and Obetz |
| 238 | 5HTSA4323K7601502 | 2019 | HEIL TANK TRAILER | | Worley and Obetz |
| 239 | 5HTSA4323K7601503 | 2019 | HEIL TANK TRAILER | | Worley and Obetz |
| 242 | 2HSCEAPR45C029758 | 2005 | INTERNATIONAL | 60848603302WO | Worley and Obetz |
| 243 | 3AKJGND12GDGX3465 | 2016 | FREIGHTLINER | NO TITLE | Worley and Obetz |
| 244 | 1C4RJFBM8FC796401 | 2015 | JEEP | 74852303601WO | Worley and Obetz |
| 245 | 1FTNM21P03EB6036 | 2003 | FORD | 72123328002WO | Worley and Obetz |
| 246 | 1B7KM2688LS711430 | 1990 | DODGE | 42932918707WO | Worley and Obetz |
| 248 | 5HTAM452477L72688 | 2007 | HEIL TRAILER | 75741011601WO | Worley and Obetz |
| 249 | 1GB0GRFG5G1309296 | 2016 | CHEVROLET | 77945784602WO | Worley and Obetz |
| 252 | HW13929 | 1979 | DORSEY TRAILER | 56022290603WO | Worley and Obetz |
| 253 | 1TKC02421HM038953 | 1987 | TRAIL KING | 69539336302WO | Worley and Obetz |
| 254 | 1FDWE3FL2DDA85254 | 2013 | FORD | 72476003402WO | Worley and Obetz |
| 255 | 1FUJGED57GLGX4492 | 2016 | FREIGHTLINER | NO TITLE | Worley and Obetz |
| 256 | 1FUJGED57GLGX4493 | 2016 | FREIGHTLINER | NO TITLE | Worley and Obetz |
| 257 | 5HTAB4321F7H80771 | 2015 | HEIL TRAILER | NO TITLE | Worley and Obetz |
| 258 | 5HTAB4323F7H80772 | 2015 | HEIL TRAILER | NO TITLE | Worley and Obetz |
| 259 | 5HTAB4325F7H80773 | 2015 | HEIIL TANK TRAILER | NO TITLE | Worley and Obetz |
| 260 | 2HSFHASRXXC031142 | 1999 | INTL | 52742318001 SH | Worley and Obetz Inc. |
| 261 | 2HSCHAER32C238246 | 2002 | INTL | 56915409002 SH | Worley and Obetz Inc. |
| 262 | 2HSCHAPR37C432012 | 2007 | INTL | 68890883001 SH | Worley and Obetz Inc. |
| 263 | 3HSCUAPR0AN243190 | 2010 | INTERNATIONAL | 67651633902 SH | Worley and Obetz Inc. |
| 264 | 3HSDMAPR6FN572598 | 2015 | INTERNATIONAL | 74271227001 MY | Worley and Obetz Inc. |
| 265 | 2HSCZAPR7AC168576 | 2010 | INTERNATIONAL | 66843032002 MY | Worley and Obetz Inc. |
| 266 | 3HSCXAPR5GN276413 | 2016 | INTERNATIONAL | 76327313201 MY | Worley and Obetz Inc. |
| 270 | 5HTAM442517H64994 | 2001 | HEIL | 66738761801 SH | Worley and Obetz Inc. |
| 271 | 5HTAM432227H66690 | 2002 | HEIL | 67785277301 SH | Worley and Obetz Inc. |
| 272 | 5HTAM432027H66686 | 2002 | HEIL | 68367796301 SH | Worley and Obetz Inc. |

