IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re<br><br>WORLEY & OBETZ, INC., *et al.*,<br><br>Debtors. | CHAPTER 7<br><br>Case No. 18-13774 (REF)<br>(Jointly Administered) |

**CHAPTER 7 TRUSTEE'S MOTION TO COMPEL COMPLIANCE WITH THE COURT'S ORDER DATED SEPTEMBER 18, 2018 AND FOR SANCTIONS AGAINST DIESEL DIRECT HOLDINGS, INC.**

Christine C. Shubert, the Chapter 7 Trustee (the "Trustee" or the "Plaintiff") for the jointly-administered estates of the Worley & Obetz, Inc.,[1] *et al.* (collectively, the "Debtors"),[2] respectfully requests the entry of an order (1) compelling Diesel Direct Holdings, Inc. ("Diesel") to comply with the Court's *Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Interest, Claims and Encumbrances; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpected Leases; and (C) Granting Certain Related Relief*, dated September 18, 2018 (the "Sale Order"); and (2) for sanctions against Diesel. In support of this Motion, the Trustee states as follows:

**PRELIMINARY STATEMENT**

1. This Motion arises out of Diesel's refusal to comply with the Court's Sale Order by failing to fulfill its obligations as set forth in the Asset Purchase Agreement by and between

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) Worley & Obetz, Inc. (6576) (Case No. 18-13774-REF); (ii) Americomfort, Inc. (7605) (Case No. 18-13775-REF); (iii) RPHAC, Inc. (9625) (Case No. 18-13776-REF); (iv) Amerigreen Energy, Inc. (6284) (Case No. 18-13777-REF); (v) Advance Air, Inc. (8111) (Case No. 18-13778-REF); (vi) Amerigreen Energy Brokers, LLC (2358) (Case No. 18-13779-REF); (vii) Amerigreen Electricity, LLC (8977) (Case No. 18-13780-REF); (viii) Amerigreen Hedging Services, LLC (8549) (Case No. 18-13781-REF); (ix) Amerigreen Lubricants, LLC (7489) (Case No. 18-13782-REF); (x) Amerigreen Natural Gas, LLC (3222) (Case No. 18-13783-REF); and (xi) Amerigreen Propane, LLC (Case No. 18-13784-REF).

[2] For purposes of this Motion, the defined term "Debtors" does not include Debtor RPHAC, Inc. (Case No. 18-13776-REF).

the Trustee, as seller, and Diesel, as purchaser (the "Asset Purchase Agreement"). [See Dkt. No. 427].[3]

2. As set forth herein, Diesel failed to perform an inventory of the fuel assets that it purchased from the Debtors pursuant to the deadlines set forth in the Asset Purchase Agreement.

3. Instead, Diesel waited months to attempt to gain access to the fuel assets, despite its obligations under the Asset Purchase Agreement and the Trustee's good faith and commercially reasonable assistance in coordinating Diesel's access to the fuel assets.

4. Diesel is now attempting to benefit from its failures by arguing that the purchase price of the fuel assets should be based on the date that Diesel accesses the fuel assets instead of September 28, 2018—the date that the Trustee and Diesel (together, the "Parties") closed on the sale (the "Closing Date") and the date that title to the fuel assets passed to Diesel.

5. Diesel is advancing this irrational and unsupported position to avoid paying the Trustee the aggregate value of the fuel assets, which totals $388,361.07.

6. Over the past four months, the Trustee has attempted to work with Diesel in good faith to resolve this dispute, but Diesel has refused to acknowledge its liability under the Asset Purchase Agreement.

7. Accordingly, for the reasons set forth herein, the Trustee respectfully requests that the Court (1) order Diesel to comply with the terms of the Sale Order and the Asset Purchase Agreement by paying the Trustee $388,361.07 for the fuel assets, and (2) sanction Diesel for its willful violation of the Court's Sale Order by ordering Diesel to pay the Trustee the attorneys' fees and costs she incurred preparing this Motion.