ACTIVE\64374627.v4

| | | | | | |
|---|---|---|---|---|---|
| 273 | 5HTAM4527C7H76517 | 2012 | HEIL | 70246154501 SH | Worley and Obetz Inc. |
| 274 | 5HTAM4524D7H77691 | 2013 | HEIL | 71470522501 SH | Worley and Obetz Inc. |
| 275 | 5HTAM4525E7H79273 | 2014 | HEIL | 72444974001 SH | Worley and Obetz Inc. |
| 276 | 5HTAB452317H64593 | 2001 | HEIL | 73438147002 SH | Worley and Obetz Inc. |
| TRK-11 | 1FTYR2CV2GKA44575 | 2016 | FORD | 75792386001 WO | Worley and Obetz |
| TRK-24 | 2NPLHD7X57M685005 | 2007 | PETERBILT | 63478937201 WO | Worley and Obetz |
| TRK-25 | 1FTYR2CV0GKA44574 | 2016 | FORD | 75792237301 WO | Worley and Obetz |
| TRK-26 | 2NPLHD7X27M698200 | 2007 | PETERBILT | 63737176601 WO | Worley and Obetz |
| TRK-31 | WD0PE745X85236935 | 2008 | DODGE | 65729840301 WO | Worley and Obetz |
| TRL-124 | 1FTFX1EF4GFB61435 | 2016 | FORD | 76328568101 WO | Worley and Obetz |
| | 1GRAA902XCB062401 | 1982 | GREAT DANE TRLR | 58476978902WO | Worley and Obetz |
| | BB5142692 | 1932 | FORD | 36614733802 | Worley & Obetz Inc. |
| 95 | SALGS2RK2JA383212 | 2018 | LAND ROVER | 78895829001WO | Worley & Obetz Inc. |
| V-1 | 1C4RJFBMXFC112982 | 2015 | JEEP | 75819713601AM | AMERIGreen |
| V-2 | 1FMCU9GX5GUA48830 | 2016 | FORD | 75695910401AM | AMERIGreen |
| V-3 | 1J4PR4GK8AC108380 | 2010 | JEEP | 71951298802AM | AMERIGreen |
| V-4 | 1FMCU9G96GUC49962 | 2016 | FORD | 75829655501AM | AMERIGreen |
| V-6 | 1J4PR4GK4AC143515 | 2010 | JEEP | 72003492303AM | AMERIGreen |
| V-7 | 1C4RJFCM8EC384850 | 2014 | JEEP | 73330270501AM | AMERIGreen |
| V-9 | 1C4RJFBM5EC315793 | 2014 | JEEP | 74598477602AM | AMERIGreen |
| V-10 | 3FRNF6FC1BV411137 | 2011 | FORD | 76340525901AM | AMERIGreen |
| V-11 | 1GNSKCKC8FR505906 | 2015 | CHEVROLET | 75966360001AM | AMERIGreen |
| V-12 | 1C4RJFBM2EC521444 | 2014 | JEEP | 77909543502AM | AMERIGreen |
| 500 | 1FV6HJBAXXHA93594 | 1999 | FREIGHTLINER F70 | TRUCK FOR AVONDALE TRANSLOADER | AMG Propane |
| 501 | 431FS2529X1000515 | 1999 | CROSS COUNTRY TRAILER | TRAILER FOR AVONDALE TRANSLOADER | AMG Propane |

65

ACTIVE\64374627.v4

**Schedule 2.2(f)**

**Wo-Go Stations Tangible Personal Property**

**WOGO & PACIFIC PRIDE DIVISIONS**

<u>Description</u>

Retail fueling stations (unmanned) for use by customers who have cards that are on the respective networks.

Main office operations were from 202 Greenfield Road, Lancaster, PA (NO LONGER AVAILABLE)

| Leases Included: | 1634 W. Main St, Ephrata, PA (Charles Rutt) |
| | 101 E. Cherry St, Elizabethtown, PA (Lime Ridge Farm) |
| | 854 S. 16th St, Harrisburg, PA (Scheler Realty) |

Includes Franchise Agreement with Pacific Pride Services, LLC

| Locations: | Manheim WoGo - 35 Doe Run Road, Manheim, PA (LEASED) |
| | Lititz WoGo - 746 Rothsville Road, Lititz, PA (OWNED) |
| | Ephrata WoGo/Pacific Pride - 1634 West Main Street, Ephrata, PA (LEASED) |
| | Greenfield WoGo/Pacific Pride - 202 Greenfield Road, Lancaster, PA (LEASED) |
| | Mount Joy Pacific Pride - 30 Orchard Road, Mount Joy, PA (OWNED) |
| | Elizabethtown Pacific Pride - 101 East Cherry Street, Elizabethtown, PA (LEASED) |
| | Harrisburg WoGo - 854 South 16th Street, Harrisburg, PA (LEASED) |

All pumps, tanks and other equipment utilized in the operations of the Cardlock divisions, including remaining fuel inventory

Access to applicable Cardlock software systems for customer information

Trucks:

| No. | | Description | | VIN |
|-----|------|---------------|---------------------|-------------------|
| | | | | |
| 23 | 2014 | RAM PROMASTER | WOGO OPS VAN | 3C6TRVCD6EE123628 |
| 151 | 2002 | DODGE VAN | WOGO OPS VAN - SPARE | 2B7JB21Y92K110755 |

Any and all Intellectual Property relating to Wo-Go.