---

[3] The Asset Purchase Agreement is attached as Exhibit A to the Sale Order at Dkt. No. 427.

2

## JURISDICTION AND VENUE

8.  The Court (the "Bankruptcy Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).

9.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The statutory predicates for the relief requested herein are 11 U.S.C. § 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9104.

## FACTUAL BACKGROUND

### A.   Bankruptcy Procedural History and the Debtors' Business Operations

11. On June 6, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

12. On June 6, 2018, the Office of the United States Trustee appointed Christine C. Shubert as Chapter 7 Trustee of the Debtors' estates, which appointment remains in effect.

13. By Order entered on June 19, 2018, this Court consolidated the Debtors' cases, for procedural purposes only, and ordered the joint administration of the Debtors' cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 under *In re Worley & Obetz, Inc., et al.*, Case No. 18-13774 (REF). [Dkt. No. 75].

14. Prior to the Petition Date, certain Debtors operated as total energy providers, and provided energy products and services to their commercial and residential clients, including but not limited to, the following:

   a.   Fuel, gasoline, biodiesel, heating oil, kerosene, naptha, propane, and other forms of renewable energy;

   b.   Electricity and natural gas;

3

87220314

  c. HVAC installation, repair, maintenance, and service; and

  d. Plumbing system installation, repair and maintenance.

15. Additionally, certain Debtors operated as energy wholesalers to retail distributors operating in the Mid-Atlantic and New England markets, and provided certain energy products and services to their retail fuel distributors, fuel stations, commercial clients, and commercial and residential clients of Debtor Worley & Obetz, Inc. ("Debtor W&O"), including but not limited to, the following:

  a. Ethanol and biodiesel inventory supply and delivery to retail fuel distributors and commercial clients;

  b. Hedging and marketing services to fuel distributor customers;

  c. Electricity and natural gas plans to commercial and residential clients;

  d. Delivery and supply to Debtor W&O commercial and residential customers of Amerigreen fuel, biodiesel, biofuels, petroleum, and diesel fuels; and

  e. Operate, supply and delivery of Amerigreen energy products to Amerigreen stations.

**B. The Sale Order**

16. On August 24, 2018, the Trustee filed a Motion for (I) an Order (A) Approving Bidding Procedures, Including Break-Up Fee and Expense Reimbursement; (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Notice Thereof; and (C) Approving Procedures to Fix Cure Amounts Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Approving Notice Thereof; and (II) an Order Approving (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Interest,

87220314

Claims and Encumbrances and (B) the Assumption, Sale and Assignment to Purchaser of Certain Contracts of Debtors. [Dkt. No. 353].

17. On September 18, 2018, after conducting a sale hearing, and upon review of the Asset Purchase Agreement, the Court entered the Sale Order, approving of the Asset Purchase Agreement. [Dkt. No. 427].

18. The Sale Order contains the following provisions that are pertinent to the instant dispute:

> Q. **Prompt Consummation**. The Sale of the Purchased Assets[4] must be approved and consummated promptly in order to preserve the value of the Purchased Assets. Therefore, time is of the essence in consummating the Sale, and the Trustee and the Purchaser intend to close the Sale as soon as possible.
>
> 11. All persons and entities who are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of such Purchased Assets to the Purchaser on the Closing Date. Purchaser shall have ninety (90) days from and after the Closing Date to remove the Purchased Assets from any real property not conveyed to the Purchaser under the Asset Purchase Agreement, and the owner of such real property shall not be entitled to assert against Purchaser payment for rent, storage or the like.
>
> 27. As specifically provided in the Asset Purchase Agreement, the Trustee will cooperate with the Purchaser, and the Purchaser will cooperate with the Trustee, in a commercially reasonable manner, in each case to ensure that the transactions contemplated in the Asset Purchase Agreement are consummated, and the Trustee will make such modifications or supplements to any bill of sale or other document executed in connection with the closing to facilitate such consummation as contemplated by the Asset Purchase Agreement (including, without limitation, adding such specific assets, to such documents as may be reasonably requested by the Purchaser to the terms of the Asset Purchase Agreement).
>
> 30. This Court shall retain jurisdiction to enforce and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, except as otherwise provided therein, and each of the agreements executed in connections therewith in all respects, including, but not

---

[4] The Sale Order incorporates the definition of "Purchased Assets" as set forth in the Asset Purchase Agreement, which is set forth in Paragraph 16 of this Motion. [See Dkt. No. 427, n. 1; Asset Purchase Agreement, ¶ 2.1(c)].