Exhibit A – Page 1

**Schedule 3.5**

**Required Consents**

The following agreements require written consent:

1. Lease Agreement between Worley & Obetz, Inc. and 202 Greenfield LP dated August 30, 2013
2. DEP Grant Agreement between Worley & Obetz, Inc. and the Commonwealth of Pennsylvania, Department of Environmental Protection, Office of Pollution Prevention and Energy Assistance
3. Lease Agreement between 333 Sylvan Avenue, LLC and Amerigreen Energy, Inc. dated April 26, 2013
4. Lease Agreement between 333 Sylvan Avenue, LLC and Amerigreen Energy, Inc. dated April 22, 2015
5. Commercial Lease Agreement between Lyons & Obetz and AmeriGreen dated April 1, 2014
   a. AmeriGreen has the right to assign the lease to a corporation with which AmeriGreen may merge or consolidate, to any subsidiary of AmeriGreen, to any corporation under common control with AmeriGreen or to a purchaser of substantially all of AmeriGreen's assets without consent.
6. Commercial Lease Agreement between Lyons & Obetz and AmeriGreen dated July 1, 2011
   a. AmeriGreen has the right to assign the lease to a corporation with which AmeriGreen may merge or consolidate, to any subsidiary of AmeriGreen, to any corporation under common control with AmeriGreen or to a purchaser of substantially all of AmeriGreen's assets without consent.
7. Lease Agreement between RZ Realty, LP and AmeriGreen Energy, Inc. dated November 25, 2014
   a. AmeriGreen Energy, Inc. has the right to assign the lease to an affiliate or successor by reason of merger, consolidation, asset or stock acquisition without consent.
8. Equipment Lease Agreement  between Elbow River Marketing USA LTD and AmeriGreen Propane, LLC dated July 1, 2017
9. Biodiesel Terminal Storage and Thru Put Agreement between Westmore Fuel Co., Inc, and AmeriGreen Energy dated October 30, 2014
   a. AmeriGreen has the right to assign to an affiliate or subsidiary without consent.
10. Propane Throughput Agreement between AmeriGreen Energy and Boyle Energy
    a. Agreement states that Boyle Energy may assign without prior written consent, implying that AmeriGreen Energy cannot because the agreement can only be amended by written consent.
11. Thruput Agreement between General Bangtson LLC and AmeriGreen Energy, Inc.
12. ~~Lease Agreement between Buckeye Energy Services, LLC and Worley & Obetz Inc. dated June 28, 2017~~
13. ~~Lease Agreement between Buckeye Terminals, LLC and Worley & Obetz Inc. dated September 19, 2014~~

Exhibit A – Page 1

12. ~~14.~~Lease Agreement between Crowe Realty, LLC and Worley & Obetz dated September 8, 2005

13. ~~15.~~Lease Agreement between Crowe Realty, LLC and Worley & Obetz dated October 1, 2010

14. ~~16.~~Lease and Purchase Agreement between Crowe Realty, LLC and Worley & Obetz dated September 9, 2010

15. ~~17.~~Commercial Lease Agreement between Doe Run Road LLC and Worley & Obetz Inc. dated January 1, 2012
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

16. ~~18.~~Commercial Lease Agreement between Doe Run Road LLC and Worley & Obetz Inc. dated June 1, 2012
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

17. ~~19.~~Commercial Lease Agreement between Doe Run Road LLC and Worley & Obetz Inc. dated September 1, 2011
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

18. ~~20.~~Agreement between H. L. Wiker, Inc. and Worley & Obetz, Inc. dated August 2008
    a. Even if written consent is granted, Worley & Obetz is still liable for payment of all terms, conditions, and covenants.

19. ~~21.~~Lease Agreement between H. L. Wiker, Inc. and Worley & Obetz, Inc. dated January 16, 2008
    a. Even if written consent is granted, Worley & Obetz is still liable for payment of all terms, conditions, and covenants.