87220314

limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Purchaser free and clear of Encumbrances and Interests (other than Permitted Encumbrances), or compel the performance of other obligations owed by the Trustee, (b) compel delivery of the Purchase Price or performance of other obligations owed to the Trustee, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, except as otherwise provided therein, (d) interpret, implement and enforce the provisions of this Order and (e) protect the Purchaser against (i) claims made related to any of the Excluded Liabilities (as defined in the Asset Purchase Agreement), (ii) any claims of successor liability related to the Purchased Assets or the Assumed Contracts, or (iii) any claims of Encumbrances and Interests (other than Permitted Encumbrances) asserted against the Purchased Assets, of any kind or nature whatsoever, and (f) require delivery of (i) any Purchased Assets or proceeds thereof by the Trustee or any third-party to the Purchaser or (ii) any Excluded Assets or proceeds thereof by the Purchaser to the Trustee.

[Dkt. No. 427].

### C.    The Asset Purchase Agreement

19.    The Asset Purchase Agreement, as approved by the Sale Order, contains the following provisions that are pertinent to the instant dispute:

**2.    Purchase and Sale.**

2.1    Purchase and Sale. Subject to the terms and conditions set forth in this Agreement and the Approval Order, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all right, title and interest of Seller as of the Closing Date in and to all of Seller's and Debtors' properties and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and whether or not carried or reflected on the books and records of Seller, that are listed in subsections (a) – (l) below, other than the Excluded Assets (the "Purchased Assets"), free and clear of all Liens (other than the Assumed Liabilities and Permitted Encumbrances). The cost of collecting and removing the Purchased Assets from their various locations shall be borne by Purchaser; *provided, however,* Seller shall, at her cost, use commercially reasonable efforts to assist Seller's efforts by enforcing the terms of this Agreement and the Approval Order against third parties. Subject to Section 2.2, the Purchased Assets purchased hereunder shall include the following:

6

87220314

(c) all inventory, including, without limitation, that set forth on Schedule 2.1(c)[5], including, but not limited to, propane, gasoline, kerosene, diesel, diesel exhaust fluid, retail and wholesale inventory for sale or distribution of any kind except to the extent contained in an Excluded Asset.

2.7 Consideration: Allocation of Consideration

(c) Following the Approval Hearing and up to Closing, Purchaser shall inspect the Purchased Assets, including, without limitation, the vehicles, to confirm that they are present and accounted for, provided that *Purchaser shall have up to thirty (30) days after the Closing (the "Inventory Expiration Date") to count the fuel inventory* and further provided that a Seller representative must be present at all times during Purchased Assets inspection, including, without limitation, during vehicles and fuel inventory counts. *Purchaser shall provide to Seller a written count of the vehicles at Closing and of the fuel inventory on or prior to the Inventory Expiration Date (collectively, the "Inventory Count").* Seller shall have up to ten (10) business days after the Inventory Expiration Date to investigate the Inventory Count (the expiration of such ten (10) business day period is referred to as the "Adjustment Date"). If Seller agrees with the Inventory Count, or fails to oppose the Inventory Count on or before the Adjustment Date, the Inventory Count shall be deemed final (the "Final Inventory Count"). If Seller opposes the Inventory Count, it shall notify Purchaser in writing prior to the Adjustment Date, and describe its opposition in reasonable detail. If Purchaser and Seller resolve such opposition, the Inventory Count shall be deemed to be a Final Inventory Count upon such resolution. If Purchaser and Seller are unable to resolve Seller's opposition to the Inventory County, either party may submit its claim to the Bankruptcy Court for disposition as its sole means of recourse. The Inventory County shall be deemed to be a Final Inventory Count upon such resolution.