20. ~~22.~~Lease Agreement between J. W. Bishop Properties, LLC and Worley & Obetz, Inc. dated March 4, 2013

21. ~~23.~~Commercial Lease Agreement between Lester R. Summers, Inc. and Worley & Obetz Inc. dated July 1, 2015

22. ~~24.~~Commercial Lease Agreement between Lester R. Summers, Inc. and Worley & Obetz Inc. dated September 1, 2016

23. ~~25.~~Commercial Lease Agreement between Lyons & Obetz and Worley & Obetz Inc. dated September 1, 2016 (41 Doe Run Road)
    a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

24. ~~26.~~Commercial Lease Agreement between Lyons & Obetz and Worley & Obetz Inc. dated September 1, 2016 (55 Doe Run Road)

2

      a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

25. ~~27.~~ Commercial Lease Agreement between Lyons & Obetz and Worley & Obetz Inc. dated September 1, 2009

      a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz, to any corporation under common control with Worley & Obetz, or to a purchaser of substantially all of Worley & Obetz's assets without consent.

26. ~~28.~~ Commercial Lease between Obetz Enterprises and Worley & Obetz Inc. dated April 24, 1997

27. ~~29.~~ DEP Grant Agreement Worley & Obetz, Inc. and the Commonwealth of Pennsylvania, Department of Environmental Protection, Office of Pollution Prevention and Energy Assistance dated July 6, 2017

28. ~~30.~~ Operating Agreement of PJM Interconnection, LLC (to which AmeriGreen Energy, Inc. is a member)

      a. The rights and obligations created by the Agreement shall inure to and bind the successors and assigns of AmeriGreen; provided, however, that the rights and obligations of AmeriGreen hereunder shall not be assigned without the approval of the Members Committee except as to a successor in operation of AmeriGreen's electric operating properties by reason of a merger, consolidation, reorganization, sale, spin-off, or foreclosure, as a result of which substantially all such electric operating properties are acquired by such a successor, and such successor becomes a Member.

29. ~~31.~~ Product Sales Agreement between UGI Energy Services, LLC and AmeriGreen Energy, Inc. dated May 19, 2014

      a. If AmeriGreen is assigning the agreement to an affiliate (who's creditworthiness is comparable to or higher than that of the AmeriGreen), or assigning the agreement to any person or entity succeeding to all or substantially all of the assets of the AmeriGreen, then only written notice is required.

30. ~~32.~~ Propane Throughput Agreement between AmeriGreen Energy, Inc. and UGI Energy Services, LLC dated May 1, 2014

      a. Agreement states that UGI Energy Services, LLC may assign without prior written consent, implying that AmeriGreen Energy, Inc. cannot because the agreement can only be amended by written consent.

31. ~~33.~~ Propane Throughput Agreement between AmeriGreen Energy, Inc. and UGI Energy Services, LLC dated May 1, 2015

      a. Agreement states that UGI Energy Services, LLC may assign without prior written consent, implying that AmeriGreen Energy, Inc. cannot because the agreement can only be amended by written consent.

32. ~~34.~~ Propane Throughput Agreement between AmeriGreen Energy, Inc. and UGI Energy Services, LLC dated May 1, 2016

      a. Agreement states that UGI Energy Services, LLC may assign without prior written consent, implying that AmeriGreen Energy, Inc. cannot because the agreement can only be amended by written consent.