(d) If the Final Inventory Count indicates that there are vehicles or fuel inventory that are listed on Schedule 2.1(h) and Schedule 2.1(c), respectively, but are missing ("Missing Assets") with an aggregate value determined in good faith that exceeds Thirty Thousand Dollars ($30,000), Seller shall reimburse Purchaser and credit against the Purchase Price the aggregate value of such Missing Assets that exceeds Thirty Thousand Dollars ($30,000) promptly after the Final Inventory Count is determined. If the Inventory Count indicates that there are vehicles or fuel inventory wherever located that are not listed on Schedule 2.1(h) and Schedule 2.1(c), respectively (the "Additional Assets") with an aggregate value determined in good faith that exceeds Thirty Thousand Dollars ($30,000), the Purchase Price shall be increased by the aggregate value of such Additional Assets that exceeds Thirty Thousand Dollars ($30,000) and Purchaser shall pay such increase to Seller promptly after the Final Inventory Count is determined.

---

[5] Schedule 2.1(c) lists "Fuel Inventory, wherever located, as follows:
　　Tank and Bulk Fuel Inventory　　424,593.03 gallons
　　Truck and Fuel Inventory　　44, 191.00 gallons"

7

87220314

### D. Diesel Fails To Inventory The Fuel Assets As Required By The Asset Purchase Agreement

20. As set forth above, pursuant to the Asset Purchase Agreement, Diesel was required to conduct an inventory of the fuel assets, wherever they were located. [See Asset Purchase Agreement, ¶ 2.7(c)].

21. The fuel assets were located in various places throughout Southeastern Pennsylvania, including the Debtors' headquarters and at separate terminals, each of which were independently owned by third-parties (the "Terminals").

22. Accordingly, by the Inventory Expiration Date, i.e., October 28, 2018, Diesel was required to inspect the fuel assets at each of the Terminals and provide the Trustee with a written Inventory Count. [See Asset Purchase Agreement, ¶ 2.7(c)].

23. Diesel did not inspect the fuel assets and did not provide the Trustee with the Inventory Count prior to the Inventory Expiration Date. Instead, on October 26, 2018, after it became apparent that Diesel would not provide the Trustee with the Inventory Count, the Trustee submitted her own initial Inventory Count based on information that was available to the Trustee at the time. [See Email from J. Harris, Esquire (Counsel for the Trustee) to K. Northup, Esquire (Counsel for the Trustee), dated October 26, 2018, attached as Exhibit A].

24. In light of Diesel's apparent refusal to comply with the terms of the Asset Purchase Agreement, and in a good faith effort to finalize the sale of the fuel assets as quickly as possible, the Trustee continued to contact the Terminal owners to inventory the fuel assets and coordinate the turnover of the fuel assets to Diesel. [See Email from P. Schildwachter (Vice President of Schildwachter Oil) to J. Manfrey, Esquire (Counsel for the Trustee), dated September 26, 2018, attached as Exhibit B; see also Email from E. Goldstein, Esquire (Counsel for Lucknow-Highspire Terminals LLC) to J. Harris, Esquire (Counsel for the Trustee), dated

8

87220314

October 26, 2018, attached as Exhibit C; Email from E. Goldstein, Esquire to J. Harris, Esquire, dated November 14, 2018, attached as Exhibit D]. The Trustee provided Diesel with updated Inventory Counts on a rolling basis as additional information was received.

25. On November 27, 2018, to further the reconciliation process, counsel for the Trustee wrote to Diesel providing Diesel with a list of all contact persons at each Terminal "who can help [Diesel] verify the inventory amounts, as well as assist with the transition." [See Email from J. Harris, Esquire (Counsel for the Trustee) to K. Northup, Esquire (Counsel for Diesel) dated November 27, 2018, attached as Exhibit E].