3

33. ~~35.~~Propane Throughput Agreement between AmeriGreen Energy, Inc. and UGI Energy
Services, LLC dated June 1, 2017
   a. Agreement states that UGI Energy Services, LLC may assign without prior
      written consent, implying that AmeriGreen Energy, Inc. cannot because the
      agreement can only be amended by written consent.
34. ~~36.~~Propane Throughput Agreement between AmeriGreen Energy, Inc. and UGI Energy
Services, LLC dated May 3, 2018
   a. Agreement states that UGI Energy Services, LLC may assign without prior
      written consent, implying that AmeriGreen Energy, Inc. cannot because the
      agreement can only be amended by written consent.
35. ~~37.~~Propane Throughput Agreement between AmeriGreen Energy and RF Ohl Fuel Oil,
Inc. dated July 1, 2014
   a. Agreement states that RF Ohl Fuel Oil, Inc. may assign without prior written
      consent, implying that AmeriGreen Energy, Inc. cannot because the agreement
      can only be amended by written consent.
36. ~~38.~~Propane Throughput Agreement between AmeriGreen Propane LLC and RF Ohl Fuel
Oil, Inc. dated July 1, 2017
   a. Agreement states that RF Ohl Fuel Oil, Inc. may assign without prior written
      consent, implying that AmeriGreen Energy, Inc. cannot because the agreement
      can only be amended by written consent.
37. ~~39.~~Lease Agreement between Rohrer's Quarry and Worley & Obetz dated June 1, 2014
38. ~~40.~~Commercial Lease Agreement between Seth Obetz and Worley & Obetz Inc. dated
January 1, 2010
   a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which
      Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz,
      to any corporation under common control with Worley & Obetz, or to a purchaser
      of substantially all of Worley & Obetz's assets without consent.
39. ~~41.~~Commercial Lease Agreement between Seth Obetz and Worley & Obetz Inc. dated
January 1, 2011
   a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which
      Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz,
      to any corporation under common control with Worley & Obetz, or to a purchaser
      of substantially all of Worley & Obetz's assets without consent.
40. ~~42.~~Commercial Lease Agreement between Seth Obetz and Worley & Obetz Inc. dated
September 1, 2012
   a. Worley & Obetz Inc. has the right to assign the lease to a corporation with which
      Worley & Obetz may merge or consolidate, to any subsidiary of Worley & Obetz,
      to any corporation under common control with Worley & Obetz, or to a purchaser
      of substantially all of Worley & Obetz's assets without consent.
~~43. Biodiesel Storage & Marketing Agreement between AmeriGreen Energy, Inc. and
Buckeye Terminals, LLC dated October 1, 2012~~
   ~~a. Written consent is not needed for an assignment to an affiliate, a successor of all
      or substantially all of the assignor's business and assets, or any entity that the
      assignor merges into or consolidates with. However, an assignment to an affiliate
      will not relieve the transferor of any of its obligations.~~
41. ~~44.~~Agreement between IPT, LLC and AmeriGreen Energy Inc. (January 2012)

---

4

   a. Written consent is not needed for an assignment to one or more of the assignor's
      wholly owned corporate affiliates or subsidiaries or to a successor of all or of
      substantially all of the assignor's entire business and assets or to a corporation
      which assignor merges into or consolidates with. However, an assignment to a
      corporate affiliate or subsidiary will not relieve the assignor of any of its
      obligations.

42. 45. Agreement between IPT, LLC and AmeriGreen Energy Inc. (July 2012)
   a. Written consent is not needed for an assignment to one or more of the assignor's
      wholly owned corporate affiliates or subsidiaries or to a successor of all or of
      substantially all of the assignor's entire business and assets or to a corporation
      which assignor merges into or consolidates with. However, an assignment to a
      corporate affiliate or subsidiary will not relieve the assignor of any of its
      obligations.

43. 46. Agreement between IPT, LLC and AmeriGreen Energy Inc. (November 2014)
   a. Written consent is not needed for an assignment to one or more of the assignor's
      wholly owned corporate affiliates or subsidiaries or to a successor of all or of
      substantially all of the assignor's entire business and assets or to a corporation
      which assignor merges into or consolidates with. However, an assignment to a
      corporate affiliate or subsidiary will not relieve the assignor of any of its
      obligations.

44. 47. Agreement between IPT, LLC and AmeriGreen Energy Inc. (November 2016)
   a. Written consent is not needed for an assignment to one or more of the assignor's
      wholly owned corporate affiliates or subsidiaries or to a successor of all or of
      substantially all of the assignor's entire business and assets or to a corporation
      which assignor merges into or consolidates with. However, an assignment to a
      corporate affiliate or subsidiary will not relieve the assignor of any of its
      obligations.

45. 48. Agreement between IPT, LLC and AmeriGreen Energy Inc. (November 2017)
   a. Written consent is not needed for an assignment to one or more of the assignor's
      wholly owned corporate affiliates or subsidiaries or to a successor of all or of
      substantially all of the assignor's entire business and assets or to a corporation
      which assignor merges into or consolidates with. However, an assignment to a
      corporate affiliate or subsidiary will not relieve the assignor of any of its
      obligations.

46. 49. Tank Storage Agreement between Colmar Terminal, Inc. and AmeriGreen, Inc. dated
    February 19, 2014
   a. Written consent is not needed for a merger, consolidation, or transfer of all of the
      transferor's assets for valid business purposes (other than the avoidance of
      obligations under the agreement).

47. 50. Terminalling Agreement between AmeriGreen Energy and Arc Terminals
    Pennsylvania Holdings LLC dated July 25, 2016
   a. AmeriGreen Energy may assign the agreement to an affiliate, but it will still be
      liable for the obligations.