26. Upon information and belief, Diesel did not make a good faith effort to contact the Terminals and arrange for the inspection and turnover of the fuel assets. [See Email from D. LeoGrande (Windsor Fuel Co. Inc. ("Windsor") representative) to J. Harris, Esquire (Counsel for the Trustee), dated December 6, 2018, attached as Exhibit F (confirming that Diesel did not attempt to contact Windsor)].

27. In light of Diesel's refusal to fulfill its inventory obligations as set forth in the Asset Purchase Agreement, and in a good faith effort to finalize the sale, the Trustee performed an inspection and calculation of the fuel assets at its own costs and provided the results of that inspection to Diesel.

28. On January 10, 2019, Counsel for the Trustee provided Counsel for Diesel with the results of its inspection, which reflected a total fuel inventory of 624,296.8 gallons (the "Total Fuel Inventory").

29. Upon information and belief, Diesel does not genuinely dispute the Total Fuel Inventory.

E. **Diesel Refuses To Pay The Agreed Upon Purchase Price For The Additional Assets.**

30. On January 10, 2019, Counsel for the Trustee wrote to Counsel for Diesel advising that Diesel owes the Trustee a total of $388,361.07 for the Additional Assets, calculated as follows:

| Product | Price Per Gallon as of the Closing Date | Gallons | Value |
|---|---|---|---|
| Propane | $ 1.083 | 141,337.8 | $ 153,068.84 |
| ULSD | $ 2.352 | 74,369.0 | $ 174,915.89 |
| NRLM | $ 2.352 | 8,577.0 | $ 20,173.10 |
| Heating Oil | $ 2.330 | 216,413.0 | $ 504,242.29 |
| Biodiesel | $ 2.578 | 159,608.0 | $ 411,389.62 |
| E85 | $ 1.370 | 6,817.0 | $ 9,339.29 |
| Gasoline 87 | $ 2.158 | 7,433.0 | $ 16,040.41 |
| Kero | $ 2.267 | 1,300.0 | $ 2,947.10 |
| Naptha | $ 2.883 | 1,900.0 | $ 5,477.70 |
| DEF | $ 1.000 | 6,542.0 | $ 6,542.00 |
| **Subtotal** | | **624,296.8** | **$ 1,304,136.24** |
| **Basket** | | | **$ (30,000.00)** |
| **Amount delivered after Basket** | | | **$ 1,274,136.24** |
| **Amount promised above** | | | **$ 885,775.17** |
| **Total Amount owed to the Trustee for the Additional Assets** | | | **$ 388,361.07** |

[See Email from J. Harris, Esquire (Counsel for the Trustee) to Paul Barnes (Diesel's Director of Corporate Finance and Development), dated January 10, 2019, attached as Exhibit G].

31. The Trustee based the price per gallon on the market rate for each of the fuel assets as of the Closing Date. [See Asset Purchase Agreement, ¶ 2.7(d)].

32. On January 15, 2019, Paul Barnes, Diesel's Director of Corporate Finance and Development ("Barnes"), wrote to Counsel for the Trustee, advising that Diesel would not pay

10

87220314

for the Additional Assets at the market rate as of the Closing Date. [See Email from Barnes to M. Menkowitz, Esquire (Counsel for the Trustee) dated January 15, 2019, attached as Exhibit H].

33. Instead, Barnes advised that Diesel would agree to pay for the Additional Assets at the market rate on the day that Diesel obtains access to the fuel assets. [See id.].

34. Diesel's proposal significantly decreases the amount owed to the Trustee for the Additional Assets, as the market price of the fuel assets has steadily decreased since the Closing Date, and continues to decrease.

35. Despite the Trustee's good faith attempts to resolve this dispute, Diesel has refused to pay for the Additional Assets pursuant to the terms of the Asset Purchase Agreement.