48. 51. Terminal Services Agreement between Plains Products Terminals LLC and
    AmeriGreen Energy Inc. dated May 1, 2010

5

     a.  AmeriGreen Energy may assign the agreement to an affiliate or subsidiary upon 10 days prior written notice, but it will still be liable for the obligations.

49. ~~52.~~Product Terminal Services Agreement between Sunoco Partners Marketing & Terminals and AmeriGreen dated November 21, 2014

     a.  Written consent is not needed for an assignment to one or more of the assignor's affiliates or subsidiaries, or to a successor of all or of substantially all of the assignor's business and assets or to a corporation which assignor merges into or consolidates with. However, an assignment will not relieve the assignor of any of its obligations.

50. ~~53.~~Biodiesel Terminal Storage and Thru Put Agreement between Windsor Fuel Co., Inc. and AmeriGreen Energy dated August 1, 2015

     a.  AmeriGreen Energy may assign the agreement to an affiliate or subsidiary.

51. ~~54.~~Terminal Throughput Agreement between Fred M. Schildwachter & Sons, Inc. and AmeriGreen Energy, Inc. dated November 9, 2015

52. ~~55.~~Terminal Throughput Agreement between Fred M. Schildwachter & Sons, Inc. and AmeriGreen Energy, Inc. dated September 2014

53. ~~56.~~Master Agreement between Vendor Services Group and Worley & Obetz (December 2016)

54. ~~57.~~Lease Agreement between Waverly Trade Center, LLC and Worley & Obetz dated May 1, 2013

55. ~~58.~~Lease Agreement between H. C. Rineer Sons Partnership ("Landlord") and Worley & Obetz dated May 30, 2006

     a.  Worley & Obetz remains liable to H. C. Rineer unless otherwise agreed to in writing by H. C. Rineer.

**56. ~~59.~~Non-Exclusive Fee Agreement between Ecova, Inc. and AmeriGreen Energy, Inc. dated August 19, 2013**

**57. ~~60.~~Channel Partner Agreement between Agera Holdings LLC and AmeriGreen Energy, Inc. [2017]**

**58. ~~61.~~Confidential Marketing Agreement between EnerPenn USA, LLC and AmeriGreen Energy, Inc.**

     **a.  Confidentiality Agreement between EnerPenn USA, LLC and AmeriGreen Energy, Inc. attached as Exhibit A**

**59. ~~62.~~Non-Exclusive Fee Agreement between AmeriGreen and South Jersey Energy Company [2014]**

**60. ~~63.~~Independent Contractor Agreement between AmeriGreen Energy, Inc. and NextEra Energy Services, LLC**

**61. ~~64.~~Broker Agreement between AmeriGreen Energy, Direct Energy Business, LLC, and Direct Energy Business Marketing, LLC [2015]**

**62. ~~65.~~Broker Agreement between AmeriGreen Energy and Energy Service Providers, Inc. dated October 6, 2015**

**63. ~~66.~~Agent Services Agreement between Supreme Energy Inc. and AmeriGreen Energy, Inc.**

**64. ~~67.~~Master Broker Agreement between AmeriGreen Energy, Inc. and Constellation NewEnergy, Inc., Constellation Energy Services, Inc., and Constellation Energy Services of New York, Inc.**

---

6

65. 68.Sales Agent Agreement between AmeriGreen Energy and U.S. Energy Partners LLC dated March 21, 2018

66. 69.Brokerage Agreement between New York Energy Inc. and AmeriGreen Energy, Inc. dated May 24, 2018

67. 70.Customer Referral Agreement between AmeriGreen Energy, Inc. and Mint Energy, LLC

68. 71.Broker Agreement between AmeriGreen Energy, Inc. and TriEagle Energy, LP dated December 11, 2013

69. 72.Payment Remittance Agreement between AmeriGreen Energy, Inc. and AP Gas & Electric (TX), LLC dated December 22, 2017

70. 73.Broker Agreement between AmeriGreen Energy, Inc. and FPP Holdings, LLC dated October 12, 2016

71. 74.Commodity Broker Agreement between AmeriGreen Energy, Inc. and Source Power & Gas LLC dated December 14, 2017

72. 75.Commercial Sales Partnership Agreement between AmeriGreen Energy, Inc. and SFE Energy Inc.