## RELIEF REQUESTED

36. By this Motion, the Trustee respectfully requests that the Court enter an order compelling Diesel to pay the Trustee the amount due under the Asset Purchase Agreement for the Additional Assets, which totals $388,361.07.

37. The Trustee additionally respectfully requests that the Court award the Trustee the attorneys' fees and costs it has incurred preparing this Motion as a sanction for Diesel's willful violation of the Sale Order and breach of the Asset Purchase Agreement.

## BASIS FOR RELIEF

38. Section 105(a) of the Bankruptcy Code states the following:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

87220314

11 U.S.C. §105(a).

39. Pursuant to Section 105(a) of the Bankruptcy Code, the Court by motion of a party or *sua sponte* may compel a party to comply with a sale order entered under Section 363 of the Bankruptcy Code. See 11 U.S.C. § 105(a); see also In re North Port Assocs., Inc., 184 B.R. 789 (Bankr. E.D. Mos. 1995) ("[A] § 363 order may compel a sale pursuant to the terms of the order and need not be done by the time consuming and costly process of an adversary proceeding. Indeed, an order approving a sale may authorize and direct the parties to close. Section 105(a) may be invoked in order to compel compliance.").

40. Additionally, pursuant to Section 105(a), "a bankruptcy court has the authority to impose civil contempt to enforce compliance with a court order and to compensate a party damaged by a violation of that order." In re Swanson, 207 B.R. 76, 80 (Bankr. D.N.J. 1997) (holding debtors in civil contempt when they refused to vacate property that was the subject of a sale approved pursuant to a Section 363 order).

41. Here, in the Sale Order, the Court expressly retained jurisdiction to enforce and implement the terms of the Asset Purchase Agreement, including, but not limited to, compelling Diesel to fulfill its payment and other obligations as set forth in the Asset Purchase Agreement. [Dkt. 497, ¶ 30].

42. Accordingly, pursuant to its authority under Section 105(a), the Court should (1) compel Diesel to comply with the Sale Order by ordering Diesel to pay the Trustee the amounts due under the Asset Purchase Agreement for the Additional Assets in the amount of $388,361.07, and (2) sanction Diesel for violating the Sale Order by awarding the Trustee the attorneys' fees and costs it incurred preparing this Motion.

87220314

### A. The Court Should Compel Diesel To Pay The Trustee $388,361.07 For The Additional Assets.

43. As set forth above, the Asset Purchase Agreement establishes the procedures by which the parties must promptly determine the fuel inventory and the amount owed to the Trustee for any Additional Assets. [See Asset Purchase Agreement, ¶ 2.7(c)-(d)].

44. Diesel was required to inspect the fuel assets, including those assets located at the independently owned Terminals, and provide the Trustee with a written Inventory Count by October 28, 2018. [See id.].

45. If Diesel encountered any difficulties gaining access to the Terminals to conduct the inventory, Diesel was required to seek the Court's intervention to compel the Terminal owners to turn over the fuel assets. [See id., ¶ 11].

46. The Trustee used commercially reasonable efforts to assist Diesel in gaining assets to the fuel assets located at the Terminals, including, but not limited to, providing Diesel with the contact information for the Terminals and coordinating Diesel's access to the Terminals. [See Exhs. A - C].

47. Once it became apparent that Diesel would not provide the Trustee with the Inventory Count by October 28, 2018, as required, the Trustee inventoried the fuel assets at various Terminals at her own cost and expense, and provided her initial Total Fuel Inventory analysis to Diesel on October 26, 2018. [See Exh. D]. The Trustee continued to provide updated inventory amounts on a rolling basis as additional information was received.

48. Diesel does not materially dispute the results of the Trustee's inventory and agrees that the Total Fuel Inventory amounts to at least 622,893 gallons of fuel. Moreover, there can be no serious dispute that title to the fuel inventory transferred to Diesel as of the Closing Date.