73. 76.Broker Agreement between AmeriGreen Energy, Inc. and Freepoint Energy Solutions LLC dated May 3, 2018

74. 77.Sourcing Fee Agreement between AmeriGreen Energy, Inc. and Infinite Energy dated January 12, 2017

75. 78.Agent Agreement between AmeriGreen Energy, Inc. and Spark Energy Gas, LLC

The following agreements require approval, but it does not need to be written:
1. Franchise Agreement for a Pacific Pride Commercial Fueling System Territory between Pacific Pride Services, LLC and Worley & Obetz Inc.

The following agreements contain restrictions on sharing information and thus approval should be obtained:
1. Non-Disclosure Agreement between Mansfield Oil Company of Gainesville, Inc. and AmeriGreen Energy, Inc. dated July 28, 2017
2. Confidentiality Agreement between Elbow River Marketing LTD. and AmeriGreen Propane, LLC
3. Non-Disclosure Agreement between Superior Gas Liquids and AmeriGreen Propane, LLC
4. Confidentiality and Non-Disclosure Agreement (Letter form) between United Metro Energy Corp. and AmeriGreen Energy dated July 20, 2017
5. Confidentiality and Non-Disclosure Agreement (Letter form) between IPC(USA), Inc. and AmeriGreen Energy, Inc. dated January 2, 2018
6. Confidentiality Agreement between U.S. Venture Inc. and AmeriGreen Energy, Inc.
7. **Mutual Confidentiality Agreement between Summit Energy Services, Inc. and AmeriGreen Energy, Inc.**

7

## Schedule 3.6

## Litigation

None.

ACTIVE\64374627.v4

**Schedule 3.7**

**Permits**

None.

ACTIVE\64374627.v4

## Schedule 3.10

### Environmental Matters

None.

## Schedule 3.11

## Real Property

None.

ACTIVE\64374627.v4

### Schedule 3.12

### Employment Matters

- Worley & Obetz, Inc. 401k Plan
- Robert H. Ranck, Inc. 401k Plan – assumed on sale of Ranck Plumbing Heating & Air Conditioning, Inc.
- Worley & Obetz, Inc. Health Plan
- Amerigreen Energy, Inc. Health Plan – terminated for non-payment effective June 30, 2018

ACTIVE\64374627.v4

**Schedule 3.15**

**Insurance**

| WORLEY & OBETZ, INC. | **2018** |
|---|---|
| Updated 6/6/18 | |

**CASUALTY/SUMMIT:**      Underwritten By: Old Republic/Effective 2/1/2018-19

| | | |
|---|---|---|
| Workers Compensation | $ 1,000,000 | Accident/Disease/Employee |
| | $ 15,000,000 | Payroll Projection |
| General Liability | $ 1,000,000 | Occurrence |
| | $ 2,000,000 | Aggregate |
| | $ 1,000,000 | Employee Benefits Liability Sales |
| | $ 537,500,000 | Projection |
| Automobile | $ 1,000,000 | Bodily Injury/Property Damage Liability |
| | $250 and $500 | Comprehensive/Collision Deductibles |
| | $ 1,000 | Tractor Deductibles |
| | 284 | Total Vehicles |

**UMBRELLA:**      Underwritten By: Allied World/Effective 2/1/2018-19

| | | |
|---|---|---|
| | $ 15,000,000 | Occurrence/Aggregate |
| | $ 10,000 | Retention |

**XS AUTO UMBRELLA:**      Underwritten By: Endurance/Effective 2/1/2018-19

| | | |
|---|---|---|
| | $ 4,000,000 | Occurrence/Aggregate |
| | $ - | Retention |

**POLLUTION:**      Underwritten By: Chubb/Ace American/Effective 2/1/2018-20

| | | |
|---|---|---|
| | $ 4,000,000 | Aggregate Program |
| | $ 4,000,000 | Occurrence |
| | $ 50,000 | Deductible |

**EXECUTIVE PROTECTION:**      Underwritten By: Travelers/Effective 2/1/2018-19

| | | |
|---|---|---|
| | $ 2,000,000 | Fiduciary |
| | $ 2,000,000 | Employment Practices Employee |
| | $ 50,000 | Theft |
| | $ 1,000,000 | Cyber Liability - added to this policy 2/1/17 |
| | $ 1,000,000 | Third Party |

**PROPERTY:**      Underwritten By: XL Insurance/Effective 2/1/2018-19

| | | |
|---|---|---|
| | $ 25,517,929 | Property Limits Business |
| | $ 5,000,000 | Income |
| | $ 2,500,000 | Earthquake |
| | $ 1,000 | Property Deductible |
| | $ 25,000 | Earthquake Deductible |
| | $ 50,000 | Motor Truck Cargo/Filings Included |