87220314

49. Yet, despite obtaining title to the fuel inventory as of the Closing Date, Diesel now attempts to avoid paying the Trustee for the true value of the Additional Assets by arguing that the purchase price of the Additional Assets should be based on the market rate as of the date that Diesel gains access to the Additional Assets.

50. Diesel's position is untenable because Diesel is contractually required to promptly collect and remove the fuel assets from the Terminals at its own expense. [See Asset Purchase Agreement, ¶ 2.1 ("The cost of collecting and removing the Purchased Assets from their various locations shall be borne by Purchaser")].

51. Additionally, Diesel's argument contradicts the clear language of the Sale Order, which, among other provisions, directs the Parties to promptly consummate the sale of the Debtors' assets to "preserve the value of the Purchased Assets." [Dkt. No. 427 ("[T]ime is of the essence in consummating the Sale, and the Trustee and the Purchaser intend to close the Sale as soon as possible.")].

52. If the Court were to adopt Diesel's position, Diesel could indefinitely delay obtaining access to the fuel assets, thereby avoiding its obligation to pay the Trustee for the assets.

53. Diesel should not be permitted to benefit from its breaches of the Asset Purchase Agreement.

54. Accordingly, the Trustee respectfully requests that the Court compel Diesel to pay the Trustee for the Additional Assets according to the terms of the Asset Purchase Agreement in the amount of $388,361.07.

87220314

### B. The Court Should Sanction Diesel For Violating The Sale Order By Awarding The Trustee The Attorneys' Fees And Costs Incurred Preparing This Motion.

55. Pursuant to Section 105(a) of the Bankruptcy Code, "a bankruptcy court has the authority to impose civil contempt to enforce compliance with a court order and to compensate a party damaged by a violation of that order." In re Swanson, 207 B.R. at 80.

56. The Court may compensate the damaged party by "issuing sanctions such as costs, compensatory damages and attorneys' fees." In re Brown, 481 B.R. 351, 363 (Bankr. W.D. Pa. Nov. 1, 2012) (citing In re Meyers, 344 B.R. 61, 66 (Bankr. E.D. Pa. 2006)).

57. Here, as set forth above, Diesel failed to comply with the terms of the Sale Order, thereby forcing the Trustee to prepare and file the current Motion seeking Diesel's compliance with the Sale Order.

58. The Trustee, therefore, respectfully requests that the Court sanction Diesel for its violation of the Sale Order and award the Trustee the attorneys' fees and costs she has incurred preparing the instant Motion. See 11 U.S.C. § 105(a); In re Brown, 481 B.R. at 363.

59. Should the Court permit such an award, the Trustee is prepared to offer evidence of its attorneys' fees and costs.

### NOTICE

60. Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the Eastern District of Pennsylvania; (ii) the Debtors and their counsel; (iii) Fulton Bank and their counsel; (iv) other secured creditors and their counsel, if known; (v) Diesel Direct Holdings, Inc. and their counsel; (vi) all parties who have requested notice pursuant to Fed. R. Bankr. P. 2002; and (vii) in accordance with this Court's August 1, 2018 *Order Pursuant to 11 U.S.C. §§ 102 and 105(a) and Fed. R. Bankr. P. 2002(m) and 9007 Establishing Notice and Service Procedures.* [Dkt. No. 265].

87220314

## CONCLUSION

**WHEREFORE**, the Trustee respectfully requests that this Court (1) order Diesel Direct Holdings, Inc. to pay the Trustee for the Additional Assets according to the terms of the Asset Purchase Agreement, in the amount of $388,361.07, and (2) award the Trustee the attorneys' fees and costs incurred preparing this Motion.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By: /s/
Michael G. Menkowitz, Esquire
Jason C. Manfrey, Esquire
Jesse M. Harris, Esquire
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
Phone: (215) 299-2000
mmenkowitz@foxrothschild.com
jmanfrey@foxrothschild.com
jesseharris@foxrothschild.com
*Counsel for Christine C. Shubert, Chapter 7 Trustee for the Debtors*

Dated: February 7, 2019

87220314