13

ACTIVE\64374627.v4

|  | $ | 25,000 | Installation |
|  | $ | 87,900 | Contractors Equipment |
|  | $ | 1,700,000 | Electronic Data Processing |
| **BOILER & MACHINERY:** | **Underwritten By: Travelers/Effective 2/1/2018-19** | | |
|  | $ | 24,982,032 | Property Limit |
|  | $ | 5,000,000 | Business Interruption |
|  | $ | 2,500 | Deductible |
| **McConkey Service Fee** | $ | 500 | **Per Month 2/1/18-19** |
| **PERSONAL UMBRELLAS:** | **Effective 7/1/17-18** | | |
|  | $ | 5,000,000 | Jeff Lyons  **CHUBB** |

## Amerigreen Energy, Inc.

| __Coverages__ | | __2-1-2018__ |
|---|---|---|
| Property (including floaters) | | |
| | Limits | $ 6,155,500 |
| | Premium (Incl. Tax/Fee) | $ **13,365** |
| General Liability | | |
| | Gallons | $ 60,000,000 |
| | Sales (Lube) | $ 200,000 |
| | Premium | $ **52,447** |
| Automobile | | |
| | # of Units | $ 15 |
| | Premium | $ **15,409** |
| Workers' Compensation | | |
| | Payroll | $ 2,775,000 |
| | Premium | $ **9,966** |
| Umbrella | | |
| | Limit | $ 3,000,000 |
| | Premium | $ **12,198** |
| McConkey Energi Fee | | $ **9,751** |

14

**Executive Protection**

|  | D&O & EPL |  |  |
|---|---|---|---|
|  | Limit | $ | 1,000,000 |
|  | Premium | $ | 10,339 |

**Pollution**

|  |  | 2/1/18 to 2/1/19 |  |
|---|---|---|---|
|  | Limit | $ | 2,000,000 |
|  | Premium | $ | 20,770 |

| **Credit Insurance - 11-30-17/18** | $ | 26,208 |
|---|---|---|

| **All policies are paid in full** | $ | 170,453 |
|---|---|---|

ACTIVE\64374627.v4

| Comparison Details | |
|---|---|
| Title | **compareDocs Comparison Results** |
| Date & Time | 9/17/2018 6:42:35 PM |
| Comparison Time | 3.88 seconds |
| compareDocs version | v4.3.200.37 |

| Sources | |
|---|---|
| Original Document | [ACTIVE][#64374627] [v1] Worley & Obetz - Diesel Direct Asset Purchase Agreement.docx |
| Modified Document | [ACTIVE][#64374627] [v4] Worley & Obetz - Diesel Direct Asset Purchase Agreement.docx |

| Comparison Statistics | |
|---|---|
| Insertions | 58 |
| Deletions | 43 |
| Changes | 82 |
| Moves | 12 |
| Font Changes | 0 |
| Paragraph Style Changes | 0 |
| Character Style Changes | 0 |
| TOTAL CHANGES | 195 |
| | |
| | |
| | |
| | |
| | |

| Word Rendering Set Markup Options | |
|---|---|
| Name | Standard with bold for redlining |
| Insertions | |
| Deletions | |
| Moves / Moves | |
| Font Changes | |
| Paragraph Style Changes | |
| Character Style Changes | |
| Inserted cells | |
| Deleted cells | |
| Merged cells | |
| Changed lines | Mark left border. |
| Comments color | By Author. |
| Balloons | False |

| compareDocs Settings Used | Category | Option Selected |
|---|---|---|
| Open Comparison Report after Saving | General | Always |
| Report Type | Word | TrackChanges |
| Character Level | Word | False |
| Include Headers / Footers | Word | True |
| Include Footnotes / Endnotes | Word | True |
| Include List Numbers | Word | True |
| Include Tables | Word | True |
| Include Field Codes | Word | True |
| Include Moves | Word | True |
| Show Track Changes Toolbar | Word | True |
| Show Reviewing Pane | Word | True |
| Update Automatic Links at Open | Word | False |
| Summary Report | Word | End |
| Include Change Detail Report | Word | Separate |
| Document View | Word | Print |
| Remove Personal Information | Word | False |
| Flatten Field Codes | Word | True |